IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | | |
|---|---|---|
| Chief Petty Officer JOHN FISCHER and | ) | |
| ASHLEY FISCHER | ) | |
| 4076 Watervale Way | ) | |
| Orange Park, FL 32065 | ) | |
| | ) | |
| Chief Warrant Officer JORGE ROMAN | ) | |
| and RAVEN ROMAN | ) | |
| 1150 Camellia Drive | ) | |
| Vass, NC 28394 | ) | |
| | ) | Case No.: _____ |
| | ) | |
| *Plaintiffs*, | ) | CLASS ACTION |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| Belvoir Land, LLC | ) | |
| 2 BETHESDA METRO CENTER | ) | |
| STE 250, BETHESDA, MD, 20814 | ) | |
| SERVE: | ) | |
| CORPORATION SERVICE COMPANY, | ) | |
| 100 SHOCKOE SLIP FL 2, RICHMOND | ) | |
| VA 23219; | ) | |
| | ) | |
| CLARK PINNACLE BELVOIR LLC | ) | |
| DBA BELVOIR MANAGER LLC | ) | |
| 2 BETHESDA METRO CENTER | ) | |
| STE 250 BETHESDA, MD., 20814 | ) | |
| SERVE: | ) | |
| CORPORATION SERVICE COMPANY, | ) | |
| 100 SHOCKOE SLIP FL 2, RICHMOND | ) | |
| VA 23219; | ) | |
| | ) | |
| CLARK REALTY CAPITAL, L.L.C., | ) | |
| 7500 OLD GEORGETOWN ROAD, | ) | |
| 15TH FLOOR, BETHESDA, MD 20814 | ) | |
| SERVE: | ) | |
| Corporation Service Company, | ) | |
| 100 Shockoe Slip Fl 2, Richmond Va., | ) | |
| 23219; | ) | |
| | ) | |
| CEI REALTY, INC., | ) | |
| 7500 OLD GEORGETOWN ROAD, | ) | |

15TH FLOOR, BETHESDA, MD 20814   )
SERVE:   )
Corporation Service Company, 100 Shockoe)
Slip Fl 2, Richmond Va 23219;   )
   )
CEI REALTY, LLC.,   )
7500 OLD GEORGETOWN ROAD,   )
15TH FLOOR, BETHESDA, MD 20814   )
SERVE:   )
Corporation Service Company, 100 Shockoe)
Slip Fl 2, Richmond Va 23219   )
   )
PINNACLE BELVOIR LLC,   )
2801 ALASKA WAY STE 200,   )
SEATTLE, WA, 98121   )
SERVE:   )
Corporation Service Company, 100 Shockoe)
 Slip Fl 2, Richmond Va 23219;   )
   )
CRC BELVOIR, LLC dba   )
BELVOIR MANAGER LLC,   )
2 BETHESDA METRO CENTER   )
STE 250,BETHESDA, MD., 20814   )
SERVE:   )
Corporation Service Company,   )
100 Shockoe  Slip Fl 2,   )
Richmond Va 23219;   )
   )
Fort Belvoir Residential Communities, LLC,)
2 BETHESDA METRO CENTER   )
STE 250, BETHESDA, MD., 20814   )
SERVE:   )
Corporation Service Company, 100 Shockoe)
 Slip Fl 2, Richmond Va 23219;   )
   )
CLARK REALTY BUILDERS LLC.   )
VIRGINIA LIMITED LIABILITY   )
COMPANY   )
4401 WILSON BLVD STE 600,   )
ARLINGTON, VA. 22203`  `   )
SERVE:   )
Corporation Service Company,   )
100 Shockoe Slip Fl 2,   )
Richmond Va 23219;   )
   )
 The Michaels Organization, LLC,   )
 2 COOPER ST,P.O. BOX 90708,   )

CAMDEN, N.J. 08101 )
SERVE: )
 )
And )
 )
Michaels Management Services, LLC c., )
Formally d/b/a Michaels Management )
Services, Inc., 2 COOPER ST FL 14, )
CAMDEN NJ 08102 )
 )
SERVE: )
C T Corporation )
4701Cox Rd Ste 285, Glen Allen VA 23060 )
 )
 )
*Defendants.* )
_____ )

## CLASS ACTION COMPLAINT

COME NOW, the Plaintiffs, JOHN FISCHER, ASHLEY FISCHER, JORGE ROMAN, and RAVEN ROMAN; bringing this action on their own behalf and on behalf of a class of others similarly situated, by their undersigned counsel, for their Complaint against the Defendants, BELVOIR LAND, LLC ("Belvoir Land"); CLARK PINNACLE BELVOIR LLC dba BELVOIR MANAGER; CLARK REALTY CAPITAL, L.L.C. ("CLARK" OR "CLARK REALTY"); CEI REALTY, INC.; PINNACLE BELVOIR LLC; CRC BELVOIR, LLC  DBA BELVOIR MANAGER LLC ("CRC BELVOIR"); FORT BELVOIR RESIDENTIAL COMMUNITIES, LLC ("FBRC"), CLARK REALTY BUILDERS, LLC; THE MICHAELS ORGANIZATION, LLC ("MICHAELS"), MICHAELS MANAGEMENT SERVICES, INC AND MICHAELS MANAGEMENT SERVICES, LLC ("MMS") (ALL COLLECTIVELY "MICHAELS ORGANIZATION", stating as follows: collectively

## NATURE OF THE CASE

1.     This is a case about basic housing protections provided by law to all Americans in rental housing – except to Servicemembers like Chief Petty Officer Fischer and Chief Warrant

Officer Roman, who devote years, and careers, to their country.  This is a case about service men and women, and their families, whose Basic Allowance for Housing ("BAH") is paid to private companies which are supposed to "improve [the] quality of life for military families by offering safe, affordable and attractive residential communities." The intent behind the privatization of military housing is simple: to provide military families the same quality of life in housing as the civilians they defend. Unfortunately, intention is not sufficient. As Plaintiffs Chief Petty Officer Fischer and Chief Warrant Officer 3 Roman, their families and other similarly situated class members have learned, the private for-profit companies which build, renovate, repair and manage military housing at Fort Belvoir in suburban Washington, D.C. – the constellation of Defendant corporations and entities in this case – apparently care more about their profit margins than the servicemembers and families they house. On paper the privatized military housing at Fort Belvoir sounds ideal – two-to five- bedroom homes with backyards and neighborhood amenities. In reality, the Plaintiffs and class members have encountered persistent problems with water intrusion, mold growth and pest infestations, among others -- conditions that, in the civilian sector, is considered uninhabitable. These conditions have been met with insufficient and untimely repairs and inadequate remediation, if at all. Despite a long and well-documented history of failing Plaintiffs and other servicemembers, Defendants' entities continued to pocket their BAH and the shameful housing conditions at Fort Belvoir and other military bases continued—and continue-- unchecked.

2.      Among the military bases surrounding Washington, D.C., Fort Belvoir is the largest in size and population. Although the Army operates Fort Belvoir, representation from more than 145 mission partners includes all other branches of the military and dozens of federal entities. This makes up a population of 245,000 who live and work on Fort Belvoir. Fort Belvoir Residential Communities LLC offers privatized military housing on Fort Belvoir and is currently managed by The Michaels Organization. There are 2,154 units of privatized military housing provided by the

Army at Fort Belvoir.[1]  The privatized housing consists of fifteen housing villages, collectively called "The Villages at Belvoir", which provide homes ranging from three to five bedrooms, to service members of all branches.  The fifteen (15) villages and their pertinent homes breaks down as follows:

- Belvoir Village:  61 historic and 5 new colonial-style, multi-story houses (for senior officers);

- Cedar Grove Village:  82 colonial-style four- and five-bedroom homes with fenced-in backyards (Ranks**:** 04-05, W3-W4, ADA);

- Colyer Village:  72 larger colonial-style four- and five-bedroom homes with fenced-in backyards, patios, and two-car garages (Ranks: E6, E7-E8, O1-O3, O4-O5, W1-W2, W-3-W4, ADA);

- Dogue Creek Village: three-, four-, and five-bedroom brick homes with assigned parking (Ranks: E1-E5, E6, E7-E8, E9, O1-O3, O4-O5, O6, O7-O10, W1-W2, W3-W4, W5, ADA);

- Fairfax Village: 101 Colonial-style houses with four and five bedrooms, homes include a fenced-in backyard, outdoor patio, two-car garages (Ranks: E9, O4-O5, W3-W4, ADA);

- Gerber Village: 75 historic homes in three- and four-bedroom duplexes and single-family home configurations (Ranks: E7-E8, E9, O1-O3, O4-O5, O6, W1-W2, W3-W4);

---

[1] https://www.crccompanies.com/portfolio/fort-belvoir.

- George Washington Village: 196 Colonial-style three-, four-, and five-bedroom homes with fenced-in backyards, outdoor patios, and two-car garages (Ranks: E1-E5, E6, E7-E8, O1-O3, O4-O5, W1-W2, W-3-W4, ADA);

- Herryford Village: 171 three-, four-, and five-bedroom homes with fenced-in backyards, outdoor patios, and two-car garages (Ranks: E1-E5, E6, E7-E8, E9, O1-O3, O4-O5, O6, O7-O10, W1-W2, W3-W4, W5, ADA);

- Jadwin Loop Village: Colonial-revival three- and four-bedroom homes with porches, two-car garages, and landscaped yards (Ranks: O1-O3, O4-O5, W1-W2, W3-W4);

- Lewis Village:  274 Colonial-style three-, four-, and five-bedroom homes with fenced-in backyards, outdoor patios, and two-car garages (Ranks: E1-E5, E6, E7-E8, E9, O1-O3, O4-O5, W1-W2, W3-W4, ADA);

- Parker Village: 22 craftsman-style homes and two fully restored historic homes, each house has two-car garages, wood-flooring, and a fireplace (Ranks: E9);

- River Village: 186 three-bedroom duplexes with private, fenced-in backyards and front porch swings (Ranks: E1-E5, E6, E7-E8);

- Rossell Village:  70 Colonial-style four- and five-bedroom homes with fenced-in backyards, outdoor patios, and two-car garages (Ranks: O1-O3, O4-O5, W1-W2, W3-W4, ADA);

- Vernondale Village: 162 Colonial-style three-, four-, and five-bedroom homes with two-car garages, fenced-in backyards, and outdoor patios (Ranks: E6, E7-E8, O1-O3, W1-W2, ADA);

- Woodlawn Village: four- and five-bedroom homes with attached garages, private, fenced-in backyards (Ranks: E1-E5, E6, E7-E8, E9, O1-O3, O4-O5, W1-W2, W3-W4).[2]

3.      According to the Department of Defense (DOD): "Fort Belvoir housing is privatized under the Army's Residential Communities Initiative program. The program's goal is to **improve quality of life for military families** by offering safe, affordable and attractive residential communities. The intent of the program is to provide military families the same quality of life in housing as the civilians they defend. While Fort Belvoir Residential Communities is the owner, various private partners handle all of the day-to-day construction and operations activities."[3](emphasis added).

4.      The Defendants build, own, renovate, and manage the privatized housing units at Fort Belvoir under the terms of a 50-year ground lease with the Army.  The ground lease is dated December 1, 2003.  Active management and control over the residential housing lies with the Defendants.  The nature of the privatized housing structure has led to unacceptable residential housing conditions for the named Plaintiffs and for other similarly situated servicemember families.  Plaintiffs sue to recover compensatory damages and equitable relief for themselves and a putative class.

5.      The goal of the MHPI is to provide military families with access to safe, quality, affordable, well-maintained housing in a community where they choose to live. MHPI projects involve the Army leasing land and conveying housing and associated improvements to a private

---

[2] Villages information excerpted from: https://mybaseguide.com/installation/fort-belvoir/community/fort-belvoir-housing/
[3] https://installations.militaryonesource.mil/military-installation/fort-belvoir/housing/government-housing.

developer for the purpose of revitalizing, maintaining, and managing military family housing communities for a period of 50 years.

6.     As alleged in detail below, Clark's failure to properly develop and build, and the Michaels Defendants' failure to maintain and manage Plaintiffs' and the proposed Class members' housing at Fort Belvoir has resulted in widespread and well-known problems with mold, leading to serious injuries and safety issues for Plaintiffs, Class members, and their families. As a result of mold exposure, Plaintiffs and Class members have paid excessive amounts for the housing they rented, have incurred unreimbursed out-of-pocket economic losses, and have suffered and continue to suffer from severe health issues including, without limitation, pulmonary and respiratory problems, sinusitis, enlarged lymph nodes, allergies, headaches, and rashes, among other medical issues.

7.     The problems at Fort Belvoir and other privatized military housing projects have led to public outcry, congressional hearings and governmental watchdog investigations, all within the last two years.  As a result, the top five privatized providers, including the Defendants at issue here (described further below), have admitted to allowing intolerable and unacceptable conditions.  They have promised to make upgrades prospectively but have not offered any compensation retroactively for military families.  The purpose of this lawsuit is to obtain such relief.

8.     Plaintiffs and class members share common issues.  These stem from the common facts prevalent across the putative class, and include the following:

   a.   During the class period embracing the last five years, servicemembers executed substantially identical form leases with Defendants;

   b.   The families have lived in similar units built using economies of scale;

   c.   The families have all relied on the same property management;

8

    d.   Servicemembers pay similar Basic Allowance for Housing ("BAH") amounts;

    e.   Each servicemember's BAH amount was calculated based on the cost of reasonable rental housing;

    f.   But servicemembers uniformly did not get a reasonable rental housing product worth the full BAH;

    g.   Servicemembers depend on the landlord to repair and maintain the premises, including its appliances, HVAC and other fixtures;

    h.   Part of military family quality of life, i.e., their housing experience, consists of having a good experience with service, repair and maintenance, and upkeep of the premises;

    i.   But that is not the leased housing product they got.  A 2019 objective, vetted survey of Fort Belvoir servicemember families found that Fort Belvoir had a "below average" scaled overall score.[4]

8.    The named Plaintiff class representatives exemplify the negative effects this unfair and deceptive residential leasing business model caused. While the effects may differ by family, the causes are common.  The case is appropriate for class certification.

## THE PARTIES

### Plaintiffs

9.    John R. Fischer is an E7 (Chief Petty Officer) who has served the US Navy for over 13 years.  From October 2017 through August 2019,  Chief Fischer, his wife Ashley, and their three minor children resided in military housing at Fort Belvoir at 9547 Kezia Trail, Fort Belvoir, Va.  22060.  From August 2019 to December 2020 the family resided in other military housing at

---

[4] CEL & Associates, Inc. "Summary of the Headquarters Department of the Army Residential Communities Initiative (RCI) 2019 Fall Resident Survey (On-Base).

Fort Belvoir at 9225 Soldier Road, Fort Belvoir, Va.  22060. The Fishers currently reside at 4076 Watergate Way, Orange Park FL 32065.

10.    On October 24, 2017, Chief Fischer executed a form lease with Fort Belvoir Residential Communities, LLC regarding the 9547 Kezia Trail property.  During the pertinent times, Chief Fischer was a contracting party under the lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.

11.    Plaintiff Ashley Fischer is the wife of Chief Petty Officer Fischer.  During the pertinent times, Ms. Fischer held a possessory and occupancy interest in the property.

12.    Jorge Roman is a Chief Warrant Officer 3 (CWO3) who has served in the U.S Army for over 18 years.  From May 2018 through September 2018 Chief Roman, his wife Raven, and their three minor children resided in military housing at Fort Belvoir at 5200 Stable Court, Fort Belvoir, Va.  22060, in Woodlawn Village.  From September 2018 to September 2019 the family resided in other military housing at Fort Belvoir at 5493 Jadwin Loop, Fort Belvoir, Va.  22060, in Jadwin Loop Village.  The Romans currently reside at 1150 Camellia Drive, Vass NC 28394.

13.    On May 17, 2018, Chief Roman executed a form lease with Fort Belvoir Residential Communities, LLC regarding the 5200 Stable Court property.  During the pertinent times, Chief Roman was a contracting party under the lease, made rental payments pursuant to his Basic Housing Allowance (BAH), and held a possessory and occupancy interest in the property.

14.    Plaintiff Raven Roman is the wife of Chief Warrant Officer 3 Roman.  During the pertinent times, Ms. Roman held a possessory and occupancy interest in the property.

**Defendants**

15.    The Defendants consist of entities associated with Belvoir Land, LLC and Clark Realty, which are related entities.  As shown further below, these entities constitute part of a complex, tangled web of entities which renovate, build, own and manage the privatized military

housing at Fort Belvoir.  To do so, they set up a convoluted corporate structure alleged further below.

16.     Defendant Belvoir Land, LLC is the named lessee under the 50-year ground lease with the Army.  Belvoir Land, LLC is organized under the laws of the State of Delaware, with a principal office at 2 Bethesda Metro Center Ste 250, Bethesda, MD, 20814. It was authorized to transact business in Virginia; however, it is now inactive. The Virginia agent for service of process for Belvoir Land, LLC is Corporation Service Company, at 100 Shockoe Slip Fl 2, Richmond Va 23219.  The ground lease was executed on Belvoir Land, LLC's behalf by two of its "managers": (1) Clark Pinnacle Belvoir LLC (by Clark Pinnacle Belvoir, LLC's Administrative Managing Member Clark Realty Capital, LLC and its Manager CEI Realty, Inc. "Clarks"); and (2) Pinnacle Belvoir LLC.

17.     Defendant Clark Pinnacle Belvoir LLC dba Belvoir Manager LLC is a Virginia limited liability company with a principal office addressed at "C/O Clark Realty Capital LLC, 2 Bethesda Metro Center Ste 250, Bethesda, MD., 20814."  The entity name for this entity has been changed on the Virginia SCC website from Clark Pinnacle Belvoir LLC to "Belvoir Manager LLC."  The Virginia agent for service of process for Clark Pinnacle Belvoir LLC/Belvoir Manager LLC is Corporation Service Company, at 100 Shockoe Slip Fl 2, Richmond VA 23219.  Clark Pinnacle Belvoir LLC executed the pertinent ground lease with the Army, as the Administrative Managing Member of Belvoir Land, LLC (by its Manager Clark Realty Capital, LLC and its Manager CEI Realty, Inc.).

18.     Defendant Clark Realty Capital, L.L.C. (hereinafter "Clark Realty Capital") is a Delaware limited liability company with its principal place of business located at 7500 Old Georgetown Road, 15th Floor, Bethesda, MD 20814. The Virginia agent for service of process for Clark Realty Capital, LLC is Corporation Service Company, at 100 Shockoe Slip Fl 2,

Richmond Va., 23219.  Clark Realty Capital, LLC is indicated in the pertinent ground lease at the "manager" of Clark Pinnacle Belvoir, LLC which executed the ground lease on behalf of Clark Pinnacle Belvoir, LLC—along with CEI Realty, Inc.  On its website, Clark Realty Capital highlights 31 different Military Housing Privatization Initiative (MPHI) projects among is portfolio across the nation, and specifically, the Fort Belvoir Military Family Housing project is listed as one of its "Featured Projects." Clark Realty Capital hired Michaels and/or MMS to serve as the property manager for all Fort Belvoir Military Family Housing.

19.    Defendant CEI Realty, Inc. was a D.C. Corporation and was authorized to do business in Virginia but the Virginia State Corporation Commission's public online records show that it is now inactive based on a conversion to a Delaware LLC, CEI Realty LLC, which is authorized to do business in Virginia.   Its principal place of business was located at 7500 Old Georgetown Road, 15th Floor, Bethesda, MD 20814. The Virginia agent for service of process for CEI Realty, Inc. is Corporation Service Company, at 100 Shockoe Slip Fl 2, Richmond Va 23219. CEI Realty, Inc. is indicated in the pertinent ground lease as the "manager" of Clark Pinnacle Belvoir, LLC which executed the ground lease on behalf of Clark Pinnacle Belvoir, LLC—along with Clark Realty Capital, L.L.C.

20.    Defendant CEI Realty, LLC. is a Delaware Corporation who is authorized to do business in Virginia, with its principal place of business located at 7500 Old Georgetown Road, 15th Floor, Bethesda, MD 20814. The Virginia agent for service of process for CEI Realty, Inc. is Corporation Service Company, at 100 Shockoe Slip Fl 2, Richmond Va 23219. Upon information and belief based on the Virginia State Corporation Commission public online records CEI Realty, Inc., converted to CEI Realty, LLC.

20.    Pinnacle Belvoir LLC is a Washington limited liability company with a principal place of business at 2801 Alaska Way Ste 200, Seattle, Wa, 98121.  The Virginia agent for

service of process for Pinnacle Belvoir LLC is Corporation Service Company, at 100 Shockoe Slip Fl 2, Richmond Va 23219.  Virginia SCC website indicates that Pinnacle Belvoir LLC is in "inactive status"; its corporate status was "voluntarily cancelled—can reinstate".  Pinnacle Belvoir LLC executed the ground lease on behalf of Belvoir Land LLC as a "Manager."

21.     Clark Realty Capital created and operates CRC Belvoir, LLC and Fort Belvoir Residential Communities, LLC ("FBRC") as part of its operations in Virginia. Defendant Fort Belvoir Residential Communities is the current owner of the Fort Belvoir military housing.[5]

22.     CRC Belvoir LLC dba Belvoir Manager LLC is a Virginia limited liability company with a principal office addressed at "C/O Clark Realty Capital LLC, 2 Bethesda Metro Center Ste 250, Bethesda, MD., 20814."  The Virginia agent for service of process for CRC Belvoir LLC/Belvoir Manager LLC is Corporation Service Company, at 100 Shockoe Slip Fl 2, Richmond Va 23219.  Its name has been changed from "CRC Belvoir LLC" to "Belvoir Manager LLC".

23.     Defendant Fort Belvoir Residential Communities LLC is a Delaware limited liability company with a principal office at 2 Bethesda Metro Center Ste 250, Bethesda, MD., 20814.  The Virginia agent for service of process for Fort Belvoir Residential Communities LLC is Corporation Service Company, at 100 Shockoe Slip Fl 2, Richmond Va 23219.  Fort Belvoir Residential Communities, LLC is indicated to be the "landlord" under the Fischer and Roman leases.  The "Resident Responsibility Guide" provided to each military family tenant and which becomes part of the lease, states: "The Fort Belvoir Residential Communities, LLC (FBRC) partnership officially began operations at Fort Belvoir on 1 December 2003, and our team has been working ever since to rebuild, renovate, and maintain to the highest standards of family housing at Fort Belvoir."[6]

---

[5] https://installations.militaryonesource.mil/military-installation/fort-belvoir/housing/government-housing
[6] The Villages at Belvoir Resident Responsibility Guide, Revised 14 April 2017.

24.     Defendant Clark Realty Builders LLC is an active Virginia limited liability company with a principal address at 4401 Wilson Blvd Set 600, Arlington, VA. 22203.  The Virginia agent for service of process for Clark Realty Builders LLC is Corporation Service Company, at 100 Shockoe Slip Fl 2, Richmond VA 23219.

25.     In December 2003, Clark Realty Builders, LLC entered into a Construction Agreement with Fort Belvoir Residential Communities, LLC ("FBRC" or the "Owner"), a Delaware limited liability company. In that Construction Agreement, Defendant Clark agreed to construct housing for military personnel and their families at Fort Belvoir, Fairfax County, Virginia, on land subleased by FBRC. This project was called the "Fort Belvoir Family Housing Community" project (the "Project").[7] Pursuant to the Construction Agreement, Clark constructed and renovated new and historic housing for families in multiple villages at Fort Belvoir.[8]

26.     Defendant The Michaels Organization LLC (hereinafter "Michaels") is a New Jersey limited liability company with its principal place of business located at 2 Cooper Street, PO BOX 90708, Camden, New Jersey 08101. Michaels is registered with the Commonwealth of Virginia State Corporation Commission ("SCC") to do business in Virginia with a registered agent address of C T CORPORATION SYSTEM 4701 COX RD STE 285, GLEN ALLEN, VA 23060. Michaels is the ultimate parent of Defendant Michaels Management Services, Inc ("MMS") and Michaels Management Services, LLC. Michaels is prominently displayed on the Villages at Belvoir website.

_____

[7] The contents in this paragraph are sourced from the decision in *U.S. ex rel. Capitol Bldg. Supply, Inc. v. Clark Realty, LLC*, No. 1:10CV06, 2010 WL 3767853, at *1 (E.D. Va. Sept. 15, 2010).
[8] U.S. ex rel. Capitol Bldg. Supply, Inc. v. Clark Realty, LLC, No. 1:10CV06, 2010 WL 3767853, at *1 (E.D. Va. Sept. 15, 2010).

27.     Michaels was founded by Michael Levitt, who serves as its Chairman, and is operated by John J. O'Donnell, who serves as its Chief Executive Officer, and Mark Morgan, who serves as its Chief Operating Officer. According to Michaels' website, Ron Hansen serves as Michaels' President and leads its "military housing development, renovations, and management operations." Mr. Hansen also serves as President of MMS.

28.     Defendant Michaels Management Services, Inc. (hereinafter "MMS") is a New Jersey corporation with its principal place of business located at 2 Cooper St. Fl 14, Camden, NJ 08102-2348  MMS was registered with the SCC to do business in Virginia, but based on the Virginia State Corporation Commissions website online records it is now inactive due to a merger with Michaels Management Services LLC. MMS is a subsidiary of Michaels.  Ron Hansen, President of Michaels, also serves as the President of MMS. Upon information and belief, MMS is the legal entity used by Michaels in connection with its role as FBRC's property manager for the MHPI Contract at Fort Belvoir. No distinction was made by MMS or Michaels representatives, all references to "Michaels Affiliates" are intended to include Michaels and MMS.  All employees of MMS and Michaels held themselves out as members of The Michaels Organization.

29.     Defendant Michaels Management Services, LLC (hereinafter "MMS") is a New Jersey corporation with its principal place of business located at 2 Cooper St. Fl 14, Camden, NJ 08102-2348  This entity is registered with the SCC  as active to do business in Virginia and is active. Based on the Virginia SCC website online records that it merged with Michaels Management Services Inc. MMS is a subsidiary of Michaels.  Ron Hansen, President of Michaels, also serves as the President of MMS. Upon information and belief, MMS is the legal entity used by Michaels in connection with its role as FBRC's property manager for the MHPI Contract at Fort Belvoir. No distinction was made by MMS or Michaels representatives, all references to "Michaels

Affiliates" are intended to include Michaels and MMS. All employees of MMS and Michaels held themselves out as members of The Michaels Organization.

29.    This class action lawsuit has been filed for similar acts as alleged against these parties and/or their subsidiaries and agents as alleged herein.

30.    Defendants are joint tortfeasors, agents of the other, joint venturers, and/or engaged in the joint enterprise of leasing military housing at Fort Belvoir, as well as the conduct and acts alleged herein. During the pertinent times, each of the Defendants was directly and materially involved in the relevant facts, acts and omissions, rising to a level so as to have joint and several liability in this matter due to its direct material involvement. In addition, or in the alternative, on information and belief, and to the extent that the evidence shows, and equity may require, during the relevant times, there has existed a unity of interest and ownership among Defendants, their predecessors, agents, and parent, such that any individuality and separateness among them has ceased, and each such entity is the alter ego of each other entity.

31.    Defendants are not persons or entities acting under a federal officer, nor are Defendants subject to any sovereign immunity, governmental immunity or government contractor defense herein.

## JURISDICTION AND VENUE

32.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Fort Belvoir is a federal enclave.

33.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2) (diversity jurisdiction) and the Class Action Fairness Act, in that (i) there is complete diversity (any one plaintiff diverse from any one defendant), (ii) the amount in controversy exceeds $5,000,000.00 (Five Million Dollars) exclusive of interest and costs, and (iii)

there are 100 or more members of the proposed Plaintiffs' class.

34.     Venue is proper in this District under 28 U.S.C. § 1391 because Plaintiffs reside in this Judicial District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this Judicial District. In addition, all Defendants do business and/or transact business in this Judicial District, and therefore, are subject to personal jurisdiction in this Judicial District and reside here for venue purposes.

## FACTS COMMON TO ALL COUNTS

35.     In 1996, Congress enacted the Military Housing Privatization Initiative ("MHPI") in response to Department of Defense ("DOD") concerns about the effect of poor-quality housing on servicemembers and their families.   Being a landlord is not a core competency of the military. Under the MHPI, responsibility was transferred to private-sector developers for construction, renovation, maintenance, and repair of housing.

36.     Since 1996, private-sector developers and property management companies have assumed primary responsibility for military family housing and are now responsible for the construction, renovation, maintenance, and repair of about 99 percent of domestic military family housing in the United States.

37.     Under the MHPI, the private company enters into a 50-year ground lease with the applicable department of the military.  These ground leases share generic similarities.  Under the ground lease terms, the relevant branch of the military is not involved in the day-to-day operations pertaining to the construction or management of the housing units.

38.     In 2001, Clark and Pinnacle joined together to bid for privatization projects for U.S. military housing. Clark Realty and Pinnacle won contracts to develop and manage residential properties at Monterey Presidio and Fort Ord in California; Fort Belvoir, Virginia; Fort Irwin, Moffett Field, and Parks Reserve Training Grounds in California; and Fort Benning, Georgia.

Upon information and belief, Clark Realty and Pinnacle won these contracts based on their extraordinary experience, resources, and competencies in the fields of construction and property management.

39.    Upon information and belief, Clark utilized a common structure to establish, control and manage the various interrelated companies formed to execute its various MHPI Contracts.

40.    In litigation concerning this MHPI Contract, the United States District Court for the Northern District of California, San Jose Division, analyzed the general ownership structure used by Clark and Pinnacle and stated in a written opinion that "at each property, or 'project' Clark Realty and [Pinnacle] set up a series of 'interrelated limited liability Companies to manage, own and operate the projects.'" *Monterey Bay Military Hous., LLC v. Pinnacle Monterey, LLC*, 2015 U.S. Dist. LEXIS 45536, *5, 2015 WL 1548833. The opinion further states, "untangling the underpinnings of the present preliminary injunction against the Plaintiffs requires an understanding of the many layers of contracts and limited liability companies that make up the parties' relationship." *Id.* at 10. As part of its analysis, the Court reviewed the many layers of contract and limited liability companies involved in this MHPI project, including provisions which mandated interrelated companies to enter into agreements with other interrelated companies. Through this analysis, the Court found that Clark Pinnacle Monterey Bay, LLC and Clark Pinnacle California Military Communities, LLC are "comprised of groups of member entities affiliated with Clark Realty and [Pinnacle]. Each member group, acting collectively appoints one Manager – the 'Clark Manager' for the members affiliated with Clark Realty and the 'Pinnacle Manager' for the members affiliated with [Pinnacle]." *Id.* at 13. Relevant to this case, the Court determined that "the Clark Manager has 'acting authority to make all decisions regarding the management of the Company's business and affairs' except with respect to 'Major

Decisions.'" *Id*. at 14.

41.    Concerning the MHPI Contract for Fort Benning, Clark and Pinnacle likewise formed several interrelated companies under their management and control, specifically, they formed Pinnacle Benning, LLC, Clark Pinnacle Benning, LLC, Clark Benning, LLC and Fort Benning Family Communities, LLC.

42.    In another lawsuit between Clark and Pinnacle, the Court of Appeals of Georgia, found that Clark Benning, LLC was a 70% member and Pinnacle was a 30% member of Clark Pinnacle Benning, LLC. *Pinnacle Benning, LLC v. Clark Realty Capital, LLC*, 314 Ga. App. 609 (2012). An undisputed fact in the case was that Clark Realty held management and control authority of Clark Pinnacle Benning, LLC as the "Clark Manager." Moreover, Pinnacle alleged in the litigation that through this corporate structure, Clark controlled the Clark Benning, LLC and Fort Benning Family Communities, LLC companies. *Id*. at 610.

43.    With regard to the MHPI Contract at Fort Belvoir, the Secretary of the Army ("the Army") accepted the Statement of Qualifications submitted by Clark Pinnacle for the Fort Belvoir opportunity and qualified the company within the "exclusive competitive range." Clark Pinnacle then submitted an RFQ Proposal. The Army accepted Clark Pinnacle's RFQ Proposal, and the Army and Clark Pinnacle entered into Contract No. DACA31-02-C-0005 ("the MHPI Contract"). The MHPI Contract awarded Clark Pinnacle the right and obligation to design, develop, demolish, expand, construct, renovate, repair, replace, rehabilitate, maintain, manage, and operate all military family housing on Fort Belvoir.

44.    Upon award of the Fort Belvoir MHPI Contract, Clark and Pinnacle formed Clark Pinnacle Belvoir, LLC ("Clark Pinnacle"), CRC Belvoir, and FBRC. Following the MHPI Contract award, and due to fraudulent activity of Pinnacle, Pinnacle was forced by the Department of Justice to withdraw from the joint venture and Clark Pinnacle Belvoir, LLC was renamed CRC

Belvoir, LLC. It is undisputed that Clark is a non-member manager of CRC Belvoir, and that CRC Belvoir is in turn the managing member of FBRC.

45.     At all relevant times, Clark has managed and controlled CRC Belvoir. Clark also formed FBRC and named CRC Belvoir as its Managing Member. Clark controls FBRC through its management and control of CRC Belvoir.

46.     FBRC was established to be the Landlord of military housing units leased under the MHPI Contract. However, upon information and belief, CRC Belvoir or another interrelated company formed by Clark owns the physical housing structures at Fort Belvoir.

47.     CRC Belvoir and FBRC entered into a management agreement with the Michaels Organization to, among other things, fulfill its obligation under the MHPI Contract to manage and maintain military family housing on Fort Belvoir, including the Residence. Management of the military family housing on Fort Belvoir was without direct supervision or control by the Army.

48.     Upon information and belief, Clark structured, managed, and controlled all of the interrelated companies established for the 31 MHPI Contracts it currently holds, and for the Fort Belvoir MHPI Contract specifically, in a manner generally consistent with the scheme found used at Monterey Presidio, Fort Ord, and Fort Benning.

49.     Consistent with this belief, evidence exists in this case to demonstrate Clark remains integrally involved in the control over the military family housing on Fort Belvoir, as a Clark Realty Project Executive sits on the "Exception to Policy Committee" charged with considering whether any exceptions to policy requested by the residents should be granted.

**The Fort Belvoir Ground Lease**

50.     Under the December 1, 2003, 50-Year Ground Lease, by and between the army and "Belvoir Land LLC", Defendants collect rents equivalent to Basic Allowance for Housing (the Basic Allowance for Housing shall be referred to as "BAH"). The BAH amount is set by the

military to reflect a rental amount that would obtain reasonable quality housing in the region. The BAH amount also varies according to rank. However, during the class period within the last four years, Plaintiffs and other servicemember families have not received such housing. The rental housing offered by Defendants has been plagued by water intrusion, mold, mildew, filth, insect pests, broken and unreliable HVAC and appliances, and other problems such as dirty carpets, loose door boards, rust, holes in walls and outlets, and cracks in window screens and windowsills.

51.    Paragraph 7 of the ground lease requires the Lessee (Defendants) to "faithfully observe and comply with all applicable Federal, State and local laws, regulations, order, ordinances, permits and all covenants of Lessee under the Deeds…".

**Lease agreements with servicemembers at Fort Belvoir military housing.**

52.    During the pertinent times, the Defendants have promulgated generic form lease agreements with take-it-or-leave-it terms. The form leases of the named Plaintiff servicemember lessees are substantially similar. The terms of the form lease and incorporated materials reflect that Defendants were obligated to provide quality housing and property management. The terms also reflect that servicemember families were effectively captive to the lease over its term.

53.    The terms of the form lease represent that the Tenant's monthly rent shall equal the senior service members' Basic Allowance for Housing (BAH).

54.    The form lease expressly incorporates by reference a "Resident Responsibility Guide", which forms part of the form lease and is also generic with take-it-or-leave-it terms.

55.    The "Resident Responsibility Guide" expressly incorporated into the form lease defines "Landlord" as "Fort Belvoir Residential Communities, LLC (FRBC)".

56.    The "Resident Responsibility Guide" expressly incorporated into the form lease provides in part in the introduction section to that document:

"We know that your quality of life is not just impacted by your home here at The

Villages at Belvoir, but also by the quality of the community in which you live and the services you receive   as a resident. To ensure that your time with us as a resident is enjoyable and stress free, our team is dedicated to providing you and your family with a level of quality services that exceed your expectations."

57.     The "Resident Responsibility Guide" expressly incorporated into the form lease represents that "Landlord Responsibilities" are set forth in paragraph 2.2 as follows:

**"2.2   Landlord Responsibilities**

Landlord agrees to maintain all electrical, plumbing, heating, ventilating, air conditioning, appliances and other facilities and common areas in good and safe working condition, subject to the covenants and duties undertaken by Resident(s) below. Landlord further agrees to comply with all applicable building and housing code requirements governing residential rental property in the Commonwealth of Virginia."

58.      The "Resident Responsibility Guide" expressly incorporated into the form lease further provides as follows:

**"3.9 Rent/Basic Allowance for Housing**

Each Resident senior service member will receive a monthly Basic Allowance for Housing (BAH) for the Fort Belvoir duty station based on the Resident's rank and family status. At the time of move in, the senior-ranking service member must establish an allotment to FBRC with the Defense Finance and Accounting Service (DFAS) using the Military Assistance Company (MAC) in order for Landlord to receive rent automatically. Proof of such action must be provided to Landlord at the time of Agreement signing, by submission of DD Form 5960 accompanied by a copy of the Resident's military assignment orders."

59.    The "Resident Responsibility Guide" expressly incorporated into the form lease further provides as follows:

**"5.2 Exterior Condition/Appearance"**

While Landlord is responsible for all exterior repairs and maintenance…"

60.    The "Resident Responsibility Guide" expressly incorporated into the form lease further provides as follows:

**"5.5 Maintenance and Repair"**

"Landlord agrees to:

- Keep common areas clean (to include the removal of leaves);

- Keep lawns mowed, trimmed, and edged during the growing season (fenced back yards excluded);

- Provide pest control services as needed;

- Maintain fixtures, furnaces, water heaters, and appliances in good and safe working condition; and

- Make all reasonable repairs (subject to Resident's obligation to pay for damages for which Resident is liable and subject to the covenants undertaken by the resident).

Although Landlord agrees to provide the above, failure to do so will not be grounds for Resident's termination of the Agreement unless Resident has given written notice of the defective condition and Landlord fails to remedy the condition within 21 days…"

61.    The "Resident Responsibility Guide" expressly incorporated into the form lease further provides as follows:

**"8.12 Failure to Repair"**

Where Landlord has a duty to repair or remedy a condition that materially affects the physical health or safety of a Resident, the Resident may not terminate the Agreement, withhold rent, offset rent against needed repairs, or pursue judicial remedies unless all of the following procedures have been followed:

(i) The Resident has given Landlord prior written notice to repair or remedy a condition which materially affects the physical health or safety of an ordinary Resident;

(ii) The Landlord has had a reasonable time to repair or remedy the condition, considering the nature of the problem and the reasonable availability of materials, labor and utilities from the utility provider;

(iii) The Landlord has not made a diligent effort to repair or remedy the condition;

(iv) Resident has given subsequent written notice to Landlord stating that the Resident intends to terminate the Agreement, complete the repair and deduct charges from rent, or pursue judicial remedies in the event the condition is not repaired or remedied; and

(v) The Resident is not delinquent in the payment of rent when both notices under (i) and (iv) were given."

62.    During the class period, as a result of Defendants' uniform property management policies, practices, and funding, the Defendants' representations described above were false and contractual promises were breached for every Plaintiff and Class member.

63.    Under the form lease, the servicemember tenant agrees to pay monthly Rent equal to the Basic Allowance for Military Housing and their allotted dependent rate (the "BAH") at the Resident's duty station of the pay grade of the Resident service member.

64.     There is no ability for a service member to negotiate the price of this housing; the service member is required to pay the rent in full.  A service member must forfeit the entire BAH upon acceptance of housing. Service members have no discretion or choice of where they are sent.

65.     The Plaintiffs and Class Members singed a generic Form Lease with take-it-or-leave-it terms. The Plaintiffs and Class Members were forced to accept the conditions of the lease, which is a contract of adhesion because military members are transferred under orders for Permanent Change of Station (PCS). The Plaintiffs and Class Members were effectively held captive to the leases. Plaintiffs and Class Members detrimentally relied on the Defendants to provide reasonable, quality housing as part of their benefits with the government.

66.     The BAH program provides an in-kind, tax-free benefit to service members in recognition of the fact that the average military assignment of three years makes purchasing a home untenable.  By obtaining automatic assignment of the BAH through the provisions of the form lease, Defendants treat the BAH as a guaranteed revenue stream.

67.     The lease agreement prohibits residents from taking many self-help measures.

68.     Defendants were aware when agreeing to perform privatized military housing construction, repair and maintenance services at Fort Belvoir that the base was located in a warm, wet, southern climate and environment, in low-lying lands near the ocean and its inlets, and subject to periodic hurricanes and weather events. The climate and environmental conditions of Fort Belvoir are conducive to water intrusion and the growth of mold.  During the class period, Defendants breached their contractual and landlord-tenant duties to provide safe housing and responsible property management for Plaintiffs and class members pertaining to mold.

69.     In light of the significant issues with mold, Defendants inserted a "Mold/Mildew Addendum" in their lease documents.  While much of it is self-serving, the document nonetheless

does not modify, reduce, or negate the Landlord's maintenance and repair obligations under the form lease and incorporated in the "Resident Responsibility Guide".

70.    Service members and their families reasonably expect housing that is safe, habitable and properly maintained.  Defendants are required to provide such housing.

71.    Military families need and deserve safe and healthy homes at their assigned installations to sustain military and family readiness, recruitment and retention.

72.    Defendants are required to operate the housing at Fort Belvoir in good order and in a clean, safe condition at their expense, in accordance with their marketing representations that they offer first-class residential rental housing for tenants.

73.    Many military families are young families with infants or young children.  The servicemember parent is often deployed, far away from home for an extended period, or busy with demanding assignments on base. Due to these circumstances, it is important that servicemember families receive safe housing and effective service.

74.    During the last four years, Defendants' conduct has substantially and unreasonably interfered with Plaintiffs and class members' ability to use and enjoy their homes and has materially affected their health, safety and well-being in their homes, and has resulted in unacceptable, unsanitary, unsafe, unhealthy and intolerable conditions at the military housing owned and operated by Defendants at Fort Belvoir and elsewhere.

75.    The specific facts of the named Plaintiffs, described further below, reflect these unacceptable and intolerable conditions.

76.    Defendants, by virtue of their course of administering, leasing, building, and repairing the houses at Fort Belvoir, were uniquely aware, by common knowledge, of the substandard conditions of the houses, including the existence of mold, electrical, plumbing, insect, water intrusion, and HVAC issues associated with the houses they manage. Nevertheless,

Defendants knowingly and intentionally leased houses to Plaintiffs, misrepresenting that they were habitable, and that appropriate repair and remedy work had been undertaken in the past and would be undertaken in the future.

### Congressional and Other Investigations

77.    Congress is continuing to investigate military housing and the Defendants have admitted that the housing is substandard.  After the conditions at Fort Belvoir and other bases grew intolerable, military families pled for help.  The Reuters news agency published award-winning investigative reporting on the subject. Outraged, Congressional leaders calendared hearings, including in 2018, 2019 and 2020.[9]  At the hearings, the Senate and House, as well as the public, heard testimony from military family members who bravely went public despite threats of intimidation and retaliation.  They provided graphic and disturbing testimony about mold exposure, pest infestations, water intrusion, rude and dismissive house management, and ineffective oversight.

78.    Other reports have also documented the unacceptable conditions.  On October 14, 2016, the Office of Inspector General issued a report to "summarize and analyze previous DoD Office of Inspector General (DoD OIG) health and safety inspections of DoD-occupied facilities and military housing."   One "objective was to identify common issues and broader findings." The report findings included: "Deficiencies in electrical system safety, fire protection systems, and environmental health and safety were pervasive because of a lack of adequate preventative

---

[9] For example, Bill S. 1513, the Better Military Housing Act, was introduced on May 16, 2019, in the 116th Congress (2019-2020. This bill would require the "Department of Defense (DOD) to develop and implement a plan to address health, safety, and quality issues at privatized military housing." The DOD would have to provide tenants information on "tenant rights, expectations regarding reporting by tenants and landlords of maintenance, health, or safety issues relating to the unit; a comprehensive accounting of the rights and responsibilities relating to maintenance; and a comprehensive maintenance, repair, and remediation history of the unit."

maintenance and inspections being performed at the installations. As a result, DoD personnel and military families were exposed to health and safety hazards at installations around the world." "These systemic problems resulted in increased health and safety risks to service members."  The OIG summarized prior reports finding "critical deficiencies [which] included safety problems, such as … unmitigated mold growth in multiple buildings and family housing units."

79.    In the fiscal year 2019 Defense Appropriations Act, Congress included a provision asking GAO to look at how the Military Housing Privatization Initiative was working.  The reason that they wanted the GAO to do that was that Congress was increasingly hearing from servicemembers and their families who were very concerned about the condition of their privatized housing, complaints about things like mold and pest infestation, and a concern that the Department of Defense was not doing enough to help them address those problems. [10]

80.    In the fall of 2019, Army Headquarters engaged RER Solutions, Inc. and CEL & Associates, Inc.  to conduct a Resident Satisfaction and Opinion Survey of residents living in privatized family and unaccompanied on-base housing, for the fifth year.  The survey was conducted at 43 installations consisting of 385 neighborhoods/buildings between November and December of 2019.  The results were contained in a January 2020 report, which provided each installation an overall score.  Fort Belvoir military housing had a "Below Average" overall score.

81.    In March 2020, Elizabeth Field, a Defense Capabilities and Management director with the US Government Accountability Office, stated that when her group investigated tenant complaints as to privatized military housing, "we really found problems related to privatized housing at every location that we visited."

---

[10] *See generally* Statement of Elizabeth A. Field, Director, Defense Capabilities and Management, GAO, Preliminary Observations on DOD's Oversight of the Condition of Privatized Military Housing, Dec. 3, 2019, No. GAO-20-280T.

82.    When the GAO held meetings and focus groups with servicemembers and their families, they found that some members of the military had decided they were going to get out, because they were not confident that their home was clean and safe.  Other servicemembers said that even though they were going to stay in military service, the amount of time and turmoil that they have gone through to deal with the companies that manage their privatized housing has really had an impact on their ability to focus on the job at hand.

83.    The problems associated with privatized military have become so severe that on May 6, 2021  House Armed Services Committee on military personnel committee chairwoman Rep. Jackie Speier stated that the military housing contracts should be terminated, as they are "poorly crafted" and provide commanders little say in how private companies spend money to improve and maintain homes.[11]  She further stated "The accountability for fixing sewage problems, leaky roofs [and] mold is really, I think, abysmal. So, if I had my druthers right now, I would terminate that contract."[12]

84.    On March 10, 2021, the House Armed Services Committee on military personnel conducted a hearing as part of their investigation of military housing.  Clark Realty Capital declined to participate in the hearing, drawing the ire of top committee members.  Committee Chairwoman Speier stated "We have heard and seen firsthand horror stories in these houses, from mold, to water leaks to incorrect lead abatement that has directly affected the health and safety of these families."[13]  At the hearing, Speier and other lawmakers said that they were recently briefed

---

[11] Thayer, Rose L. (2021), "Rep. Speier on Army's Housing Deal: 'I Would Terminate the Contract'", Stars And Stripes (May 6, 2021), accessed at https://www.stripes.com/news/us/rep-speier-on-army-s-housing-deal-i-would-terminate-that-contract-1.672579.
[12] Id.
[13] Dickstein, Corey (2021)", "Lawmakers Say They Still Hear Reports of 'Horror Stories' in On-Post Housing, Blast Company for Declining to Testify", Stars And Stripes (March 10, 2021), accessed at https://www.stripes.com/news/us/lawmakers-say-they-still-hear-reports-of-horror-stories-in-on-post-housing-blast-company-for-declining-to-testify-1.665315.

by housing advocates from Fort Belvoir who described "disturbing conditions" at housing on the post.[14] Representative Speier further stated: "I want to call out the irresponsible conduct of Clark Realty. I want to convey to them that you can run, but you can't hide."[15] She noted that in the closed session with military family advocates, lawmakers heard serious complaints about some of the Clark properties, including continued resident dissatisfaction at Fort Belvoir "due to shoddy maintenance and improper remediation of environmental hazards."[16]

85.    Regarding Clark Realty Capital's refusal to attend the March 10, 2021 hearing, California Representative John Garamendi stated:

> "Clark Realty has declined our invitation to join this hearing. I'm really upset about this. I'm gravely disappointed by their decision and it raises concerns about their willingness and their ability to be transparent, not only to Congress, but far more importantly, to the families that are in their homes."

> "Clark Realty, you are clearly in the sights of this committee, and we will be assessing which of our oversight tools might be brought to bear to get answers."[17]

Garamendi further stated that, since Clark would not come to congress, congress would take a trip to Fort Belvoir to explore resident's problems.[18]

86.    Since taking control of housing at Fort Belvoir, Defendants have received numerous complaints and repair requests, including those from Plaintiffs and other members of the class, evidencing the defects in the housing. However, Defendants have systematically failed to promptly and permanently repair and remediate the housing.

87.    With regard to water intrusion and mold, the Defendants' failures have caused a

---

[14] *Id*.
[15] Jowers, Karen (2021), "Lawmaker: Base Commanders Should Be Held Responsible for Enforcing Tenants' Rights", Military Times (March 10, 2021), accessed at https://www.militarytimes.com/pay-benefits/2021/03/11/base-commanders-should-be-held-responsible-for-enforcing-tenants-rights-lawmaker-says/.
[16] *Id.*
[17] *Id.*
[18] *Id.*

reasonable fear among servicemember families that they have suffered mold-related illness and adverse health effects.   In many instances Defendants have simply "painted over" mold which is discovered at Fort Belvoir military housing.

88.    On information and belief, on or about March 21, 2021, the Fort Belvoir Fire and Emergency Services inspected over 25 homes in Fairfax Village for gas leaks and discovered that ten (10) of the homes suffered from gas leaks.

89.    As a result of Congressional investigations and hearings, Defendants have promised to take steps to remedy the unacceptable and intolerable conditions.   The steps the company has outlined boil down to establishing a credible repair, service and maintenance facility, like it has promised before but did not provide, and replacing the unfair and deceptive tenant satisfaction surveys, which it calls "customer service analytics". [19]

90.    These changes necessary to remedy intolerable and unacceptable conditions should have occurred years ago.   However, Defendants have failed to refund BAH amounts or otherwise compensate servicemember families injured and damaged by the unacceptably poor residential conditions.   Nor have Defendants sought to offer other remedial measures to servicemember families, such as paying for medical assessment or monitoring for mold-exposed families.

**Plaintiffs John and Ashley Fischer**

_____

[19] These surveys conducted by Defendants were misleading and false which promoted slanted customer surveys to paint a misleading picture of tenant satisfaction. [61] Statement of Elizabeth A. Field, Director, Defense Capabilities and Management, GAO, Preliminary Observations on DOD's Oversight of the Condition of Privatized Military Housing, Dec. 3, 2019 (GAO 12/3/19), available at https://www.gao.gov/assets/710/702950.pdf.  See also Richard Sisk, Military dot com, Surveys Showing High https://www.military.com/daily-news/2019/12/03/surveys-showing-high-satisfaction-military-housing-are-bogus-gao-says.html

89.     John R. Fischer is an E7 (Chief Petty Officer) who has served the US Navy for over 13 years.  From October 2017 through August 2019 Mr. Fischer, his wife Ashley, and their three minor children resided in military housing at Fort Belvoir at 9547 Kezia Trail, Fort Belvoir, Va. 22060.  From August 2019 to December 2020 the family resided in other military housing at Fort Belvoir at 9225 Soldier Road, Fort Belvoir, Va.  22060.  They are now stationed on Naval Air Station Mayport, while Chief Petty Officer Fischer is currently deployed on Sea-Duty.

90.     On October 24, 2017, Chief Petty Officer Fischer executed a form lease with Fort Belvoir Residential Communities, LLC regarding the 9547 Kezia Trail property.  During the pertinent times, Chief Fischer was a contracting party under the lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.

91.     Plaintiff Ashley Fischer is the wife of Chief Petty Officer Fischer.  During the pertinent times, Mrs. Fischer held a possessory and occupancy interest in the property. In November of 2019, Mrs., Fischer was nominated for recognition as the Armed Forces Insurance Military Spouse of the Year and finished within the top three finalists due to her community involvement.

92.     Among her charitable activities on base, Mrs. Fischer (volunteered and) became the Displaced Resident Liaison for Ft. Belvoir.  Due to the efforts of Mrs. Fischer, three military families who lived in three (3) military family homes at Fort Belvoir which were destroyed by fire were provided households goods, furnishings, and other necessities, paid for with community donations.  Additionally, with the assistance of local churches and veteran's organizations, Ms. Fischer was able to provide other Fort Belvoir military families who were displaced (due to various causes, including fire, mold, pests, gas, etc.) a weekly pizza night, monthly dinner, convection ovens, and even Christmas trees—this type of assistance was provided to approximately 60 military families who were displaced due to no fault of their own and, in many instances, due to

the substandard, unsafe, and unsanitary conditions in the Fort Belvoir military housing provided by Defendants.

93.    Ms. Fischer received official recognition fromfor the U.S Navy Spouse of the Year and Military Spouse of the Year boards, from both General Gustave Perna and Command Sergeant Major Rodger Mansker.

94.    The Fischers currently reside at Orange Park, Florida, since December of 2020. Due to their experiences with the substandard, unsafe, and unsanitary housing provided to them at Fort Belvoir, Chief Fischer requested orders to transfer, which were granted.

95.    Chief Petty Officer John R. Fischer is a career member of the United States Navy.  He enlisted in the Navy in 2007.  Ashley married John in April of 2011.  They have three minor children, as of mid-2021, ages 5, 8 and 13.

96.    In October 2017, the Fischers applied to be granted on-base housing at Fort Belvoir from Defendants.   On October 24, 2017, Chief Fischer executed a form lease with Fort Belvoir Residential Communities, LLC regarding the 9547 Kezia Trail property.  During the pertinent times, Chief Fischer was a contracting party under the lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.

97.    The Fischer family moved into their on-base home, which was located in the Vernondale community in the Villages at Belvoir.  Immediately upon moving into the house, starting around November, Ms. Fischer began to suffer from chronic migraines (weekly, approximately 3-4 days a week), as well as what she believed to be panic attacks. Ms. Fischer sought treatment in March of 2019 for treatment for her anxiety and migraines by her primary care physician and neurologist.

98.    In January 2018, the Fischers reported gaps in the back door to Defendants, noting that the door would open on its own and allow in wind and rain.  It was never properly repaired

during the Fischers' time living at the property.   However, after the Fischers moved out, the door was replaced in preparation for new tenants.

99.    In January 2018, the Fischers reported linoleum lifting in the upstairs master bathroom.  Maintenance responded by gluing the linoleum and leaving a large rock on it to hold it down.  Maintenance did not return to remove the rock and did not provide any instructions to the Fischers as to when or if they should remove it.

100.    In October 2018, the Fischers noticed issues with the HVAC unit.  Water was overflowing onto the floor, and there was water flooding the laundry room floor, damaging the floor and leaving visible signs of water damage.  Maintenance was notified, but they never opened the HVAC system and properly repaired it.  HVAC issues were again reported in January and June 2019.

101.    Work orders regarding to the HVAC were placed in October 1, 2018 (the home felt "warm and muggy"), October 22, 2018 (a cap was missing and splashing water onto the HVAC closet floor—it was eventually discovered that this condition had caused mold to form in the area), and January 21, 2019 (the home's heating unit went entirely out and would not operate).  Each time the Defendant's representatives who filled the work order would advise the Fischers that the issues with the HVAC were normal, and that the observed excessive dirt and humidity at the home were no cause for concern. In June 2019, mold was discovered in the ducts, On June 11th, 2019, a work order was submitted where the Fischers stated "I believe there is potentially mold in the ducts".  In June of 2019, the representatives improperly painted over moldy fiberboard duct work with IAQ 8000 which is a coating material which is resistant to mold only on the surface of the coating. The product does not protect users or others against disease causing bacteria, viruses, germs, or other disease-causing organisms. Ms. Fischer documented the use of IAQ 8000 with the following photograph:



*Photograph 1*: IAQ 8000

102.    In June 2019 a work order was submitted which alerted the Fischers that there was "a hole in the ceiling, with potential water damage, above the sink…" Defendants' representatives inspected the hole, and falsely advised the Fischers that there was no water damage, and simply cosmetically repaired the hole without addressing the water damage or determining its cause.

103.    Potential mold was also noted in the HVAC unit, plenum, duct work, and HVAC closet flooring. A third-party contractor, Americlean, was brought in to clean the HVAC duct on June 21, 2019. Within minutes, the duct cleaning company packed all their supplies and stated there was "mildew or something" and they couldn't clean the duct work. The problem was so severe that the duct cleaning service declined to clean the ducts. Mrs. Fischer documented the unsealed HVAC and affected floor with this photograph:



*Photograph 2*: Unsealed HVAC and Flooring

104.    Mold tests were conducted at the home on June 26, 2019.  It revealed the presence of various molds at the home, including aspergillus, Cladosporium, Chaetomium, penicillin, hyphae, Alternaria, basidiospores, penicillium, and penicillium/aspergillus.

105.    The family had no other choice but to move into a hotel as one of their children, Rhett, was immunocompromised because he was on chemotherapy for brain cancer.  From the hotel, they moved into the Dogue Creek hospitality house, where they stayed from June 2019 to August 2019, to await the repairs at the 9547 Kezia Trail property.  The Dogue Creek hospitality suite had been remediated prior to their move-in.

106.    When the family moved back to the 9547 Kezia Trail address in August after repairs were supposedly conducted, they found mold on a subfloor and on a vent.

 

*Photographs 3 and 4: Mold on Subfloor and Vent*

107.    The home's ducts had been sprayed with Benefect Decon 30 by maintenance previously, during remediation.  Immediately upon moving back into the home, the Fischer's family pet (a 2-year-old Goldendoodle) passed away suddenly due to unknown causes. The Fischers reported the continued presence of mold at the property—Defendants conducted a cursory inspection of the property and improperly painted over the moldy subfloor, leaving the damaged

and unsanitary carpet in place. They did not investigate or repair the cause of the mold. They advised the Fischers that the home was now safe to live in.

108.    Due to the mold and other issues at 9547 Kezia Trail, the family moved to 9225 Soldier Road in August 2019.

109.    While residing at the Kezia Trail property, the Fischers' now 5-year old was diagnosed with a Juvenile Pilocytic Astrocytoma, which is normally a slow-growing, benign brain tumor, The Fischer child's tumor grew at six times the normal rate and was labeled as malignant due to speed of growth and location: the brain stem.

110.    After leaving the Kezia Trail property, Ms. Fischer's migraines have improved.

**Stimson Road Home Shown to Fischers**

111.    During the time of displacement and repair, the Fischers' allege the repairs of mold in the HVAC were not repaired according to industry standards. The Fischers requested to relocate from 9547 Kezia to another 4-bedroom home on the installation. The Fischers were shown a "ready to move in" home on Stimson Road in Colyer Village. Upon inspecting the property, Ms. Fischer with her friend, Jeni Johnson, and Community Manager, Nicole Walker, found a home with visible water damage in the HVAC closet, visible water damage to the first-floor bathroom, a rotting back door frame, and visible suspect fungal growth covering a wall in the storage closet. Mrs. Fischer documented this with a photograph:



*Photograph 5: Fungal Growth in Storage Closet*

112.    The Fischers declined the offer to move into this home and subsequently moved into 9225 Soldier Road.

**9225 Soldier Road Home**

113.    In August 2019, Chief Petty Officer Fischer executed a form lease with Fort Belvoir Residential Communities, LLC regarding the 9225 Soldier Road.   During the pertinent times, Chief Fischer was a contracting party under the lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.

114.    Upon moving into the Soldier Road property, the family immediately noticed in September 2019 problems in the bathroom, which had been remediated previously.    Mold was discovered in the shower area--at the edge of the shower and behind the toilet. This issue was remedied by flood cutting the walls and painting the walls affected studs with IAQ, which is not the recommended solution for mold per the EPA.

115.    A work order was submitted on August 27, 2019, which stated, "the AC is not cooling and the humidity in the home is 58%, recommended being 40-50 otherwise mold can

grow." The Fischers were not provided any details about the repair, however the work order states it was a malfunctioning compressor due to a bad capacitor. This was replaced by the Defendants.

116.    On November 30, 2019 the family then noticed mold in the HVAC.  This required installation of a new HVAC unit. AJ Heating and Cooling was sent out to install a new HVAC inside and outside and to replace the exhaust pipe that was leaking from the roof/ceiling on December 4, 2019.

117.    Due to their experiences with the substandard, unsafe, and unsanitary housing provided to them at Fort Belvoir, in summer 2020 Chief Petty Officer Fischer requested orders to transfer, which were granted in November 2020.  In December 2020 the family conducted a permanent change of station to Naval Air Station Mayport.

**Plaintiffs Jorge and Raven Roman.**

118.    Jorge Roman is a Chief Warrant Officer 3 (CWO3) who has served in the U.S Army for over 18 years.  From May 2018 through September 2018 Chief Roman, his wife Raven, and their three minor children resided in military housing at Fort Belvoir at 5200 Stable Court, Fort Belvoir, Va.  22060, in Woodlawn Village.  From September 2018 to September 2019 the family resided in other military housing at Fort Belvoir at 5493 Jadwin Loop, Fort Belvoir, Va.  22060, in Jadwin Loop Village.

119.    On May 17, 2018, Chief Roman executed a form lease with Fort Belvoir Residential Communities, LLC regarding the 5200 Stable Court property.  During the pertinent times, Chief Roman was a contracting party under the lease, made rental payments pursuant to his Basic Housing Allowance (BAH), and held a possessory and occupancy interest in the property.

120.    Plaintiff Raven Roman is the wife of Chief Warrant Officer 3 Roman.  During the pertinent times, Ms. Roman held a possessory and occupancy interest in the property.

121.    From March 2019 to February 2020, she served as a community representative of Jadwin Loop Village and member of the Fort Belvoir Garrison Command Housing Focus Group in an effort to improve the quality-of-life housing program for residents. During that time, dozens of displaced military families were experiencing emotional and financial challenges. In an effort to help families meet those challenges, Mrs. Roman collaborated with base-wide organizations to provide resources to displaced families offered by Military Family Life Counselors and Fairfax County Public Schools for Homeless Families.

122.    Subsequently, the Romans resided in Lorton, Virginia, in off-base housing from 2019 to 2020. Chief Roman was transferred, and his family currently resides in North Carolina.

123.    Jorge Roman is a career member of the United States Army. He enlisted in the Army in 2003 and received his commission as a Warrant Officer in October 2012. Raven married Jorge on April 23, 2005. They have three minor children, as of mid-2021, ages 4, 7 and 15.

**5200 Stable Court**

124.    In May 2018, the Romans applied to rent family military housing at Fort Belvoir from Defendants. On May 17, 2018, Chief Warrant Officer Roman executed a form lease with Fort Belvoir Residential Communities, LLC regarding the 5200 Stable Court property. During the pertinent times, Chief Warrant Officer 3 Roman was a contracting party under the lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property. During the pertinent times, Ms. Roman held a possessory and occupancy interest in the property.

125.    The Roman family moved into the home, which was located in the Villages at Belvoir, in Woodlawn Village.

126.    The Roman family experienced and noticed serious issues involving the safety, sanitation, and condition of the property upon move-in.  As set forth in their move-in inventory checklist, immediately upon moving into the home the Roman's observed issues involving pests, old carpets (not new as noted by Defendants), water intrusion in the garage, mold on the drywall over the garage door, mold on the sealant on the sink and in the cabinetry underneath the sink, lifting vinyl plank flooring, rusty plumbing.. .  Defendants performed cursory repairs.

127.    On May 18, 2018 the Romans reported pest issues: ants and spiders were discovered in the home. Ants were entering throughout the entire first floor of the home and through cracks on the banister in the hallway on the second level of the home. Carpenter ants were also discovered in the upstairs bedroom (daughter's room) coming in through the window and crawling on the walls and ceilings. In response, Defendants treated for pests but were unable to fully treat for ants due to "heavy rain." The Roman's were not able to move their personal belongings to their bedrooms upon move-in until the following week due to the unsanitary and unsafe condition of the carpets.  On May 22, 2018 the Roman's submitted a request for a steam cleaning of the carpets.  They discovered thumbtacks and nails throughout the entire second level of the home, in addition to stains, jewelry, and food left behind by previous tenants. Following the call, the vendor arrived with a household vacuum to clean the second level of the home. The Roman's submitted a second maintenance request for cleaning. The carpets were steam cleaned during the second visit, but the vendor insisted the carpets were "new" and did not require a cleaning. The following are photographs which show ants, thumbtacks, and nails:



*Photographs 6 and 7: Ants*



*Photographs 8 and 9: Thumbtacks and Nails*

128.    On May 31, 2018, the Villages at Belvoir maintenance arrived to repair holes in the walls and to paint the garage. The technician painted over the mold over the garage door and water intrusion stains on the wall.  On June 4, 2018, for a second time, Mrs. Roman reported the water intrusion on the wall, a possible roof leak, and the exterior downspout flooding the backyard and air conditioning unit.  Mrs. Roman was never contacted.   On June 13, 2018, Mrs. Roman reported, for a third time, the water intrusion and roof leak. On June 14, 2018, a work order was created for this maintenance request. There was no further investigation as to the cause, but the work order was marked complete. The following photographs show mold and water intrusion:

 

*Photographs 10 and 11: Mold and Evidence of Water Intrusion*

129.    During the next three months, there were many additional issues. CWO3 Roman was required to report to Warrant Officer Advanced Course (WOAC) on July 12, 2018. Mrs. Roman and her 3 children resided in the home during that time. Water intrusion remained a substantial issue. Mrs. Roman reported a leak under the kitchen sink, a leaking toilet, pest issues, and HVAC problems. The Roman's began to notice high levels of moisture in the kitchen and other areas which attracted a panoply of pests including slugs, silverfish, carpet beetles, and booklice. The Roman's noticed a consistent odor, a "rotting/mildew smell", coming from under the kitchen sink and cabinets that became more pungent when it rained. Mrs. Roman reported the odor several times. Slugs were found under the cabinets, in the dishwasher, and crawling on the kitchen floor. Eventually Mrs. Roman and her children were unable to use any of the bathrooms due to unsuccessful pest control treatments and an infestation of booklice that quickly spread throughout the home.

130.    On June 18, 2018 (2nd report) the Roman's reported carpenter ants located in the daughter's room. Defendants treated for ants twice. The issue subsided but continued. Also on June 18, 2018 the Roman's reported "mold in window". The work order was marked complete with no further investigation. The following photos show ants and mold:



*Photographs 12 and 13*: Ants and Mold

131.    On July 25, 2018 the Roman's reported "small bugs" in the bathroom (silverfish and booklice). Defendants had Eagle Pest Control treat the inside of the home. The following are photographs of the booklice and silverfish.



*Photographs 14 and 15*: Booklice and Silverfish

132.    On July 30, 2018, the Roman's reported for a fourth time, "water is entering through side wall from outside living area."  In response, shingles were repaired, but drywall was not removed, and no further investigation was made into water damage to the interior of the roof or garage wall. The following photos show water damage:



*Photographs 16 and 17*: Water Damage

133.    On July 31, 2018 (2nd report) the Roman's reported "rotting, mildew smell coming from the sink and up under the cabinets."  Maintenance did not investigate further and denied the existence of the smell.  The following are photographs of water staining under the sink, which is likely evidence of mold and mildew.



*Photographs 18 and 19*: Water Staining Under Sink

134.    On August 7, 2018 (2nd report) the Roman's reported bugs in the bathroom.  The Defendants treated inside the home. On August 28, 2018 (3rd report) a work order was placed by the Roman's for the presence of bugs in the second hallway bathroom, under the kitchen sink and

in the cabinets.  On August 28, 2018 (4th report) the Roman's also reported crawling insects, and silver fish in the entire unit. Defendants retained Eagle Pest Control, who treated with aerosol spray.  The exterminator with Eagle Pest Control advised the Roman's that he notified the Villages at Belvoir there was a humidity issue within the home during the initial pest control treatments in the home. The following photos show bugs under the sink in the bathroom.

135.    Also, on August 28, 2018 (3rd report) the Roman's reported "moisture under the kitchen sink and dishwasher."  Defendants' maintenance supervisor came to the home and got a positive reading for moisture under the sink. He sprayed with an antimicrobial spray and reported everything was fine.

136.    On September 3, 2018, the Romans reported water leaking in the laundry area from the AC unit.  In response, Defendants appeared to have wrapped putty around the pipe that was leaking.



*Photographs 20 and 21*: Water Damage from Leak and Putty Wrapped around Pipe

137.    The Romans also began experiencing medical issues around this time.  All (3) children became ill with rashes, upper respiratory infections, congestion, a hacking cough.  Raven

Roman suffered from fatigue, headaches, drastic weight loss, vision problems, rashes, light sensitivity, high blood pressure, and joint pain.

138.    The problems were so severe that the Romans requested a new home or hotel accommodations.  Defendants' response on August 31, 2018, was "we have not identified any concerns in your home that would prevent you from staying in the home". Mrs. Roman had no choice but to move out of the home and into a hotel with her 3 children on Labor Day 2018—and incurred out-of-pocket expenses to do so.

139.    On September 4, 2018, the Romans received a phone call from the maintenance supervisor used by Defendants.  He stated that the Romans could no longer enter the premises without an escort due to moisture that was found behind the dishwasher. The Romans were not provided a clear answer of the findings behind the dishwasher. Prior to being locked out of the home that day by Defendants, Mrs. Roman returned to the home to retrieve personal items for her children. While there, she pulled the dishwasher out and found a black trash bag taped to the wall. Chief Roman requested support from his 1st SGT. and CPT in his absence to meet his wife to observe her findings. They arrived and witnessed the mold found behind the dishwasher.



*Photographs 22 and 23*: Mold Behind Dishwasher

140.    The Romans had the mold present behind the dishwasher tested on September 11, 2018.  The tests revealed the presence of Stachybotrys, a toxic mold.

141.     The Roman family was displaced from September 2 to September15, 2018. The Romans left 5200 Stable Court to stay at the Residence Inn in Springfield, VA from September 2- September 4, 2018, where they paid out of pocket for 3 nights.[20] Defendants then moved the family to the Staybridge Suites from September 5 to September15, 2018.

142.    Subsequently, after several meetings with management, Defendants moved the Romans to 5493 Jadwin Loop. The Defendants arranged for a moving company to move the Romans' possessions from 5200 Stable Court property to 5493 Jadwin Loop.  On September 13, 2018, the day of the move, The Romans discovered mold had visibly spread throughout the entire home at 5200 Stable Court. The Defendants' maintenance supervisor took some of the Romans' personal possessions from a closet which had visible mold on the ceiling and put them into a plastic trash bag to be "dry cleaned"—ultimately Defendants disposed of these belongings and did not clean them. Mrs. Roman's subsequent inquiries as to the status of these belongings were ignored, and the personal property was never returned. Defendants gave them a partial reimbursement of a portion of rent and items in the closet in November 2018.

---

[20]  VA Code §55.1-1231 "Where mold condition in the dwelling unit materially effects the health or safety of any tenant…"The Landlord shall provide the tenant with either (i) a comparable dwelling unit, as selected by the landlord, at no expense or cost to the tenant or (ii)a hotel room, as selected by the landlord, at no expense or cost to the tenant."



*Photographs 24, 25, and 26: Destroyed Persona Property*

**5493 Jadwin Loop**

143.    On September 12, 2018, Chief Warrant Officer Roman executed a form lease with Fort Belvoir Residential Communities, LLC regarding the 5493 Jadwin Loop property.  Again, during the pertinent times, Chief Roman was a contracting party under the lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property. During the pertinent times, Ms. Roman held a possessory and occupancy interest in the property.

144.    On March 18, 2019, the Roman family requested reimbursement for their belongings that were transported to the home to 5493 Jadwin Loop from 5200 Stable Court which had been impacted by mold.  This request was denied.[21]

145.    After moving into the 5493 Jadwin Loop property, the Roman children suffered from chronic ear infections, chronic coughs, upper respiratory illness, sore throats, headaches, congestion, developmental and behavioral health issues.  From November 2018 thru March 23, 2019 the Roman family reported and work orders were submitted for issues related to the deck,

---

[21]  VA Code §8.01-226.12. Duty of landlord and managing agent with respect to visible mold. "Mold remediation in accordance with professional standards "means mold remediation of that portion of the dwelling unit or premises affected by mold or any personal property of the tenant affected by mold" …

door, shingles, HVAC, locks, lighting, windows, and pest control.  This is discussed in further detail below.

146.    On September 26, 2018, the Romans reported carpet beetles in the kitchen and upstairs bathroom.  Defendants conducted a pest control treatment. The following photographs show carpet beetles in the Roman home.



*Photographs 27 and 28*: Carpet Beetles

147.    On October 2, 2018 the Romans reported a sewage-type odor in the basement.  In response, Defendants sent a maintenance technician who said he could not see or smell anything. There was no further investigation.

148.    On November 14, 2018 the Romans reported that their daughters' bedroom smelled like mold and there appeared to be visible mold on the windows.  They also reported mold on the front door, two windows that did not shut properly in the living room, and the absence of weather stripping needed for all. In response, their daughters' window was cleaned with bleach and painted, the weather strip was placed over the mold on the front door, and remaining request were never completed. The following photos are mold in the windows.


*Photographs 29 and 30: Mold in Windows*

149.    On January 29, 2019 (1st report) the Roman's reported the existence of wood on the bottom of the entryway door which was "rotting/chipping away."  This was not repaired. The below photograph shows the rotting wood on the entryway door.


*Photograph 31: Rotting Wood Door*

150.    On February 8, 2019, the Roman's reported gaps between the baseboard and floors and rusty nail pops throughout the entire home.  In response, Defendants caulked and patched the nail pops.

151.    On February 27, 2019, (2nd report), the Romans reported deterioration of the entryway door due to rot.  The door was replaced.

152.    On February 28, 2019, the Roman's reported that the ducts were dirty, and giving off an odor so they requested a duct cleaning.  Defendants sent Americlean to conduct a duct cleaning.

153.    On March 3, 2019, the Roman's reported tree bugs in the bathroom.  Defendants scheduled pest control to treat the area.

154.    On March 9, 2019, the Romans reported a rotten windowsill. Defendants painted over the rotting wood on the window. No further investigation was made to check for water intrusion. The below photograph shows the rotten windowsill.



*Photograph 32: Rotting Window Sill*

155.    Subsequently, on March 26, 2019, the Romans requested that Defendants inspect, repair, and remediate the Jadwin Loop property due to visible mold present on the beam in the attic, mold-related problems with the kitchen range hood, issues with the HVAC, and condensation on the windows throughout the home and the laundry area where the utility closet was located.  In response, the mold issues related to the attic beam and the kitchen were remediated. The HVAC was not properly remediated and the cause of the condensation in the home was never addressed

by Defendants at any time.  The other issues reported were addressed in cursory fashion, but the causes of the issues were not properly determined or repaired by Defendants (see below).

156.    On March 29, 2019, the Romans reported mold in the attic. Remediation was completed by PBI Restoration on April 16, 2019. The following photograph depicts mold in the attic.



*Photograph 33*: Mold in Attic

157.    April 25, 2019, the Romans reported that the 1st level bathroom had what appeared to be previous water damage under the cabinet that was painted over. Defendants replaced the cabinet but left the corroded plumbing. Below are photographs of the previous water damage:



*Photographs 34, 35, and 36*: Water Damage Under Cabinet

158.    On July 8, 2019, the Romans reported condensation throughout entire home on windows and in the dryer in the laundry room. The work order was marked complete, but maintenance was never scheduled to assess. The below photographs show condensation in the windows and dryer of the laundry room.



*Photographs 37 and 38: Condensation in the Laundry Room*

159.    On July 19, 2019, the Roman's reported water leaking from the range hood. A maintenance technician came but advised there was no repair needed. The range hood continued leaking and the Romans were unable to use their stove. On July 25, 2019, the Roman's again reported the leak and the presence of mold on the range hood. The Romans were unable to use their stove until the range hood and duct were remediated on July 26, 2019. After remediation, Mrs. Roman discovered the duct was never replaced.

160.    On August 21, 2019, the Roman's discovered the presence of mold and rust on the vent register in the laundry area and in the upstairs rooms.  They also discovered condensation and water accumulating in the dryer.  As a result, the Romans were displaced and moved to a hotel, from August 21 to August 30, 2019. The following photographs show mold, rust and condensation:



*Photographs 39 and 40*: Rust, Mold, and Condensation



*Photographs 41 and 42*: Rust, Mold, and Condensation

161.    On August 23, 2019, the Roman's stopped by their home and discovered that proper containment was not set up to ensure personal belongings were not contaminated and the AC unit was left running by Defendants. The below photographs depict the containment attempt.



*Photographs 43 and 44*: Improper Containment

162.    On August 25, 2019, the Roman's discovered that the ducts were not encapsulated properly. The below photographs are the inside of the ducts:



*Photographs 45 and 46*: Inside of Ducts

163.    As a result of their exposure to conditions in the two Fort Belvoir military housing units provided by Defendants, the two Roman daughters suffered from chronic coughs, chronic ear infections, bronchitis and pneumonia. The youngest daughter, who is developmentally delayed and in special education classes in Fairfax County Public Schools, developed asthma. She requires ongoing therapy.  They are now seeking physicians off post.

164.    As a result of the conditions in both of the Fort Belvoir housing units provided by Defendants, the Romans decided to move off base Labor Day 2019 to 9162 Power House Road in Lorton, VA.  The Romans now reside in North Carolina.

## CONDITIONS PRECEDENT

168.    All conditions precedent to Plaintiffs' recovery have occurred or have been waived, excused, or otherwise satisfied. All required notices have been or will be provided or were waived, excused, or otherwise satisfied.

## NO GOVERNMENTAL IMMUNITY

169.    Defendants are not persons or entities acting under a federal officer so as to give

rise to a defense of qualified immunity, nor are Defendants subject to any sovereign immunity, derivative sovereign immunity, governmental immunity or government contractor defense.

170.    None of the named Defendants are governmental officials entitled to raise the defense of qualified immunity.

171.    With regard to its involvement in one or more Clark/Pinnacle/Fort Belvoir privatized military housing projects, the United States has denied that it was controlling, supervising or managing the project.

172.    Defendants are not private individuals engaged in public service, and the Defendants violated basic landlord-tenant duties and other rights of the Plaintiffs and class members that were clearly established at the time of suit.

173.    Plaintiffs have pled no claim against the government, or one of its departments or agencies, or against a government officer or agent based on the performance of governmental duties, within the scope of sovereign immunity.

174.    Defendants are not entitled to derivative governmental immunity because they violated the government's explicit instructions in the form of the requirements and obligations set forth in the operative agreements, and the Plaintiffs and class members are persons adversely affected by the violation.

175.    Plaintiffs are not alleging a failure to warn or design defect product liability claim.

176.    The government did not exercise its discretion and approve the relevant service, repair and maintenance practices used by the Defendants. Further, Defendants were aware of dangers in their repair and maintenance practices that were known to them but not to the government.

177.    The Defendants' obligations to the government do not conflict with the state law duties alleged herein such that they may not comply with both government and state law

directives.

178.    Plaintiffs do not argue that the agreements and plans that Defendants entered into with the Army were defective, but rather, that Defendants did not comply with those agreements and plans or with their own internal plans with regard to the communities.

## CLASS ALLEGATIONS

179.    Pursuant to the Fed. R. Civ. Pro. 23(b)(2) and (b)(3), Plaintiffs respectfully request that the Court certify a class defined as follows:

**Class:** All servicemember tenants based at Fort Belvoir who have entered into lease agreements with Defendants for residential housing units during the five years prior to the date of filing of the complaint, and all authorized adult family member spouses or other occupants.

Plaintiffs further request certification of two subclasses defined as follows:

**Five-year subclass**: All servicemember tenants based at Fort Belvoir who have entered into lease agreements to lease privatized military housing for residential housing units from five years prior to the filing of this complaint to present, and all authorized adult family member spouses or other occupants.

**Injunctive relief subclass:** All servicemember tenants based at Fort Belvoir who currently have ongoing lease agreements with for the privatized military housing residential housing units.

180.    Excluded from the Class are Defendants' legal representatives, officers, assigns, directors, successors, and other individuals as is normal and customary in class certification.  Also excluded are all persons who make a timely election to be excluded from the Class and any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff.

181.    This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements. Plaintiffs seek to represent an ascertainable class, as determining inclusion in the class can be done through review of Defendants' own records.

182.    <u>Fed. R. Civ. P. 23(a)(1) (numerosity):</u>  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class Members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  The disposition of claims of these Class Members is a single action will provide substantial benefits to all and an efficient means to adjudication.  If many individuals were to proceed the courts would be overrun with claims and also enables litigation where it might otherwise not occur if individual claims are small and/or class members are financially unable to fund litigation themselves, individual joinder is practically impossible. Members of the Class may be notified of the pendency of this action by both regular and electronic mail using a form of notice customarily used in class actions.

183.    <u>Fed. R. Civ. P. 23(a)(2) (common issues):</u>  Questions of law and fact common to the Class exist, which predominate over any questions affecting only individual Class Members. These common questions of law and fact are shared among the Class Members as the deficiencies claimed herein have affected all Class Members, including, inter alia:

> A.    Whether, during the class period, some or all of the Defendants were subject to contractual duties under the terms of the form lease;

> B.    Whether, during the class period, the Defendants breached their contractual duties under the leases entered into with Plaintiffs and class members;

> C.    Whether, during the class period, the Defendants violated Virginia Residential Landlord/Tenant Act;

D.     Whether Defendants breached the implied warranty of habitability;

E.     Whether class members have suffered impairment of their occupancy interest in their leaseholds rising to the level of breach of the warranty of habitability;

F.     Whether Defendants have caused Plaintiffs and class members to experience substantial and unreasonable loss of use and enjoyment of their occupancy interests causing Defendants to be liable for temporary recurrent private nuisance;

G.     Whether, during the class period, the Defendants caused there to be unacceptably bad housing conditions for an unreasonably high number of servicemember families at Fort Belvoir;

H.     Whether, during the class period, the Defendants engaged in unfair and deceptive trade practices in connection with Plaintiffs and class members proscribed by Virginia's Consumer Protection Act ("VCPA");

I.     Whether, during the class period, the Defendants engaged in unfair and deceptive service, repair and maintenance policies and procedures with regard to the residential housing at Fort Belvoir;

J.     Whether Defendants overcharged Plaintiffs and class members for repair and maintenance items or obligated Plaintiffs and class members to pay out-of-pocket for services or products for which Defendants should have paid;

K.     Whether the capital expenditures and structural reforms announced by Defendants only after congressional hearings should have been implemented years ago;

L.      Whether, due to the structural inadequacy of Defendants' uniform customer service, repair and maintenance policies during the class period, the Plaintiffs and class members did not receive the rental housing they were promised or that their BAH was to pay for;

M.      Whether Plaintiffs and class members have sustained damages and, if so, what is the proper measure of damages;

N.      Whether the circumstances giving rise to a private nuisance are abatable;

O.      Whether the Court should order full or partial refunds or disgorgement of BAH revenues obtained over the class period; and

P.      Whether the Court should award other declaratory, injunctive or equitable relief.

184.    <u>Fed. R. Civ. P. 23(a)(3) (typicality)</u>:  Plaintiffs are members of the putative class. Plaintiff's claims are typical of those of other Class Members because they are or have been all residents of Ft. Belvoir base housing. All such claims arise out of the same course of events and each class member has similar legal claims and arguments that prove the Defendants liability under the causes of actions alleged herein and are like that of every other Class Member.  All of the Plaintiffs and the Class Members were directly affected by the deficiencies claimed herein, which resulted in damages to the Plaintiffs and Class Members who have all suffered and will continue to suffer harm and damages as a result of the Defendants unlawful and wrongful conduct, the factual basis of which is common to all Class Members. The claims asserted by the Plaintiffs are typical of the claims of the members of the putative class, as the claims arise from the same course of conduct by Defendants and the relief sought is common.

185.    <u>Fed. R. Civ. P. 23(a)(4) (adequacy)</u>:  Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative class, as their interests coincide with, and

are not antagonistic to, the other members.  Plaintiffs have retained counsel competent and experienced in both military housing and class action litigation.

186.    Fed. R. Civ. P. 23(b)(1)(A):  A class action is appropriate because prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

187.    Fed. R. Civ. P. 23(b)(1)(B): A class action is appropriate because adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

188.    Fed. R. Civ. P. 23(b)(2):  A class action is appropriate because Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

189.    Fed. R. Civ. Pro. 23(b)(3) (Predominance and Superiority):  Certification of a class is appropriate because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affection only individual members.  The Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members and the deficiency issues arising from the Defendants' conduct that affected the Plaintiffs was common to all Class Members.  This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications and to avoid piecemeal litigation.  Absent a class action it would be highly unlikely that the members of the class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed the expected recovery and would therefore have no effective remedy.  A class action is a superior method for the adjudication of the controversy in that it will

permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and the burden of the courts that individual actions would create. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of the class action.

190.    Fed. R. Civ. P. 23(c)(4):[22]  In addition, or in the alternative, the certification of a class limited to one or more of the common issues is appropriate because proof of one or more common issues of general relevance to all class members would substantially simplify their ability to proceed further with individual claims.

191.    Defendant has acted on grounds that apply generally to the Classes as a whole, so that class certification and monetary damages are appropriate on a class-wide basis.

192.    All conditions precedent to bring this action have occurred or been waived.

**FIRST CLAIM FOR RELIEF--VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT  CHAPTER 17 §59.1-196 THROUGH §59.1-207**

193.     Plaintiffs re-allege the above paragraphs as if fully set forth herein.

194.    This claim is brought by Plaintiffs individually and on behalf of the Class.  At all times relevant herein, Defendants were engaged in commerce in the Commonwealth of Virginia and are otherwise proper defendants under Virginia's Consumer Protection Act ("VCPA"). Plaintiffs and class members are members of the consuming public as defined by the VCPA, as they sought to acquire goods and services by lease. Under Virginia Code §59.1-199, a lessee may bring an action under the VCPA if the act or practice of a landlord constitutes a misrepresentation

---

[22] Fed. R. Civ. P. 23(c)(4) ("(4) *Particular Issues.* When appropriate, an action may be brought or maintained as a class action with respect to particular issues.").

or fraudulent act or practice under §59.1-200 as alleged herein.

195.    The VCPA was enacted with "the intent of the General Assembly that [it] shall be applied as remedial legislation to promote fair and ethical standards of dealings between suppliers and the consuming public." Va. Code Ann. §59.1-197.  It is illegal to "[use] ... deception, fraud, false pretense, false promise, or misrepresentation in connection With a consumer transaction." In pertinent part, Va. Code Ann.§ 59.1–198 defines a "[c]onsumer transaction" as "[t]he advertisement, sale, lease, license or offering for sale, lease or license, of goods or services to be used primarily for personal, family or household purposes." "Goods" are defined as "all real, personal or mixed property, tangible or intangible."  a "[s]upplier" is defined as "a seller, lessor or licensor who advertises, solicits or engages in consumer transactions."

196.    Defendants were each directly and materially involved in providing the leased residential housing herein, or in providing property management services, such that each is jointly and severally liable for violations of the VCPA.

197.    Defendants during the pertinent times have engaged in unfair and deceptive trade practices and prohibited practices under §59.1-200 in connection with Plaintiffs and class members including as follows:

      a.  By offering, marketing and leasing residential housing to Plaintiffs and class members that had defects and deficiencies far in excess of what was acceptable and reasonable;

      b.  By offering, marketing and leasing residential housing to Plaintiffs and class members that had water intrusion and mold contamination incidences far in excess of what was acceptable and reasonable;

    c.    By unfairly and deceptively marketing lease offerings as coming with excellent customer service, repair and maintenance, when in fact that was not the case;

            By receiving payment in the form of the BAH for Plaintiffs and Class Members, where the BAH was calculated based on an assumption that it was paying for reasonable and safe housing, when in fact that was not the case;

    d.    By conducting, sponsoring, or participating in resident satisfaction surveys that were inaccurate and misleading, and by using those inaccurate and misleading surveys to avoid oversight of their unacceptable housing practices;

    e.    By maintaining customer service, repair and maintenance records and data that were inaccurate, incomplete, and unreliable, and by using that inaccurate and incomplete repair and maintenance data to avoid oversight of their unacceptable housing practices; and

    f.    By breaching the implied warranty of habitability, or other law, including as alleged in the other claims for relief.

198.    The conduct of Defendants as set forth herein was against established public policy of the State; was unethical, oppressive, unscrupulous, and substantially injurious to consumers; and had the capacity and tendency to deceive the average consumer.

199.    During the class period, Defendants received numerous complaints and repair requests, including from Plaintiffs and class members.  Many of the conditions complained of were the same unfit conditions identified by prior servicemember tenants of the same properties, units and buildings.  Defendants had knowledge of this historical information regarding the rental properties, while the incoming new tenants did not.

200.    Defendants, by virtue of their course of administering, leasing, building and repairing units at Fort Belvoir, were uniquely aware of the condition of them, including the unacceptable and unsafe conditions and the existence of conditions likely to cause a substantial and unreasonable interference with the occupants' ability to use and enjoy the leased properties.

201.    Nevertheless, Defendants knowingly leased those units to Plaintiffs and class members, marketing and representing the communities to the Plaintiffs and class members as being safe, habitable, and well-serviced by the property managers.

202.    Had Plaintiffs and Class Members known in advance of the actual nature of the Defendants' leasing and property management practices and the actual condition of the units, they would not have entered into the leases on the terms proposed by Defendants.

203.    Defendants have used their 50-year ground lease business structure, the disparity in information available to the servicemembers and their families, the lack of transparency afforded to the servicemembers as well as regulators, the servicemembers' weaker economic position, and the limitations on families being able to break the lease and move, to effectively hold Plaintiffs' hostage in their leases until they received orders stationing them elsewhere.

204.    During the pertinent times, Defendants collected the full amount of the BAH, as income otherwise payable to the servicemember Plaintiffs, giving those Plaintiffs no discount for the size, quality, or condition of their house, nor for the inadequate repair and maintenance.

205.    During the class period, Defendants underpaid outside repair, maintenance and service vendors, chose ill-equipped and poorly trained vendors on the basis of cost, and imposed limits on the abilities of outside vendors to engage in repair and maintenance services, such that problems such as moisture intrusion and mold were likely to occur and once "repaired," were likely to recur.

206.    During the class period, Defendants engaged in arrangements with outside

service vendors and used policies and procedures that resulted in unfairly transferring service, repair and maintenance costs off of the Defendants and onto the Plaintiffs and class members.

207.     Plaintiffs and Class Members suffered actual injury as a direct and proximate result of Defendants' unfair and deceptive conduct, including out-of-pocket costs for repair, service, maintenance, diagnostic, sampling, mold assessment, or cleaning products, and the overpayment of their BAH rent by comparison with the quality of the homes provided during the class period.

208.     Plaintiffs and Class Members have been damaged and are entitled to recover compensatory damages, treble damages and reasonable attorney's fees and expenses.

### SECOND CLAIM FOR RELIEF--VIOLATION OF THE VIRGINIA RESIDENTIAL LANDLORD/TENANT ACT CHAPTER 12 §59.1-1200 THROUGH §59.1-1262

209.     Plaintiffs re-allege the above paragraphs as if fully set forth herein.

210.     This claim is brought by Plaintiffs individually and on behalf of a subclass of all class members who were occupants of residential units at Fort Belvoir for which Defendants, or any one of them, were the owner or property manager within the last three years.

211.     During the pertinent times, Defendants had a duty to provide fit and habitable housing under the Virginia Residential Landlord/Tenant Act and/or Virginia common law.

212.     Virginia Code Section 55.1-1220 provides that landlords shall, in part:

1.  Comply with the requirements of applicable building and housing codes materially affecting health and safety;

2.  Make all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition;

3.  Keep all common areas shared by two or more dwelling units of a multifamily premises in a clean and structurally safe condition;

4.  Maintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating, air-conditioning, and other facilities and appliances, including elevators, supplied or required to be supplied by him;

5.  Maintain the premises in such a condition as to prevent the accumulation of moisture and the growth of mold and promptly respond to any notices from a tenant as provided in subdivision A 10 of § 55.1-1227 and § 55.1-1220. Where there is visible evidence of mold, the landlord shall promptly remediate the mold conditions in accordance with the requirements of subsection E of § 8.01-226.12 § 55.1-1231 and reinspect the dwelling unit to confirm that there is no longer visible evidence of mold in the dwelling unit. The landlord shall provide a tenant with a copy of a summary of information related to mold remediation occurring during that tenancy and, upon request of the tenant, make available the full package of such information and reports not protected by attorney-client privilege. Once the mold has been remediated in accordance with professional standards, the landlord shall not be required to make disclosures of a past incidence of mold to subsequent tenants;

6.  Provide and maintain appropriate receptacles and conveniences for the collection, storage, and removal of ashes, garbage, rubbish, and other waste incidental to the occupancy of dwelling units and arrange for the removal of same;

7.  Supply running water and reasonable amounts of hot water at all times and reasonable air conditioning if provided and heat in season except where

the dwelling unit is so constructed that heat, air conditioning, or hot water

is generated by an installation within the exclusive control of the tenant or

supplied by a direct public utility connection; and

8. Provide a certificate to the tenant stating that all smoke alarms are present,

have been inspected, and are in good working order no more than once

every 12 months. The landlord, his employee, or an independent

contractor may perform the inspection to determine that the smoke alarm

is in good working order.

213. Virginia Code Section 55.1-1215 states:

"As part of the written report of the move-in inspection required by § 55.1-1214, the landlord shall disclose whether there is any visible evidence of mold in areas readily accessible within the interior of the dwelling unit. If the landlord's written disclosure states that there is no visible evidence of mold in the dwelling unit, this written statement shall be deemed correct unless the tenant objects to it in writing within five days after receiving the report. If the landlord's written disclosure states that there is visible evidence of mold in the dwelling unit, the tenant shall have the option to terminate the tenancy and not take possession or remain in possession of the dwelling unit. If the tenant requests to take possession, or remain in possession, of the dwelling unit, notwithstanding the presence of visible evidence of mold, the landlord shall promptly remediate the mold condition but in no event later than five business days after the tenant's request to take possession or decision to remain in possession, reinspect the dwelling unit to confirm that there is no visible evidence of mold in the dwelling unit, and prepare a new report stating that there is no visible evidence of mold in the dwelling unit upon reinspection."

214. During all relevant times, Defendants were the owners and a contracting party

pursuant to the leases and otherwise subject to the coverage of the Virginia Residential

Landlord/Tenant Act.

215. During all relevant times, Defendants acted as the property manager and a

contracting party pursuant to the leases, an agent of the owner, or otherwise were materially

involved in providing property management services under the leases and subject to the coverage

of the Virginia Residential Landlord/Tenant Act.

216.    During all relevant times, some or all of the Defendants had actual or apparent authority to perform the landlords' obligations under the leases and the Virginia Residential Landlord/Tenant Act and did perform such duties, or otherwise were subject to the coverage of the Virginia Residential Landlord/Tenant Act.

217.    During all relevant times, Virginia Residential Landlord/Tenant Act required Defendants to comply with the current applicable codes governing residential construction, required Defendants to make all repairs and do whatever necessary to put and keep the tenants' premises in a fit and habitable condition., required Defendants, within a reasonable period of time based upon the severity of the condition, to repair or remedy any imminently dangerous condition after acquiring knowledge or receiving notice.

218.    During the pertinent times, Defendants had knowledge regarding the recurrent problems of all of the housing units at Fort Belvoir.  Plaintiffs and class members did not.  During the pertinent times, Defendants received numerous tenant complaints regarding residential problems and defects.  Under the facts and circumstances, Plaintiffs and class members should be deemed to have satisfied any applicable notice requirement for purposes of triggering any Virginia Residential Landlord/Tenant Act duties that had a notice prerequisite.

219.    During the class period, Defendants impliedly warranted to Plaintiffs and class members that the premises available for lease were in fit and habitable condition.  In fact, Defendants knew that an unacceptably high proportion of units had mold, insects, defective HVAC systems or other deficiencies.  Nonetheless, Defendants held out their privatized housing at Fort Belvoir to be high-quality and safe.

220.    The units leased by Plaintiffs and class members have had moisture intrusion, mold, insects, defective HVAC systems and other conditions which threatened the health and safety of family members.  Defendants had adequate time to repair and remedy the unsafe and

unsanitary conditions after years of complaints and repair requests but failed to make a reasonable effort to repair and remedy the defective conditions.

221. During the pertinent times Defendants violated Virginia Residential Landlord/Tenant Act and the implied warranty of habitability as to Plaintiffs and class members, thereby proximately causing injury to the Plaintiffs and class members.

222. As a direct and proximate result of Defendants' breaches of the implied warranty of habitability, Plaintiffs and class members were injured, and are entitled to damages and declaratory, injunctive or equitable relief to the extent available.

223. Defendants breached their implied warranty of habitability thereby proximately causing damages to Plaintiffs and class members, including out-of-pocket costs, costs representing the labor value of needless time consumed by residents seeking to repair and maintain units themselves, and monies representing the overpayment of BAH rent amounts in whole or in part exceeding the reasonable rental value of the units during the period of occupancy.

## THIRD CLAIM FOR RELIEF—BREACH OF CONTRACT

224. Plaintiffs re-allege the above paragraphs as if fully set forth herein.

225. This claim is brought by Plaintiffs individually and on behalf of a subclass of all class members who were servicemember lessees under leases with one or more of the Defendants as owners, lessors and property managers, with regard to residential units at Fort Belvoir within the last five years. During the pertinent times, servicemember Plaintiffs and class members entered into valid contracts with Defendants in the form of residential leases.

226. The leases and incorporated materials imposed explicit and implicit duties on Defendants, as owners or entities materially involved in providing property management, to perform the contract so as to ensure the units were fit for human habitation. During the pertinent times, Defendants warranted that units were reasonably safe and habitable for occupancy.

227.    During the pertinent times, Defendants failed to comply with the material terms of the leases by failing to ensure the houses were fit for human habitation and by failing to diligently repair and remedy the conditions affecting habitation.  Defendants breached provisions of the form lease and incorporated materials including by failing to provide adequate repair and maintenance services to residents.

228.    On information and belief, the Defendants were directly and materially involved in performing under the lease contracts, or otherwise directly and materially involved on the facts, so as to be fairly held jointly and severally liable for breach of contract.

229.    A contract carries with it an implied covenant by the parties to act fairly and in good faith in carrying out the agreement.   Defendants here had a duty to act fairly and in good faith in connection with performance under the residential leases herein.

230.    Defendants had an implicit obligation to act in good faith and make reasonable efforts to perform their obligations under the leases including, but not limited to, keeping the units safe and habitable, providing adequate repair and maintenance services, providing honest information to the tenants, and not using Defendants' vastly more powerful economic position to oppress and intimidate families.  During the pertinent times, Defendants breached the implied covenant of good faith and fair dealing.

231.    Plaintiffs sustained damages as a result of Defendants' breaches of contract including the overpayment of rent, as well as incurring of out-of-pocket expenses and other consequential and special damages in an amount to be proven at trial.

232.    As a proximate and legal result of Defendants' breaches of contract, Class Plaintiffs and Class Members are entitled to an award of all their actual and consequential damages including, but not limited to, attorneys' fees and costs, in amounts to be proven at time of trial.

## FOURTH CLAIM FOR RELIEF—NEGLIGENT REPAIR

233.    Plaintiffs re-allege the above paragraphs as if fully set forth herein.

234.    This claim is brought by the Plaintiffs individually and on behalf of a subclass consisting of all occupants of residential units at Fort Belvoir during the last Five years, as an issue class pursuant to Fed. R. Civ. P. 23(c)(4).

235.    During the pertinent times, all of the named Defendants were directly and materially involved in building and managing the residential leased properties such that each incurred a duty to act with due care to the Plaintiffs and class members with regard to their residential construction, repair, maintenance and property management services.

236.    During the pertinent times, Defendants owed a duty to Plaintiffs and class members to communicate truthful information regarding known defects in their military housing, including material facts regarding the condition of leased homes which Defendants had knowledge, and Plaintiffs lacked knowledge, of which Plaintiffs to be informed before entering into leases.

237.    During the pertinent times, Defendants owed a duty to Plaintiffs and class members to respond promptly, effectively, and truthfully to concerns about the condition of the units expressed to them by Plaintiffs, including refraining from providing misinformation when responding to concerns.

238.    During the pertinent times, Defendants owed a duty to Plaintiffs and class members to faithfully observe and comply with all applicable Federal, State and local laws, rules, regulations, orders, ordinances, and other governmental standards and requirements.

239.    During the pertinent times, Defendants owed a duty to Plaintiffs and class members to maintain leased houses in good order and in a decent, safe and sanitary condition and to respond competently and reasonably to requests and complaints of the tenants.

240.    During the pertinent times, Defendants owed a duty to Plaintiffs and class members to perform repairs and maintenance at the leasehold premises in a non-negligent manner and to avoid, by positive acts of negligence, the creation of dangerous conditions.

241.    During the pertinent times, Defendants breached their duties with regard to Plaintiffs and class members including by performing all repairs and maintenance in a negligent manner and causing a dangerous condition, failing to communicate truthful information regarding the housing, failing to respond promptly, effectively, and truthfully to concerns about the condition of the units expressed by Plaintiffs, including refraining from providing misinformation when responding to said concerns, and by failing to maintain leased houses in good order and in a decent, safe and sanitary condition, both in terms of protecting Plaintiffs and class members from water intrusion and mold, acting reasonably to respond to mold complaints, and otherwise.

242.    Defendants' breaches of duties constitute negligence, gross negligence, negligence per se, and/or reckless and willful conduct.

243.    As a proximate and legal result of Defendants' breaches of the duty of care, Plaintiffs and class members have been injured.

244.    Plaintiffs and class members have been injured as a result of Defendants' breaches of the duty of due care.

245.    As a proximate and legal result of Defendants' negligence, negligence per se, recklessness, and gross negligence, Plaintiffs and Class Members are entitled to an award of damages in amounts to be proven at time of trial. To the extent that Defendants' conduct was undertaken intentionally or with reckless disregard for the foreseeable consequences to Plaintiffs and class members, Plaintiffs and class members should be awarded exemplary or punitive damages.

## FIFTH CLAIM FOR RELIEF—TEMPORARY RECURRENT PRIVATE NUISANCE

246.    Plaintiffs re-allege the above paragraphs as if fully set forth herein.

247.    This claim is brought by Plaintiffs individually and on behalf of a subclass of all class members who were occupants of residential units at Fort Belvoir within the last five years.

248.    The Plaintiffs and class members who occupied the residential units during the pertinent times have standing to bring this claim due to their possessory and occupancy interests.

249.    During the pertinent times, the Defendants proximately caused the Plaintiffs and class members to incur a substantial and unreasonable interference with their ability to use and enjoy their leasehold properties.

250.    As a direct and proximate result of Defendants' creation and maintenance of a temporary and recurrent private nuisance, the Plaintiffs and Class Members have each been injured and/or will continue to suffer the particular damages and injuries alleged herein.

251.    The nuisance conditions herein are abatable, but Defendants have unreasonably refused to abate them.  Therefore, these nuisance conditions were under the control of the Defendants, which injuriously affected each of the Plaintiffs and Class Members individually who occupied the premises resulting in continuous interference with the enjoyment and occupation of the premises. As a result of the Defendants' creation and maintenance of a private nuisance, the Plaintiffs and class members are entitled to compensatory damages and to injunctive relief in the form of an order requiring Defendants to abate the further persistence of the private nuisance.

## SIXTH CLAIM FOR RELIEF—DECLARATORY AND INJUNCTIVE RELIEF

252.    Class Plaintiffs re-allege the above paragraphs as if fully set forth herein.

253.    This claim is brought by Plaintiffs individually and on behalf of a subclass of tenants and occupants who currently lease and occupy Defendants' residential units at Fort Belvoir.

254.    Those Plaintiffs and class members who continue to lease and occupy residential units pursuant to ongoing lease contracts with Defendants are entitled to entry of declaratory relief and for the Court to construe and clarify the express and implied terms of the form lease and declare the respective rights and duties of the parties.  Among other things, Plaintiffs respectfully seek declaratory relief specifying and clarifying Defendants' duties to provide adequate and fair customer service, repair and maintenance property management services, and, to undertake resident surveys in an accurate and objective manner, under the express and implied terms of the parties' agreements.

255.    During the pertinent times, Defendants knew, or should have known, that the homes in question were non-compliant with applicable Federal, State and local laws, rules, regulations, orders, ordinances, and other governmental standards and requirements.  However, Defendants failed to act appropriately under the obligations imposed by the lessor-lessee relationship.

256.    Under the circumstances, particularly due to the existence of Plaintiffs and class members who are parties to currently ongoing leases, available remedies at law may be in whole or in part inadequate, and injunctive relief may assist to preserve the status quo pending the ultimate resolution of this action.

257.    During the pertinent times, Defendants have collected significant BAH and other income related to providing the deficient residential leased properties to servicemembers and their families.  To the extent not subject to Plaintiffs' breach of contract claim, Plaintiff have conferred a benefit on Defendants which it would be unjust for Defendants to retain in whole or part, and Defendants have been unjustly enriched. In addition, or in the alternative, to the claims alleged above, Plaintiffs request that the Court order an equitable accounting, refund, disgorgement and restitution, including to the extent that Defendants' revenues traceable to the Plaintiffs' and class

members tenancies exceed the reasonable value of the leaseholds during the pertinent times.

258.    Plaintiffs request that the Court enter declaratory and injunctive relief construing the terms of the form lease agreement and declaring the respective rights and obligations of the parties; enjoining Defendants from continuing violations of their duties as landlords and property managers herein; awarding relief in the form of appointing a special master or auditor at the Defendants' expense to engage in an accounting; awarding disgorgement and full or partial restitution of monies to eligible servicemembers; or awarding such other declaratory, injunctive or equitable relief as the Court may deem appropriate.

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury of all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in their favor against Defendants as follows:

1. For designation of the Plaintiffs as class representatives;

2. For appointment of the undersigned counsel as class counsel;

3. For certification of a class and specified subclasses with regard to the Plaintiffs' stated claims for relief, and with regard to one or more common issues with regard to Plaintiffs' claim for negligence;

4. For an award of actual, compensatory, special, and consequential damages in an amount to be proven at trial;

5. For an award of treble damages;

6. For an award of rent abatement, in whole or in part, prospectively and/or retrospectively; restitution; or disgorgement of the monies obtained by Defendants;

7. For an award of reasonable attorneys' fees and costs;

8. For an award of punitive damages;

9. For equitable relief to abate a nuisance; and

10.    For such other and further relief as the Court may deem just and proper.

DATED: March 15, 2022.                    Respectfully submitted,

/s/ Joseph M. Langone
David Hilton Wise, VA Bar No. 30828
Joseph M. Langone, VA Bar No. 43543
WISE LAW FIRM PLC
10640 Page Avenue, Suite 320
Fairfax, Virginia 22030
Phone: 703-934-6377
dwise@wiselaw.pro
jlangone@wiselaw.pro
*Counsel for Plaintiffs*

Joel R. Rhine, NC State Bar No. 16028
Martin A. Ramey, NC State Bar No. 33617
Ruth A. Sheehan, NC State Bar No. 48069
RHINE LAW FIRM, P.C.
1612 Military Cutoff Rd., Suite 300
Wilmington, NC 28403
Phone: 910-772-9960
jrr@rhinelawfirm.com
mjr@rhinelawfirm.com
RAS@rhinelawfirm.com
*Counsel for Plaintiffs*

Mona Lisa Wallace, NC State Bar No. 009201
John Hughes, NC State Bar No. 22126
WALLACE AND GRAHAM, PA.
525 N. Main Street
Salisbury, NC 28144
Phone: 704-633-5244
mwallace@wallacegraham.com
jhughes@wallacegraham.com
*Counsel for Plaintiffs*

John A. Yanchunis, FL Bar No. 324681
Kenya Reddy, FL Bar No. 459933
MORGAN & MORGAN LAW FIRM
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Phone: 813-223-5505
JYanchunis@ForThePeople.com
KReddy@ForThePeople.com
*Counsel for Plaintiffs*