**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| Chief Petty Officer JOHN FISCHER and | * | |
| ASHLEY FISCHER | * | |
| | * | |
| Chief Warrant Officer JORGE ROMAN | * | |
| and RAVEN ROMAN | * | |
| | * | |
| Plaintiffs | * | |
| | * | |
| v. | * | Case No. 1:22-cv-00286 |
| | * | |
| FORT BELVOIR RESIDENTIAL | * | |
| COMMUNITIES LLC, et al. | * | |
| | * | |
| Defendants | * | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION TO STRIKE PORTIONS OF PLAINTIFFS' AMENDED COMPLAINT

Defendants, Fort Belvoir Residential Communities LLC, Michaels Management Services, Inc., and MMS Army, LLC, by and through their attorneys, and pursuant to Fed. R. Civ. P. 12(b)(6), Fed. R. Civ. P. 12(f) and LCvR 7, submit the following Memorandum in Support of their Motion to Dismiss or, in the Alternative, Motion to Strike Portions of Plaintiffs' First Amended Complaint.

## INTRODUCTION

This case involves a landlord-tenant dispute concerning allegations by Plaintiffs regarding their former military family housing located at the U.S. Army Garrison Fort Belvoir in Fairfax County, Virginia. Plaintiffs' initial Complaint (ECF 1) contained 78 pages and 258 numbered paragraphs and named 11 different Defendants, most of which played no role whatsoever with Plaintiffs' former housing. After several discussions among Plaintiffs' and Defendants' counsel, Plaintiffs' counsel agreed to dismiss all of the originally named Defendants except two – Fort

Belvoir Residential Communities LLC (FBRC) and Michaels Management Services, Inc. (MMS). Plaintiffs' notice of voluntary dismissal for nine Defendants was filed on June 7, 2022 (ECF 7). The Court issued an Order granting the dismissal on June 9, 2022 (ECF 9).

Plaintiffs then filed a First Amended Complaint (FAC), naming FBRC and MMS plus a new Defendant – MMS Army, LLC (MMS Army). The FAC asserts the same six claims for relief raised in the initial Complaint:

1. First Claim for Relief – Violation of the Consumer Protection Act

2. Second Claim for Relief – Violation of the Virginia Residential Landlord/Tenant Act

3. Third Claim for Relief – Breach of Contract

4. Fourth Claim for Relief – Negligence and Negligent Repair

5. Fifth Claim for Relief – Temporary Recurrent Private Nuisance

6. Sixth Claim for Relief – Declaratory and Injunctive Relief.

However, the FAC has now grown to more than 100 pages and 448 numbered paragraphs.

For the reasons set forth herein, Plaintiffs' FAC should be dismissed in its entirety as a "shotgun pleading" that takes a "kitchen sink" approach and repeatedly makes undifferentiated assertions against all Defendants. The FAC also contains numerous irrelevant statements and overly broad allegations, such that it is impossible to determine which assertions support which claims against which Defendants, or even how to respond to some of the allegations that reference non-parties, housing communities other than Fort Belvoir, and accusations that have no bearing on Plaintiffs' alleged claims.

As a separate matter, Plaintiffs' FAC also fails to state a claim as to their First Claim for Relief – Violation of the Virginia Consumer Protection Act, Fourth Claim for Relief – Negligence

and Negligent Repair, and Sixth Claim for Relief – Declaratory and Injunctive Relief. Those claims should be dismissed with prejudice even if the Court finds that the other claims for relief in the FAC are pled sufficiently.

Finally, if the Court does not dismiss the FAC in its entirety, Defendants move to strike the following 39 numbered paragraphs from the FAC – ¶¶ 11, 22, 23, 27, 28, 30, 31, 32, 33, 34, 37, 38, 43, 279, 280, 281, 282, 284, 285, 286, 287, 288, 289, 290, 324, 325, 326, 327, 329, 330, 334, 335, 336, 337, 338, 339, 340, 341, and 345.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) gives the Court the authority to dismiss a complaint that fails to state a claim upon which relief may be granted.  In ruling on a motion to dismiss, the Court accepts as true the facts alleged in the complaint, but not the legal conclusions. *See Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint must offer more than "labels and conclusions", and a "'formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

Alternatively, Federal Rule of Civil Procedure 12(f) gives the Court the authority to strike portions of a complaint that are "redundant, immaterial, impertinent, or scandalous matter." The moving party must demonstrate that "it is clear that the material in question can have no possible bearing upon the subject matter of the litigation and the material may prejudice the other party."

*Simaan, Inc. v. BP Prods. N. Am., Inc.*, 395 F. Supp. 2d 271, 278 (M.D.N.C. 2005) (citation omitted). "In granting a Rule 12(f) motion to strike, the court must determine that 'the challenged allegations are so unrelated to the plaintiff's claims as to be unworthy of any consideration as a defense and that their presence in the pleading throughout the proceeding will be prejudicial to the moving party.'" *Info. Planning & Mgmt. Serv. v. Dollar Gen. Corp.*, No. 2:15cv206, 2016 U.S. Dist. LEXIS 883, *4-5 (E.D. Va. Jan. 5, 2016) (citing *Grant v. Bank of Am., N.A.* No. 2:13cv342, 2014 U.S. Dist. LEXIS 24645, *2 (E.D. Va. Feb. 25, 2014)).

As set forth below, Defendants move to strike the following 39 numbered paragraphs from the FAC – ¶¶ 11, 22, 23, 27, 28, 30, 31, 32, 33, 34, 37, 38, 43, 279, 280, 281, 282, 284, 285, 286, 287, 288, 289, 290, 324, 325, 326, 327, 329, 330, 334, 335, 336, 337, 338, 339, 340, 341, and 345. These portions of the FAC contain dozens of redundant, immaterial, impertinent, and scandalous allegations regarding non-parties and unrelated matters in an apparent effort by Plaintiffs to confuse the facts and besmirch the reputations of the actual Defendants in this matter.

## ARGUMENT

### A. Plaintiffs' First Amended Complaint Is an Improper "Shotgun Pleading" and Should Be Dismissed In Its Entirety

The FAC fails a basic pleading requirement – that a complaint must give *each defendant* fair notice of the claims and allegations *against it*.  Defendants move to dismiss Plaintiffs' FAC in its entirety because it is a "shotgun" pleading that impermissibly deprives the Defendants of notice of the allegations against each of them. "A complaint fails to state a claim if it does not contain 'a short and plain statement showing that the pleader is entitled to relief.'" *Carter v. Va. Dep't of Game & Inland Fisheries*, No. 3:16cv661, 2018 U.S. Dist. LEXIS 126328, at *8–9 (E.D. Va. July 27, 2018) (quoting  Fed. R. Civ. P. 8(a)(2)). A court analyzing whether a complaint complies with Rule 8(a) "should consider various factors, including: 'the length and complexity of the complaint,

whether the complaint was clear enough to enable the defendant to know how to defend himself, and whether the plaintiff was represented by counsel.'" *Id.* at *9 (quoting *North Carolina v. McGuirt*, 114 F. App'x 555, 558 (4th Cir. 2004)); *see also* Fed. R. Civ. P. 8(d)(1) (requiring each allegation to be "simple, concise, and direct").

Further, a complaint must provide "fair notice of what the claim is and the grounds upon which it rests," *Carter*, 2018 U.S. Dist. LEXIS at *14 (citation omitted), and "be clear enough to enable the defendant to know how to defend himself." *Id.* (quoting *McGuirt*, 114 F. App'x at 558). A complaint fails to provide fair notice of the claims and their bases when it contains only "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

In addition to Rule 8(a)(2)'s requirement of a "short and plain statement," Rule 10(b) provides that a "party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances." A complaint that violates Rules 8(a)(2) and 10(b) such that it is "virtually impossible to know which allegations of fact are intended to support which claim(s) for relief" are referred to as "shotgun pleadings." *Negron-Bennett v. McCandless*, 2013 U.S. Dist. LEXIS 103681, at *15 (E.D. Va. July 24, 2013) (citing *Anderson v. Dist. Bd. of Trustees of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996)).

Plaintiffs' FAC exemplifies all the characteristics of a shotgun pleading. The factual allegations are not "simple, concise and direct." Fed. R. Civ. P. 8(d)(1). Numerous paragraphs throughout the FAC are lengthy and convoluted, not limited to a "single set of circumstances." Fed. R. Civ. P. 10(b).

The FAC names three distinct companies as Defendants – FBRC, MMS, and MMS Army. Plaintiffs allege that FBRC is the owner/landlord of the housing that Plaintiffs leased at Fort

Belvoir, and that MMS and MMS Army are property managers that manage that housing.[1] Despite the separate and distinct nature of each Defendant, and their differing roles with respect to the Fort Belvoir military housing community, the FAC makes undifferentiated claims against all Defendants throughout. Throughout over 100 pages and 458 numbered paragraphs, the FAC repeatedly directs allegations and causes of action collectively against the Defendants as a group, such that the FAC improperly treats the three Defendants as if they are a single entity. In only a few instances does the FAC direct a specific allegation against a specific Defendant. Indeed, the FAC improperly groups allegations against all Defendants at least ***265 times,*** making it impossible for Defendants to determine which allegations are directed at them so they can answer and prepare their defenses. Examples include:

- "Defendants had actual knowledge of … ."  FAC ⁋ 48.

- "Defendants' representatives inspected the hole … ." *Id.* at ⁋ 63.

- "Defendants conducted a cursory inspection … ." *Id.* at ⁋ 71.

- "In response, Defendants treated for pests … ."  *Id.* at ⁋ 104.

- "Defendants knew that spraying for ants would not correct a problem … ." *Id.* at ⁋ 136.

- "Defendants' response on August 31, 2018, was to say … ." *Id.* at ⁋ 170.

Exacerbating the issue, the FAC also defines two of the Defendants – Michaels Management Services, Inc., and MMS Army, LLC – using an identical name – "Michaels." *See* FAC p. 1. The FAC then repeatedly uses the "Michaels" name interchangeably to reference various non-parties to this action. Some particularly confusing examples of this pleading word salad are:

> In 2019, Congress called upon the top executives of the biggest companies involved in FBRC and the other private-public ventures to testify at Congress. However, when Congress asked the president of the Clark organization to testify, he refused.  *Then, it was*

---

[1] MMS is a former property manager that managed the housing at Fort Belvoir when the Plaintiffs lived there. MMS Army did not exist when Plaintiffs lived at Fort Belvoir.

> *announced in late 2021 that Michaels was entirely taking over Clark's role as to the housing, to go along with prior property management duties that Michaels held.* The misconduct complained of by the Plaintiffs occurred in the time period when both Michaels and Clark were involved with FBRC.

and:

> On information and belief, MMS Army LLC *is owned and controlled by the Michaels enterprise* and ultimately by The Michaels Organization.

and:

> The amount of revenues and profits that an entity like MMS Army *contributes to the larger Michaels enterprise* … .

*See* FAC ⁋⁋ 23, 29, and 35 respectively (emphasis added). Paragraphs like these are vague and conflicting because it is unclear which "Michaels" company or companies are being referenced. However, it is clear that the FAC incorrectly uses "Michaels" repeatedly because (i) a property management company (like MMS or MMS Army) could not and did not "take over" the landlord company's role, (ii) MMS Army does not "own" or "control" itself, and (iii) MMS Army does not "contribute" revenue or profits to itself.

The FAC is lengthy, repetitive, and includes pages and pages of irrelevant allegations. There are a plethora of allegations that reference conclusory, vague, confusing, or immaterial facts that do not clearly match with a particular cause of action. The actual claims for relief do not start until page 83. Approximately 17 of 103 pages of the FAC reference non-parties to this litigation, congressional investigations or hearings that were not about Fort Belvoir, other military bases that have nothing to do with Fort Belvoir, and unrelated lawsuits involving parties not involved in this litigation. *See* FAC ¶¶ 11, 22, 23, 27, 28, 30, 31, 32, 33, 34, 37, 38, 43, 279, 280, 281, 282, 284, 285, 286, 287, 288, 289, 290, 324, 325, 326, 327, 329, 330, 334, 335, 336, 337, 338, 339, 340, 341, and 345. Virginia's pleading standard requires Defendants to respond to every sentence in every paragraph of the complaint; Defendants cannot simply respond with a blanket denial.

Defendants should not be required to respond to allegations that do not concern the housing at Fort Belvoir, the named parties to this litigation, or the Plaintiffs' actual claims against the Defendants in this matter.

As a result of Plaintiffs' impermissible "shotgun pleading" approach, which commingles Plaintiffs' claims against each Defendant in a lengthy, indirect, and conclusory form, and includes multiple pages of irrelevant and inflammatory allegations against non-parties, Defendants cannot fairly and accurately address Plaintiffs' allegations. Therefore, the FAC should be dismissed in its entirety.

**B. The First Claim for Relief Must Be Dismissed Because Landlord-Tenant Transactions Are Not Subject to the Virginia Consumer Protection Act and it is Barred by the Statute of Limitations**

**1. This Landlord-Tenant Dispute Is Not Subject to the Virginia Consumer Protection Act**

In the First Claim for Relief, Plaintiffs assert claims against all Defendants pursuant to the Virginia Consumer Protection Act, Va. Code Ann. §§ 59.1-196–207 (VCPA). However, the VCPA generally excludes landlord-tenant disputes. *See id.* at § 59.1-199(E). Therefore, the FAC fails to state a claim for relief under the VCPA.

The VCPA does not apply to "[a]ny aspect of a consumer transaction which is subject to the Landlord and Tenant Act … or the Virginia Residential Landlord and Tenant Act … unless the act or practice of a landlord constitutes a misrepresentation or fraudulent act or practice under § 59.1-200." *Id.*; *see also Miller v. Charles E. Smith Mgmt., Inc.* 1999 U.S. App. LEXIS 1013, at *8–9 (4th Cir. Jan. 26, 1999) ("[A] claim otherwise governed by the Virginia Residential Landlord and Tenant Act may proceed under the [VCPA] where fraud exists."). Va. Code Ann. § 59.1-200, in turn, "sets out those fraudulent acts or practices committed by a supplier of goods or services that are actionable under Code § 59.1-204." *Interbuild, Inc. v. Sayres*, 94 Va. Cir. 261, 265 (2016).

Plaintiffs' VCPA claim must be dismissed because the FAC does not allege "a misrepresentation or fraudulent act or practice under § 59.1-200." For actions based on allegations of fraudulent acts or practices under the VCPA, the plaintiff must prove the element of reliance. *Owens v. DRC Auto. Fantomworks, Inc.*, 764 S.E.2d 256, 260-61 (Va. 2014). The plaintiff must further prove the landlord had knowledge of the alleged defect at the time of the lease's execution. *See Guy v. Tidewater Inv. Props.*, 41 Va. Cir. 218, 230-31 (1996) (citations omitted). In federal court, a VCPA claim under § 59.1-200 is subject to Rule 9(b), under which a plaintiff is "required to 'state with particularity the circumstances constituting fraud or mistake,' including the 'time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *Wynn's Extended Care, Inc. v. Bradley*, 619 F. App'x 216, 220 (4th Cir. 2015) (quoting *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 219 (4th Cir. 2015), *cert. denied*).

In this case, applying Rule 9(b)'s heightened pleading standards, the FAC fails to state a claim under the VCPA. Although Rule 9(b) requires Plaintiffs to state their VCPA claims with specificity, the entirety of the First Claim for Relief contains only general allegations against the Defendants as a group; it contains no assertions of any specific individual factual instance. *See* FAC ¶¶ 375-395. The FAC does not identify a single individual person in their First Claim for Relief, despite the fact that Rule 9(b) requires Plaintiffs to identify the person making the misrepresentation. This claim is further devoid of any particularized allegation as to Defendants' knowledge of the alleged defects at the time of the lease's execution (*see Guy*, 41 Va. Cir. at 230-31), or any allegation demonstrating reliance by Plaintiffs on a statement made by any representative of Defendants. *See Owens*, 764 S.E.2d at 260-61.

## 2.    *Plaintiffs' Claims Under the Virginia Consumer Protection Act Are Time Barred*

Section 59.1-204.1 of the VCPA requires that any action be brought within two years after the initial accrual. Va. Code. Ann. § 8.01-230 states that the accrual is deemed to run from "the date the injury is sustained" in personal injury or property damage cases, and in contract actions "when the breach of contract occurs," not when the damages are discovered. However, Va. Code Ann. § 8.01-249(1) states that in an action for a violation of the VCPA based on misrepresentation, deception, or fraud, accrual begins at time of discovery or "by the exercise of due diligence reasonably should have been discovered."

The FAC at ¶ 382 alleges that the Defendants engaged in prohibited practices under § 59.1-200 by (a) offering, marketing, and leasing housing to Plaintiffs that had defects in excess of what was acceptable or reasonable; (b) offering, marketing, and leasing housing to Plaintiffs that had water intrusion and mold contamination in excess of what was acceptable or reasonable; (c) marketing lease offerings as having excellent customer service, repair and maintenance; (d) receiving BAH payments based on assumptions that payments were for reasonable and safe housing; (e) conducting, sponsoring, or participating in resident satisfaction surveys and using survey results to avoid oversight; (f) maintaining inaccurate, incomplete, and unreliable customer service repair and maintenance records; and (g) breaching the implied warranty of habitability. Because the initial Complaint in this matter was filed on March 16, 2022, any right of action for a claim under the VCPA must have accrued **on or after March 16, 2020**.

### Plaintiff Fischer's Claims

Plaintiffs allege that in January 2018, the Fischers reported defects at the Kezia Trail property with the back door and the linoleum flooring which were allegedly never fixed by the maintenance staff. *See* FAC ¶¶ 55-56. In October 2018, the Fishers allegedly reported issues with their HVAC. *Id*. at ¶¶ 57-60. Plaintiffs allege that in June 2019, the Fischers reported alleged mold

issues at the Kezia Trail property. *Id*. at ¶¶ 62-65. The Fischers moved to a property on Soldier Road and reported alleged mold in September 2019. *Id*. at ¶¶ 82-84. Therefore, any claim the Fischers might have had under the VCPA must have accrued prior to March 2020 and thus are time-barred.

### *Plaintiff Roman's Claims*

The FAC alleges that when the Romans moved into the property on Stable Court in May 2018, they reported issues with the condition of the property, including pests and mold. *See* FAC ¶¶ 100-101. The Romans allege the maintenance staff came to the property and never properly fixed these issues. Next, the Romans moved to a property on Jadwin Loop in September 2018. *Id*. at ¶ 196. They allege that "[f]rom November 2018 thru March 23, 2019, the Roman family reported, and work orders were submitted for issues related to, the deck, door, shingles, HVAC, locks, lighting, windows, and pest control." *Id*. at ¶ 200. All of the claims the Romans assert under the VCPA must have accrued prior to March 2020, and are time-barred.

Based on the foregoing, Defendants request that the Court dismiss the First Claim for Relief with prejudice because it is barred by the statute of limitations, and Plaintiffs fail to state a claim for misrepresentation or fraudulent acts or practices under the VCPA.

### C. The Fourth Claim for Relief for "Negligence and Negligent Repair" Should be Dismissed Because it is Plead Improperly and Barred by the 2-Year Statute of Limitations

Plaintiffs' Fourth Claim for Relief is confused. It is unclear what cause of action Plaintiffs are alleging and Defendants should not have to guess as to what they think Plaintiffs are alleging. The FAC titles it as a claim for "Negligence and Negligent Repair," but then alleges that "Defendants' breaches of duties constitute negligence, gross negligence, negligence per se, and/or reckless and willful conduct." FAC ¶ 431. Each of these separate causes of action have different elements and pleading requirements, and Plaintiffs should not be permitted to slip in claims

regarding gross negligence, negligence per se, and reckless and wanton conduct into a cause of action for general negligence and negligent repair.

Further, Plaintiffs allege, without specificity, that they were "injured" as a result of Defendants' alleged negligence. *See* FAC ¶¶ 432-433. To the extent the unidentified "injuries" are personal or bodily injuries, Plaintiffs' claims are barred by Virginia's two-year statute of limitations. Va. Code Ann. § 8.01-243(A) states, "every action for personal injuries, ***whatever the theory of recovery***, and every action for damages resulting from fraud, shall be brought within two years after the cause of action accrues" (emphasis added). Va. Code Ann. § 8.01-243(B) provides that every action for injury to property shall be brought within five years after the cause of action accrues.

The Fourth Circuit has pointed out that the distinction between Virginia's two-year statute of limitations regarding personal injuries and its five-year statute regarding injuries to property "can be hard to draw… ." *Dunlap v. Cottman Transmissions Sys., LLC,* 539 Fed. Appx. 69, 73 (4th Cir. 2013) (requesting certification of a statute of limitations issue from the Virginia Supreme Court). However, the Fourth Circuit has held that when a plaintiff "seeks to recover based on [a defendant's] alleged breach of duty to him individually; the resulting loss of property he alleges merely flows as a consequence of his alleged injury." *Ranney v. Nelson,* 176 Fed. Appx. 405, 408 (4th Cir. 2006). The Court concluded that the plaintiff's "allegations d[id] not constitute an 'injury to property' for purposes of determining the applicable limitations period." *Id*. At 409.

Here, Plaintiffs' claims of personal injury must have accrued before March 16, 2020. The Fischers and Romans resided at Fort Belvoir in between 2017 – 2019, and the FAC does not assert any claims arose after March 2020. Accordingly, the Fourth Claim for Relief for Negligence and Negligent Repair should be dismissed with prejudice.

### D.  *The Sixth Claim for Relief for Declaratory and Injunctive Relief Must Be Dismissed Because It is Duplicative of the Breach of Contract Claim*

The Third Claim for Relief asserts a claim for Breach of Contract against FBRC. *See* FAC ¶ 414 ("This claim is brought by Plaintiffs individually and on behalf of a subclass of all class members who were servicemember lessees under leases with Defendant FBRC as owner, lessor and property manager, with regard to residential units at Fort Belvoir within the last five years. During the pertinent times, servicemember Plaintiffs and class members entered into valid contracts with Defendant in the form of residential leases."). The Sixth Claim for Relief asserts a claim for Declaratory and Injunctive Relief, stating that "[t]his claim is brought by Plaintiffs individually and on behalf of a subclass of tenants and occupants who currently lease and occupy Defendants' residential units at Fort Belvoir."

Putting aside the merits of Plaintiffs' class allegations, which Defendants contest, any putative class members would also be asserting a breach of contract claim along with the current named Plaintiffs. Like Plaintiffs, putative class members cannot assert both a breach of contract claim and seek declaratory relief because the claims and defenses of the parties can be addressed by the underlying breach of contract claim. *See Bagley v. Wells Fargo Bank, N.A.,* 3:12cv617, 2013 U.S. Dist. LEXIS 11880, 2013 WL 350527, at *7 (E.D. Va. Jan. 29, 2013) (granting a motion to dismiss a claim for relief because there was "no reasonably certain future conduct to be prevented or mandated" and the determination of the parties' rights would be "addressed by the underlying contract claim"). Courts have "repeatedly recognized that a declaratory judgment serves no useful purpose when it seeks only to adjudicate an already-existing breach of contract claim." *Seneca Ins. Co. v. Shipping Boxes LLC*, 30 F. Supp. 3d 506, 2014 U.S. Dist. LEXIS 79013, [WL] at *5-6 (*quoting Metra Indus., Inc. v. Rivanna Water & Sewer Autk*, No. 3:12cv49, 2014 U.S. Dist. LEXIS 21568, 2014 WL 652253, at *2 (W.D. Va. Feb. 19, 2014)). In addition, "a

declaratory judgment is an inherently forward-looking mechanism, intended to guide parties' behavior in the future." *Merino v. EMC Mortg. Corp.*, No. 1:09-cv-1121, 2010 U.S. Dist. LEXIS 26539, at *14, 2010 WL 1039842 (E.D. Va. Mar. 19, 2010).

Plaintiffs' Sixth Claim for Relief serves no useful purpose because it is duplicative of their breach of contract claim. Plaintiffs allege past conduct with respect to the leases and past collection of rent payments. Whether FBRC complied with the duties imposed by the lessor-lessee relationship, and whether Plaintiffs suffered any injury resulting from a breach of any such duties, those issues fall squarely under Plaintiffs' breach of contract claim. Therefore, the Sixth Claim for Relief should be dismissed with prejudice.

### E. Defendants Move to Strike Certain Portions of Plaintiffs' First Amended Complaint

In the event this Court finds that any portion of the FAC survives Defendants' Motion to Dismiss, Defendants further move to strike certain portions of the FAC under Federal Rule of Civil Procedure 12(f) as redundant, immaterial, impertinent, and scandalous matter.

I.    Allegation Under "Nature of the Case" Section of the FAC

Under "Nature of the Case", Plaintiffs include the following allegation:

11. The problems at Fort Belvoir and other privatized military housing projects have led to public outcry, congressional hearings and governmental watchdog investigations, starting in late 2018. As a result, the privatized providers have publicly apologized and admitted to allowing intolerable and unacceptable conditions. They promised to make upgrades in the future but have not offered any compensation for the damage and oppression they caused in the past to military families. The purpose of this lawsuit is to obtain such relief.

Defendants move to strike Paragraph 11 on the ground that allegations relating to other military housing projects, an alleged "public outcry," congressional hearings and governmental "watchdog" investigations have no bearing on this lawsuit and whether or to what extent the Plaintiffs may have any valid claims against the Defendants in this action. Likewise, public

apologies and promises allegedly made by unnamed non-parties about different housing at other military installations are completely immaterial to the claims raised by Plaintiffs regarding their former housing, and these allegations merely work to provoke scorn and prejudice the Defendant.

II.    Allegations Under the "Defendants" Section of the FAC

In this section, Plaintiffs assert numerous allegations against non-parties, including entities that Plaintiffs have voluntarily dismissed from the action. The Court entered an order dismissing nine parties from the case – Belvoir Land, LLC, Clark Pinnacle Belvoir LLC dba Belvoir Manager LLC, Clark Realty Capital, L.L.C., CEI Realty, Inc., CEI Realty, LLC, Pinnacle Belvoir LLC, CRC Belvoir, LLC dba Belvoir Manager LLC, Clark Realty Builders LLC, and The Michaels Organization, LLC. *See* ECF 9. Despite this, the FAC includes a host of immaterial allegations regarding the dismissed entities and other non-parties that have no bearing on the claims raised against the Defendants:

22. During the early years of the ground lease, a company called Clark-Pinnacle was the private-company managing member of the FBRC LLC entity which was essentially a joint venture between the private company and the Army with the private company having the active role. FBRC is fully liable for its conduct as an active LLC, and for the choices it made with the input and direction of its major owner, the Clark private organization.

23. In 2019, Congress called upon the top executives of the biggest companies involved in FBRC and the other private-public ventures to testify at Congress. However, when Congress asked the president of the Clark organization to testify, he refused. Then, it was announced in late 2021 that Michaels was entirely taking over Clark's role as to the housing, to go along with prior property management duties that Michaels held. The misconduct complained of by the Plaintiffs occurred in the time period when both Michaels and Clark were involved with FBRC. See facts below alleged for Romans (circa 2018-2019) and the Fischers (circa 2017-2019).

27. Belvoir Land, LLC is the named lessee under the 50-year ground lease with the Army with regard to the Fort Belvoir Military Housing Privatization Initiative ("MHPI") project. That ground lease was dated 2003. At that time, Belvoir Land, LLC entered into a sublease with FBRC. Pursuant to that sublease, FBRC as a practical matter has acted as the owner/landlord under the ground lease, owning

all the housing and other improvements. Based on these contract arrangements, Plaintiffs' understanding is that Belvoir Land, LLC during the class period has not 27. Belvoir Land, LLC is the named lessee under the 50-year ground lease with the Army with regard to the Fort Belvoir Military Housing Privatization Initiative ("MHPI") project. That ground lease was dated 2003. At that time, Belvoir Land, LLC entered into a sublease with FBRC. Pursuant to that sublease, FBRC as a practical matter has acted as the owner/landlord under the ground lease, owning all the housing and other improvements. Based on these contract arrangements, Plaintiffs' understanding is that Belvoir Land, LLC during the class period has not owned any of the housing and has never constructed or managed any of the homes at Fort Belvoir. Rather, the owner under the ground lease for all practical purposes has been Defendant FBRC.

28. The 50 year ground lease was executed in 2003 on Belvoir Land, LLC's behalf by two of its "managers": (1) Clark Pinnacle Belvoir LLC (by Clark Pinnacle Belvoir, LLC's Administrative Managing Member Clark Realty Capital, LLC and its Manager CEI Realty, Inc.); and (2) Pinnacle Belvoir LLC. Belvoir Manager LLC was previously known as Clark Pinnacle Belvoir LLC and previously known as CRC Belvoir LLC. It is a Virginia limited liability company formed in 2003. It was first formed as Clark Pinnacle Belvoir, LLC, then changed names for CRC Belvoir LLC on December 18, 2015. CRC Belvoir, LLC changed names to Belvoir Manager, LLC on February 17, 2021.[12] Under its old name Clark Pinnacle Belvoir LLC, it executed the ground lease with the Army, as the Administrative Managing Member of Belvoir Land, LLC (by its Manager Clark Realty Capital, LLC and its Manager CEI Realty, Inc.).

30. Nonparty Clark Realty Capital, LLC is a Delaware limited liability company. Clark Realty Capital, LLC is indicated in the 50 year ground lease at the "manager" of Clark Pinnacle Belvoir, LLC and along with CEI Realty, Inc., executed the ground lease on behalf of Clark Pinnacle Belvoir, LLC. Nonparty CEI Realty, LLC is a Delaware limited liability company. It was formerly known as CEI Realty, Inc. prior to a corporate conversion. CEI Realty, Inc. was indicated on the ground lease as the "manager" of Clark Pinnacle Belvoir, LLC which executed the ground lease on behalf of Clark Pinnacle Belvoir, LLC, along with Clark Realty Capital, L.L.C. Nonparty Pinnacle Belvoir LLC is a dissolved (as of 2017) former limited liability company that in 2003 had executed the ground lease on behalf of Belvoir Land LLC as a "Manager."

31. On information and belief, Clark Realty Capital, LLC had involvement in the subject housing operations during some of the relevant times. *See* U.S. Army Fort Belvoir website, stating on November 14, 2021 that it was reported that "[t]he Michaels Organization acquired the 2,100 Fort Belvoir homes formerly owned by Clark Realty Capital in late August, according to Jennifer Hudson, Fort Belvoir's acting chief of housing."[13] In fact, in the eyes of the law, the "owner" of the homes at Belvoir was and is Defendant FBRC. However, as noted, before Michaels took over more responsibility, Clark was the managing member of the FBRC LLC.

32. Nonparty Clark Realty Builders, LLC is an active Virginia limited liability company with a principal address at 4401 Wilson Blvd Set 600, Arlington, VA. 22203.

33. In December 2003, Clark Realty Builders, LLC entered into an agreement with FBRC to construct housing for military personnel and their families at Fort Belvoir on the land subleased by FBRC. This project was the "Fort Belvoir Family Housing Community" project. Clark Realty Builders, LLC agreed to construct and renovate housing for families at Fort Belvoir.

34. Nonparty The Michaels Organization, LLC ("TMO") is a New Jersey limited liability company with its principal place of business in New Jersey. TMO is registered with the Commonwealth of Virginia State Corporation Commission ("SCC") to do business in Virginia. Michaels is the ultimate parent of Michaels Management Services, Inc., Michaels Management Services, LLC and MMS Army LLC.

37. TMO was founded by Michael Levitt, who serves as its Chairman, and is operated by John J. O'Donnell, who serves as its Chief Executive Officer, and Mark Morgan, who serves as its Chief Operating Officer. According to TMO's website, Ron Hansen serves as TMO's President and leads its "military housing development, renovations, and management operations."

38. TMO during the last several years has advertised and posted helped-wanted postings identifying itself, The Michaels Organization, as the employer, including for job openings at Fort Belvoir. In fact, it is believed that TMO runs these job postings on behalf of other Michaels entities.

43. Nonparty Belvoir Manager LLC f/k/a CRC Belvoir LLC f/k/a Clark Pinnacle Belvoir LLC was formed on May 29, 2003. It has an address of 2 Cooper St Fl 14, Camden, NJ, 08102-2348. The entity's name changed from Clark Pinnacle Belvoir LLC to CRC Belvoir LLC on December 18, 2015. It changed from CRC Belvoir LLC to Belvoir Manager LLC on February 17, 2021. This entity is believed to be the active member-manager of Defendant FBRC.

Plaintiffs dismissed the aforementioned companies based on information that counsel for the Defendants provided, including signed declarations from representatives of some of the Defendants. One of the purposes in providing that information was to ensure Plaintiffs' counsel dismissed improperly named parties without forcing Defendants to file motions to dismiss and/or seek Rule 11 sanctions. Plaintiffs dismissed nine of the eleven original Defendants and added a

new Defendant in the FAC. However, instead of streamlining their allegations, Plaintiffs expanded

their claims from a 258 paragraph Complaint against eleven Defendants into a 448 paragraph FAC

against three Defendants that still asserts numerous allegations against the dismissed parties.

Defendants should not be required to respond to immaterial allegations about non-parties;

therefore, Paragraphs 22, 23, 27, 28, 30, 31, 32, 33, 34, 37, 38, and 43 should be stricken.

III.    Allegations Under "Additional facts regarding general background and the MHPI"
        and "Congressional and Other Investigations" Sections of the FAC

In these sections of the FAC, Plaintiffs include redundant, immaterial, and scandalous

allegations concerning news stories, investigations, and other matters involving non-parties to this

action, and often relating to different housing providers at other military installations. These

allegations have no bearing on Plaintiffs' claims regarding their former housing at Fort Belvoir

and merely serve to prejudice Defendants by seeking to suggest that Defendants are *somehow*

responsible for, or implicated by, issues and events involving entirely different parties and totally

different circumstances. Accordingly, Defendants move to strike the following paragraphs:

> 279. While premises quality and service quality plunged, the military partner was
> not fully advised of the situation by Defendants. Reviewing work order business
> records later, the GAO found that all of the largest military housing companies
> (which would include Defendants) kept repair and maintenance records that were
> so unreliable that they could not be normally audited. The GAO made similar
> findings as to the integrity of the customer satisfaction surveys that Defendants
> held up and touted as showing they got stellar feedback.

> 280. Reuters investigative reporting at the end of 2018 combined with cascading
> complaints of military families who were willing to go public with their stories.
> Congress called public hearings in 2019, and the largest military housing companies
> announced they were abruptly making huge capital investments in their housing
> projects. Civil lawsuits were brought against several of the companies alleging
> individual or class claims. The Department of Justice opened criminal proceedings
> against the largest of all of the housing companies, Balfour Beatty. Balfour Beatty
> pleaded guilty in federal district court in Washington in December 2021 to
> defrauding the armed forces by falsifying housing repair records from 2013 to
> 2019 in order to receive higher performance awards. The company paid $65
> million in fines and restitution.

281.  The specific background on Defendants' involvement with the problem housing at Fort Belvoir dates back to 2001, when one or more Clark entities and one or more entities associated with American Management Services (also known as AMS or Pinnacle) joined together to bid for privatization projects for U.S. military housing. Clark and AMS won contracts to develop and manage properties at Monterey Presidio and Fort Ord in California; Fort Belvoir, Virginia; Fort Irwin, Moffett Field, and Parks Reserve Training Grounds in California; and Fort Benning, Georgia.

282.  Clark won these contracts, including the Fort Belvoir contract, based on Clark's promises and representations to the effect that it had extraordinary experience, resources, and competencies in the fields of construction and property management, that it, Clark, could be trusted for its core competencies; and that if it was awarded the 50-year ground lease contract it would provide a first-class leased housing product for the soldiers' families. FBRC knew or should have known that these promises and commitments had been made, and had a duty to perform accordingly.

284. Beginning in or about 2003, the U.S. Army entered into a series of agreements with AMS and Clark to implement the MHPI. At each base, an LLC like FBRC was formed, and was given responsibility for developing new housing and general oversight, and an AMS-affiliated entity was given responsible for routine property management services, including obtaining property and general liability insurance.

285. AMS was paid a fee pursuant to the agreement at the Fort Belvoir base for its services, which was the sole compensation AMS was permitted to receive. Any excess funds not spent under the agreements were obligated to be used, at least in part, to renovate and construct new military housing. The AMS/Pinnacle organization ceased to be involved at Fort Belvoir with regard to operating the housing, before the five year class period herein opens (2017). However, some factual background on AMS is appropriate because ultimately it is Defendants who are liable and responsible for any failures by AMS that could have affected the Plaintiffs indirectly.

286.  In 2022, it was announced that AMS had agreed to pay approximately $1.6 million pursuant to a deferred prosecution agreement to resolve criminal charges that the company defrauded the U.S. Army and Clark Realty Capital LLC while performing property management services for military housing at Fort Belvoir, Virginia; Fort Benning, Georgia; Fort Irwin, California; and the Presidio at Monterey, California.

287. AMS admitted that from 2004 to 2011, it fraudulently obtained approximately $1 million by skimming and concealing undisclosed fees from insurance premiums paid by entities that oversaw privatized housing at the four bases. Two individuals

previously pleaded guilty and were sentenced as part of the government's investigation: Eddie T. Hudspeth III, a former AMS maintenance director at Fort Belvoir, was sentenced in May 2015 to two years in prison and fined $15,000 for soliciting and accepting more than $27,000 in kickbacks from a heating, ventilation and air-conditioning company based in Lorton, Virginia, from December 2008 through February 2011; and Philip Robrahn, a partial owner of that company, was sentenced to probation and ordered to pay a $10,000 fine for his role in the kickback scheme.

288. After the problems with AMS/Pinnacle were exposed, the AMS/Pinnacle role in the Belvoir project saw AWS/Pinnacle superseded by TMO/Michaels.

289. With regard to the MHPI Contract at Fort Belvoir, the Secretary of the Army accepted the Statement of Qualifications submitted by Clark Pinnacle for the Fort Belvoir opportunity and qualified the company within the "exclusive competitive range." Clark Pinnacle then submitted an RFQ Proposal. The Army accepted Clark Pinnacle's RFQ Proposal, and the Army and Clark Pinnacle entered into Contract No. DACA31-02-C-0005 ("the MHPI Contract"). The MHPI Contract awarded Clark Pinnacle the right and placed on it the obligation to design, develop, demolish, expand, construct, renovate, repair, replace, rehabilitate, maintain, manage, and operate all military family housing on Fort Belvoir.

290. Upon award of the Fort Belvoir MHPI Contract, Clark Realty Capital LLC and Pinnacle formed Clark Pinnacle Belvoir, LLC, CRC Belvoir, and Defendant FBRC was formed. Following the MHPI Contract award, and due to fraudulent activity of Pinnacle, Pinnacle was forced by the Department of Justice to withdraw from the joint venture and Clark Pinnacle Belvoir, LLC was renamed CRC Belvoir, LLC. It is believed that the Clark Realty Capital LLC is or during some of the class period was a non-member manager of CRC Belvoir, and that CRC Belvoir is or was in turn the managing member of FBRC.

324. Congress is continuing to investigate military housing and the Defendants have admitted that the housing is substandard. After the conditions at Fort Belvoir and other bases grew intolerable, military families pled for help. The Reuters news agency published award-winning investigative reporting on the subject. Outraged, Congressional leaders calendared hearings, including in 2018, 2019, 2020, 2021, and 2022. At the hearings, the Senate and House, as well as the public, have heard testimony from military family members who bravely went public despite threats of intimidation and retaliation. They provided graphic and disturbing testimony about mold exposure, pest infestations, water intrusion, rude and dismissive house management, and ineffective oversight.

325. These facts led to Congressional action. For example, Bill S. 1513, the Better Military Housing Act, was introduced on May 16, 2019, in the 116th Congress (2019-2020). This bill directed the "Department of Defense (DOD) to develop and implement a plan to address health, safety, and quality issues at

privatized military housing." Under the initiative, housing companies would have to provide tenants information on "tenant rights, expectations regarding reporting by tenants and landlords of maintenance, health, or safety issues relating to the unit; a comprehensive accounting of the rights and responsibilities relating to maintenance; and a comprehensive maintenance, repair, and remediation history of the unit."

326. These legislative efforts led to the enactment of a "Tenant Bill of Rights," enshrining some of the basic rights of tenants. An announcement dated effective on August 1, 2021, entitled "Military Housing Privatization Initiative Tenant Bill of Rights," described:

The Department of Defense is fully committed to ensuring that Military Housing Privatization Initiative (MHPI) housing projects provide our Nation's most valued resource—its military members and their families—safe, quality, and well-maintained housing where our members and their families want and choose to live. The Department of Defense has issued all policy guidance necessary <u>to implement prospectively</u> all rights for military members and their families residing in privatized family and unaccompanied housing (Tenants) at all MHPI housing projects…. <u>The following rights are effective on</u> August 1, 2021: 1. <u>The right to reside in a housing unit and a community that meets</u> applicable health and environmental standards…..

(Emphasis added). Note that, while after August 1, 2021, this language means that Defendants must provide housing units that meet health and environmental standards, the Defendants also already had to meet health and environmental standards before August 1, 2021 too. The Bill of Rights merely codifies and clarifies those rights prospectively.

327. The Tenant Bill of Rights goes on to list other rights. Plaintiffs contend that under the law that applied to FBRC and Michaels, the companies already <u>had</u> a duty to provide "a housing unit and a community that meets applicable health and environmental standards." Plaintiffs contend that Defendants violated this duty during the class period and that Defendants held the duty even before the Tenant Bill of Rights was adopted.

328. After the military housing scandal first hit the news in November 2018 due to the Reuters investigative news reporting, some of the largest of the private housing companies, in an attempt to lobby for their cause and inflect the tide of negative PR, formed their own industry association. That association was entitled the "Military Housing Association" and has a website, www.militaryhousingassociation.org. The members of the association include Michaels.

329. The industry housing association, in endorsing the Tenant Bill of Rights, has neglected to note that some of the rights it codified were actually already

held by the tenants months and years ago. See industry association blog entry dated June 29, 2021:

> Service member tenants in MHA member company communities are now eligible to access each right in the Tenant Bill of Rights….

(Emphasis added). This is a misleading statement insofar as military families have all along had the right to safe clean housing, and the right to sue FBRC civilly under Virginia state law if the landlord violated its duties to the families. The blog entry proceeds to state:

> MHA member companies – including Balfour Beatty Communities, Corvias, Hunt Military Communities, Lincoln Military Housing, Patrician Management, and **the Michael's [sic] Organization – provide quality housing … and customer service for service members and their families living in over 140,000 homes on military installations across the country**.

(Emphasis added).

330. The companies sent executives to Washington, D.C. to apologize. The companies used varying degrees of euphemisms but admitted that for some servicemember families, housing conditions had grown intolerable. The companies announced large capital investment plans to correct housing conditions prospectively and have been implementing some of those plans, including to take problem homes offline and replace or renovate such homes, as well as plans to upgrade the quality of staff and support services and make sure that when tenants complain of conditions, the landlord corrects the root cause of the condition, and treats the families properly.

334. It is important to note that Defendants and their predecessors in interest were aware of the defective housing conditions and the existence of problem homes at Belvoir long before the Reuters investigative news report was released in November 2018 and before any of the named Plaintiffs and their families moved in and complained. Multiple reports had documented the unacceptable conditions. These reports were known to Defendants given their industry expertise in construction and housing and their status as privatized operators of housing at a large base. These reports were not at all known to the Plaintiffs or the average military families.

335. For example, on October 14, 2016, the DOD Office of Inspector General issued a report to "summarize and analyze previous DoD Office of Inspector General (DoD OIG) health and safety inspections of DoD-occupied facilities and military housing." One "objective was to identify common issues and broader findings." The report findings included: "Deficiencies in electrical system safety, fire protection systems, and environmental health and safety were pervasive because of a lack of adequate preventative maintenance and inspections being performed at the installations. As a result, DoD personnel and military families

were exposed to health and safety hazards at installations around the world." "These systemic problems resulted in increased health and safety risks to service members." The OIG summarized prior reports finding "critical deficiencies [which] included safety problems, such as … unmitigated mold growth in multiple buildings and family housing units."

336. In the fiscal year 2019 Defense Appropriations Act, Congress included a provision asking GAO to look at how the MHPI was working. The reason that they wanted the GAO to do that was that Congress was increasingly hearing from servicemembers and their families who were very concerned about the condition of their privatized housing, complaints about things like mold and pest infestation, and a concern that the Department of Defense was not doing enough to help them address those problems.

337. In March 2020, Elizabeth Field, Defense Capabilities and Management director with GAO, stated that when her group investigated tenant complaints as to military housing, "we really found problems related to privatized housing at every location that we visited."

338. When the GAO held meetings and focus groups with servicemembers and their families, they found that some members of the military had decided they were going to get out, because they were not confident that their home was clean and safe. Other servicemembers said that even though they were going to stay in military service, the amount of time and turmoil that they have gone through to deal with the companies that manage their privatized housing has really had an impact on their ability to focus on the job at hand.

339. The problems associated with privatized military have become so severe that on May 6, 2021 House Armed Services Committee on military personnel committee chairwoman Rep. Jackie Speier stated that the military housing contracts should be terminated, as they are "poorly crafted" and provide commanders little say in how private companies spend money to improve and maintain homes. She further stated "The accountability for fixing sewage problems, leaky roofs [and] mold is really, I think, abysmal. So, if I had my druthers right now, I would terminate that contract."

340. On March 10, 2021, the House Armed Services Committee on military personnel conducted a hearing as part of their investigation of military housing. Clark Realty Capital declined to participate in the hearing, drawing the ire of top committee members. Committee Chairwoman Speier stated "We have heard and seen firsthand horror stories in these houses, from mold, to water leaks to incorrect lead abatement that has directly affected the health and safety of these families." At the hearing, Speier and other lawmakers said that they were recently briefed by housing advocates from Fort Belvoir who described "disturbing conditions" at housing on the post. Representative Speier further stated: "I want to call out the irresponsible conduct of Clark Realty. I want to convey to them that

you can run, but you can't hide." She noted that in the closed session with military family advocates, lawmakers heard serious complaints about some of the Clark properties, including continued resident dissatisfaction at Fort Belvoir "due to shoddy maintenance and improper remediation of environmental hazards." These statements all under the law directly relate to the liability of FBRC.

341. Regarding Clark Realty Capital's refusal to attend the March 10, 2021 hearing, California Representative John Garamendi stated:

"Clark Realty has declined our invitation to join this hearing. I'm really upset about this. I'm gravely disappointed by their decision and it raises concerns about their willingness and their ability to be transparent, not only to Congress, but far more importantly, to the families that are in their homes."

"Clark Realty, you are clearly in the sights of this committee, and we will be assessing which of our oversight tools might be brought to bear to get answers." Garamendi further stated that, since Clark would not come to congress, congress would take a trip to Fort Belvoir to explore resident's problems.

345. As a result of Congressional investigations and hearings, Defendants have promised to take steps to remedy the unacceptable and intolerable conditions. The steps the company has outlined boil down to establishing a credible repair, service and maintenance facility, like it has promised before but did not provide, and replacing the unfair and deceptive tenant satisfaction surveys, which it calls "customer service analytics".

All of the above paragraphs in each section identified should be stricken because they contain "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Allegations regarding legal matters that involve totally separate companies – and none of the Defendants – are clearly irrelevant to the claims in this matter. Congressional inquiries and statements regarding different military housing providers, different military bases, and unrelated complaints are irrelevant to the claims in this action. Statements attributed to government officials and others regarding non-parties are inflammatory and have no bearing on whether the Defendants – none of whom are referenced in any of these alleged statements – are in any way liable to the Plaintiffs.

Defendants should not be required to respond to these redundant, immaterial, and scandalous allegations; therefore, Paragraphs 279, 280, 281, 282, 284, 285, 286, 287, 288, 289, 290, 324, 325, 326, 327, 329, 330, 334, 335, 336, 337, 338, 339, 340, 341, and 345 should be stricken.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court grant their Motion to Dismiss or, in the Alternative, Motion to Strike Portions of Plaintiffs' First Amended Complaint. In the event the Court does not grant the Motion to Dismiss the entire FAC, Defendants request that the Court dismiss the First Claim for Relief (Virginia Consumer Protection Act), Fourth Claim for Relief (Negligence and Negligent Repair), and Sixth Claim for Relief (Declaratory or Injunctive Relief) with prejudice. Defendants also move to strike FAC ¶¶ 11, 22, 23, 27, 28, 30, 31, 32, 33, 34, 37, 38, 43, 279, 280, 281, 282, 284, 285, 286, 287, 288, 289, 290, 324, 325, 326, 327, 329, 330, 334, 335, 336, 337, 338, 339, 340, 341 and 345.

Respectfully submitted,

    */s/ Kathryn E. Bonorchis*
Kathryn E. Bonorchis #80007
Joseph Doukmetzian, #91685
Lewis, Brisbois, Bisgaard & Smith, LLP
100 Light Street, Suite 1300
Baltimore, Maryland, 21202
Telephone: 410-525-6409
Fax: 410-779-3910
Kathryn.Bonorchis@lewisbrisbois.com
Joseph.Doukmetzian@lewisbrisbois.com
*Attorneys for Defendants*

Richard G, Morgan, *Pro Hac* Forthcoming
Tina Syring, *Pro Hac* Forthcoming
LEWIS BRISBOIS BISGAARD & SMITH LLP
Wells Fargo Center
90 South 7th Street, Suite 2800
Minneapolis, Minnesota 55402
Phone: 612.428.5000
Fax: 612.428.5001
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of July, 2022, a copy of the foregoing Memorandum in Support of Motion to Dismiss or, in the Alternative, Motion to Strike Portions of Plaintiffs' First Amended Complaint, was served electronically through CM/ECF to counsel for Plaintiffs:

David Hilton Wise, VA Bar No. 30828
Joseph M. Langone, VA Bar No. 43543
WISE LAW FIRM PLC
10640 Page Avenue, Suite 320
Fairfax, Virginia 22030
Phone: 703-934-6377
dwise@wiselaw.pro
jlangone@wiselaw.pro

Joel R. Rhine, NC State Bar No. 16028
Martin A. Ramey, NC State Bar No. 33617
Ruth A. Sheehan, NC State Bar No. 48069
RHINE LAW FIRM, P.C.
1612 Military Cutoff Rd., Suite 300
Wilmington, NC 28403
Phone: 910-772-9960
jrr@rhinelawfirm.com
mjr@rhinelawfirm.com
RAS@rhinelawfirm.com

Mona Lisa Wallace, NC Bar No. 009201
John Hughes, NC State Bar No. 22126
WALLACE AND GRAHAM, PA.
525 N. Main Street
Salisbury, NC 28144
Phone: 704-633-5244
mwallace@wallacegraham.com
jhughes@wallacegraham.com

John A. Yanchunis, FL Bar No. 324681
Kenya Reddy, FL Bar No. 459933
MORGAN & MORGAN LAW FIRM
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Phone: 813-223-5505
JYanchunis@ForThePeople.com
KReddy@ForThePeople.com

/s/ Kathryn E. Bonorchis
Kathryn E. Bonorchis