**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**
**Case No. 1:22-CV-00286**

| | |
|---|---|
| **CHIEF PETTY OFFICER JOHN FISCHER,** | ) |
| **ASHLEY FISCHER, CHIEF WARRANT** | ) |
| **OFFICER JORGE ROMAN, RAVEN** | ) |
| **ROMAN, JOHN LANE and CASSANDRA** | ) |
| **LANE, individually and on behalf of a class of** | ) |
| **those similarly situated,** | ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) |
| **v.** | ) |
| | ) |
| **FORT BELVOIR RESIDENTIAL** | ) |
| **COMMUNITIES, LLC, and MICHAELS** | ) |
| **MANAGEMENT SERVICES, LLC,** | ) |
| | ) |
| *Defendants.* | ) |

_____

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Chief Petty Officer John Fischer (CPO, E-7), spouse Ashley Fischer, Chief

Warrant Officer 3 Jorge Roman (CW3), spouse Raven Roman, Supervisory Special Agent John

Lane, and his wife Cassandra Lane, on their own behalf and on behalf of a class of others similarly

situated, by their undersigned counsel, and for their Second Amended Complaint ("SAC") against

the Defendants, Fort Belvoir Residential Communities, LLC ("FBRC") and Michaels

Management Services, LLC ("Michaels"), hereby allege:

## NATURE OF THE CASE

1.      This is a case about basic housing protections provided by law to all Americans in

rental housing – except to Servicemembers like Chief Petty Officer Fischer, Chief Warrant Officer

3 Roman, and Supervisory Special Agent Lane, who devoted years, and careers, to their country.

This is a case about service men and women, and their families, whose Basic Allowance for

Housing ("BAH") is paid to private companies like FBRC and Michaels who are supposed to "improve [the] quality of life for military families by offering safe, affordable and attractive residential communities." The intent behind the privatization of military housing is simple: to provide military families the same quality of life in housing as the civilians they defend. Unfortunately, as Plaintiffs and their families have learned, the Defendants -- private for-profit companies that own and manage military housing at Fort Belvoir in suburban Washington, D.C. – care more about their profit margins than the servicemembers and families whom they house.

2.      On paper, the privatized military housing at Fort Belvoir sounds ideal – two-to five-bedroom homes with backyards and amenities. In reality, Plaintiffs and class members were placed in homes with water intrusion, mold growth and pest infestations, among other conditions, and Defendants performed insufficient and untimely repairs and remediation.  Despite a long and well-documented history of failing Plaintiffs and numerous other servicemembers, during the class period, Defendants continued to pocket their BAH payments and go on with the shameful housing. Plaintiffs and the class are entitled to a full refund of all their BAH payments.

3.      Among the military bases surrounding Washington, D.C., Fort Belvoir is the largest in size and population. Although the Army operates it, representation includes all other branches of the military and dozens of federal entities. This makes up a population of 245,000 who live and work on Fort Belvoir.  Today, FBRC is the owner/landlord for the privatized military housing and the property manager is MMS Army, LLC, part of The Michaels Organization.[1]  There are 2,154 units of privatized military housing at Fort Belvoir.[2]  The housing in in 15 communities,

---

[1] https://tmo.com/.

[2] As of 2015, "FBRC own[ed] and manage[d] 2,154 accompanied housing units in the 15 accompanied housing communities."  Inspector General, U.S. Department of Defense ("DOD"), Aug. 13, 2015, Continental United States Military Housing Inspections, National Capital Region, DODIG-2015-162 (Project No. D2014-DT0TAD-0005), p. 3 ("DOD IG 2015").

4880-7172-6381.1

collectively branded as "The Villages at Belvoir," which are: Belvoir Village, Cedar Grove Village, Colyer Village, Dogue Creek Village, Fairfax Village, Gerber Village, George Washington Village, Herryford Village, Jadwin Loop Village, Lewis Village, Parker Village, River Village, Rossell Village, Vernondale Village, and Woodlawn Village.[3]

4.      According to the DOD: "Fort Belvoir housing is privatized under the Army's Residential Communities Initiative program. The program's goal is to improve quality of life for military families by offering safe, affordable and attractive residential communities. The intent of the program is to provide military families the same quality of life in housing as the civilians they defend. While Fort Belvoir Residential Communities is the owner, various private partners handle all of the day-to-day construction and operations activities."[4]

5.      The Defendants build, own, renovate, and manage the privatized housing units at Fort Belvoir under the terms of a 50-year ground lease with the Army dated December 1, 2003. Active management and control over the housing lies with the Defendants.  Their reckless conduct led to the unacceptable housing conditions for the named Plaintiffs and other similarly situated servicemember families.

6.      The goal of the MHPI is to provide military families with access to safe, quality, affordable, well-maintained housing in a community where they choose to live. MHPI projects involve the Army (or other military branch) leasing land and conveying housing and associated improvements to a private developer for the purpose of revitalizing, maintaining, and managing military family housing communities for a period of 50 years.

---

[3] DOD IG 2015, p. 2.
[4] https://installations.militaryonesource.mil/military-installation/fort-belvoir/housing/government-housing.  "This website is part of the U.S. Department of Defense's network of support for the military community."  *Id.*
4880-7172-6381.1

7.     As alleged below, Defendants' failure to properly maintain, manage, renovate and rebuild Plaintiffs' and class members' housing at Fort Belvoir resulted in widespread problems with moisture intrusion and mold, originally concealed but now well-known.  But-for Defendants' unlawful and uniform conduct, there would not have been defective homes in the Belvoir housing inventory.  Defendants would have engaged in timely root cause analysis of tenant complaints and housing defects, would have taken suspect units out of the active housing inventory, and would not have leased such homes to families like the Plaintiffs' with young children with developing lungs who need safe clean housing.

8.     During pertinent times, Plaintiffs and class members have paid rental/lease payments (also known as BAH payments) for the housing they rented and are entitled to a refund of their BAH due to Defendant FBRC's breach of contract and breach of the implied duty of good faith and fair dealing.[5]

9.     Further, each Plaintiff and affected family in the class suffered a private nuisance: a substantial and unreasonable impairment of their ability to use and enjoy their property interest (a lessee occupancy interest) due to the wrongful conduct by the Defendants who misused their own property interest (owner/landlord).[6]  While nuisance *damages* may not be subject to class

---

[5] *E.g., Stoney Glen, LLC v. Southern Bank and Trust Co*., 944 F. Supp. 2d 460, 465 (E.D. Va. 2013) ("The United States Court of Appeals for the Fourth Circuit has consistently held that Virginia does recognize an implied duty of good faith and fair dealing in common law contracts.").

[6] *See National Energy Corp. v. O'Quinn*, 223 Va. 83, 85, 286 S.E.2d 181, 182 (1982) (quoting Barnes v. Quarries, Inc., 204 Va. 414, 417, 132 S.E.2d 395, 397 (1963)); *Virginian Railway Co. v. London*, 114 Va. 334, 344-45, 76 S.E. 306 (1912) ("A private nuisance is the using, or authorizing the use of, one's property, or of anything under one's control, so as to injuriously affect an owner or occupier of property (1) by diminishing the value of that property; (2) by continuously interfering with his power of control or enjoyment of that property; (3) by causing material disturbance or annoyance to him in his use or occupation of that property."); *Bowers v. Westvaco Corp*., 244 Va. 139, 148-49, 419 S.E.2d 661, 668 (1992) (litigant who is a home owner or occupant and is suing for intrusion by Defendant into his quality of home life is entitled to recover, as an element of damages, compensation for physical or emotional injuries resulting from a nuisance which has endangered life or health).
4880-7172-6381.1

treatment, nuisance *discovery, merits and liability issues* herein are properly subject to class treatment under Rule 23.

10.     Each affected family is entitled to refund of BAH.  Each has endured a loss of habitability of their home, has had their use and enjoyment of their home impaired due to the presence of a private nuisance in the form of the premises conditions created by the landlord and which the landlord refused to alleviate via appropriate root cause analysis or renovation/replacement of problem units, and each claimant may have suffered from and may continue to suffer from adverse health effects caused by the unclean and unsafe conditions.

11.     Plaintiffs and class members share common issues.  These stem from the common facts prevalent across the putative class, and include the following:

    a.   Whether during the class period embracing the last five years, servicemembers executed substantially identical form leases with the landlord.

    b.   Whether the families lived in similar units built using economies of scale together in the past, meaning that the units have today similar levels of current decrepitude and uninhabitability.

    c.   Whether the families experienced unfair and deceptive property management, call center, repair and maintenance service from the landlord.

    d.   Whether servicemembers paid BAH amounts calculated based on the cost of reasonable rental housing; whether class members uniformly did not receive reasonably high quality and safe rental housing product for which they paid their BAH, and for which Defendants also received government bonuses or subsidies.

    e.   Whether families reasonably depended on the landlord to repair and maintain the premises, including its appliances, HVAC and other fixtures, and whether Defendants systematically failed to carry out those duties as to problem units.

    f.   Whether part of military family quality of life, i.e., the housing experience, consists of having a quality, clean, and safe housing experience with competent service, repair and maintenance, conscientious upkeep of the premises, and above all, truth and transparency coming from the landlord.

    g.   Whether at Fort Belvoir, the combination of frequent turnover of military family tenants (frequent PCS transfers), and limited government oversight, led Defendants

intentionally and recklessly to let housing and service quality decline in the class period, up until when the situation was exposed in the public media and Congressional hearings.

h.   Whether Defendants gamed the work order system in a manner that made the work order records so unreliable as to not be susceptible to an audit; whether as a result, the work order system was systematically unreliable.

i.   Whether Defendants gamed the customer service system in a manner which rendered the purported glowing customer satisfaction reviews unreliable, compared to more accurate surveys like a 2019 survey that found that Fort Belvoir residents reported 75% manifest effects for maintenance, repair or remediation issues.[7]

j.   Whether the Plaintiffs were Fort Belvoir privatized housing consumers whom Defendants knowingly and deliberately placed in residential units that the Defendants, but not the Plaintiffs, knew to be problem units.

k.   Whether Defendants violated their duties relative to a tenant cohort that Defendant knew was heavily weighted toward pregnancies, infants and young children in the families; whether according to medical science, infants and young children are more vulnerable and at a higher risk of negative health effects due to living in an indoor environment that had unclean and unsafe air conditions, filth, insects, water damage and mold.

l.   Whether the demographic of tenant families at Fort Belvoir was dominated by families of lower-rank enlisted servicemembers with one or more young babies or children in almost every family; whether because of the presence of babies and young children living at home and who are vulnerable to unhealthy conditions, Defendants had a duty throughout the class period to provide top-quality leased safe clean housing.

m.   Whether during the class period, Defendants would not pay the capital expenditures necessary to correct the problem housing.

12.   Plaintiffs seek to represent a class so that not only they but other families may recover refunds of their BAH payments.  They also have individual claims for damages, however, those claims under the circumstances do not predominate.[8]

---

[7] May 2019 MFAN report, available at https://www.mfan.org/research-reports/.

[8] Under Rule 23(b)(3) the court in order to certify a class *inter alia* must "find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Here, the mere fact that some families may also have a potential individual personal injury, private nuisance or punitive damages claim, to accompany their class claim for BAH refunds, does not negate predominance.  Military family members in problem units have a right to class relief by way of refunds.  The number depends on the number of problem units over the class period – a data point known to the Defendants, and ascertainable in discovery.  If a family also has an

4880-7172-6381.1

## THE PARTIES

### Plaintiffs

13.    **John R. Fischer** is an E7 (Chief Petty Officer) has served with the U.S. Navy for over 13 years.  From October 2017 through August 2019, Chief Fischer, his wife Ashley, and their three minor children resided in military housing at Fort Belvoir.  Their unit was located at 9547 Kezia Trail, Fort Belvoir, Virginia 22060.  From August 2019 to December 2020 the family resided in other military housing at Fort Belvoir, located at 9225 Soldier Road, Fort Belvoir, Virginia 22060. The Fishers currently reside off of Fort Belvoir, no longer in Virginia; today they live at 4076 Watergate Way, Orange Park, Florida 32065.

14.    On October 24, 2017, Chief Fischer executed a form lease with FBRC regarding the 9547 Kezia Trail property.  Chief Fischer was a contracting party under the lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.

15.    **Ashley Fischer** is the wife of Chief Petty Officer Fischer.  During the pertinent times, Ms. Fischer held a possessory and occupancy interest in the property. She was an authorized occupant under the contract and the lease between the family and the landlord.

16.    **Jorge Roman** is a Chief Warrant Officer 3 (CWO3) who has served in the U.S. Army for over 18 years.  From May 2018 through September 2018 Chief Roman, his wife Raven, and their three minor children resided in military housing at Fort Belvoir at 5200 Stable Court, Fort Belvoir, Virginia 22060, in the "Woodlawn Village" area.  From September 2018 to September 2019 the family resided in other military housing at Fort Belvoir at 5493 Jadwin Loop,

---

individual claim (for doctor-diagnosed mold personal injury, private nuisance "discomfort and annoyance" damages, or punitive damages), those claims may be addressed without undoing the value of the class proceedings.
4880-7172-6381.1

Fort Belvoir, Virginia 22060, in "Jadwin Loop Village." The Romans currently reside off of the base, at 1150 Camellia Drive, Vass, NC 28394.

17.    On May 17, 2018, Chief Roman executed a form lease with FBRC regarding the 5200 Stable Court property. During the pertinent times, Chief Roman was a contracting party under the lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.

18.    Plaintiff **Raven Roman** is the wife of Chief Warrant Officer 3 Roman. During the pertinent times, Ms. Roman held a possessory and occupancy interest in the property. She was an authorized occupant under the contract and the lease between the family and the landlord.

19.    Plaintiff **John J. Lane** is a Supervisory Special Agent, with the Fort Richardson CID Office of the U.S. Army, 1107 Doe Street, JBER, AK 99505. Agent Lane and his wife, Cassandra Lane, and their four children reside at 20874 Mountainside Drive, Eagle River, Alaska 99577.

20.    Agent Lane and his wife and their four minor children previously pertinently resided in military housing at Fort Belvoir at 9739 Barlow Road, Fort Belvoir, Virginia 22060, in the "Dogue Creek" area. On or about April 21, 2015, Agent Lane executed a form lease with FBRC regarding the 9739 Barlow Road property. During the pertinent times, Agent Lane was a contracting party under the lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.

21.    Plaintiff **Cassandra Lane** is the wife of Supervisory Special Agent Lane. During the pertinent times, she held a possessory and occupancy interest in the property. She was an authorized occupant under the contract and the lease between the family and the landlord.

**Defendants.**

4880-7172-6381.1

22.     Defendant **Fort Belvoir Residential Communities, LLC ("FBRC")** is a Delaware limited liability company organized in 2003.   FBRC has a principal office at 2 Bethesda Metro Center, Suite 250, Bethesda, Maryland 20814.   FBRC has an address listed on the generic form tenant lease for the 15 Belvoir communities or developments aggregated as The Villages of Belvoir, as P.O. Box 496, Fort Belvoir, VA 22060.   FBRC is listed as the "Landlord" under the Plaintiffs' leases, and in the generic Fort Belvoir lease form available online.[9]

23.     During the pertinent times, FBRC and Michaels were paid for and held responsibilities for design, home renovation, home replacement, new home construction, as well as repair and maintenance and property management services.   FBRC on information and belief had duties to periodically inspect units; to assess their condition.   The problems that the housing in question had with regard to the Plaintiffs were known to FBRC.   FBRC either did not pertinently inspect units during the pertinent times, including the named Plaintiffs' units, or, conducted an inspection that deliberately did not include seeking to determine the root cause for chronic water moisture and mold conditions in the units.

24.     The "Resident Responsibility Guide"[10] provided to each military family tenant and which is deemed to be incorporated into the lease, states: "The Fort Belvoir Residential Communities, LLC (FBRC) partnership officially began operations at Fort Belvoir on 1 December

---

[9] See copy of Fort Belvoir privatized military housing lease located online at
https://static1.squarespace.com/static/5f173c35b6425b1882daa130/t/5fbe90837acac6192a999e94/1606324356236/Sample+Lease.pdf.  The form says at the bottom left of each page,  "ROA_Rev021215_Updated301219."  The web links back to the official Fort Belvoir housing website, branded as The Villages at Belvoir.
https://www.villagesatbelvoir.com/.
[10] See "The Villages at Fort Belvoir Resident Responsibility Guide Revised 30 September 2021,"
https://static1.squarespace.com/static/5f173c35b6425b1882daa130/t/617162e8f4723e44479b76fc/1634820847800/Resident+Responsibility+Guide_Villages+at+Belvoir_JW_Rev09302021.pdf.
4880-7172-6381.1

2003, and our team has been working ever since **to rebuild, renovate, and maintain to the highest standards of family housing** at Fort Belvoir."[11] (Emphasis added).

25. During the pertinent times, Defendants systematically failed to meet this standard for Plaintiffs or other similarly situated and abjectly failed to rebuild, renovate, or adequately maintain the Plaintiffs' units and those of other families.

26. During the pertinent times, FBRC was the sub-lessee, under the ground lease. Belvoir Land, LLC was the lessee, under the ground lease. FBRC held the role of owner and landlord under the 50-year ground lease.

27. Under the Restatement,[12] for purposes of a private nuisance claim, the finder of fact must review the social value and benefits brought by the privatized housing project, and the burdens that it has imposed on the community. The amount of revenues and profits that the project contributes to the larger Michaels enterprise, and the data regarding that parent entity's own total revenues and profits, executive pay, and budgeting, is relevant to this aspect of the nuisance analysis. Defendants have funneled monies out of the Fort Belvoir MHPI project thus far over its 50-year term, which went not into reinvestment in the community at Belvoir, but rather were paid to the owners of Michaels. Defendants failed to adequately reinvest monies back to correct problem units promptly.

28. The Villages at Belvoir website has statements that reflect the special health and safety needs of military family members, given that military families so often have pregnant mothers, infants and young children, who are in the home:

> We are honored and privileged to serve those who serve our country. We know that the military families who are protecting our country deserve comfortable and supportive places **to raise children** and build their future....

---

[11] The Villages at Belvoir Resident Responsibility Guide, Revised 14 April 2017.
[12] Restatement 2d of Torts, § 828.
4880-7172-6381.1

By partnering with the local businesses and community-based groups, our Community Connections program also ensures that the personnel new to our communities are provided with the opportunities to get to know the benefits and services available in neighborhoods surrounding the installation. The programs are designed to specifically cater to military families and take into consideration all of the necessary support that one would need as a member of a military family, whether their **entire family** is on base or members are serving deployment.

Our military living portfolio includes housing we developed and own as well as on-post housing that we fee-manage for other private owners.[13]

29.     As of November 14, 2021, it was reported on the U.S. Army website that "[t]he Michaels Organization acquired the 2100 Fort Belvoir homes formerly owned by Clark Realty Capital in late August."[14]  Plaintiffs' understanding is that in fact, the landlord/owner remained FBRC, with another Michaels entity, as the property manager.  That was Michaels Management, LLC Services and/or MMS Army, LLC.

30.     Defendant **Michaels Management Services, LLC ("Michaels")** is a New Jersey corporation with its principal place of business located in New Jersey.  This entity is registered with the Virginia SCC as active to do business in Virginia and is active.  It merged with and/or was formerly known as Michaels Management Services Inc.  It is a subsidiary of The Michaels Organization ("TMO").  Ron Hansen, President of TMO, also serves as the president of it. Upon information and belief, Michaels was FBRC's property manager for the MHPI Contract at Fort Belvoir prior to or in addition to MMS Army LLC. For example, a circa 2019 version of the form tenant lease indicates that FBRC was the landlord and Michaels was the property manager.

31.     Michaels has through its spokesperson admitted failures of housing at Fort Belvoir:

Michaels Management Services, a New Jersey-based company, is the private contractor that manages housing at Belvoir.  Ron Hansen, the company's president,

---

[13] https://tmo.com/market/military-living/.
[14] https://home.army.mil/belvoir/index.php/about/Garrison/public-affairs/digital-belvoir-eagle/fort-belvoir-housing-under-new-ownership.
4880-7172-6381.1

was not available for an in-person interview, but did agree to talk with us on the phone. **We asked if what the company is doing at Fort Belvoir is good enough for these families. "Obviously, it's not good enough or we wouldn't be talking," he said.**

(Emphasis added).

32.     Defendants are joint tortfeasors, agents of the other, joint venturers, and/or engaged in the joint enterprise of leasing military housing at Fort Belvoir, as well as the conduct and acts alleged herein. During the pertinent times, each of the Defendants was directly and materially involved in the relevant facts, acts and omissions. Defendants are not persons or entities acting under a federal officer, nor are Defendants subject to any sovereign immunity, governmental immunity or government contractor defense herein.

## JURISDICTION AND VENUE

33.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Fort Belvoir is a federal enclave.

34.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2) (diversity jurisdiction) and the Class Action Fairness Act, in that (i) there is complete diversity (any one plaintiff diverse from any one defendant), (ii) the amount in controversy exceeds $5,000,000.00 (Five Million Dollars) exclusive of interest and costs, and (iii) there are 100 or more members of the proposed Plaintiffs' class.

35.     Venue is proper in this District under 28 U.S.C. § 1391 because Plaintiffs reside in this Judicial District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this Judicial District. In addition, all Defendants do business and/or transact business in this Judicial District, and therefore, are subject to personal jurisdiction in this Judicial District and reside here for venue purposes.

4880-7172-6381.1

## FACTS COMMON TO ALL COUNTS

### Facts Regarding Plaintiffs John and Ashley Fischer.

36.     Chief Petty Officer John R. Fischer is a career member of the United States Navy. He enlisted in the Navy in 2007.  Ashley married John in April of 2011.  They have three minor children, who were as of mid-2021 ages five, eight and 13.  Defendants had actual knowledge of the fact that the family entering the residential unit in the case of the Fischers had young children who therefore, by that very status, had an important need for clean and healthy housing.

37.     From October 2017 through August 2019, Mr. Fischer, his wife Ashley, and their three minor children resided in military housing at Fort Belvoir at 9547 Kezia Trail, Fort Belvoir, Virginia  22060.  From August 2019 to December 2020 the family resided in other military housing at Fort Belvoir at 9225 Soldier Road.  They are now stationed on Naval Air Station Mayport, while Chief Petty Officer Fischer is currently deployed on Sea-Duty.

38.     In November of 2019, Mrs., Fischer was nominated for recognition as the Armed Forces Insurance Military Spouse of the Year and finished within the top three finalists due to her community involvement. Among her charitable activities on base, Mrs. Fischer volunteered for and became the Displaced Resident Liaison for Fort Belvoir.  Due to the efforts of Mrs. Fischer, three military families who lived in three military family homes at Fort Belvoir which were destroyed by fire were provided households goods, furnishings, and other necessities, paid for with community donations.   Additionally,  with  the  assistance  of  local  churches  and  veteran's organizations, Ms. Fischer was able to provide other Fort Belvoir military families who were displaced, due to various causes, including fire, mold, pests, gas, etc., a weekly pizza night, monthly dinner, convection ovens, and even Christmas trees.  This type of assistance was provided to approximately 60 military families who were displaced due to no fault of their own and, in many

4880-7172-6381.1

instances, due to the substandard, unsafe, and unsanitary conditions in the Fort Belvoir military housing provided by Defendants.  Ms. Fischer has received official recognition, from the U.S Navy Spouse of the Year and Military Spouse of the Year boards, from both General Gustave Perna and Command Sergeant Major Rodger Mansker.

39.    The Fischers currently reside at Orange Park, Florida, since December of 2020. Due to their experiences with the substandard, unsafe, and unsanitary housing provided to them at Fort Belvoir, Chief Fischer requested orders to transfer, which were granted.

40.    In October 2017, the Fischers applied to contract for on-base housing at Fort Belvoir with FBRC.  On October 24, 2017, Chief Fischer executed a form lease with FBRC regarding the 9547 Kezia Trail property.  During the pertinent times, Chief Fischer was a contracting party under the lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.  The Fischer family moved into their on-base home, which was located in the Vernondale community in the Villages at Belvoir.

41.    Immediately upon moving in, starting around November 2017, Ms. Fischer began to suffer from chronic migraines (weekly, approximately 3-4 days a week), as well as what she believed to be panic attacks. Ms. Fischer sought treatment in March of 2019 for treatment for her anxiety and migraines by her primary care physician and neurologist.

42.    In January 2018, the Fischers reported gaps in the back door to the property manager, noting that the door would open on its own and allow in wind and rain.  It was never properly repaired during the Fischers' time living at the property.  However, after the Fischers moved out, the door was replaced in preparation for new tenants.

43.    In January 2018, the Fischers reported linoleum lifting in the upstairs master bathroom.  Maintenance responded by gluing the linoleum and leaving a large rock on it to hold it

4880-7172-6381.1

down.  Maintenance did not return to remove the rock and did not provide any instructions to the Fischers as to when or if they should remove it.

44.    In October 2018, the Fischers noticed issues with the HVAC unit.  Water was overflowing onto the floor, and flooding the laundry room floor, damaging the floor and leaving visible signs of water damage.  Maintenance was notified, but they never opened the HVAC system and properly repaired it.  HVAC issues were again reported in January and June 2019.

45.    HVAC issues are a common marker for the problem homes in privatized military housing communities.  Especially in older housing, the HVAC equipment, fixtures, and the associated ductwork, may never have been fixed, cleaned or replaced, since it was installed.  Due to the nature of HVAC, with heat transference, there is moisture generated and moisture in the vicinity, as anyone seeing an air conditioner drip knows.  In the right conditions and with the right kinds of surfaces, this breeds mold.  Over time, HVAC areas and ductwork can become replete with mold which, moreover, is in places where family members in their ordinary scope of their daily life may not see it.  It falls uniquely to the landlord's responsibility to control this problem.

46.    Work orders regarding to the HVAC were placed on October 1, 2018 (the home felt "warm and muggy"), October 22, 2018 (a cap was missing and splashing water onto the HVAC closet floor—it was eventually discovered that this condition had caused mold to form in the area), and January 21, 2019 (the home's heating unit went entirely out and would not operate).

47.    Each time the landlord's representatives who filled the work order would advise the Fischers that the issues with the HVAC were normal, and that the observed excessive dirt and humidity at the home were no cause for concern.  These statements were false and fraudulent.

48.    An average military family would have been duped at worst by this advice, and confused at best.  In fact, if the promises made by the private companies to the Army when they

4880-7172-6381.1

won this project are to be believed, Defendants were to provide top-quality, excellent, clean and safe military housing.  But none of the families ever saw this contract or the duties that it imposed on the landlord.  Families could be unaware that the owner of their community was not even the military.  They were actually living in a community owned, under a 50 year ground lease, by a private enterprise – here, Defendants.

49.    In June 2019, mold was discovered in the ducts, On June 11th, 2019, a work order was submitted where the Fischers stated "I believe there is potentially mold in the ducts".  In June of 2019, the representatives improperly painted over moldy fiberboard duct work with IAQ 8000 which is a coating material which is resistant to mold only on the surface of the coating. The product does not protect users or others against disease-causing bacteria, viruses, germs, or other organisms.[15] Ms. Fischer documented the use of IAQ 8000 with the following photograph:

_____

[15] From product label available at https://www.fiberlock.com/wp-content/uploads/IAQ_8000-8380-PDS.pdf: "The IAQ 8000 coating is resistant to mold only on the surface of the coating. **No mold resistance claim is made other than to the coating itself.** The use of this product does not protect users or others against food-borne or disease-causing bacteria, viruses, germs or other disease-causing organisms. **Do not apply when** air or surface temperature is below 50°F, or when **drying conditions are poor or when surfaces are above a 15% moisture level** content. Use adequate ventilation during application. When applying with a sprayer, wear a NIOSH approved respirator with any R, P, N or HE filter. For interior use only. Check with local building code enforcement authority for any additional requirements." (Emphasis added).
4880-7172-6381.1



*Photograph 1*: IAQ 8000

50.    In June 2019 a work order was submitted which alerted that there was "a hole in the ceiling, with potential water damage, above the sink…" Defendants' representatives inspected the hole, and falsely advised the Fischers that there was no water damage, and simply cosmetically repaired the hole without addressing the water damage or determining its root cause. This was once again unfair, deceptive, false and fraudulent conduct.

51.    Potential mold was also noted in the HVAC unit, plenum, duct work, and HVAC closet flooring. A third-party contractor, Americlean, was brought in to clean the HVAC duct area on June 21, 2019. Within minutes, the duct cleaning company packed all their supplies and stated there was "mildew or something" and they couldn't clean the duct work. The problem was so severe that the duct cleaning service declined to clean the ducts.[16] Mrs. Fischer documented the unsealed HVAC and affected floor with this photograph:

---

[16] On information and belief, to correct the problem and repair at the root cause, it would have cost FBRC at least $5,000 to $10,000. The company was unwilling to invest in making those repairs.

4880-7172-6381.1

17



*Photograph 2*: *Unsealed HVAC and Flooring*

52.     Mold tests were conducted at the home on June 26, 2019.  This testing revealed the presence of various molds at the home, including aspergillus, Cladosporium, Chaetomium, penicillin, hyphae, Alternaria, basidiospores, penicillium, and penicillium/aspergillus.

53.     The family had no other choice but to move into a hotel as one of their children, R.F., was immunocompromised because he was on chemotherapy for brain cancer.[17]  From the hotel, they moved into the Dogue Creek hospitality house, where they stayed from June 2019 to

---

[17] The Plaintiffs reserve the right to amend the complaint as the case proceeds in the event they determine there is evidence of medical causation of personal injury or illness as a result of the mold and other household indoor air exposures, meeting the applicable Virginia state-law causation standard for an individual personal injury claim.  *See Kristensen ex rel. Kristensen v. Spotnitz*, 2011 U.S. Dist. LEXIS 107027, 2011 WL 4380893 (W.D. Va. 2011) (discussing medical causation testimony/expert issues in a mold case); *Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir. 1999) (expert causation issues).
4880-7172-6381.1

18

August 2019, to await the repairs at the 9547 Kezia Trail property. The Dogue Creek hospitality suite had been remediated prior to their move-in.

54.     When the family moved back to the 9547 Kezia Trail address in August after repairs were supposedly conducted, they found mold on a subfloor and on a vent.

 

*Photographs 3 and 4*: Mold on Subfloor and Vent

55.     The home's ducts had been sprayed with Benefect Decon 30 by maintenance previously, during remediation.

56.     Immediately upon moving back into the home, the Fischer's family pet (a 2-year-old Goldendoodle) passed away suddenly due to unknown causes.

57.     The Fischers reported the continued presence of mold at the property.

58.     Defendants conducted a cursory inspection of the property and improperly painted over the moldy subfloor, leaving the damaged and unsanitary carpet in place. They once again did not investigate or repair the cause of the mold. They advised the Fischers that the home was now safe to live in.[18] This representation was false and unfair and deceptive because, first, the home

---

[18] This fact pattern happened over and over again. Its ubiquity, and what it infers about the nature of Defendants' business practices and uniform staffing and training policies, its uniform lack of effective inspection and audit practices, and so forth, reflects a common issue.
4880-7172-6381.1

remained unsafe, and because, second, no Defendant had performed the real root cause analysis required to start the process of truly correcting the problem in the unit.

59.     Due to the mold and other issues at 9547 Kezia Trail, the family moved to 9225 Soldier Road in August 2019.

60.     While residing at the Kezia Trail property, the Fischers' now 5-year-old was diagnosed with a Juvenile Pilocytic Astrocytoma, which is normally a slow-growing, benign brain tumor.  The Fischer child's tumor grew at six times the normal rate and was labeled as malignant due to speed of growth and location: the brain stem.

61.     After leaving the Kezia Trail property, Ms. Fischer's migraines have improved.

**Stimson Road Home Shown to Fischers.**

62.     During the time of displacement and repair, the repairs of mold damage in the HVAC were not done according to industry standards.

63.     The Fischers requested to relocate from 9547 Kezia to another 4-bedroom home on the installation.

64.     The Fischers were shown a "ready to move in" home on Stimson Road in Colyer Village.

65.     Upon inspecting the property, Ms. Fischer with her friend, Jeni Johnson, and Community Manager, Nicole Walker (who identified herself during pertinent times as working for Michaels), encountered a home with:

a.     visible water damage in the HVAC closet,
b.     visible water damage to the first-floor bathroom,
c.     a rotting back door frame, and
d.     visible suspect fungal growth covering a wall in the storage closet.

66.     Mrs. Fischer documented that last problem with a photograph:

4880-7172-6381.1



*Photograph 5: Fungal Growth in Storage Closet*

67.    The Fischers declined the offer to move into this home and subsequently moved

into 9225 Soldier Road.

**9225 Soldier Road Home.**

68.    In August 2019, Chief Petty Officer Fischer executed a form lease with FBRC

regarding the 9225 Soldier Road property.  During the pertinent times, Chief Fischer was a

contracting party under the lease, made rental payments pursuant to his BAH, and held a

possessory and occupancy interest in this property and each FBRC unit the family was in.

69.    Upon moving into the Soldier Road property, the family immediately noticed in

September 2019 problems in the bathroom, which also apparently had been remediated previously.

Mold was discovered in the shower area--at the edge of the shower and behind the toilet.

4880-7172-6381.1

70.    Defendants tried to correct that mold problem by flood cutting the walls[19] and painting the walls' affected studs with IAQ, which is not the recommended solution for mold per the EPA.

71.    A work order was submitted on August 27, 2019, which stated, "the AC is not cooling and the humidity in the home is 58%, recommended being 40-50 otherwise mold can grow."

72.    The Fischers were not provided any details about the repair.  The work order states that the problem was a malfunctioning compressor due to a bad capacitor. This was apparently replaced by the Defendants.

73.    On November 30, 2019 the family noticed mold in the HVAC.

74.    This fact required installation of a new HVAC unit. This time, the landlord determined to replace the HVAC, although the scope was limited.

75.    AJ Heating and Cooling was sent out to install a new HVAC inside and outside and to replace the exhaust pipe that was leaking from the roof/ceiling, on December 4, 2019.

76.    Due to their experiences with the substandard, unsafe, and unsanitary housing provided to them at Fort Belvoir, in summer 2020 Chief Petty Officer Fischer requested orders to transfer, which were granted in November 2020.  In December 2020 the family conducted a permanent change of station to Naval Air Station Mayport.

**Plaintiffs Jorge and Raven Roman.**

---

[19] So-called because often must be done after flooding in a commercial building.  That is a typical situation where it may be necessary for the restoration company to perform a "flood cut" of the drywall in a building. The reason this is called a flood cut is because the cut is made 12-18 inches above where the flood damage stops. It is done to facilitate drywall tear out. A flood cut may be performed in a variety of situations.
4880-7172-6381.1

77.     Jorge Roman is a Chief Warrant Officer 3 (CWO3) who has served in the U.S Army for over 18 years.  From May 2018 through September 2018 Chief Roman, his wife Raven, and their three minor children resided in military housing at Fort Belvoir at 5200 Stable Court, Fort Belvoir, VA 22060, in Woodlawn Village.  From September 2018 to September 2019 the family resided in other military housing at Fort Belvoir at 5493 Jadwin Loop, in Jadwin Loop Village.

78.     On May 17, 2018, Chief Roman executed a form lease with FBRC regarding the 5200 Stable Court property.  During the pertinent times, Chief Roman was a contracting party under the lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.

79.     Plaintiff Raven Roman is the wife of Chief Warrant Officer 3 Roman.  During the pertinent times, Ms. Roman held a possessory and occupancy interest in the property.

80.     Ms. Roman was active in the community, and wanted her house to be a home.  From March 2019 to February 2020, she served as a community representative of Jadwin Loop Village and member of the Fort Belvoir Garrison Command Housing Focus Group in an effort to improve the quality-of-life housing program for residents.

81.     During that time, dozens of displaced military families were experiencing emotional and financial challenges. In an effort to help families meet those challenges, Mrs. Roman collaborated with base-wide organizations to provide resources to displaced families, offered by the Military Family Life Counselors group and the Fairfax County Public Schools for Homeless Families.

82.     Subsequently, the Romans resided in Lorton, Virginia, in off-base housing from 2019 to 2020.  Chief Roman was transferred, and his family currently resides in North Carolina.

4880-7172-6381.1

83.     Jorge Roman is a career member of the United States Army.  He enlisted in the Army in 2003 and received his commission as a Warrant Officer in October 2012.  Raven married Jorge on April 23, 2005.  They have three minor children, as of mid-2021, ages 4, 7 and 15.

**Unit at 5200 Stable Court.**

84.     In May 2018, the Romans applied to rent family military housing at Fort Belvoir. On May 17, 2018, Chief Warrant Officer Roman executed a form lease with FBRC regarding the 5200 Stable Court property.  During the pertinent times, Chief Warrant Officer 3 Roman was a contracting party under the lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.  During the pertinent times, Ms. Roman held a possessory and occupancy interest in the property.  The Roman family moved into the home, which was located in the Villages at Belvoir, in Woodlawn Village.

85.     The Roman family experienced and noticed serious issues involving the safety, sanitation, and condition of the property upon move-in.

86.     As set forth in their move-in inventory checklist, immediately upon moving into the home the Romans observed issues involving

   a.     pests,
   b.     old carpets (not new as noted by Defendants),
   c.     water intrusion in the garage,
   d.     mold on the drywall over the garage door,
   e.     mold on the sealant on the sink,
   f.     and in the cabinetry underneath the sink,
   g.     lifting vinyl plank flooring, and
   h.     rusty plumbing.

87.     However, Defendants performed merely a cursory superficial response to Plaintiffs' requests and complaints as to the housing.

88.     On May 18, 2018, the Romans reported pest issues: ants and spiders were discovered in the home. Ants were entering throughout the entire first floor of the home and

4880-7172-6381.1

through cracks on the banister in the hallway on the second level of the home. Carpenter ants were also discovered in the upstairs bedroom (daughter's room) coming in through the window and crawling on the walls and ceilings.

89.    In response, Defendants treated for pests but said they were unable to fully treat for ants due to "heavy rain."

90.    The Romans were not able to move their personal belongings to their bedrooms upon move-in until the following week due to the unsanitary and unsafe condition of the carpets.

91.    On May 22, 2018, the Romans submitted a request for a steam cleaning of the carpets.  They discovered thumbtacks and nails throughout the entire second level of the home, in addition to stains, jewelry, and food left behind by previous tenants.

92.    Following the call, the vendor arrived with a household vacuum to clean the second level of the home.  That was a cursory superficial response to their request and to the situation. Defendants were not providing the excellent housing product that they had promised to the Military in order to win this MHPI Project for which they were paid handsomely.

93.    The Romans submitted a second maintenance request for cleaning.

94.    The carpets were steam cleaned during the second visit.

95.    Nonetheless, the vendor insisted the carpets were "new" and did not require a cleaning.

96.    The following are photographs which show ants, thumbtacks, and nails:

4880-7172-6381.1

25




*Photographs 6 and 7*: Ants




*Photographs 8 and 9*: Thumbtacks and Nails

97.    On May 31, 2018, the Villages at Belvoir maintenance person arrived to repair holes in the walls and to paint the garage.

98.    The technician painted over the mold over the garage door and water intrusion stains on the wall.

4880-7172-6381.1

99.     On June 4, 2018, for a second time, Mrs. Roman reported the water intrusion on the wall, a possible roof leak, and the exterior downspout flooding the backyard and air conditioning unit.

100.     After making that complaint, she was never contacted.

101.     On June 13, 2018, Mrs. Roman reported, for a third time, the water intrusion and roof leak.

102.     On June 14, 2018, a work order was created for this maintenance request.

103.     There was no further investigation as to the cause.

104.     No work occurred.

105.     Then the work order was marked complete.

106.     The fact pattern reflected at paragraphs 101-105 was a common occurrence.

107.     The following photographs show contemporaneous mold and water intrusion:

 

*Photographs 10 and 11*: Mold and Evidence of Water Intrusion

108.     During the next three months, there were many additional issues.

109.     CWO3 Roman was required to report to Warrant Officer Advanced Course (WOAC) on July 12, 2018.

4880-7172-6381.1

110.    Mrs. Roman and her three children resided in the home during that time.  CWO3 Roman was less available to protect them or help them with household environmental issues.

111.    Water intrusion remained a substantial issue.  During all of this time, FBRC had actual knowledge that this was a problem home.  And that there were young children.

112.    Mrs. Roman reported

      a.     a leak under the kitchen sink,
      b.     a leaking toilet,
      c.     pest issues, and
      d.     HVAC problems.

113.    The Romans began to notice high levels of moisture in the kitchen and other areas which attracted a panoply of pests including slugs, silverfish, carpet beetles, and booklice.

114.    The Roman's noticed a consistent odor, a "rotting/mildew smell", coming from under the kitchen sink and cabinets that became more pungent when it rained.

115.    Mrs. Roman reported the odor several times.

116.    Slugs were found under the cabinets, in the dishwasher, and crawling on the kitchen floor.  The presence of slugs is indicative of moisture, of moisture intrusion, and of housing defects.

117.    Eventually Mrs. Roman and her children were unable to use any of the bathrooms due to unsuccessful pest control treatments and an infestation of booklice that quickly spread throughout the home.

118.    On June 18, 2018 (2nd report) the Roman's reported carpenter ants located in the daughter's room.

119.    Defendants treated for ants twice.

120.    The issue subsided but continued.

121.    Defendants knew that spraying for ants would not correct a problem whose root cause was really something like structural defects or improper gaps and openings.

4880-7172-6381.1

122.    Also on June 18, 2018 the Roman's reported "mold in window".

123.    The work order was marked complete with no further investigation.

124.    The following photos show ants and mold:



_Photographs 12 and 13_: *Ants and Mold*

125.    On July 25, 2018, the Romans reported "small bugs" in the bathroom (silverfish and booklice).

126.    Defendants had Eagle Pest Control treat the inside of the home.

127.    The following are photographs of the booklice and silverfish.

 

_Photographs 14 and 15_: *Booklice and Silverfish*

128.    On July 30, 2018, the Romans reported for a fourth time, "water is entering through side wall from outside living area."

4880-7172-6381.1

129.    In response, shingles were repaired.

130.    However, drywall was not removed, and no further investigation was made into the

root cause of evident water damage to the interior of the roof or garage wall.

131.    The following photos show water damage:



_Photographs 16 and 17_: Water Damage

132.    On July 31, 2018 (2nd report) the Romans reported "rotting, mildew smell coming

from the sink and up under the cabinets."

133.    Maintenance did not investigate further.

134.    They denied the existence of the smell.

135.    The following are photographs of water staining under the sink, which is likely

evidence of mold and mildew.

 

_Photographs 18 and 19_: Water Staining Under Sink

136.    On August 7, 2018 (2nd report) the Romans reported bugs in the bathroom.

137.    In response, the Defendants treated inside the home.  They did not do more.

138.    On August 28, 2018 (3rd report) a work order was placed by the Romans for the presence of bugs in the second hallway bathroom, under the kitchen sink and in the cabinets.

139.    On August 28, 2018 (4th report) the Romans also reported crawling insects, and silverfish in the entire unit.

140.    Defendants retained Eagle Pest Control, who treated with aerosol spray.

141.    The exterminator with Eagle Pest Control advised the Romans that he notified the Villages at Belvoir there was a humidity issue within the home during the initial pest control treatments in the home.

142.    During this time, under Defendants' intentional business model, they chose to periodically pay a pest person to come spray for bugs, over fixing the root cause.  This was strictly a cost decision.  Defendants knew young children lived in the unit and knew that all else being equal, it is more of a health risk to spray insecticides inside homes, than not to.

4880-7172-6381.1

143.    Also, on August 28, 2018 (3rd report) the Romans reported "moisture under the kitchen sink and dishwasher."

144.    Defendants' maintenance supervisor came to the home.   He got a positive reading for moisture under the sink, using some type of test or instrument.

145.    He sprayed the area with an antimicrobial spray and reported everything was fine.

146.    In fact, everything was not fine.  Defendants, being the very ones hearing the tenant requests and complaints, and periodically sending out the pest men, knew that the problem would continue in the future as it had in the past.  Incoming new tenants did not have this knowledge but Defendants did.   Merely occasionally sending a low-paid service person to take the quickest, lowest-cost, most temporary and superficial approach – wiping off mold, painting over mold, wiping off moisture, spraying for insects – was a business practice that increased risks of adverse health effects to infants and children, as well as pregnant mothers among the tenant census at any given time.

147.    On September 3, 2018, the Romans reported water leaking in the laundry area from the AC unit.

148.    In response, Defendants appeared to have wrapped putty around the pipe that was leaking.

4880-7172-6381.1



*Photographs 20 and 21*: Water Damage from Leak and Putty Wrapped around Pipe

149.    That was, once again, a miniature fact pattern once more to show:

    a.  Tenant complaining
    b.  of a repeat problem (water intrusion)
    c.  Landlord opens work order
    d.  Landlord sends low-wage employee/contractor who
    e.  Performs no root cause assessment,
    f.  Is only there briefly, and
    g.  Uses the cheapest fix.
       Presumably Defendants close this work order and then submit it, with all the others, precisely as purported reliable, affirmative evidence supporting the company's annual claim for a sizeable monetary bonus from the Military, above and beyond all of their BAH receipts.

150.    The Romans also began experiencing medical issues around this time.

151.    All three children became ill.  They complained of rashes, upper respiratory infections, congestion, a hacking cough.

152.    Raven Roman suffered from fatigue, headaches, drastic weight loss, vision problems, rashes, light sensitivity, high blood pressure, and joint pain.

4880-7172-6381.1

33

153.    The problems were so severe that the Romans requested a new home or hotel accommodations.

154.    Defendants' response on August 31, 2018, was to say that "we have not identified any concerns in your home that would prevent you from staying in the home."

155.    On information and belief, that was a scripted response, using generic recommended or template language, and reflected one aspect of the company's poor treatment of tenants who were displaced to other units, hotels or "courtesy suites" due to the poor housing conditions – an alleged subclass in this case.

156.    Mrs. Roman had no choice but to move out of the home and into a hotel with her three children on Labor Day 2018.  The Roman family incurred out-of-pocket expenses to do so.

157.    On September 4, 2018, the Romans received a phone call from the maintenance supervisor used by Defendants.  He stated that the Romans could no longer enter the premises without an escort due to moisture that was found behind the dishwasher.  The Romans were never provided a clear explanation or disclosure of the findings of what did or did not exist behind the dishwasher.

158.    Mrs. Roman was very concerned about what could be the potential impacts of whatever was really in the house, as to her children.

159.    FBRC had a duty to clearly and contemporaneously fully disclose to the tenants whenever there is a known problem to the home that could endanger the health of children.

160.    Prior to being locked out of the home that day by Defendants, Mrs. Roman returned to the home to retrieve personal items for her children.

161.    While there, she pulled the dishwasher out and found a black trash bag taped to the wall.

4880-7172-6381.1

162.     Chief Roman requested support from his 1st SGT. and CPT in his absence to meet his wife to observe her findings.

163.     They arrived and witnessed the mold found behind the dishwasher.

 

*Photographs 22 and 23*: *Mold Behind Dishwasher, and Dishwasher Area.*

164.     The Romans had the mold present behind the dishwasher tested on September 11, 2018.

165.     The tests revealed the presence of Stachybotrys, a toxic mold.

166.     The Roman family was displaced from September 2 to September 15, 2018.

167.     The Romans left 5200 Stable Court to stay at the Residence Inn in Springfield, VA from September 2-September 4, 2018, where they paid out of pocket for 3 nights.[20]

---

[20] *Compare* Va. Code § 55.1-1231 "Where mold condition in the dwelling unit materially effects the health or safety of any tenant…"The Landlord shall provide the tenant with either (i) a comparable dwelling unit, as selected by the landlord, at no expense or cost to the tenant or (ii)a hotel room, as selected by the landlord, at no expense or cost to the tenant."

4880-7172-6381.1

168.    Defendants then moved the family to the Staybridge Suites from September 5 to September 15, 2018.

169.    Subsequently, after several meetings with management, Defendants moved the Romans to 5493 Jadwin Loop.  The Defendants arranged for a moving company to move the Romans' possessions from 5200 Stable Court property to 5493 Jadwin Loop.

170.    All of these events caused intrusion on the family's ability to use and enjoy their leased home and their occupancy property interest, causing aggravation, discomfort, annoyance and irritation.

171.    On September 13, 2018, the day of the move, The Romans discovered mold had visibly spread throughout the entire home at 5200 Stable Court.

172.    The Defendants' maintenance supervisor took some of the Romans' personal possessions from a closet which had visible mold on the ceiling and put them into a plastic trash bag to be "dry cleaned."

173.    Ultimately Defendants disposed of these belongings and did not clean them.

174.    Mrs. Roman's subsequent inquiries as to the status of these belongings were ignored, and the personal property was never returned.

175.    Defendants gave them a partial reimbursement of a portion of rent and items in the closet in November 2018.

4880-7172-6381.1



_Photographs 24, 25, and 26_: Destroyed Personal Property

**5493 Jadwin Loop.**

176.    On September 12, 2018, Chief Warrant Officer Roman executed a form lease with FBRC regarding the 5493 Jadwin Loop property.

177.    On March 18, 2019, the Roman family requested reimbursement for their belongings that were transported to the home to 5493 Jadwin Loop from 5200 Stable Court which had been impacted by mold.

178.    This request was denied.[21]

179.    After moving to the 5493 Jadwin Loop property, the Roman children suffered from

    a.    chronic ear infections,
    b.    chronic coughs,
    c.    upper respiratory illness,
    d.    sore throats,
    e.    headaches,
    f.    congestion,
    g.    developmental and behavioral health issues, and
    h.    other adverse health effects.

---

[21] _See_ Va. Code § 8.01-226.12, Duty of landlord and managing agent with respect to visible mold. "Mold remediation in accordance with professional standards "means mold remediation of that portion of the dwelling unit or premises affected by mold or any personal property of the tenant affected by mold" …
4880-7172-6381.1

180.    From November 2018 thru March 23, 2019, the Roman family reported, and work orders were submitted for issues related to, the deck, door, shingles, HVAC, locks, lighting, windows, and pest control.  This is discussed in further detail below.

181.    On September 26, 2018, the Romans reported carpet beetles in the kitchen and upstairs bathroom.

182.    Defendants conducted a pest control treatment.

183.    The following photographs show carpet beetles in the Roman home.



*Photographs 27 and 28*: Carpet Beetles

184.    On October 2, 2018 the Romans reported a sewage-type odor in the basement.

185.    In response, Defendants sent a maintenance technician who said he could not see or smell anything.  There was no further investigation.

186.    On November 14, 2018 the Romans reported that their daughters' bedroom smelled like mold and there appeared to be visible mold on the windows.

187.    They also reported mold on the front door, two windows that did not shut properly in the living room, and the absence of weatherstripping needed for all.

188.     In response, their daughters' window was cleaned with bleach and painted, the weather strip was placed over the mold on the front door, and the remaining requests were never completed.

189.     The following photos show mold in the windows.



_Photographs 29 and 30_: Mold in Windows

190.     On January 29, 2019 (1st report) the Romans reported the existence of wood on the bottom of the entryway door which was "rotting/chipping away."

191.     This was not repaired.

192.     The below photograph shows the rotting wood on the entryway door.



*Photograph 31*: *Rotting Wood Door*

193.    On February 8, 2019, the Romans reported gaps between the baseboard and floors and rusty nail pops throughout the entire home.

194.    In response, Defendants caulked and patched the nail pops.

195.    On February 27, 2019, (2nd report), the Romans reported deterioration of the entryway door due to rot.  The door was replaced.

196.    On February 28, 2019, the Romans reported that the ducts were dirty, and giving off an odor so they requested a duct cleaning.  Defendants sent Americlean to conduct a duct cleaning.  The duct cleaning was inadequate.  The HVAC/ductwork problem root cause remained unconfirmed.

197.    On March 3, 2019, the Romans reported tree bugs in the bathroom.     Defendants scheduled pest control to treat the area.

198.    On March 9, 2019, the Romans reported a rotten windowsill.   In response, Defendants painted over the rotting wood on the window. No further investigation was made to check for water intrusion. The below photograph shows the rotten windowsill.



*Photograph 32*: *Rotting Window Sill*

199.    Subsequently, on March 26, 2019, the Romans requested that Defendants inspect, repair, and remediate the Jadwin Loop property due to

    a.    visible mold present on the beam in the attic,
    b.    mold-related problems with the kitchen range hood,
    c.    issues with the HVAC, and
    d.    condensation on the windows throughout the home and in the laundry area where the utility closet was located.

200.    In response, the mold issues related to the attic beam and the kitchen were purportedly remediated.  The HVAC was not properly remediated.  The cause of the condensation in the home was never addressed by Defendants at any time.  The other issues reported were addressed in cursory fashion, but the causes of the issues were not properly determined or repaired by Defendants.

201.    On March 29, 2019, the Romans reported mold in the attic. Remediation was purportedly completed by PBI Restoration on April 16, 2019. The following photograph depicts mold in the attic.



*Photograph 33*: Mold in Attic

202.    April 25, 2019, the Romans reported that the first level bathroom had what appeared
to be previous water damage under the cabinet that was painted over. Defendants replaced the
cabinet but left the corroded plumbing.  Below are photographs of the previous water damage:

  

*Photographs 34, 35, and 36: Water Damage Under Cabinet*

203.    On July 8, 2019, the Romans reported condensation throughout the entire home on
windows and in the dryer in the laundry room.

204.    A work order in that regard was opened by Defendants. Defendants had no actual
work done to fulfill the work order. Defendants then marked the work order complete and closed
it. Maintenance was never scheduled to assess the actual problem.

205.    On information and belief, that very work order was included among the supporting
data for Defendants' incentive award request to the government.

206.    The below photographs show condensation in the windows and dryer area of the
laundry room.



*Photographs 37 and 38*: *Condensation in the Laundry Room*

207.    An assessment of the root cause at that time might and, Plaintiffs allege, would have determined that under all the facts and circumstances, Defendants should not have been letting out that home to any family at that time.

208.    First, Defendants should have conducted a root cause assessment.  If this meant keeping the home out of the active inventory being rented out to families, then so be it.

209.    Then, if the result of the assessment meant that the entire HVAC system had to be replaced, then Defendants should have replaced it.

210.    If the assessment mean that the whole unit had to be renovated, or torn down and replaced, Defendants had the duty so to perform.  This was because they had an integrated duty to assess, manage, repair when needed, maintain when needed, replace entire systems when needed, renovate the home when needed, build new homes when needed.

211.    Defendants have been paid and continue to be paid millions of dollars under the 50 year ground lease, and have received revenues both from BAH payments and bonuses and incentive awards and other payments in the millions of dollars.

212.    The conduct by which Defendants allowed conditions in the Roman home to deteriorate to this level was culpable.

213.    On July 19, 2019, the Romans reported water leaking from the range hood.  A maintenance technician came but advised there was no repair needed.  In fact, on information and belief, a repair was needed. The range hood continued leaking. The Romans were unable to use their stove.

214.    Presumably for that tenant interaction, FBRC opened, marked successfully fulfilled, closed, and used as a basis for BAH payments and incentive awards, a work order.

215.    On July 25, 2019, the Romans again reported the leak and the presence of mold on the range hood.  The Romans were unable to use their stove until the range hood and duct were purportedly fixed, or remediated, on July 26, 2019.

216.    After the "remediation," Mrs. Roman discovered the duct was never replaced.

217.    On August 21, 2019, the Romans discovered the presence of mold and rust on the vent register in the laundry area and in the upstairs rooms.  They also discovered condensation and water accumulating in the dryer.  The Romans were displaced and moved to a hotel, from August 21 to August 30, 2019.

218.    The following photographs show some of the mold, rust and condensation:

4880-7172-6381.1




*Photographs 39 and 40: Rust, Mold, and Condensation*




*Photographs 41 and 42: Rust, Mold, and Condensation*

219.    On August 23, 2019, the Romans stopped by their home and discovered that proper containment was not set up to ensure personal belongings were not contaminated.  The AC unit was left running by Defendants. The below photographs depict the "containment" attempt.

4880-7172-6381.1



_Photographs 43 and 44_: Improper Containment

220.     On August 25, 2019, the Romans discovered that the ducts were not encapsulated properly. The below photographs are the inside of the ducts:



_Photographs 45 and 46_: Inside of Ducts

221.     The further that the Romans looked into the condition of their home, the more problems that they found.  They had no recourse, in their minds, except to complain and make requests to the property manager, the landlord.  However, the landlord clearly had no intention to alleviate the slumlord conditions.  Rather, the landlord depended on a loss-avoidance strategy that was unfair and deceptive.  It included these elements:

a.   Simply overlooking decrepit conditions of housing and allowing the decrepit units to stay in use.

b.   Budgeting a minimal customer service facility which ignored, underserved and lied and fibbed to the tenants.

c.   Not allowing tenants to withhold their rent money.  It was automatically paid.

d.   Taking advantage of the tenant perception that the landlord was the government, and not a private company.  Tenants believing the landlord was the Army were less likely to complain or sue.  It could interfere with the servicemember's career or mark him as a whiner.  Also the Army was taxpayer money and maybe slumlord conditions was all the government could afford.

e.   Defendants also deliberately obfuscated the nature of the governing law and its legal duties. In truth Defendants owe multiple common law and code and standard as well as statutory duties, but for years Defendants hid behind the "federal enclave" doctrine and asserted governmental immunity.  Under the circumstances this was not just a position taken on a choice-of-law issue, but a loss avoidance measure.  In fact, the law is fairly clear that federal enclave status here does not insulate Defendants nor is there any immunity.

g.   In short, Defendants have concededly provided unacceptable housing conditions for some residents at Belvoir for the last five years.  Affected tenants can be identified.  Defendants do not contest and cannot contest liability globally in certain important respects.  Defendants out of their duty to act in good faith and with fair dealing toward the housing project, should assist Plaintiffs with identifying the affected Belvoir families.

222.   As a result of their exposure to conditions in the two Fort Belvoir military housing units provided by Defendants, the two Roman daughters suffered from chronic coughs, chronic ear infections, bronchitis and pneumonia.

223.   The youngest daughter, who is developmentally delayed and in special education classes in Fairfax County Public Schools, developed asthma.  She requires ongoing therapy.

224.   As a result of the conditions in both of the Fort Belvoir housing units provided by Defendants, the Romans decided to move off base Labor Day 2019 to 9162 Power House Road in Lorton, VA.  The Romans now reside in North Carolina.

**Facts Regarding Plaintiffs John and Cassie Lane.**

225.    Supervisory Special Agent Lane is a career member of the United States Army. John and his wife Cassie have four minor children, who were as of mid-2022 between ages nine and 14.  Defendants had actual knowledge of the fact that the family entering the residential unit in the case of the Lanes had young children who therefore, by that very status, had an important need for clean and healthy housing.

226.    From on or about April 21, 2015 through in or about June 2018, Mr. Lane, his wife Cassie, and their four minor children resided in military housing at Fort Belvoir at 9739 Barlow Road, Fort Belvoir, VA  22060.   Below is a photo of the exterior:



*Photograph 47: Exterior of structure.*

227.    The Lane family, while they lived at 9739 Barlow Road, Fort Belvoir, VA 22060 from April 2016 to June 2018, had maintenance at their home three times to address mold.  Serious concerns over testing and quality of work were not addressed.  Mold in the home was clearly a reoccurring problem and the root cause was never explored, just the visible signs.

4880-7172-6381.1

228.    In June 2017, Cassie complained of a mildew smell coming from her side of the bed in the master bedroom.  The Lanes asked housing to investigate.  Janet Mooneyhan, Senior Community Manager-Dogue Creek, was convinced to look at the problem area the family identified in the southeast corner of the master bedroom.  Upon viewing it herself, Ms. Mooneyhan moved the family into a temporary housing unit directly across from the Barlow Road home for a week while work could be done.

229.    The family was especially concerned about mold and mildew and the recognized health effects associated with environmental contaminants in the home, because of their young children.  For instance, their youngest child typically slept in a little sleeper next to the bed in the master bedroom.  It was right near the place of concern for the smell of the mold and mildew.

230.    While the work took place, the family saw a large amount of insulation and sheetrock removed from the Barlow Road home, in part discolored with mold.  Large parts of the inner East and South walls were removed.  Maintenance also did some landscaping work to ensure rainwater was not flowing back at the house causing moisture.   The mold was not to the family's knowledge tested.  When they raised concerns, they were assured that the company treated all mold as if it were black mold, and that makes it somehow cheaper not to test.  The smell came back shortly after the work was done.  The family also learned after this repair that the neighbor whose living room wall was shared with the Lane's master bedroom wall had to dispose of photos because mold grew through that same wall earlier.

231.    During their approximately two weeks spent in the temporary house, the Lanes noticed that it had some mold growing out of/around the electrical outlet that was on the wall below the sink.  Agent Lane was especially concerned, as he had previously heard of an incident

in which a fire at one of the units was reportedly caused or contributed to by virtue of electrical shorting or arcing secondary to mold intrusion.

232.    On September 25, 2017, the Lanes asked maintenance to come back because of the condition of the wall in the master bedroom.  The sheetrock became saturated from the inside and the paint started changing shape and color.  A hole was cut in the wall and "George," the maintenance supervisor, related that it felt dry inside and it was fine.  The inside of the wall was treated with something called "Kilz" and the wall was repainted.  The strong smell of mold remained.  The family was not moved out when this one-day repair was done. The family requested to be moved from the home with only one year left on assignment, but housing would not pay for the move because, according to them, the mold was under control.  These conversations took place with Ms. Mooneyhan, who seemed to be annoyed, and with George, or, with Eddra Romero, Assistant Community Manager-Dogue Creek.

233.    On information and belief, the product used by the workman was "KILZ® ORIGINAL Oil-Based Primer." Its product information states: "Trusted by pros for over 40 years, excellent sealing and adhesion properties help paint adhere to most interior surfaces leading to better results.  Use on wood, drywall, plaster, paneling, wallpaper, masonry, brick, painted metal and properly prepared glossy surfaces†. Not recommended for mold or mildew-prone surfaces or on flooring." (Emphasis added).

234.    On March 29, 2018, in preparation for a Spring Break trip and their upcoming move, the Lane family was removing items from the large hall closet closest to the living room and noticed the wall was becoming saturated with a black, fur-like substance that was pushing the paint off the wall.  The family was again asked to leave the house for repairs.  The Lanes left the house a day early and went on their vacation.   While in Niagara Falls, the Lanes made an ICE

4880-7172-6381.1

complaint by phone because housing was again refusing to test the mold of explore the extent of the spreading of it.  The Lanes never received a reply from this complaint.

235.    After their trip, Mr. and Mrs. Lane started sleeping in their children's rooms or the living room because the smell was so strong in the master bedroom.  They then noticed the same smell in the small bedroom on the South side of the house.  The Lanes continued to get more and more angry over the situation because they could not get their children and belongings out of the house sooner than the PCS date.   The Lanes also made a complaint to Senator Murkowski's office.

236.    The Lanes explained all of these facts to the inspector at the time of their move-out. They were told that the inspector was separate from housing and would ensure that things were handled properly before someone else had to go through the same thing.

237.    Following their move-out, the Lanes were contacted by a neighbor who was aware of their situation.  The neighbor told the Lanes that approximately two weeks after they left, a new family moved in, including a military spouse with a health condition.  This made the Lanes yet more concerned.

238.    Since the time that the family first moved into the military housing unit at Fort Belvoir, the Lane family has had health problems that can be associated with exposure to mold. These have included sinus problems; aggravated autoimmune problems; respiratory issues; sickness in the children; neurological issues with the children; and other adverse health effects.

239.    The Lanes recall that the landlord cleaned the HVAC ducts in the unit on two occasions.  The first time it was said to be part of some routine maintenance.  The second time, the duct blowdown occurred because the family asked for remediation of the mold issues.  Agent Lane recalls that when he came home after the blowdown occurred, there was a noticeable coating of dust over everything they owned.

4880-7172-6381.1

51

240.    On one occasion, a landlord representative told the Lanes they could "just use vinegar" to deal with the mold.  Another time, one of the landlord representatives claimed that this was the first the landlord had ever heard of a mold issue.  The Lanes find this not credible.

241.    The Dogue Creek units appear to have been built circa 1956 and are over 60 years old.  There are said to be 270 total housing units in Dogue Creek, consisting of townhouses and semi-attached bungalows (primarily three-bedroom units, with some two-bedroom units).  Some units were said to be renovated in the 1990s.

242.    The Dogue Creek address was not the only time the family had lived at Fort Belvoir.  Years earlier, Agent Lane had been stationed there circa 2010, and they had resided in better community.  At that time, Dogue Creek had a reputation as being more of a "ghetto."  They were thus reluctant to take a home in Dogue Creek when, in 2015, they got ready to return to Belvoir.  They went online and sought to choose and reserve a unit to lease that was part of The Villages at Belvoir but in a different community, not Dogue Creek.

243.    The Lanes believed that they had successfully reserved a home.  But then when they arrived after a lengthy drive at Fort Belvoir, the housing office said that home was taken.  The property management tried to convince the family to take a home at Dogue Creek.  The family was at this time in a state of uncertainty, staying in a hotel.  The property manager representatives, however, gave them a sales pitch for Dogue Creek, saying they had renovated units.  Had the family known the actual facts, they would have refused the unit.

244.    On information and belief, during the time frame when the Lanes resided in the Dogue Creek home, the above-identified Ms. Mooneyhan was the Senior Community Manager for The Villages of Belvoir, listing herself as working for Michaels; she held this position from September 2014 until February 2019.

4880-7172-6381.1

245.    On information and belief, and according to her resume, during that period of time, Ms. Mooneyhan assisted the Community Director in overseeing six communities at Fort Belvoir, comprised of 2,154 homes in total.  She supervised 18 staff members.  She was responsible for conducting training for new hires; for ensuring that all communities are appropriately staffed; for helping to develop and implement new policies; and for ensuring property management software conversion from Yardi to RealPage.  She was the first point of contact for five Community Managers.  In addition to all that, she managed the Dogue Creek community comprised of 265 multifamily town homes, overseeing the office and maintenance staff and contractors.  She was obligated to meet budget requirements.  She has held out that she conducted weekly property inspections and submitted daily/weekly reports to corporate, audited resident files, was involved in move in walk throughs, and reviewed I.C.E. comment cards.

246.    During the relevant period of time, Ms. Mooneyhan did not have special expertise in assessing or addressing root causes of habitability problems in older structures; nor did she have special expertise in mold safety or mold removal and remediation.  On information and belief, she was not authorized to have units or structures condemned, rebuilt, or renovated due to mold or other issues.  Had there been management recognition of the mold problems at Dogue Creek, conscientious, accurate and honest assessment, documentation and workup of tenant complaints, and due care taken with regard to the infrastructure duties held by Defendants with regard to military families with infants and children, none of the problems experienced by the Lanes would have occurred.

247.    The Dogue Creek unit in which the Lane family resided was in an older building with five units total.  The Lanes are concerned, with a reasonable basis given the fact that they are all in the same old building, that the other units in that building also had mold.  As noted, their

4880-7172-6381.1

next-door neighbor did confirm mold that had spread through the connecting wall, and had grown so bad that at one point this neighbor said she had to throw out family photos.

248.    The Lanes are also concerned that other families may have had to go through the nuisance and disruption of being temporarily displaced from their homes, due to the poor housing conditions, in the same manner as the Lanes were.  In this regard, it was reported in December 2019 that 30 families were displaced due to poor housing conditions at Fort Belvoir.[22]  It was also reported that "[n]early all of the family displacements have involved mold in the home, which means persistent moisture."[23]

**Additional facts regarding general background and the MHPI.**

249.    In 1996, Congress enacted the MHPI in response to DOD concerns about the effect of poor-quality housing on servicemembers and their families.    Being a landlord is not a core competency of the military.    Under the MHPI, responsibility was transferred to private-sector developers for construction, renovation, maintenance, and repair of housing.    The formal entity owning the housing and acting as the landlord is an LLC like FBRC here, which follows a business model of having a secondary, minority, passive member which is the Army or another military branch, and a primary, active, lead managing member who is one of the private sector developers. The LLC itself that is the landlord, FBRC here, is not a governmental agency and is not covered by governmental immunity or by the enclave doctrine,[24] as the federal government itself has

---

[22] *See* Angela Woolsey, No home for the holidays: 30 military families still displaced by poor housing conditions at Fort Belvoir, Dec. 6, 2019, Fairfax County Times, https://www.fairfaxtimes.com/articles/no-home-for-the-holidays-30-military-families-still-displaced-by-poor-housing-conditions-at/article_7d86537c-1878-11ea-a5d2-fbd3f210b174.html.

[23] Paul Lara, Industrial hygienist brings purpose, passion to Belvoir housing mission, March 9, 2020, Belvoir Eagle, https://www.army.mil/article/233608/industrial_hygienist_brings_purpose_passion_to_belvoir_housing_mission.

[24] *See Page v. Corvias Grp., LLC*, No. 5:20-CV-336-D,2021 U.S. Dist. LEXIS 172968, 2021 WL 4163562 (E.D.N.C. Sept 13, 2021) (unpub.) (enclave doctrine did not apply to set substantive law for similar military family claims brought regarding housing at Fort Bragg; *Burn v. Lend Lease (US) Pub. P'ships LLC*, No. 7:20-CV-174-D, 2021 U.S. Dist. LEXIS 172963, 2021 WL 4164685 (E.D.N.C. Sept. 13, 2021) (same, Camp Lejeune).

4880-7172-6381.1

emphasized in past Court submissions.[25]

250.    Since 1996, private-sector developers and property management companies assumed primary responsibility for military family housing and became responsible for the construction, renovation, maintenance, and repair of about 99 percent of domestic military family housing in the United States.

251.    Under the MHPI, the private company (through appropriate subsidiaries, and subleases, as with FBRC here which is the liable landlord/owner Defendant) enters into a 50-year ground lease with the applicable department of the military.  These ground leases share generic similarities.  Under the ground lease terms, the relevant branch of the military is not involved in the day-to-day operations pertaining to the construction or management of the housing units.

252.    After the MHPI public-private partnership program in the late 1990s, Defendants and/or their subsidiaries and related entities won bids for privatization projects to operate housing on multiple military bases.

253.    In order to win the bids for bases, including for the Fort Belvoir base, Defendants and/or their predecessors made promises and representations to the U.S. Army and the U.S. Government to the effect that if awarded the work at Belvoir, Defendants would provide excellent, gold-standard housing to military families.

254.    At the time that Defendants or their predecessors were awarded the Belvoir housing under the 50 year ground lease in 2003, some of the housing inventory consisted of residential units in poor and aged condition that should have been replaced entirely by new housing, or

---

[25] *Beck v. Camp Pendleton and Quantico Housing LLC*, No. 3:20-cv-00579-LAB-WVG (S.D. Cal.), Doc. 39 (United States' Statement of Interest filed in that case). *And see Whatley v. Atlantic Marine Corps Communities, LLC,* No. 9:17-cv-02716-DCN (D.S.C.), Doc. 24 (Statement of Interest regarding Tri-Command privatized housing).
4880-7172-6381.1

extensively renovated, before it was rented out to military families with young children.

255.    However, despite being paid many millions of dollars to design, build, renovate, repair, maintain, manage and to lease out the housing units at Fort Belvoir, and despite having the ability to renovate or replace units at any time, Defendants failed to take the problem units out of the inventory of actively leased housing.

256.    Solely for cost reasons, during the pertinent times, Defendants allowed many of the housing units at Fort Belvoir to remain in legally uninhabitable conditions, and yet to continue to be rented out to families with infants and young children whose health status was inherently vulnerable.

257.    During the pertinent times, in the years after being awarded the ground lease, Defendants failed to pay the costs associated with renovating and replacing problem homes at Belvoir.  Defendants also cut costs with regard to staffing, customer service and repair and maintenance.  Many of the families who were thereby placed in substandard housing conditions, did not complain, due to their lack of power, their concern over chain of command / career repercussions, due to the fact that they had no control over paying their own rent and could not hold it back until problems were fixed; and due to the fact that on average within a year or two of being sent to Fort Belvoir, it was likely the lower enlisted servicemembers in particular would be posted over to a new station and would therefore leave Belvoir.

258.    During the pertinent times and the last five years, any reasonable and competent operation of the rental housing at Fort Belvoir, would have included a general practice of truthfulness to tenants, a no-tolerance policy for dangerous mold, and that problem homes would have immediately been taken out of the rental home inventory.  However, over the years from 2003 until 2018, Defendants allowed the housing and their tenant care to deteriorate.  Defendants

4880-7172-6381.1

used an unreliable work order system and a slanted customer survey process to hide the problem from the government.  Top military commanders, including base-level commanders who lived in special officer housing excluded from this lawsuit, knew little or nothing of the true conditions.

259.    FBRC was established to be the Landlord of military housing units leased under the MHPI Contract.

260.    Under the pertinent management and other agreements, one or both Defendants during the pertinent times while Plaintiffs resided at Fort Belvoir had a duty to manage and maintain the military family housing at Fort Belvoir, including the residences for the named plaintiff families. Management of the military family housing on Fort Belvoir was without direct supervision or control by the Army.

**The Fort Belvoir Ground Lease.**

261.    Under the December 1, 2003, 50-Year Ground Lease, Defendants collect rents equivalent to the BAH.  The BAH amount is set by the military to reflect a rental amount that would obtain reasonable quality housing in the region.  The BAH amount varies according to rank.

262.    Paragraph 7 of the ground lease requires the Lessee (Defendants) to "faithfully observe and comply with all applicable Federal, State and local laws, regulations, orders, ordinances, permits and all covenants of Lessee under the Deeds…."

263.    Read in its entirety, the 50-Year Ground Lease placed a duty on Defendants to provide Plaintiffs with safe and clean housing.

264.    During the class period within the last five years, Plaintiffs and other servicemember families did not receive safe, clean housing. Rather, the rental housing offered by Defendants was plagued by water intrusion, mold, mildew, filth, insect pests, broken and unreliable HVAC and appliances, and other problems such as dirty carpets, loose door boards,

4880-7172-6381.1

rust, holes in walls and outlets, and cracks in window screens and windowsills.

**Lease Agreements with Servicemembers.**

265.    During the pertinent times, the Defendants have promulgated generic form lease agreements with take-it-or-leave-it terms.  The form leases of the named Plaintiff servicemember lessees are substantially similar.  The terms of the form lease and incorporated materials reflect that Defendants were obligated to provide quality housing and property management.  The terms also reflect that servicemember families were effectively captive to the lease over its term.

266.    The terms of the form lease represented that the Tenant's monthly rent shall equal the service members' BAH amount.

267.    The form lease reflects that normal state law applies, including state landlord-tenant law.  See lease section 24(a):  "Landlord may terminate this Agreement and may commence <u>an eviction action</u> against the Tenant in accordance with federal, <u>state and local law</u> for Tenant's failure to pay rent or for one or more violations by Tenant of this Agreement, including the Resident Responsibility Guide, that affect or threaten to affect the health or safety of other residents in the community or substantially interfere with the right to quiet enjoyment of other residents."  (Emphasis added).

268.    The form lease expressly incorporated by reference a "Resident Responsibility Guide" ("RRG"), which formed part of the form lease and was also a generic document.

269.    The RRG that was expressly incorporated into the form lease defined "Landlord" as "Fort Belvoir Residential Communities, LLC (FRBC)".

270.    The RRG clearly contemplated that state and local laws and building codes apply to the housing.  *See, e.g.,* RRG § 2.2: "<u>Landlord agrees to maintain all electrical, plumbing, heating, ventilating, air conditioning, appliances and other facilities and common areas in good and safe</u>

4880-7172-6381.1

working condition, subject to the covenants and duties undertaken by Resident(s) below. Landlord further agrees to comply with all applicable building and housing code requirements governing residential rental property in the Commonwealth of Virginia."  (Emphasis added).

271.    The "Resident Responsibility Guide" provided in part in the introduction section to that document:

Welcome to your new home and to The Villages at Belvoir!  **Recognizing how much you and your family sacrifice for our country, we are deeply honored and proud to have the privilege of serving you at home.**

We know that **your quality of life** is not just impacted by your home here at The Villages at Belvoir, but also by the quality of the community in which you live and the services you receive as a resident. To ensure that **your time with us as a resident is enjoyable and stress free**, our team is dedicated to providing you and your family with **a level of quality services that exceed your expectations**. For example, your community features an on-site community management team, and we provide you with lawn care, leaf removal, and a 24-hour emergency and routine maintenance request line….

The Villages at Belvoir community offers military families new, renovated and traditional homes along with five new community centers and offices, each of which features numerous amenities available to you and **for the enjoyment of family** and friends. Fort Belvoir Residential Communities, LLC (FRBC) continues to enhance and add to the many amenities located throughout our community, and your ideas and suggestions are always welcome.

This Resident Responsibility Guide (RRG) is a legal part of the Resident Occupancy Agreement (Agreement)….

(Emphasis added).  The emphasized language clearly shows that the company was aware of the family quality of life aspect of the leased-housing product that they offered.

272.    The RRG goes on to have FBRC promise "the highest standards pf family housing":

The Fort Belvoir Residential Communities, LLC (FBRC) partnership officially began operations at Fort Belvoir on 1 December 2003, and our team has been working ever since to **rebuild, renovate, and maintain to the highest standards of family housing at Fort Belvoir….**

(Emphasis added).  The RRG also touted Defendants' repair and maintenance services as being

4880-7172-6381.1

59

first-rate:

> Key features of the Property Management and Operations Plan include:
> - Five Neighborhood Centers with Community Management Offices that are open to serve Residents Monday through Friday from 8:30 a.m. until 5:30 p.m.
> - **A response time of 72 hours for routine service requests, a four (4) hour response time for urgent service requests, and immediate (no more than one hour) response time for emergency situations.**
> - Hosting Resident social programs, community events, and participating in Army family services and programs.

(Emphasis added).  Clearly this language among other things was meant to make family members believe that if they moved to The Villages at Belvoir, if they needed a repair, they would receive it quickly at their unit. And, Defendants' representations also reasonably implied that the repairs would be performed competently, and that if there was a problem, it would be repaired.  The document also represents: "**The FBRC mission is simple: To improve the quality of life for members of the armed forces and their families.**" (Emphasis added). The RRG also implies that that FBRC delivers the unit to the tenant in excellent condition by adding that: "When vacating, the Resident must leave the Premises in **the same high standard of cleanliness and repair that it was received**." (Emphasis added).

273.    The RRG expressly incorporated into the form lease further provided as follows, that Defendants would automatically receive the BAH:

> Each Resident senior service member will receive a monthly Basic Allowance for Housing (BAH) for the Fort Belvoir duty station based on the Resident's rank and family status. At the time of move in, the senior-ranking service member must establish an allotment to FBRC with the Defense Finance and Accounting Service (DFAS) using the Military Assistance Company (MAC) in order **for Landlord to receive rent automatically.** Proof of such action must be provided to Landlord at the time of Agreement signing, by submission of DD Form 5960 accompanied by a copy of the Resident's military assignment orders.

274.    The RRG further provides, under section 5.2, Exterior Condition/Appearance, that

4880-7172-6381.1

"Landlord is **responsible for all exterior repairs and maintenance**.…" (Emphasis added). Importantly, in this regard, while the tenant owned the occupancy interest in the home, the landlord owned the home itself, under the 50-Year Ground Lease.  When residential units had water intrusion issues and gaps and openings in the exterior surface, this was the landlord's duty to monitor and correct.  By not taking adequate care of the homes, the landlord, here FBRC, unreasonably and substantially impaired and intruded upon the tenants' occupancy interest, and violated its contractual and landlord-tenant statutory duties.

275.    The RRG further provides, under Section 5.5, Maintenance and Repair, that the "Landlord agrees to" among other things "Keep common areas clean", to "Provide pest control services as needed;" "**Maintain fixtures, furnaces, water heaters, and appliances in good and safe working condition; and "Make all reasonable repairs**." (Emphasis added).  The landlord this promised to provide effective pest control, to maintain and repair fixtures and appliances such as HVAC, and to make all reasonable repairs.

276.    The RRG further provides under section 11.12, that the "**Landlord has a duty to repair or remedy a condition that materially affects the physical health or safety of a Resident**." (Emphasis added).

277.    During the class period, as a result of Defendants' uniform property management policies, practices, and funding, the Defendants' representations described above were false and contractual promises were breached for Plaintiffs and class members.

278.    Under the form lease, the servicemember tenant agrees to pay monthly rent equal to the Basic Allowance for Military Housing and their allotted dependent rate (the "BAH") at the Resident's duty station of the pay grade of the Resident service member.

279.    There is no ability for a service member to negotiate the price of this housing; the

4880-7172-6381.1

61

service member is required to pay the rent in full.  A service member must forfeit the entire BAH upon acceptance of housing. Service members have no discretion or choice.

280.    The Plaintiffs and class members singed a generic form lease with take-it-or-leave-it terms. They were forced to accept the conditions of the lease, which is a contract of adhesion because military members are transferred under orders for Permanent Change of Station (PCS), because families have very limited resources, and for other reasons. The Plaintiffs and class members were effectively held captive to the leases. Plaintiffs and class members detrimentally relied on the Defendants to provide reasonable, quality housing.

281.    The BAH program provides an in-kind, tax-free benefit to service members in recognition of the fact that the average military assignment of three years makes purchasing a home untenable.  By obtaining automatic assignment of the BAH through the provisions of the form lease, Defendants treat the BAH as a guaranteed revenue stream.

282.    The lease agreement during some or all of the pertinent times prohibited the residents from taking many self-help measures.

283.    Defendants were aware when agreeing to perform privatized military housing construction, repair and maintenance services at Fort Belvoir that the base was located in a warm, wet, southern climate and environment, in low-lying lands near the ocean and its inlets, and subject to periodic hurricanes and weather events. The climate and environmental conditions of Fort Belvoir are conducive to water intrusion and the growth of mold.  During the class period, Defendants breached their contractual and landlord-tenant duties to provide safe housing and responsible property management for Plaintiffs and class members pertaining to mold.

284.    In light of the significant issues with mold, Defendants inserted a "Mold/Mildew Addendum" in their lease documents.  While much of it is self-serving, the document nonetheless

4880-7172-6381.1

does not modify, reduce, or negate the Landlord's maintenance and repair obligations under the form lease and incorporated in the "Resident Responsibility Guide".

285.    Service members and their families reasonably expect housing that is safe, habitable and properly maintained.  Defendants are required to provide such housing.

286.    Military families need and deserve safe and healthy homes at their assigned installations to sustain military and family readiness, recruitment and retention.

287.    Defendants are required to operate the housing at Fort Belvoir in good order and in a clean, safe condition at their expense, in accordance with their marketing representations that they offer first-class residential rental housing for tenants.

288.    Many military families are young families with infants or young children.  The servicemember parent is often deployed, far away from home for an extended period, or busy with demanding assignments on base. Due to these circumstances, it is important that servicemember families receive safe housing and effective service.

289.    During the last five years, Defendants' conduct has substantially and unreasonably interfered with Plaintiffs and class members' ability to use and enjoy their homes and has materially affected their health, safety and well-being in their homes, and has resulted in unacceptable, unsanitary, unsafe, unhealthy and intolerable conditions at the military housing owned and operated by Defendants at Fort Belvoir and elsewhere.   The specific facts of the named Plaintiffs, described above, reflect these unacceptable and intolerable conditions.

290.    Defendants, by virtue of their course of administering, leasing, building, and repairing the houses at Fort Belvoir, were uniquely aware, by common knowledge, of the substandard conditions of the houses, including the existence of mold, electrical, plumbing, insect, water intrusion, and HVAC issues associated with the houses they manage. Nevertheless,

4880-7172-6381.1

63

Defendants knowingly and intentionally leased houses to Plaintiffs, misrepresenting that they were habitable, and that appropriate repair and remedy work had been undertaken in the past and would be undertaken in the future.

### **Congressional and Other Investigations.**

291.    After the military housing scandal first hit the news in November 2018 due to Reuters investigative news reporting, some of the largest of the private housing companies, in an attempt to lobby for their cause and inflect the tide of negative PR, formed their own industry association.  That association was entitled the "Military Housing Association" and has a website, www.militaryhousingassociation.org.  The members of the association include "The Michaels Organization."

292.    In the fiscal year 2019 Defense Appropriations Act, Congress requested that the Government Accountability Office ("GAO") review the MHPI program.[26]

293.    In March 2020, Elizabeth Field, Defense Capabilities and Management director with GAO, stated that when her group investigated tenant complaints as to military housing, "we really found problems related to privatized housing at every location that we visited."

294.    GAO issued reports regarding the military housing, which reports on information and belief were based on part on review of Fort Belvoir records and/or records of the companies involved with the housing at Belvoir. See GAO-20-281, DOD Needs to Strengthen Oversight and Clarify Its Role in the Management of Privatized Housing (March 2020), p. 1:  "The Department of Defense (DOD) is expanding its use of work order data to monitor and track the condition of privatized housing. However, based on GAO's analysis of data provided by all 14 private partners,

---

[26] *See generally* Statement of Elizabeth A. Field, Director, Defense Capabilities and Management, GAO, Preliminary Observations on DOD's Oversight of the Condition of Privatized Military Housing, Dec. 3, 2019, No. GAO-20-280T.
4880-7172-6381.1

these data cannot reliably be used for ongoing monitoring of privatized housing because of data anomalies and inconsistent business practices in how these data are collected."[27]

295.    On information and belief, on or about March 21, 2021, the Fort Belvoir Fire and Emergency Services inspected over 25 homes in Fairfax Village for gas leaks and discovered that ten (10) of the homes suffered from gas leaks.

## CONDITIONS PRECEDENT

296.    All conditions precedent to Plaintiffs' recovery have occurred or have been waived, excused, or otherwise satisfied. All required notices have been or will be provided or were waived, excused, or otherwise satisfied.

## NO GOVERNMENTAL IMMUNITY OR ENCLAVE DEFENSE

297.    Defendants are not persons or entities acting under a federal officer so as to give rise to a defense of qualified immunity, nor are Defendants subject to any sovereign immunity, derivative sovereign immunity, governmental immunity, federal enclave or government contractor defense.

298.    None of the named Defendants are governmental officials entitled to raise the defense of qualified immunity.

299.    With regard to its involvement in one or more Clark/Pinnacle/Fort Belvoir privatized military housing projects, the United States has denied that it was controlling, supervising or managing the project.

300.    Defendants are not private individuals engaged in public service, and the Defendants violated basic landlord-tenant duties and other rights of the Plaintiffs and class members that were clearly established at the time of suit.

---

[27] https://www.gao.gov/assets/gao-20-281.pdf
4880-7172-6381.1

301.    Plaintiffs have pled no claim against the government, or one of its departments or agencies, or against a government officer or agent based on the performance of governmental duties, within the scope of sovereign immunity.

302.    Defendants are not entitled to derivative governmental immunity because they violated the government's explicit instructions in the form of the requirements and obligations set forth in the operative agreements, and the Plaintiffs and class members are persons adversely affected by the violation.

303.    Plaintiffs are not alleging a failure to warn or design defect product liability claim.

304.    The government did not exercise its discretion and approve the relevant service, repair and maintenance practices used by the Defendants. Further, Defendants were aware of dangers in their repair and maintenance practices that were known to them but not to the government.

305.    The Defendants' obligations to the government do not conflict with the state law duties alleged herein such that they may not comply with both government and state law directives.

306.    Plaintiffs do not argue that the agreements and plans that Defendants entered into with the Army were defective, but rather, that Defendants did not comply with those agreements and plans or with their own internal plans with regard to the communities.

## CLASS ALLEGATIONS

307.    Pursuant to the Fed. R. Civ. P. 23(b)(2) and (b)(3), and 23(c)(4), Plaintiffs respectfully request that the Court certify a class defined as follows:

**Class:** All servicemember tenants based at Fort Belvoir who have entered into lease agreements with Defendants for residential housing units during the five years prior to the date of filing of the complaint, and all authorized adult family member spouses or other occupants.

4880-7172-6381.1

**Rule 23(c)(4) Issues:**

1.      Did Defendants have a duty to undertake a root cause analysis of homes in the active inventory at Fort Belvoir, with regard to moisture intrusion, mold, environmental dangers, HVAC problems or general decrepitude, prior to when the homes were rented to Plaintiffs and class members?

2.      Did Defendants engage in creation of a private nuisance, unfair and deceptive repair and maintenance practices, or a breach of their express or implied landlord-tenant duties, with regard to a group of the privatized Belvoir housing units that can be identified as Problem Units, for a subgroup of the tenants who can be identified as Complaining Families, over the last five years?[28]

Plaintiffs further request certification of two subclasses defined as follows:

**Injunctive relief subclass:** All servicemember tenants based at Fort Belvoir who currently have ongoing lease agreements with for the privatized military housing residential housing units with FBRC.

308.    Excluded from the Class are Defendants' legal representatives, officers, assigns, directors, successors, and other individuals as is normal and customary in class certification.  Also excluded are all persons who make a timely election to be excluded from the Class and any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff.  Also excluded are upper-level officers residing in the highest-level homes offered

---

[28] "Problem Units" are defined as housing units with mold, moisture, HVAC or other relevant documented issues in the work orders and other applicable business records, as per examination of those records.  "Complaining Families" are defined to include any families, who were tenants or adult occupants, of Belvoir housing, who are documented to have complained about housing conditions, under identification criteria including that they have complained publicly about poor housing conditions or complained as per examination of applicable Defendants' business records or complaints to military branches or watchdog agencies.  Plaintiffs reserve the right to amend this class definition as investigation and discovery proceeds.
4880-7172-6381.1

by FBRC, as these residential units are outliers.

309.    This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements. Plaintiffs seek to represent an ascertainable class, as determining inclusion in the class can be done through review of Defendants' own records.

310.    Fed. R. Civ. P. 23(a)(1) (numerosity):    The members of the Class are so numerous that joinder of all members is impracticable.    While the exact number of Class Members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.    The disposition of claims of these Class Members is a single action will provide substantial benefits to all and an efficient means to adjudication.    If many individuals were to proceed the courts would be overrun with claims and also enables litigation where it might otherwise not occur if individual claims are small and/or class members are financially unable to fund litigation themselves, individual joinder is practically impossible. Members of the Class may be notified of the pendency of this action by both regular and electronic mail using a form of notice customarily used in class actions.

311.    Fed. R. Civ. P. 23(a)(2) (common issues):    Questions of law and fact common to the Class exist, which predominate over any questions affecting only individual Class Members. These common questions of law and fact are shared among the Class Members as the deficiencies claimed herein have affected all Class Members, including, inter alia:

A.    Whether, during the class period, some or all of the Defendants were subject to contractual duties under the terms of the form lease;

B.    Whether, during the class period, the Defendants breached their contractual duties under the leases entered into with Plaintiffs and class members;

C.    Whether, during the class period, the Defendants violated the Virginia Residential Landlord/Tenant Act;

4880-7172-6381.1

68

D.      Whether Defendants breached the implied warranty of habitability;

E.      Whether class members have suffered impairment of their occupancy interest in their leaseholds rising to the level of breach of the warranty of habitability;

F.      Whether Defendants have caused Plaintiffs and class members to experience substantial and unreasonable loss of use and enjoyment of their occupancy interests causing Defendants to be liable for temporary recurrent private nuisance;

G.      Whether, during the class period, the Defendants caused there to be unacceptably bad housing conditions for an unreasonably high number of servicemember families at Fort Belvoir;

H.      Whether, during the class period, the Defendants engaged in unfair and deceptive trade practices in connection with Plaintiffs and class members proscribed by Virginia's Consumer Protection Act ("VCPA");

I.      Whether, during the class period, the Defendants engaged in unfair and deceptive service, repair and maintenance policies and procedures with regard to the residential housing at Fort Belvoir;

J.      Whether Defendants overcharged Plaintiffs and class members for repair and maintenance items or obligated Plaintiffs and class members to pay out-of-pocket for services or products for which Defendants should have paid;

K.      Whether the capital expenditures and structural reforms announced by Defendants only after congressional hearings should have been implemented years ago;

L.      Whether, due to the structural inadequacy of Defendants' uniform customer service, repair and maintenance policies during the class period, the Plaintiffs and class members did not receive the rental housing they were promised or that their BAH was to pay for;

M.      Whether Plaintiffs and class members have sustained damages and, if so, what is the proper measure of damages;

N.      Whether the circumstances giving rise to a private nuisance are abatable;

O.      Whether the Court should order full or partial refunds or disgorgement of BAH revenues obtained over the class period; and

P.      Whether the Court should award other declaratory, injunctive or equitable relief.

312.    Fed. R. Civ. P. 23(a)(3) (typicality):  Plaintiffs are members of the putative class.

Plaintiff's claims are typical of those of other Class Members because they are or have been all residents of Ft. Belvoir base housing. All such claims arise out of the same course of events and each class member has similar legal claims and arguments that prove the Defendants liability under the causes of actions alleged herein and are like that of every other Class Member.  All of the Plaintiffs and the Class Members were directly affected by the deficiencies claimed herein, which resulted in damages to the Plaintiffs and Class Members who have all suffered and will continue to suffer harm and damages as a result of the Defendants unlawful and wrongful conduct, the factual basis of which is common to all Class Members. The claims asserted by the Plaintiffs are typical of the claims of the members of the putative class, as the claims arise from the same course of conduct by Defendants and the relief sought is common.

313.    Fed. R. Civ. P. 23(a)(4) (adequacy):  Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative class, as their interests coincide with, and are not antagonistic to, the other members.  Plaintiffs have retained counsel competent and experienced in both military housing and class action litigation.

314.    Fed. R. Civ. P. 23(b)(1)(A):  A class action is appropriate because prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

315.    Fed. R. Civ. P. 23(b)(1)(B): A class action is appropriate because adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

316.    Fed. R. Civ. P. 23(b)(2):  A class action is appropriate because Defendants have

4880-7172-6381.1

acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

317.    <u>Fed. R. Civ. Pro. 23(b)(3) (Predominance and Superiority)</u>:  Certification of a class is appropriate because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affection only individual members.  The Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members and the deficiency issues arising from the Defendants' conduct that affected the Plaintiffs was common to all Class Members.  This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications and to avoid piecemeal litigation.

318.    Absent a class action it would be highly unlikely that the members of the class would be able to protect their own interests.  This is not necessarily because the cost of litigation through individual lawsuits might exceed the expected recovery and the individual claimant would therefore have no effective remedy.[29]  Rather, it is because most families do not know they have potential legal recourse.

319.    A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and the burden of the courts that individual actions would create. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that may not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of the

---

[29] (In fact, a temporary private nuisance verdict, if the facts are particularly compelling, can be significant).
4880-7172-6381.1

class action.

320.    <u>Fed. R. Civ. P. 23(c)(4)</u>:[30]  In addition, or in the alternative, the certification of a class limited to one or more of the common issues is appropriate because proof of one or more common issues of general relevance to all class members would substantially simplify their ability to proceed further with individual claims.

321.    Defendant has acted on grounds that apply generally to the Classes as a whole, so that class certification and monetary damages are appropriate on a class-wide basis.

322.    All conditions precedent to bring this action have occurred or been waived.

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF THE VIRGINIA RESIDENTIAL LANDLORD/TENANT ACT**
**CHAPTER 12 § 59.1-1200 THROUGH § 59.1-1262**

323.    Plaintiffs re-allege the above paragraphs 1 to 322 as if fully set forth herein.

324.    This claim is brought by Plaintiffs individually and on behalf of a subclass of all class members who were occupants of residential units at Fort Belvoir for which Defendants, or any one of them, were the owner or property manager within the last three years.

325.     During the pertinent times, Defendants had a duty to provide fit and habitable housing under the Virginia Residential Landlord and Tenant Act and/or Virginia common law.

326.    Virginia Code § 55.1-1220 provides that landlords shall, in part:

1.    Comply with the requirements of applicable building and housing codes materially affecting health and safety;

2.    Make all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition;

3.    Keep all common areas shared by two or more dwelling units of a multifamily premises in a clean and structurally safe condition;

---

[30] Fed. R. Civ. P. 23(c)(4) ("(4) *Particular Issues.* When appropriate, an action may be brought or maintained as a class action with respect to particular issues.").
4880-7172-6381.1

4.    Maintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating, air-conditioning, and other facilities and appliances, including elevators, supplied or required to be supplied by him;

5.    Maintain the premises in such a condition as to prevent the accumulation of moisture and the growth of mold and promptly respond to any notices from a tenant as provided in subdivision A 10 of § 55.1-1227 and § 55.1-1220. Where there is visible evidence of mold, the landlord shall promptly remediate the mold conditions in accordance with the requirements of subsection E of § 8.01-226.12 § 55.1-1231 and reinspect the dwelling unit to confirm that there is no longer visible evidence of mold in the dwelling unit. The landlord shall provide a tenant with a copy of a summary of information related to mold remediation occurring during that tenancy and, upon request of the tenant, make available the full package of such information and reports not protected by attorney-client privilege. Once the mold has been remediated in accordance with professional standards, the landlord shall not be required to make disclosures of a past incidence of mold to subsequent tenants;

6.    Provide and maintain appropriate receptacles and conveniences for the collection, storage, and removal of ashes, garbage, rubbish, and other waste incidental to the occupancy of dwelling units and arrange for the removal of same;

7.    Supply running water and reasonable amounts of hot water at all times and reasonable air conditioning if provided and heat in season except where the dwelling unit is so constructed that heat, air conditioning, or hot water is generated by an installation within the exclusive control of the tenant or supplied by a direct public utility connection; and

8.    Provide a certificate to the tenant stating that all smoke alarms are present, have been inspected, and are in good working order no more than once every 12 months. The landlord, his employee, or an independent contractor may perform the inspection to determine that the smoke alarm is in good working order.

327.    Virginia Code Section 55.1-1215 states:

"As part of the written report of the move-in inspection required by § 55.1-1214, the landlord shall disclose whether there is any visible evidence of mold in areas readily accessible within the interior of the dwelling unit. If the landlord's written disclosure states that there is no visible evidence of mold in the dwelling unit, this written statement shall be deemed correct unless the tenant objects to it in writing within five days after receiving the report. If the landlord's written disclosure states that there is visible evidence of mold in the dwelling unit, the tenant shall have the option to terminate the tenancy and not take possession or remain in possession of the dwelling unit. If the tenant requests to take possession, or remain in possession, of the dwelling unit, notwithstanding the presence of visible evidence of mold, the landlord shall promptly remediate the mold condition but in no event later than five business days after the tenant's request to take possession or decision to remain in

possession, reinspect the dwelling unit to confirm that there is no visible evidence of mold in the dwelling unit, and prepare a new report stating that there is no visible evidence of mold in the dwelling unit upon reinspection."

328.    During all relevant times, Defendants were the owners and a contracting party pursuant to the leases and otherwise subject to the coverage of the Virginia Residential Landlord/Tenant Act.

329.    During all relevant times, Defendants acted as the property manager and a contracting party pursuant to the leases, an agent of the owner, or otherwise were materially involved in providing property management services under the leases and subject to the coverage of the Virginia Residential Landlord/Tenant Act.

330.    During all relevant times, some or all of the Defendants had actual or apparent authority to perform the landlords' obligations under the leases and the Virginia Residential Landlord/Tenant Act and did perform such duties, or otherwise were subject to the coverage of the Virginia Residential Landlord/Tenant Act.

331.    During all relevant times, Virginia Residential Landlord/Tenant Act required Defendants to comply with the current applicable codes governing residential construction, required Defendants to make all repairs and do whatever necessary to put and keep the tenants' premises in a fit and habitable condition., required Defendants, within a reasonable period of time based upon the severity of the condition, to repair or remedy any imminently dangerous condition after acquiring knowledge or receiving notice.

332.    During the pertinent times, Defendants had knowledge regarding the recurrent problems of all of the housing units at Fort Belvoir.  Plaintiffs and class members did not.  During the pertinent times, Defendants received numerous tenant complaints regarding residential problems and defects.  Under the facts and circumstances, Plaintiffs and class members should be

4880-7172-6381.1

74

deemed to have satisfied any applicable notice requirement for purposes of triggering any Virginia Residential Landlord/Tenant Act duties that had a notice prerequisite.

333.    During the class period, Defendants impliedly warranted to Plaintiffs and class members that the premises available for lease were in fit and habitable condition.   In fact, Defendants knew that an unacceptably high proportion of units had mold, insects, defective HVAC systems or other deficiencies.   Nonetheless, Defendants held out their privatized housing at Fort Belvoir to be high-quality and safe.

334.    The units leased by Plaintiffs and class members have had moisture intrusion, mold, insects, defective HVAC systems and other conditions which threatened the health and safety of family members.   Defendants had adequate time to repair and remedy the unsafe and unsanitary conditions after years of complaints and repair requests but failed to make a reasonable effort to repair and remedy the defective conditions.

335.    During the pertinent times Defendants violated Virginia Residential Landlord/Tenant Act and the implied warranty of habitability as to Plaintiffs and class members, thereby proximately causing injury to the Plaintiffs and class members.

336.    As a direct and proximate result of Defendants' breaches of the implied warranty of habitability, Plaintiffs and class members were injured, and are entitled to damages and declaratory, injunctive or equitable relief to the extent available.

337.    Under Va. Code § 55.1-1220(B), "[t]he landlord shall perform the duties imposed by subsection A in accordance with law; however, the landlord shall only be liable for the tenant's actual damages proximately caused by the landlord's failure to exercise ordinary care."

338.    Here, under the circumstances, the "actual damages" should be allowed to include

4880-7172-6381.1

damages for loss of use, discomfort, irritation, annoyance and emotional distress damages.[31]   In addition, "actual damages" should be deemed to include all of Plaintiffs' BAH payments.   In addition, or in the alternative, Plaintiffs' evidence that Defendants violated their duties under the landlord and tenant statute goes to support Plaintiffs' claims for breach of contract and for restitution of all BAH monies, and for private nuisance.

339.    Defendants breached their implied warranty of habitability thereby proximately causing damages to Plaintiffs and class members, including out-of-pocket costs, costs representing the labor value of needless time consumed by residents seeking to repair and maintain units themselves, and monies representing the overpayment of BAH rent amounts in whole or in part exceeding the reasonable rental value of the units during the period of occupancy.

## SECOND CLAIM FOR RELIEF
### BREACH OF CONTRACT

340.    Plaintiffs re-allege the above paragraphs 1 to 339 as if fully set forth herein.

341.    This claim is brought by Plaintiffs individually and on behalf of a subclass of all class members who were servicemember lessees under leases with Defendant FBRC as owner, lessor and property manager, with regard to residential units at Fort Belvoir within the last five years.  During the pertinent times, servicemember Plaintiffs and class members entered into valid contracts with Defendant in the form of residential leases.

342.    This claim is brought within Virginia's five-year statute of limitations.[32]

---

[31] See Restatement (Second) of Torts § 929 & comment e (home occupant entitled to damages for discomfort and annoyance).

[32] Under Virginia law, an action based upon a written contract must be filed within five years of accrual.  *See* Va. Code § 8.01-246(2) ("Subject to the provisions of § 8.01-243 regarding injuries to person and property and of § 8.01-245 regarding the application of limitations to fiduciaries, and their bonds, actions founded upon a contract, other than actions on a judgment or decree, shall be brought within the following number of years next after the cause of action shall have accrued: … 2. In actions on any contract that is not otherwise specified and that is in writing and signed by the party to be charged thereby, or by his agent, within five years whether such writing be under seal or not…."  Under Va. Code § 8.01-230, "In every action for which a limitation period is prescribed, the

4880-7172-6381.1

343.    The leases and incorporated materials imposed explicit and implicit duties on Defendant, as owner, to perform the contract so as to ensure the units were fit for human habitation. During the pertinent times, Defendant warranted that units were reasonably safe and habitable for occupancy.

344.    During the pertinent times, Defendant failed to comply with the material terms of the leases by failing to ensure the houses were fit for human habitation and by failing to diligently repair and remedy the conditions affecting habitation.  Defendant breached provisions of the form lease and incorporated materials including by failing to provide adequate repair and maintenance services to residents.

345.    A contract carries with it an implied covenant by the parties to act fairly and in good faith in carrying out the agreement.   Defendant here had a duty to act fairly and in good faith in connection with performance under the residential leases herein.

346.    Defendant had an implicit obligation to act in good faith and make reasonable efforts to perform their obligations under the leases including, but not limited to, keeping the units safe and habitable, providing adequate repair and maintenance services, providing honest information to the tenants, and not using Defendant's vastly more powerful economic position to oppress and intimidate families.  During the pertinent times, Defendant breached the implied covenant of good faith and fair dealing.

347.    Plaintiffs sustained damages as a result of Defendant's breaches of contract including the overpayment of rent, as well as incurring of out-of-pocket expenses and other

---

right of action shall be deemed to accrue and the prescribed limitation period shall begin to run from the date the injury is sustained in the case of injury to the person or damage to property, when the breach of contract occurs in actions ex contractu and not when the resulting damage is discovered, except where the relief sought is solely equitable or where otherwise provided under § 8.01-233, subsection C of § 8.01-245, §§ 8.01-249, 8.01-250 or other statute."

4880-7172-6381.1

consequential and special damages in an amount to be proven at trial.

348.     As a proximate and legal result of Defendant's breaches of contract, Class Plaintiffs and Class Members are entitled to an award of all their actual and consequential damages including, any applicable attorneys' fees and costs, in amounts to be proven at trial.

### THIRD CLAIM FOR RELIEF
### TEMPORARY RECURRENT PRIVATE NUISANCE

349.     Plaintiffs re-allege the above paragraphs 1 to 348 as if fully set forth herein.

350.     This claim is brought by Plaintiffs individually and on behalf of a subclass of all class members who were occupants of residential units at Fort Belvoir within the last five years. The claim is brought solely against Defendant FBRC.

351.      The Plaintiffs and class members who occupied the residential units during the pertinent times have standing to bring this claim due to their possessory and occupancy interests.

352.     During the pertinent times, the Defendant proximately caused the Plaintiffs and class members to incur a substantial and unreasonable interference with their ability to use and enjoy their leasehold properties.

353.     As a direct and proximate result of Defendant's creation and maintenance of a temporary and recurrent private nuisance, the Plaintiffs and Class Members have each been injured and/or will continue to suffer the particular damages and injuries alleged herein.

354.     Plaintiffs bring their private nuisance claim within the applicable five-year statute of limitations.[33]

---

[33] *See Adams v. Star Enterprise*, 851 F. Supp. 770, 771 n.1 (E.D. Va. 1994).  That court explained:  Virginia's five-year statute of limitations covers "every action for injury to property." Va. Code Ann. § 8.01-243(B).  The court said that the essence of plaintiffs' action was that the potential spread of an oil plume depressed their property values. The action had "as its focus not relief from injury to the plaintiffs' persons, but to their property, and thus is subject to a five-year limitation under Virginia law." *Id.*, citing *Chesapeake Bay Found., Inc. v. Virginia State Water Control Bd.*, 501 F. Supp. 821, 825 (E.D. Va. 1980).  Here, the Plaintiffs claim both injunctive and damages relief.

4880-7172-6381.1

355.    The nuisance conditions herein are abatable, but Defendant unreasonably refused to abate them.  Therefore, these nuisance conditions were under the control of the Defendant, which injuriously affected each of the Plaintiffs and Class Members individually who occupied the premises resulting in continuous interference with the enjoyment and occupation of the premises. As a result of the Defendant's creation and maintenance of a private nuisance, the Plaintiffs and class members are entitled to compensatory damages and to injunctive relief in the form of an order requiring Defendant to abate the further persistence of the private nuisance.

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury of all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in their favor against Defendants as follows:

1.    For designation of the Plaintiffs as class representatives;

2.    For appointment of the undersigned counsel as class counsel;

3.    For certification of a class and specified subclasses with regard to the Plaintiffs' stated claims for relief, and/or with regard to one or more common issues under Rule 23;

4.    For an award of actual, compensatory, special, and consequential damages in an amount to be proven at trial;

5.    For an award of treble damages;

6.    For an award of rent abatement, in whole or in part, restitution, or disgorgement of monies;

---

While the Plaintiffs claim that one result of Defendants' misconduct was to make them fear adverse health effects, and in fact some family members claim they *__have__* had negative health effects, Plaintiffs do not seek the type of damages that would obligate them to put on individualized medical causation experts.  Rather, they seek damages connected with their home and property interest – the homestead is traditionally afforded special legal protection, and *__loss of use and enjoyment__* can be accounted for in a private nuisance verdict.
4880-7172-6381.1

7.      For an award of reasonable attorneys' fees and costs;

8.      For an award of punitive damages;

9.      For equitable relief to abate a nuisance; and

10.     For such other and further relief as the Court may deem just and proper.

4880-7172-6381.1

DATED: August 8, 2022.

Respectfully submitted,

/s/ Joseph M. Langone
David Hilton Wise, VA Bar No. 30828
Joseph M. Langone, VA Bar No. 43543
WISE LAW FIRM PLC
10640 Page Avenue, Suite 320
Fairfax, Virginia 22030
Phone: 703-934-6377
dwise@wiselaw.pro
jlangone@wiselaw.pro
*Counsel for Plaintiffs*

Joel R. Rhine, NC State Bar No. 16028
Martin A. Ramey, NC State Bar No. 33617
Ruth A. Sheehan, NC State Bar No. 48069
RHINE LAW FIRM, P.C.
1612 Military Cutoff Rd., Suite 300
Wilmington, NC 28403
Phone: 910-772-9960
jrr@rhinelawfirm.com
mjr@rhinelawfirm.com
RAS@rhinelawfirm.com
*Counsel for Plaintiffs*

Mona Lisa Wallace, NC State Bar No. 009201
John Hughes, NC State Bar No. 22126
WALLACE AND GRAHAM, PA.
525 N. Main Street
Salisbury, NC 28144
Phone: 704-633-5244
mwallace@wallacegraham.com
jhughes@wallacegraham.com
*Counsel for Plaintiffs*

John A. Yanchunis, FL Bar No. 324681
Kenya Reddy, FL Bar No. 459933
MORGAN & MORGAN LAW FIRM
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Phone: 813-223-5505
JYanchunis@ForThePeople.com
KReddy@ForThePeople.com
*Counsel for Plaintiffs*

4880-7172-6381.1

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 8th day of August, 2022, a copy of the foregoing *Second*

*Amended Complaint* was served electronically through CM/ECF on:

> Kathryn E. Bonorchis #80007
> Joseph Doukmetzian, 91685
> Lewis, Brisbois, Bisgaard & Smith, LLP
> 100 Light Street, Suite 1300
> Baltimore, Maryland, 21202
> Telephone: 410-525-6409
> Fax: 410-779-3910
> Kathryn.Bonorchis@lewisbrisbois.com
> Joseph.Doukmetzian@lewisbrisbois.com
> *Attorneys for Defendants*

> /s/ Joseph M. Langone
> David Hilton Wise, VA Bar No. 30828
> Joseph M. Langone, VA Bar No. 43543
> WISE LAW FIRM PLC
> 10640 Page Avenue, Suite 320
> Fairfax, Virginia 22030
> Phone: 703-934-6377
> dwise@wiselaw.pro
> jlangone@wiselaw.pro
> *Counsel for Plaintiffs*

4880-7172-6381.1