IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| **Chief Petty Officer JOHN FISCHER AND ASHLEY FISCHER** 4076 Watervale Way Orange Park, FL 32065 | |
| | |
| **Chief Warrant Officer JORGE ROMAN and RAVEN ROMAN** 1150 Camellia Drive Vass, NC 28394 | |
| | |
| **Chief Warrant Officer JOHN LANE and CASSANDRA LANE,** 20874 Mountainside Drive, Eagle River, Alaska 99577 | Civil Case No. 1:22-CV-00286 |
| | |
| **MSGT SAMUEL VIDOT and RACHEL VIDOT** 5305 Smoke House Court Fort Belvoir, VA 22060 | |
| | |
| **Staff Sergeant JAMES WAYENBERG and CHRISTINE WAYENBERG** 9536 Kezia Trail Fort Belvoir, VA 22060 | |
| | |
| **Staff Sergeant CODY ADAMS and GABRIELLE ADAMS** 9248 Miller Road Ft. Belvoir VA 22060 | |
| | |
| **Staff Sergeant DENZALE BRAGG and BRIANA BRAGG** 9519 Gunston Road Fort Belvoir, VA 22060 | |
| | |
| **Sergeant First Class STEVEN AGUILAR and MEGAN AGUILAR** 5957 Stevens Road Fort Belvoir VA 22060 | |
| | |
| **Petty Officer ANDREW ARMSTRONG And LESLIE GONZALEZ** 8229 Herb Garden Road Fort Belvoir, VA 22060 | |

**Second Lieutenant JOSE BERDECIA-HERNANDEZ
and KIM MELENDEZ
5514 Grist Mill Court N
Fort Belvoir, VA 22060**

**Navy Chief ZACHARY CAMECHIS and
ALACIA CAMECHIS,
5322A Smoke House
Fort Belvoir, VA 22060**

**JENNIFER COCCO, Retired USCM
9687 Maloney Road
Fort Belvoir, VA 22060**

**Army Specialist JAMES JACKSON
and KAITLIN COE
5304 Smoke House Court
Fort Belvoir, VA 22060**

**Sergeant JAMES HAYWARD and
DANIELLE HAYWARD
8223 Herb Garden Court
Fort Belvoir, VA 22060**

**Tech Sergeant BRYSON HUNT and
ABNIE HUNT
1879 Kula Lane
Wahiawa, HI 96786**

**Staff Sergeant BRADLEY SHIRLEY
5318 Center Road
Fort Belvoir, VA 22060**

**Staff Sergeant RAYMOND WARDEN
and TABITHA WARDEN
5362A Orchard Court
Fort Belvoir, VA 22060**

**individually and on behalf of a class of
those similarly situated,**

**        *Plaintiffs*,**

**v.**

**FORT BELVOIR RESIDENTIAL
COMMUNITIES, LLC, and MICHAELS
MANAGEMENT SERVICES, LLC,**

**and New Defendant:**

**MMS ARMY LLC**
**2 Cooper Street, Floor 14**
**Camden, NJ  08102-2348**

       **Serve Registered Agent:**
       **CT Corporation System**
       **4701 Cox Rd., Ste 285**
       **Glen Allen, Virginia, 23060-6808**

       *Defendants.*

_____

## THIRD AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Chief Petty Officer John Fischer (CPO, E-7), spouse Ashley Fischer, Chief Warrant Officer 3 Jorge Roman (CW3), spouse Raven Roman, Supervisory Special Agent John Lane, spouse Cassandra Lane, Staff Sergeant Denzale Bragg (E6),[1] spouse Breanna Bragg, Master Sergeant Samuel Vidot, spouse Rachel Vidot, Staff Sergeant James Wayenberg, spouse Christine Wayenberg, Staff Sergeant Cody Adams (E6), spouse Gabrielle Adams, Sergeant First Class Steven Aguilar, spouse Megan Aguilar, Petty Officer Andrew Armstrong, spouse Leslie Gonzalez, Second Lieutenant Jose Berdecia-Hernandez, spouse Kim Melendez, Navy Chief Zachary Camechis, spouse Alacia Camechis, Jennifer Cocco (Retired), Army Specialist James Jackson, spouse Kaitlin Coe, Sergeant James Hayward, spouse Danielle Hayward, Tech Sergeant Bryson Hunt, spouse Abnie Hunt, Staff Sergeant Bradley Shirley,[2] Staff Sergeant Raymond Warden,

---

[1] The Braggs currently have a pending administrative claim against the Defendants with the United States Army, a non-party, regarding the Defendant's obligations for repair and maintenance to the member's housing unit on Fort Belvoir pursuant to the Tenant Bill of Rights. The administrative claim should be deemed either moot or futile, or the litigation claim for the Braggs should be stayed pending exhaustion of administrative remedies.

[2] Bradley Shirley currently has a pending administrative claim against the Defendants with the United States Army, a non-party, regarding the Defendant's obligations for repair and maintenance to the member's housing unit on Fort Belvoir pursuant to the Tenant Bill of Rights. The administrative claim should be deemed either moot or futile, or the litigation claim for Bradley Shirley should be stayed pending exhaustion of administrative remedies.

spouse Tabitha Warden on their own behalf and on behalf of a class of others similarly situated, by their undersigned counsel, and for their Third Amended Complaint against the Defendants, Fort Belvoir Residential Communities, LLC ("FBRC"), Michaels Management Services, LLC ("Michaels"), and MMS Army, LLC (the last two collectively "Michaels"), hereby allege:

## NATURE OF THE CASE

29.    This is a case about basic housing protections provided by law to all Americans in rental housing – except to Servicemembers like Chief Petty Officer Fischer, Chief Warrant Officer 3 Roman, and Supervisory Special Agent Lane, who devoted years, and careers, to their country. This is a case about service men and women, and their families, whose Basic Allowance for Housing ("BAH") is paid to private companies like FBRC and Michaels who are supposed to "improve [the] quality of life for military families by offering safe, affordable and attractive residential communities." The intent behind the privatization of military housing is simple: to provide military families the same quality of life in housing as the civilians they defend. Unfortunately, as Plaintiffs and their families have learned, the Defendants -- private for-profit companies that own and manage military housing at Fort Belvoir in suburban Washington, D.C. – care more about their profit margins than the servicemembers and families whom they house.

30.    On paper, the privatized military housing at Fort Belvoir sounds ideal – two-to-five-bedroom homes with backyards and amenities. In reality, Plaintiffs and class members were placed in homes with water intrusion, mold growth and pest infestations, among other conditions, and Defendants performed insufficient and untimely repairs and remediation. Despite a long and well-documented history of failing Plaintiffs and numerous other servicemembers, during the class period, Defendants continued to pocket their BAH payments and go on with the shameful housing. Plaintiffs and the class are entitled to a full refund of all their BAH payments.

31.    Among the military bases surrounding Washington, D.C., Fort Belvoir is the largest in size and population. Although the Army operates it, representation includes all other branches

of the military and dozens of federal entities. This makes up a population of 245,000 who live and work on Fort Belvoir.  Today, FBRC is the owner/landlord for the privatized military housing and the property manager is MMS Army, LLC, part of The Michaels Organization.[3]  There are 2,154 units of privatized military housing at Fort Belvoir.[4]  The housing in in 15 communities, collectively branded as "The Villages at Belvoir," which are: Belvoir Village, Cedar Grove Village, Colyer Village, Dogue Creek Village, Fairfax Village, Gerber Village, George Washington Village, Herryford Village, Jadwin Loop Village, Lewis Village, Parker Village, River Village, Rossell Village, Vernondale Village, and Woodlawn Village.[5]

32.    According to the DOD: "Fort Belvoir housing is privatized under the Army's Residential Communities Initiative program. The program's goal is to improve quality of life for military families by offering safe, affordable and attractive residential communities. The intent of the program is to provide military families the same quality of life in housing as the civilians they defend. While Fort Belvoir Residential Communities is the owner, various private partners handle all of the day-to-day construction and operations activities."[6]

33.    The Defendants build, own, renovate, and manage the privatized housing units at Fort Belvoir under the terms of a 50-year ground lease with the Army dated December 1, 2003. Active management and control over the housing lies with the Defendants.  Their reckless conduct led to the unacceptable housing conditions for the named Plaintiffs and other similarly situated servicemember families.

---

[3] https://tmo.com/.

[4] As of 2015, "FBRC own[ed] and manage[d] 2,154 accompanied housing units in the 15 accompanied housing communities."  Inspector General, U.S. Department of Defense ("DOD"), Aug. 13, 2015, Continental United States Military Housing Inspections, National Capital Region, DODIG-2015-162 (Project No. D2014-DT0TAD-0005), p. 3 ("DOD IG 2015").

[5] DOD IG 2015, p. 2.

[6]                    https://installations.militaryonesource.mil/military-installation/fort-belvoir/housing/government-housing.   "This website is part of the U.S. Department of Defense's network of support for the military community."  *Id.*

34.     The goal of the MHPI is to provide military families with access to safe, quality, affordable, well-maintained housing in a community where they choose to live. MHPI projects involve the Army (or other military branch) leasing land and conveying housing and associated improvements to a private developer for the purpose of revitalizing, maintaining, and managing military family housing communities for a period of 50 years.

35.     As alleged below, Defendants' failure to properly maintain, manage, renovate and rebuild Plaintiffs' and class members' housing at Fort Belvoir resulted in widespread problems with moisture intrusion and mold, originally concealed but now well-known.  But-for Defendants' unlawful and uniform conduct, there would not have been defective homes in the Belvoir housing inventory.  Defendants would have engaged in timely root cause analysis of tenant complaints and housing defects, would have taken suspect units out of the active housing inventory, and would not have leased such homes to families like the Plaintiffs' with young children with developing lungs who need safe clean housing.

36.     During pertinent times, Plaintiffs and class members have paid rental/lease payments (also known as BAH payments) for the housing they rented and are entitled to a refund of their BAH due to Defendant FBRC's breach of contract and breach of the implied duty of good faith and fair dealing.[7]

37.     Further, each Plaintiff and affected family in the class suffered a private nuisance: a substantial and unreasonable impairment of their ability to use and enjoy their property interest (a lessee occupancy interest) due to the wrongful conduct by the Defendants who misused their own property interest (owner/landlord).[8]  While nuisance *damages* may not be subject to class

---

[7] *E.g., Stoney Glen, LLC v. Southern Bank and Trust Co*., 944 F. Supp. 2d 460, 465 (E.D. Va. 2013) ("The United States Court of Appeals for the Fourth Circuit has consistently held that Virginia does recognize an implied duty of good faith and fair dealing in common law contracts.").
[8] *See National Energy Corp. v. O'Quinn*, 223 Va. 83, 85, 286 S.E.2d 181, 182 (1982) (quoting Barnes v. Quarries, Inc., 204 Va. 414, 417, 132 S.E.2d 395, 397 (1963)); *Virginian Railway Co. v. London*, 114 Va. 334, 344-45, 76 S.E. 306 (1912) ("A private nuisance is the using, or authorizing

treatment, nuisance *discovery, merits and liability issues* herein are properly subject to class treatment under Rule 23.

38.     Each affected family is entitled to refund of BAH.  Each has endured a loss of habitability of their home, has had their use and enjoyment of their home impaired due to the presence of a private nuisance in the form of the premises conditions created by the landlord and which the landlord refused to alleviate via appropriate root cause analysis or renovation/replacement of problem units, and each claimant may have suffered from and may continue to suffer from adverse health effects caused by the unclean and unsafe conditions.

39.     Plaintiffs and class members share common issues.  These stem from the common facts prevalent across the putative class, and include the following:

a.   Whether during the class period embracing the last five years, servicemembers executed substantially identical form leases with the landlord.

b.   Whether the families lived in similar units built using economies of scale together in the past, meaning that the units have today similar levels of current decrepitude and uninhabitability.

c.   Whether the families experienced unfair and deceptive property management, call center, repair and maintenance service from the landlord.

d.   Whether servicemembers paid BAH amounts calculated based on the cost of reasonable rental housing; whether class members uniformly did not receive reasonably high quality and safe rental housing product for which they paid their BAH, and for which Defendants also received government bonuses or subsidies.

e.   Whether families reasonably depended on the landlord to repair and maintain the premises, including its appliances, HVAC and other fixtures, and whether Defendants systematically failed to carry out those duties as to problem units.

---

the use of, one's property, or of anything under one's control, so as to injuriously affect an owner or occupier of property (1) by diminishing the value of that property; (2) by continuously interfering with his power of control or enjoyment of that property; (3) by causing material disturbance or annoyance to him in his use or occupation of that property."); *Bowers v. Westvaco Corp.*, 244 Va. 139, 148-49, 419 S.E.2d 661, 668 (1992) (litigant who is a home owner or occupant and is suing for intrusion by Defendant into his quality of home life is entitled to recover, as an element of damages, compensation for physical or emotional injuries resulting from a nuisance which has endangered life or health).

f.  Whether part of military family quality of life, i.e., the housing experience, consists of having a quality, clean, and safe housing experience with competent service, repair and maintenance, conscientious upkeep of the premises, and above all, truth and transparency coming from the landlord.

g.  Whether at Fort Belvoir, the combination of frequent turnover of military family tenants (frequent PCS transfers), and limited government oversight, led Defendants intentionally and recklessly to let housing and service quality decline in the class period, up until when the situation was exposed in the public media and Congressional hearings.

h.  Whether Defendants gamed the work order system in a manner that made the work order records so unreliable as to not be susceptible to an audit; whether as a result, the work order system was systematically unreliable.

i.  Whether Defendants gamed the customer service system in a manner which rendered the purported glowing customer satisfaction reviews unreliable, compared to more accurate surveys like a 2019 survey that found that Fort Belvoir residents reported 75% manifest effects for maintenance, repair or remediation issues.[9]

j.  Whether the Plaintiffs were in that subgroup of Fort Belvoir privatized housing consumers whom Defendants knowingly and deliberately placed in residential units that the Defendants, but not the Plaintiffs, knew to be problem units.

k.  Whether Defendants violated their duties relative to a tenant cohort that Defendant knew was heavily weighted toward pregnancies, infants and young children in the families; whether according to medical science, infants and young children are more vulnerable and at a higher risk of negative health effects due to living in an indoor environment that had unclean and unsafe air conditions, filth, insects, water damage and mold.

l.  Whether the demographic of tenant families at Fort Belvoir was dominated by families of lower-rank enlisted servicemembers with one or more young babies or children in almost every family; whether because of the presence of babies and young children living at home and who are vulnerable to unhealthy conditions, Defendants had a duty throughout the class period to provide top-quality leased safe clean housing.

m.  Whether during the class period, Defendants would not pay the capital expenditures necessary to correct the problem housing.

---

[9]  May 2019 MFAN report, available at https://www.mfan.org/research-reports/.

40.    Plaintiffs seek to represent a class so that not only they, but other families may recover refunds of their BAH payments.  They also have individual claims for damages; however, those claims under the circumstances do not predominate.[10]

## THE PARTIES

### Plaintiffs

41.    John R. Fischer is an E7 (Chief Petty Officer) has served with the U.S. Navy for over 13 years.  From October 2017 through August 2019, Chief Fischer, his wife Ashley, and their three minor children resided in military housing at Fort Belvoir.  Their unit was located at 9547 Kezia Trail, Fort Belvoir, Virginia 22060.  From August 2019 to December 2020 the family resided in other military housing at Fort Belvoir, located at 9225 Soldier Road, Fort Belvoir, Virginia 22060. The Fishers currently reside off of Fort Belvoir, no longer in Virginia; today they live at 4076 Watergate Way, Orange Park, Florida 32065.

42.    On October 24, 2017, Chief Fischer executed a form lease with FBRC regarding the 9547 Kezia Trail property.  Chief Fischer was a contracting party under the lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.

43.    Ashley Fischer is the wife of Chief Petty Officer Fischer.  During the pertinent times, Ms. Fischer held a possessory and occupancy interest in the property. She was an authorized occupant under the contract and the lease between the family and the landlord.

---

[10] Under Rule 23(b)(3) the court in order to certify a class *inter alia* must "find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Here, the mere fact that some families may also have a potential individual personal injury, private nuisance or punitive damages claim, to accompany their class claim for BAH refunds, does not negate predominance.  Military family members in problem units have a right to class relief by way of refunds.  The number depends on the number of problem units over the class period – a data point known to the Defendants, and ascertainable in discovery. If a family also has an individual claim (for doctor-diagnosed mold personal injury, private nuisance "discomfort and annoyance" damages, or punitive damages), those claims may be addressed without undoing the value of the class proceedings.

44.     Jorge Roman is a Chief Warrant Officer 3 (CWO3) who has served in the U.S. Army for over 18 years.  From May 2018 through September 2018 Chief Roman, his wife Raven, and their three minor children resided in military housing at Fort Belvoir at 5200 Stable Court, Fort Belvoir, Virginia 22060, in the "Woodlawn Village" area.  From September 2018 to September 2019 the family resided in other military housing at Fort Belvoir at 5493 Jadwin Loop, Fort Belvoir, Virginia 22060, in "Jadwin Loop Village."  The Romans currently reside off of the base, at 1150 Camellia Drive, Vass, NC 28394.

45.     On May 17, 2018, Chief Roman executed a form lease with FBRC regarding the 5200 Stable Court property.  During the pertinent times, Chief Roman was a contracting party under the lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.

46.     Plaintiff Raven Roman is the wife of Chief Warrant Officer 3 Roman.  During the pertinent times, Ms. Roman held a possessory and occupancy interest in the property.  She was an authorized occupant under the contract and the lease between the family and the landlord.

47.     Plaintiff John J. Lane is a Supervisory Special Agent, with the Fort Richardson CID Office of the U.S. Army, 1107 Doe Street, JBER, AK 99505.  Agent Lane and his wife, Cassandra Lane, and their four children reside at 20874 Mountainside Drive, Eagle River, Alaska 99577.

48.     Agent Lane and his wife and their four minor children previously pertinently resided in military housing at Fort Belvoir at 9739 Barlow Road, Fort Belvoir, Virginia 22060, in the "Dogue Creek" area.  On or about April 21, 2015, Agent Lane executed a form lease with FBRC regarding the 9739 Barlow Road property.  During the pertinent times, Agent Lane was a contracting party under the lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.

49.    Plaintiff Cassandra Lane is the wife of Supervisory Special Agent Lane.  During the pertinent times, she held a possessory and occupancy interest in the property.  She was an authorized occupant under the contract and the lease between the family and the landlord.

50.    Plaintiff Denzele Bragg is a Staff Sergeant

51.    Plaintiff Breanna Bragg is the wife Staff Sergeant Denzele Bragg

52.    Plaintiff Samuel Vidot is a Master Sergeant

53.    Plaintiff Rachel Vidot is the wife of Master Sergeant Samuel Vidot

54.    Plaintiff James Wayenberg is a Staff Sergeant

55.    Plaintiff Christine Wayenberg is the wife of Staff Sergeant James Wayenberg

56.    Plaintiff Cody Adams is a Staff Sergeant

57.    Plaintiff Gabrielle Adams is the wife of Staff Sergeant Cody Adams

58.    Plaintiff Steven Aguilar is a Sergeant First Class

59.    Plaintiff Megan Aguilar is the wife of Sergeant First Class Steven Aguilar

60.    Plaintiff Andrew Armstrong is a Petty Officer

61.    Plaintiff Leslie Gonzalez is the wife of Petty Officer Andrew Armstrong

62.    Plaintiff Jose Berdecia-Hernandez is a Second Lieutenant

63.    Plaintiff Kim Melendez is the wife of Second Lieutenant Jose Berdecia-Hernandez

64.    Plaintiff Zachary Camechis is a Navy Chief

65.    Plaintiff Alacia Camechis is the wife of Navy Chief Zachary Camechis

66.    Plaintiff Jennifer Cocco, retired, and her two minor children previously pertinently resided in military housing at Fort Belvoir at 9627 Barlow Road in May of 2017 .  On or about July of 2019 they moved into a second home at 9687 Maloney Road, Fort Belvoir Virginia.  On or about May 10, 2017, Mrs. Cocco executed a form lease with FBRC regarding the 9627 Barlow Road property.  During the pertinent times, Mrs. Cocco was a contracting party under the lease,

made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.

67.     Plaintiff James Jackson is an Army Specialist

68.     Plaintiff Kaitlin Coe is the wife of Army specialist James Jackson

69.     Plaintiff James Hayward is a Sergeant

70.     Plaintiff Danielle Hayward is the wife of Sergeant James Hayward

71.     Plaintiff Bryson Hunt is a Tech Sergeant

72.     Plaintiff Abnie Hunt is the wife of Tech Sergeant Bryson Hunt

73.     Plaintiff Bradley Shirley is a Staff Sergeant

74.     Plaintiff Raymond Warden is a Staff Sergeant

75.     Plaintiff Tabitha Warden is the wife of Staff Sergeant Raymond Warden

**Defendants.**

76.     Defendant Fort Belvoir Residential Communities, LLC ("FBRC") is a Delaware limited liability company organized in 2003.   FBRC has a principal office at 2 Bethesda Metro Center, Suite 250, Bethesda, Maryland 20814.  FBRC has an address listed on the generic form tenant lease for the 15 Belvoir communities or developments aggregated as The Villages of Belvoir, as P.O. Box 496, Fort Belvoir, VA 22060.  FBRC is listed as the "Landlord" under the Fischer and Roman leases, and in the generic Fort Belvoir lease form available online.[11]

77.     During the pertinent times, FBRC and Michaels were paid for and held responsibilities for design, home renovation, home replacement, new home construction, as well as repair and maintenance and property management services.  FBRC on information and belief

---

[11]  See copy of Fort Belvoir privatized military housing lease located online at https://static1.squarespace.com/static/5f173c35b6425b1882daa130/t/5fbe90837acac6192a999e9 4/1606324356236/Sample+Lease.pdf.   The form says at the bottom left of each page, "ROA_Rev021215_Updated301219."  The web links back to the official Fort Belvoir housing website, branded as The Villages at Belvoir.  https://www.villagesatbelvoir.com/.

had duties to periodically inspect units; to assess their condition. The problems that the housing in question had with regard to the Plaintiffs were known to FBRC. FBRC either did not pertinently inspect units during the pertinent times, including the named Plaintiffs' units, or conducted an inspection that deliberately did not include seeking to determine the root cause for chronic water moisture and moldiness conditions in the units.

78.    The "Resident Responsibility Guide"[12] provided to each military family tenant and which is deemed to be incorporated into the lease, states: "The Fort Belvoir Residential Communities, LLC (FBRC) partnership officially began operations at Fort Belvoir on 1 December 2003, and our team has been working ever since **to rebuild, renovate, and maintain to the highest standards of family housing** at Fort Belvoir."[13] (Emphasis added).

79.    During the pertinent times, Defendants systematically failed to meet this standard for Plaintiffs or other similarly situated and abjectly failed to rebuild, renovate, or adequately maintain the Plaintiffs' units and those of other families.

80.    During the pertinent times, FBRC was the sub-lessee, under the ground lease. Belvoir Land, LLC was the lessee, under the ground lease. FBRC held the role of owner and landlord under the 50-year ground lease.

81.    Under the Restatement,[14] for purposes of a private nuisance claim, the finder of fact must review the social value and benefits brought by the privatized housing project, and the burdens that it has imposed on the community. The amount of revenues and profits that entities like the Michaels Management Services, LLC and MMS Army LLC  generate from this project are contributed to the larger Michaels enterprise, and the data regarding that parent entity's own

---

[12] See "The Villages at Fort Belvoir Resident Responsibility Guide Revised 30 September 2021," https://static1.squarespace.com/static/5f173c35b6425b1882daa130/t/617162e8f4723e44479b76f c/1634820847800/Resident+Responsibility+Guide_Villages+at+Belvoir_JW_Rev09302021.pdf.

[13] The Villages at Belvoir Resident Responsibility Guide, Revised 14 April 2017.

[14] Restatement 2d of Torts, § 828.

total revenues and profits, executive pay, and budgeting, is relevant to this aspect of the nuisance analysis.  Defendants have funneled monies out of the Fort Belvoir MHPI project thus far over its 50-year term, which went not into reinvestment in the community at Belvoir, but rather were paid to the owners of Michaels.  Defendants failed to adequately reinvest monies back to correct problem units promptly.

82.    The Villages at Belvoir website has statements that reflect the special health and safety needs of military family members, given that military families so often have pregnant mothers, infants and young children, who are in the home:

> We are honored and privileged to serve those who serve our country. We know that the military families who are protecting our country deserve comfortable and supportive places **to raise children** and build their future….
>
> By partnering with the local businesses and community-based groups, our Community Connections program also ensures that the personnel new to our communities are provided with the opportunities to get to know the benefits and services available in neighborhoods surrounding the installation. The programs are designed to specifically cater to military families and take into consideration all of the necessary support that one would need as a member of a military family, whether their **entire family** is on base, or members are serving deployment.
>
> Our military living portfolio includes housing we developed and own as well as on-post housing that we fee-manage for other private owners.[15]

83.    As of November 14, 2021, it was reported on the U.S. Army website that "[t]he Michaels Organization acquired the 2100 Fort Belvoir homes formerly owned by Clark Realty Capital in late August."[16]  Plaintiffs' understanding is that in fact, the landlord/owner remained FBRC, with another Michaels entity, as the property manager.  That was Michaels Management, LLC Services and/or MMS Army, LLC.

84.    Defendant Michaels Management Services, LLC ("Michaels") is a New Jersey corporation with its principal place of business located in New Jersey.  This entity is registered

---

[15] https://tmo.com/market/military-living/.
[16] https://home.army.mil/belvoir/index.php/about/Garrison/public-affairs/digital-belvoir-eagle/fort-belvoir-housing-under-new-ownership.

with the Virginia SCC as active to do business in Virginia and is active.  It merged with and/or was formerly known as Michaels Management Services Inc.  It is a subsidiary of The Michaels Organization ("TMO").  Ron Hansen, President of TMO, also serves as the president of it. Upon information and belief, Michaels was FBRC's property manager for the MHPI Contract at Fort Belvoir prior to or in addition to MMS Army LLC. For example, a circa 2019 version of the form tenant lease indicates that FBRC was the landlord and Michaels was the property manager. Michaels is the ultimate parent of Michaels Management Services, Inc., Michaels Management Services, LLC and MMS Army LLC.

85.     Defendant MMS ARMY LLC is a limited liability company organized under New Jersey law with a formation date of August 6, 2021.  It has a registered address of 2 Cooper St Fl 14, Camden NJ 08102-2348. Its registered agent is CT Corporation System, 4701 Cox Rd Ste 285, Glen Allen, Virginia, 23060-6808.  On information and belief, MMS Army LLC is owned and controlled by the Michaels enterprise and ultimately by The Michaels Organization and upon information and belief is the current property manager.

86.     Michaels has through its spokesperson admitted failures of housing at Fort Belvoir:

Michaels Management Services, a New Jersey-based company, is the private contractor that manages housing at Belvoir.  Ron Hansen, the company's president, was not available for an in-person interview, but did agree to talk with us on the phone.  **We asked if what the company is doing at Fort Belvoir is good enough for these families.  "Obviously, it's not good enough or we wouldn't be talking," he said.** (Emphasis added).

87.     Defendants are joint tortfeasors, agents of the other, joint venturers, and/or engaged in the joint enterprise of leasing military housing at Fort Belvoir, as well as the conduct and acts alleged herein.  During the pertinent times, each of the Defendants was directly and materially involved in the relevant facts, acts and omissions.  Defendants are not persons or entities acting under a federal officer, nor are Defendants subject to any sovereign immunity, governmental immunity or government contractor defense herein.

**JURISDICTION AND VENUE**

Page 15

88.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Fort Belvoir is a federal enclave.

89.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2) (diversity jurisdiction) and the Class Action Fairness Act, in that (i) there is complete diversity (any one plaintiff diverse from any one defendant), (ii) the amount in controversy exceeds $5,000,000.00 (Five Million Dollars) exclusive of interest and costs, and (iii) there are 100 or more members of the proposed Plaintiffs' class.

90.     Venue is proper in this District under 28 U.S.C. § 1391 because Plaintiffs reside in this Judicial District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this Judicial District. In addition, all Defendants do business and/or transact business in this Judicial District, and therefore, are subject to personal jurisdiction in this Judicial District and reside here for venue purposes.

## FACTS COMMON TO ALL COUNTS

### Facts Regarding Plaintiffs John and Ashley Fischer.

91.     Chief Petty Officer John R. Fischer is a career member of the United States Navy. He enlisted in the Navy in 2007.  Ashley married John in April of 2011.  They have three minor children, who were as of mid-2021 ages five, eight and 13.  Defendants had actual knowledge of the fact that the family entering the residential unit in the case of the Fischers had young children who therefore, by that very status, had an important need for clean and healthy housing.

92.     From October 2017 through August 2019, Mr. Fischer, his wife Ashley, and their three minor children resided in military housing at Fort Belvoir at 9547 Kezia Trail, Fort Belvoir, Virginia  22060.  From August 2019 to December 2020 the family resided in other military housing at Fort Belvoir at 9225 Soldier Road.  They are now stationed on Naval Air Station Mayport, while Chief Petty Officer Fischer is currently deployed on Sea-Duty.

93.     In November of 2019, Mrs., Fischer was nominated for recognition as the Armed Forces Insurance Military Spouse of the Year and finished within the top three finalists due to her community involvement. Among her charitable activities on base, Mrs. Fischer volunteered for and became the Displaced Resident Liaison for Fort Belvoir.  Due to the efforts of Mrs. Fischer, three military families who lived in three military family homes at Fort Belvoir which were destroyed by fire were provided households goods, furnishings, and other necessities, paid for with community donations.   Additionally, with the assistance of local churches and veteran's organizations, Ms. Fischer was able to provide other Fort Belvoir military families who were displaced, due to various causes, including fire, mold, pests, gas, etc., a weekly pizza night, monthly dinner, convection ovens, and even Christmas trees.  This type of assistance was provided to approximately 60 military families who were displaced due to no fault of their own and, in many instances, due to the substandard, unsafe, and unsanitary conditions in the Fort Belvoir military housing provided by Defendants.  Ms. Fischer has received official recognition, from the U.S Navy Spouse of the Year and Military Spouse of the Year boards, from both General Gustave Perna and Command Sergeant Major Rodger Mansker.

94.     The Fischers currently reside at Orange Park, Florida, since December of 2020. Due to their experiences with the substandard, unsafe, and unsanitary housing provided to them at Fort Belvoir, Chief Fischer requested orders to transfer, which were granted.

95.     In October 2017, the Fischers applied to contract for on-base housing at Fort Belvoir with FBRC.  On October 24, 2017, Chief Fischer executed a form lease with FBRC regarding the 9547 Kezia Trail property.   During the pertinent times, Chief Fischer was a contracting party under the lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.  The Fischer family moved into their on-base home, which was located in the Vernondale community in the Villages at Belvoir.

96.    Immediately upon moving in, starting around November 2017, Ms. Fischer began to suffer from chronic migraines (weekly, approximately 3-4 days a week), as well as what she believed to be panic attacks. Ms. Fischer sought treatment in March of 2019 for treatment for her anxiety and migraines by her primary care physician and neurologist.

97.    In January 2018, the Fischers reported gaps in the back door to the property manager, noting that the door would open on its own and allow in wind and rain.  It was never properly repaired during the Fischers' time living at the property.  However, after the Fischers moved out, the door was replaced in preparation for new tenants.

98.    In January 2018, the Fischers reported linoleum lifting in the upstairs master bathroom.  Maintenance responded by gluing the linoleum and leaving a large rock on it to hold it down.  Maintenance did not return to remove the rock and did not provide any instructions to the Fischers as to when or if they should remove it.

99.    In October 2018, the Fischers noticed issues with the HVAC unit.  Water was overflowing onto the floor, and flooding the laundry room floor, damaging the floor and leaving visible signs of water damage.  Maintenance was notified, but they never opened the HVAC system and properly repaired it.  HVAC issues were again reported in January and June 2019.

100.    HVAC issues are a common marker for the problem homes in privatized military housing communities.  Especially in older housing, the HVAC equipment, fixtures, and the associated ductwork, may never have been fixed, cleaned or replaced, since it was installed.  Due to the nature of HVAC, with heat transference, there is moisture generated and moisture in the vicinity, as anyone seeing an air conditioner drip knows.  In the right conditions and with the right kinds of surfaces, this breeds mold.  Over time, HVAC areas and ductwork can become replete with mold which, moreover, is in places where family members in their ordinary scope of their daily life may not see it.  It falls uniquely to the landlord's responsibility to control this problem.

101.    Work orders regarding to the HVAC were placed on October 1, 2018 (the home felt "warm and muggy"), October 22, 2018 (a cap was missing and splashing water onto the HVAC closet floor—it was eventually discovered that this condition had caused mold to form in the area), and January 21, 2019 (the home's heating unit went entirely out and would not operate).

102.    Each time the landlord's representatives who filled the work order would advise the Fischers that the issues with the HVAC were normal, and that the observed excessive dirt and humidity at the home were no cause for concern.  These statements were false and fraudulent.

103.    An average military family would have been duped at worst by this advice, and confused at best.  In fact, if the promises made by the private companies to the Army when they won this project are to be believed, Defendants were to provide top-quality, excellent, clean and safe military housing.  But none of the families ever saw this contract or the duties that it imposed on the landlord.  Families could be unaware that the owner of their community was not even the military.  They were actually living in a community owned, under a 50-year ground lease, by a private enterprise – here, Defendants.

104.    In June 2019, mold was discovered in the ducts, On June 11th, 2019, a work order was submitted where the Fischers stated "I believe there is potentially mold in the ducts".  In June of 2019, the representatives improperly painted over moldy fiberboard duct work with IAQ 8000 which is a coating material which is resistant to mold only on the surface of the coating. The product does not protect users or others against disease-causing bacteria, viruses, germs, or other organisms.[17] Ms. Fischer documented the use of IAQ 8000 with the following photograph:

_____

[17] From product label available at https://www.fiberlock.com/wp-content/uploads/IAQ_8000-8380-PDS.pdf: "The IAQ 8000 coating is resistant to mold only on the surface of the coating. **No mold resistance claim is made other than to the coating itself.** The use of this product does not protect users or others against food-borne or disease-causing bacteria, viruses, germs or other disease-causing organisms. **Do not apply when** air or surface temperature is below 50°F, or when **drying conditions are poor or when surfaces are above a 15% moisture level** content. Use adequate ventilation during application. When applying with a sprayer, wear a NIOSH approved



Photograph 1: IAQ 8000

105.    In June 2019 a work order was submitted which alerted that there was "a hole in the ceiling, with potential water damage, above the sink…" Defendants' representatives inspected the hole, and falsely advised the Fischers that there was no water damage, and simply cosmetically repaired the hole without addressing the water damage or determining its root cause. This was once again unfair, deceptive, false and fraudulent conduct.

106.    Potential mold was also noted in the HVAC unit, plenum, duct work, and HVAC closet flooring. A third-party contractor, Americlean, was brought in to clean the HVAC duct area on June 21, 2019. Within minutes, the duct cleaning company packed all their supplies and stated there was "mildew or something" and they couldn't clean the duct work. The problem was so severe that the duct cleaning service declined to clean the ducts.[18] Mrs. Fischer documented the unsealed HVAC and affected floor with this photograph:

---

respirator with any R, P, N or HE filter. For interior use only. Check with local building code enforcement authority for any additional requirements." (Emphasis added).

[18] On information and belief, to correct the problem and repair at the root cause, it would have cost FBRC at least $5,000 to $10,000. The company was unwilling to invest in making those repairs.

*Photograph 2*: Unsealed HVAC and Flooring

107.    Mold tests were conducted at the home on June 26, 2019.  This testing revealed the presence of various molds at the home, including aspergillus, Cladosporium, Chaetomium, penicillin, hyphae, Alternaria, basidiospores, penicillium, and penicillium/aspergillus.

108.    The family had no other choice but to move into a hotel as one of their children, R.F., was immunocompromised because he was on chemotherapy for brain cancer.[19]  From the hotel, they moved into the Dogue Creek hospitality house, where they stayed from June 2019 to August 2019, to await the repairs at the 9547 Kezia Trail property.  The Dogue Creek hospitality suite had been remediated prior to their move-in.

---

[19] The Plaintiffs reserve the right to amend the complaint as the case proceeds in the event they determine there is evidence of medical causation of personal injury or illness as a result of the mold and other household indoor air exposures, meeting the applicable Virginia state-law causation standard for an individual personal injury claim.  *See Kristensen ex rel. Kristensen v. Spotnitz*, 2011 U.S. Dist. LEXIS 107027, 2011 WL 4380893 (W.D. Va. 2011) (discussing medical causation testimony/expert issues in a mold case); *Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir. 1999) (expert causation issues).

109.     When the family moved back to the 9547 Kezia Trail address in August after repairs were supposedly conducted, they found mold on a subfloor and on a vent.

 

*Photographs 3 and 4*: Mold on Subfloor and Vent

110.     The home's ducts had been sprayed with Benefect Decon 30 by maintenance previously, during remediation.

111.     Immediately upon moving back into the home, the Fischer's family pet (a 2-year-old Goldendoodle) passed away suddenly due to unknown causes.

112.     The Fischers reported the continued presence of mold at the property.

113.     Defendants conducted a cursory inspection of the property and improperly painted over the moldy subfloor, leaving the damaged and unsanitary carpet in place. They once again did not investigate or repair the cause of the mold. They advised the Fischers that the home was now safe to live in.[20] This representation was false and unfair and deceptive because, first, the home remained unsafe, and because, second, no Defendant had performed the real root cause analysis required to start the process of truly correcting the problem in the unit.

---

[20] This fact pattern happened over and over again. Its ubiquity, and what it infers about the nature of Defendants' business practices and uniform staffing and training policies, its uniform lack of effective inspection and audit practices, and so forth, reflects a common issue.

114.     Due to the mold and other issues at 9547 Kezia Trail, the family moved to 9225 Soldier Road in August 2019.

115.     While residing at the Kezia Trail property, the Fischers' now 5-year-old was diagnosed with a Juvenile Pilocytic Astrocytoma, which is normally a slow-growing, benign brain tumor.  The Fischer child's tumor grew at six times the normal rate and was labeled as malignant due to speed of growth and location: the brain stem.

116.     After leaving the Kezia Trail property, Ms. Fischer's migraines have improved.

**Stimson Road Home Shown to Fischers.**

117.     During the time of displacement and repair, the repairs of mold damage in the HVAC were not done according to industry standards.

118.     The Fischers requested to relocate from 9547 Kezia to another 4-bedroom home on the installation.

119.     The Fischers were shown a "ready to move in" home on Stimson Road in Colyer Village.

120.     Upon inspecting the property, Ms. Fischer with her friend, Jeni Johnson, and Community Manager, Nicole Walker (who identified herself during pertinent times as working for Michaels), encountered a home with:

a.     visible water damage in the HVAC closet,
b.     visible water damage to the first-floor bathroom,
c.     a rotting back door frame, and
d.     visible suspect fungal growth covering a wall in the storage closet.

121.     Mrs. Fischer documented that last problem with a photograph:



*Photograph 5: Fungal Growth in Storage Closet*

122.    The Fischers declined the offer to move into this home and subsequently moved into 9225 Soldier Road.

**9225 Soldier Road Home.**

123.    In August 2019, Chief Petty Officer Fischer executed a form lease with FBRC regarding the 9225 Soldier Road property.  During the pertinent times, Chief Fischer was a contracting party under the lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in this property and each FBRC unit the family was in.

124.    Upon moving into the Soldier Road property, the family immediately noticed in September 2019 problems in the bathroom, which also apparently had been remediated previously. Mold was discovered in the shower area--at the edge of the shower and behind the toilet.

125.    Defendants tried to correct that mold problem by flood cutting the walls[21] and painting the walls' affected studs with IAQ, which is not the recommended solution for mold per the EPA.

126.    A work order was submitted on August 27, 2019, which stated, "the AC is not cooling and the humidity in the home is 58%, recommended being 40-50 otherwise mold can grow."

127.    The Fischers were not provided any details about the repair.  The work order states that the problem was a malfunctioning compressor due to a bad capacitor. This was apparently replaced by the Defendants.

128.    On November 30, 2019 the family noticed mold in the HVAC.

129.    This fact required installation of a new HVAC unit. This time, the landlord determined to replace the HVAC, although the scope was limited.

130.    AJ Heating and Cooling was sent out to install a new HVAC inside and outside and to replace the exhaust pipe that was leaking from the roof/ceiling, on December 4, 2019.

131.    Due to their experiences with the substandard, unsafe, and unsanitary housing provided to them at Fort Belvoir, in summer 2020 Chief Petty Officer Fischer requested orders to transfer, which were granted in November 2020.  In December 2020 the family conducted a permanent change of station to Naval Air Station Mayport.

**Facts Regarding Plaintiffs Jorge and Raven Roman.**

132.    Jorge Roman is a Chief Warrant Officer 3 (CWO3) who has served in the U.S Army for over 18 years.  From May 2018 through September 2018 Chief Roman, his wife Raven, and

---

[21] So-called because often must be done after flooding in a commercial building.  That is a typical situation where it may be necessary for the restoration company to perform a "flood cut" of the drywall in a building. The reason this is called a flood cut is because the cut is made 12-18 inches above where the flood damage stops. It is done to facilitate drywall tear out. A flood cut may be performed in a variety of situations.

their three minor children resided in military housing at Fort Belvoir at 5200 Stable Court, Fort Belvoir, VA 22060, in Woodlawn Village.  From September 2018 to September 2019 the family resided in other military housing at Fort Belvoir at 5493 Jadwin Loop, in Jadwin Loop Village.

133.    On May 17, 2018, Chief Roman executed a form lease with FBRC regarding the 5200 Stable Court property.  During the pertinent times, Chief Roman was a contracting party under the lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.

134.    Plaintiff Raven Roman is the wife of Chief Warrant Officer 3 Roman.  During the pertinent times, Ms. Roman held a possessory and occupancy interest in the property.

135.    Ms. Roman was active in the community, and wanted her house to be a home.  From March 2019 to February 2020, she served as a community representative of Jadwin Loop Village and member of the Fort Belvoir Garrison Command Housing Focus Group in an effort to improve the quality-of-life housing program for residents.

136.    During that time, dozens of displaced military families were experiencing emotional and financial challenges. In an effort to help families meet those challenges, Mrs. Roman collaborated with base-wide organizations to provide resources to displaced families, offered by the Military Family Life Counselors group and the Fairfax County Public Schools for Homeless Families.

137.    Subsequently, the Romans resided in Lorton, Virginia, in off-base housing from 2019 to 2020.  Chief Roman was transferred, and his family currently resides in North Carolina.

138.    Jorge Roman is a career member of the United States Army.  He enlisted in the Army in 2003 and received his commission as a Warrant Officer in October 2012.  Raven married Jorge on April 23, 2005.  They have three minor children, as of mid-2021, ages 4, 7 and 15.

**Unit at 5200 Stable Court.**

139.    In May 2018, the Romans applied to rent family military housing at Fort Belvoir. On May 17, 2018, Chief Warrant Officer Roman executed a form lease with FBRC regarding the 5200 Stable Court property.  During the pertinent times, Chief Warrant Officer 3 Roman was a contracting party under the lease, made rental payments pursuant to his BAH, and held a possessory and occupancy interest in the property.  During the pertinent times, Ms. Roman held a possessory and occupancy interest in the property.  The Roman family moved into the home, which was located in the Villages at Belvoir, in Woodlawn Village.

140.    The Roman family experienced and noticed serious issues involving the safety, sanitation, and condition of the property upon move-in.

141.    As set forth in their move-in inventory checklist, immediately upon moving into the home the Romans observed issues involving

a.    pests,
b.    old carpets (not new as noted by Defendants),
c.    water intrusion in the garage,
d.    mold on the drywall over the garage door,
e.    mold on the sealant on the sink,
f.    and in the cabinetry underneath the sink,
g.    lifting vinyl plank flooring, and
h.    rusty plumbing.

142.    However, Defendants performed merely a cursory superficial response to Plaintiffs' requests and complaints as to the housing.

143.    On May 18, 2018, the Romans reported pest issues: ants and spiders were discovered in the home. Ants were entering throughout the entire first floor of the home and through cracks on the banister in the hallway on the second level of the home. Carpenter ants were also discovered in the upstairs bedroom (daughter's room) coming in through the window and crawling on the walls and ceilings.

144.    In response, Defendants treated for pests but said they were unable to fully treat for ants due to "heavy rain."

145.    The Romans were not able to move their personal belongings to their bedrooms upon move-in until the following week due to the unsanitary and unsafe condition of the carpets.

146.    On May 22, 2018, the Romans submitted a request for a steam cleaning of the carpets.  They discovered thumbtacks and nails throughout the entire second level of the home, in addition to stains, jewelry, and food left behind by previous tenants.

147.    Following the call, the vendor arrived with a household vacuum to clean the second level of the home.  That was a cursory superficial response to their request and to the situation. Defendants were not providing the excellent housing product that they had promised to the Military in order to win this MHPI Project for which they were paid handsomely.

148.    The Romans submitted a second maintenance request for cleaning.

149.    The carpets were steam cleaned during the second visit.

150.    Nonetheless, the vendor insisted the carpets were "new" and did not require a cleaning.

151.    The following are photographs which show ants, thumbtacks, and nails:

 

_Photographs 6 and 7_: Ants

 

*Photographs 8 and 9*: Thumbtacks and Nails

152.    On May 31, 2018, the Villages at Belvoir maintenance person arrived to repair holes in the walls and to paint the garage.

153.    The technician painted over the mold over the garage door and water intrusion stains on the wall.

154.    On June 4, 2018, for a second time, Mrs. Roman reported the water intrusion on the wall, a possible roof leak, and the exterior downspout flooding the backyard and air conditioning unit.

155.    After making that complaint, she was never contacted.

156.    On June 13, 2018, Mrs. Roman reported, for a third time, the water intrusion and roof leak.

157.    On June 14, 2018, a work order was created for this maintenance request.

158.    There was no further investigation as to the cause.

159.    No work occurred.

160.    Then the work order was marked complete.

161.    The fact pattern reflected at paragraphs 101-105 was a common occurrence.

162.    The following photographs show contemporaneous mold and water intrusion:

 

*Photographs 10 and 11*: Mold and Evidence of Water Intrusion

163.     During the next three months, there were many additional issues.

164.     CWO3 Roman was required to report to Warrant Officer Advanced Course (WOAC) on July 12, 2018.

165.     Mrs. Roman and her three children resided in the home during that time.  CWO3 Roman was less available to protect them or help them with household environmental issues.

166.     Water intrusion remained a substantial issue.  During all of this time, FBRC had actual knowledge that this was a problem home.  And that there were young children.

167.     Mrs. Roman reported

      a.     a leak under the kitchen sink,
      b.     a leaking toilet,
      c.     pest issues, and
      d.     HVAC problems.

168.     The Romans began to notice high levels of moisture in the kitchen and other areas which attracted a panoply of pests including slugs, silverfish, carpet beetles, and booklice.

169.     The Roman's noticed a consistent odor, a "rotting/mildew smell", coming from under the kitchen sink and cabinets that became more pungent when it rained.

170.     Mrs. Roman reported the odor several times.

171.    Slugs were found under the cabinets, in the dishwasher, and crawling on the kitchen floor.  The presence of slugs is indicative of moisture, of moisture intrusion, and of housing defects.

172.    Eventually Mrs. Roman and her children were unable to use any of the bathrooms due to unsuccessful pest control treatments and an infestation of booklice that quickly spread throughout the home.

173.    On June 18, 2018 (2nd report) the Roman's reported carpenter ants located in the daughter's room.

174.    Defendants treated for ants twice.

175.    The issue subsided but continued.

176.    Defendants knew that spraying for ants would not correct a problem whose root cause was really something like structural defects or improper gaps and openings.

177.    Also, on June 18, 2018 the Roman's reported "mold in window".

178.    The work order was marked complete with no further investigation.

179.    The following photos show ants and mold:



_Photographs 12 and 13_: Ants and Mold

180.    On July 25, 2018, the Romans reported "small bugs" in the bathroom (silverfish and booklice).

181.    Defendants had Eagle Pest Control treat the inside of the home.

182.    The following are photographs of the booklice and silverfish.

 

_Photographs 14 and 15_: Booklice and Silverfish

183.    On July 30, 2018, the Romans reported for a fourth time, "water is entering through side wall from outside living area."

184.    In response, shingles were repaired.

185.    However, drywall was not removed, and no further investigation was made into the root cause of evident water damage to the interior of the roof or garage wall.

186.    The following photos show water damage:

 

_Photographs 16 and 17_: Water Damage

187.    On July 31, 2018 (2nd report) the Romans reported "rotting, mildew smell coming from the sink and up under the cabinets."

188.    Maintenance did not investigate further.

189.    They denied the existence of the smell.

190.    The following are photographs of water staining under the sink, which is likely evidence of mold and mildew.

 

*Photographs 18 and 19*: Water Staining Under Sink

191.    On August 7, 2018 (2nd report) the Romans reported bugs in the bathroom.

192.    In response, the Defendants treated inside the home.  They did not do more.

193.    On August 28, 2018 (3rd report) a work order was placed by the Romans for the presence of bugs in the second hallway bathroom, under the kitchen sink and in the cabinets.

194.    On August 28, 2018 (4th report) the Romans also reported crawling insects, and silverfish in the entire unit.

195.    Defendants retained Eagle Pest Control, who treated with aerosol spray.

196.    The exterminator with Eagle Pest Control advised the Romans that he notified the Villages at Belvoir there was a humidity issue within the home during the initial pest control treatments in the home.

197.    During this time, under Defendants' intentional business model, they chose to periodically pay a pest person to come spray for bugs, over fixing the root cause.  This was strictly a cost decision.  Defendants knew young children lived in the unit and knew that all else being equal, it is more of a health risk to spray insecticides inside homes, than not to.

198.    Also, on August 28, 2018 (3rd report) the Romans reported "moisture under the kitchen sink and dishwasher."

199.    Defendants' maintenance supervisor came to the home.   He got a positive reading for moisture under the sink, using some type of test or instrument.

200.    He sprayed the area with an antimicrobial spray and reported everything was fine.

201.    In fact, everything was not fine.  Defendants, being the very ones hearing the tenant requests and complaints, and periodically sending out the pest men, knew that the problem would continue in the future as it had in the past.  Incoming new tenants did not have this knowledge, but Defendants did.  Merely occasionally sending a low-paid service person to take the quickest, lowest-cost, most temporary and superficial approach – wiping off mold, painting over mold, wiping off moisture, spraying for insects – was a business practice that increased risks of adverse health effects to infants and children, as well as pregnant mothers among the tenant census at any given time.

202.    On September 3, 2018, the Romans reported water leaking in the laundry area from the AC unit.

203.    In response, Defendants appeared to have wrapped putty around the pipe that was leaking.



_Photographs 20 and 21_: Water Damage from Leak and Putty Wrapped around Pipe

204.    That was, once again, a miniature fact pattern once more to show:

      a.  Tenant complaining
      b.  of a repeat problem (water intrusion)
      c.  Landlord opens work order
      d.  Landlord sends low-wage employee/contractor who
      e.  Performs no root cause assessment,
      f.  Is only there briefly, and
      g.  Uses the cheapest fix.
         Presumably Defendants close this work order and then submit it, with all the others, precisely as purported reliable, affirmative evidence supporting the company's annual claim for a sizeable monetary bonus from the Military, above and beyond all of their BAH receipts.

205.    The Romans also began experiencing medical issues around this time.

206.    All three children became ill.  They complained of rashes, upper respiratory infections, congestion, a hacking cough.

207.    Raven Roman suffered from fatigue, headaches, drastic weight loss, vision problems, rashes, light sensitivity, high blood pressure, and joint pain.

208.    The problems were so severe that the Romans requested a new home or hotel accommodations.

209.    Defendants' response on August 31, 2018, was to say that "we have not identified any concerns in your home that would prevent you from staying in the home."

210.    On information and belief, which was a scripted response, using generic recommended or template language, and reflected one aspect of the company's poor treatment of tenants who were displaced to other units, hotels or "courtesy suites" due to the poor housing conditions – an alleged subclass in this case.

211.    Mrs. Roman had no choice but to move out of the home and into a hotel with her three children on Labor Day 2018.  The Roman family incurred out-of-pocket expenses to do so.

212.    On September 4, 2018, the Romans received a phone call from the maintenance supervisor used by Defendants.  He stated that the Romans could no longer enter the premises without an escort due to moisture that was found behind the dishwasher.  The Romans were never provided a clear explanation or disclosure of the findings of what did or did not exist behind the dishwasher.

213.    Mrs. Roman was very concerned about what could be the potential impacts of whatever was really in the house, as to her children.

214.    FBRC had a duty to clearly and contemporaneously fully disclose to the tenants whenever there is a known problem to the home that could endanger the health of children.

215.    Prior to being locked out of the home that day by Defendants, Mrs. Roman returned to the home to retrieve personal items for her children.

216.    While there, she pulled the dishwasher out and found a black trash bag taped to the wall.

217.    Chief Roman requested support from his 1st SGT. and CPT in his absence to meet his wife to observe her findings.

218.    They arrived and witnessed the mold found behind the dishwasher.

 

*Photographs 22 and 23*: Mold Behind Dishwasher, and Dishwasher Area.

219.    The Romans had the mold present behind the dishwasher tested on September 11, 2018.

220.    The tests revealed the presence of Stachybotrys, a toxic mold.

221.    The Roman family was displaced from September 2 to September 15, 2018.

222.    The Romans left 5200 Stable Court to stay at the Residence Inn in Springfield, VA from September 2-September 4, 2018, where they paid out of pocket for 3 nights.[22]

223.    Defendants then moved the family to the Staybridge Suites from September 5 to September15, 2018.

224.    Subsequently, after several meetings with management, Defendants moved the Romans to 5493 Jadwin Loop.  The Defendants arranged for a moving company to move the Romans' possessions from 5200 Stable Court property to 5493 Jadwin Loop.

---

[22] *Compare* Va. Code § 55.1-1231 "Where mold condition in the dwelling unit materially effects the health or safety of any tenant…"The Landlord shall provide the tenant with either (i) a comparable dwelling unit, as selected by the landlord, at no expense or cost to the tenant or (ii)a hotel room, as selected by the landlord, at no expense or cost to the tenant."

225.    All of these events caused intrusion on the family's ability to use and enjoy their leased home and their occupancy property interest, causing aggravation, discomfort, annoyance and irritation.

226.    On September 13, 2018, the day of the move, The Romans discovered mold had visibly spread throughout the entire home at 5200 Stable Court.

227.    The Defendants' maintenance supervisor took some of the Romans' personal possessions from a closet which had visible mold on the ceiling and put them into a plastic trash bag to be "dry cleaned."

228.    Ultimately Defendants disposed of these belongings and did not clean them.

229.    Mrs. Roman's subsequent inquiries as to the status of these belongings were ignored, and the personal property was never returned.

230.    Defendants gave them a partial reimbursement of a portion of rent and items in the closet in November 2018.

  

_Photographs 24, 25, and 26_: Destroyed Personal Property

**5493 Jadwin Loop.**

231.    On September 12, 2018, Chief Warrant Officer Roman executed a form lease with FBRC regarding the 5493 Jadwin Loop property.

232.    On March 18, 2019, the Roman family requested reimbursement for their belongings that were transported to the home to 5493 Jadwin Loop from 5200 Stable Court which had been impacted by mold.

233.    This request was denied.[23]

234.    After moving to the 5493 Jadwin Loop property, the Roman children suffered from

    a.    chronic ear infections,
    b.    chronic coughs,
    c.    upper respiratory illness,
    d.    sore throats,
    e.    headaches,
    f.    congestion,
    g.    developmental and behavioral health issues, and
    h.    other adverse health effects.

235.    From November 2018 thru March 23, 2019, the Roman family reported, and work orders were submitted for issues related to, the deck, door, shingles, HVAC, locks, lighting, windows, and pest control.  This is discussed in further detail below.

236.    On September 26, 2018, the Romans reported carpet beetles in the kitchen and upstairs bathroom.

237.    Defendants conducted a pest control treatment.

238.    The following photographs show carpet beetles in the Roman home.

 

_Photographs 27 and 28_: Carpet Beetles

---

[23] _See_ Va. Code § 8.01-226.12, Duty of landlord and managing agent with respect to visible mold. "Mold remediation in accordance with professional standards "means mold remediation of that portion of the dwelling unit or premises affected by mold or any personal property of the tenant affected by mold" …

239.    On October 2, 2018 the Romans reported a sewage-type odor in the basement.

240.    In response, Defendants sent a maintenance technician who said he could not see or smell anything.  There was no further investigation.

241.    On November 14, 2018 the Romans reported that their daughters' bedroom smelled like mold and there appeared to be visible mold on the windows.

242.    They also reported mold on the front door, two windows that did not shut properly in the living room, and the absence of weatherstripping needed for all.

243.    In response, their daughters' window was cleaned with bleach and painted, the weather strip was placed over the mold on the front door, and the remaining requests were never completed.

244.    The following photos show mold in the windows.



*Photographs 29 and 30*: *Mold in Windows*

245.    On January 29, 2019 (1st report) the Romans reported the existence of wood on the bottom of the entryway door which was "rotting/chipping away."

246.    This was not repaired.

247.    The below photograph shows the rotting wood on the entryway door.



*Photograph 31*: *Rotting Wood Door*

248.    On February 8, 2019, the Romans reported gaps between the baseboard and floors and rusty nail pops throughout the entire home.

249.    In response, Defendants caulked and patched the nail pops.

250.    On February 27, 2019, (2nd report), the Romans reported deterioration of the entryway door due to rot.

251.    The door was replaced.

252.    On February 28, 2019, the Romans reported that the ducts were dirty, and giving off an odor so they requested a duct cleaning.

253.    Defendants sent Americlean to conduct a duct cleaning.

254.    The duct cleaning was inadequate.   The HVAC/ductwork problem root cause remained unconfirmed.

255.    On March 3, 2019, the Romans reported tree bugs in the bathroom.

256.    Defendants scheduled pest control to treat the area.

257.    On March 9, 2019, the Romans reported a rotten windowsill.

258.    In response, Defendants painted over the rotting wood on the window.

259.    No further investigation was made to check for water intrusion.

260.    The below photograph shows the rotten windowsill.



*Photograph 32*: *Rotting Window Sill*

261.    Subsequently, on March 26, 2019, the Romans requested that Defendants inspect, repair, and remediate the Jadwin Loop property due to

      a.     visible mold present on the beam in the attic,
      b.     mold-related problems with the kitchen range hood,
      c.     issues with the HVAC, and
      d.     condensation on the windows throughout the home and in the laundry area where the utility closet was located.

262.    In response, the mold issues related to the attic beam and the kitchen were purportedly remediated.

263.    The HVAC was not properly remediated.

264.    The cause of the condensation in the home was never addressed by Defendants at any time.

265.    The other issues reported were addressed in cursory fashion, but the causes of the issues were not properly determined or repaired by Defendants.

266.    On March 29, 2019, the Romans reported mold in the attic.

267.    Remediation was purportedly completed by PBI Restoration on April 16, 2019.

268.    The following photograph depicts mold in the attic.



*Photograph 33: Mold in Attic*

269.    April 25, 2019, the Romans reported that the first level bathroom had what appeared to be previous water damage under the cabinet that was painted over.

270.    Defendants replaced the cabinet but left the corroded plumbing.

271.    Below are photographs of the previous water damage:



*Photographs 34, 35, and 36: Water Damage Under Cabinet*

272.    On July 8, 2019, the Romans reported condensation throughout the entire home on windows and in the dryer in the laundry room.

273.    A work order in that regard was opened by Defendants.

274.    Defendants had no actual work done to fulfill the work order.

275.    Defendants then marked the work order complete and closed it.

276.    Maintenance was never scheduled to assess the actual problem.

277.    On information and belief, that very work order was included among the supporting data for Defendants' incentive award request to the government.

278.    The below photographs show condensation in the windows and dryer area of the laundry room.



*Photographs 37 and 38*: Condensation in the Laundry Room

279.    An assessment of the root cause at that time might and, Plaintiffs allege, would have determined that under all the facts and circumstances, Defendants should not have been letting out that home to any family at that time.

280.    First, Defendants should have conducted a root cause assessment.  If this meant keeping the home out of the active inventory being rented out to families, then so be it.

281.    Then, if the result of the assessment meant that the entire HVAC system had to be replaced, then Defendants should have replaced it.

282.    If the assessment mean that the whole unit had to be renovated, or torn down and replaced, Defendants had the duty so to perform.  This was because they had an integrated duty to assess, manage, repair when needed, maintain when needed, replace entire systems when needed, renovate the home when needed, build new homes when needed.

283.    Defendants have been paid and continue to be paid millions of dollars under the 50-year ground lease, and have received revenues both from BAH payments and bonuses and incentive awards and other payments in the millions of dollars.

284.    The conduct by which Defendants allowed conditions in the Roman home to deteriorate to this level was culpable.

285.    On July 19, 2019, the Romans reported water leaking from the range hood.  A maintenance technician came but advised there was no repair needed.  In fact, on information and belief, a repair was needed. The range hood continued leaking. The Romans were unable to use their stove.

286.    Presumably for that tenant interaction, FBRC opened, marked successfully fulfilled, closed, and used as a basis for BAH payments and incentive awards, a work order.

287.    On July 25, 2019, the Romans again reported the leak and the presence of mold on the range hood.  The Romans were unable to use their stove until the range hood and duct were purportedly fixed, or remediated, on July 26, 2019.

288.    After the "remediation," Mrs. Roman discovered the duct was never replaced.

289.    On August 21, 2019, the Romans discovered the presence of mold and rust on the vent register in the laundry area and in the upstairs rooms.  They also discovered condensation and water accumulating in the dryer.  The Romans were displaced and moved to a hotel, from August 21 to August 30, 2019.

290.    The following photographs show some of the mold, rust and condensation:



*Photographs 39 and 40: Rust, Mold, and Condensation*



*Photographs 41 and 42: Rust, Mold, and Condensation*

291.    On August 23, 2019, the Romans stopped by their home and discovered that proper containment was not set up to ensure personal belongings were not contaminated.  The AC unit was left running by Defendants. The below photographs depict the "containment" attempt.

 

_Photographs 43 and 44_: Improper Containment

292.    On August 25, 2019, the Romans discovered that the ducts were not encapsulated properly. The below photographs are the inside of the ducts:

 

_Photographs 45 and 46_: Inside of Ducts

293.    The further that the Romans looked into the conditions of their home, the more problems that they found.  They had no recourse, in their minds, except to complain and make requests to the property manager, the landlord.  However, the landlord clearly had no intention to alleviate the slumlord conditions.  Rather, the landlord has frankly depended on a loss-avoidance strategy that was inherently unfair and deceptive.  It included these elements:

a.    Simply overlooking decrepit conditions of housing and allowing the decrepit units to stay in use.

b.     Budgeting a minimal customer service facility which ignored, underserved and lied and fibbed to the tenants.

c.     The tenant could not withhold their rent money.  It was automatically paid.

d.     Many tenants believed the landlord was the government, and not a private company.  Tenants believing the landlord was the Army were less likely to complain or sue.  It could interfere with the servicemember's career or mark him as a whiner.  Also, the Army was taxpayer money and maybe slumlord conditions was all the government could afford.

e.     In fact, the landlord was a for-private company with an internally perceived duty not toward the military or the taxpayer but its shareholders, its owners.  These private companies were more likely than the Army to put profit over quality, but many families did not know their landlord was private.

f.     Defendants also deliberately obfuscated the nature of the governing law and its legal duties. In truth Defendants owe multiple common law and code and standard as well as statutory duties, but for years Defendants hid behind the "federal enclave" doctrine and asserted governmental immunity.  Under the circumstances this was not just a position taken on a choice-of-law issue, but a loss avoidance measure.  In fact, the law is fairly clear that federal enclave status here does not insulate Defendants nor is there any immunity.

g.     In short, Defendants have concededly provided unacceptable housing conditions for some residents at Belvoir for the last five years.  Affected tenants can be identified.  Defendants do not contest and cannot contest liability globally in certain important respects.  Defendants out of their duty to act in good faith and with fair dealing toward the housing project, should assist Plaintiffs with identifying the affected Belvoir families.

294.     As a result of their exposure to conditions in the two Fort Belvoir military housing units provided by Defendants, the two Roman daughters suffered from chronic coughs, chronic ear infections, bronchitis and pneumonia.

295.     The youngest daughter, who is developmentally delayed and in special education classes in Fairfax County Public Schools, developed asthma.  She requires ongoing therapy.

296.     As a result of the conditions in both of the Fort Belvoir housing units provided by Defendants, the Romans decided to move off base Labor Day 2019 to 9162 Power House Road in Lorton, VA.  The Romans now reside in North Carolina.

**Facts Regarding Plaintiffs John and Cassie Lane.**

297.    Supervisory Special Agent Lane is a career member of the United States Army. John and his wife Cassie have four minor children, who were as of mid-2022 between ages nine and 14. Defendants had actual knowledge of the fact that the family entering the residential unit in the case of the Lanes had young children who therefore, by that very status, had an important need for clean and healthy housing.

298.    From on or about April 21, 2015 through in or about June 2018, Mr. Lane, his wife Cassie, and their four minor children resided in military housing at Fort Belvoir at 9739 Barlow Road, Fort Belvoir, VA  22060.   Below is a photo of the exterior:



*Photograph 47: Exterior of structure.*

299.    The Lane family, while they lived at 9739 Barlow Road, Fort Belvoir, VA 22060 from April 2016 to June 2018, had maintenance at their home three times to address mold. Serious concerns over testing and quality of work were not addressed. Mold in the home was clearly a reoccurring problem and the root cause was never explored, just the visible signs.

300.    In June 2017, Cassie complained of a mildew smell coming from her side of the bed in the master bedroom.  The Lanes asked housing to investigate.  Janet Mooneyhan, Senior Community Manager-Dogue Creek, was convinced to look at the problem area the family identified in the southeast corner of the master bedroom.  Upon viewing it herself, Ms. Mooneyhan moved the family into a temporary housing unit directly across from the Barlow Road home for a week while work could be done.

301.    The family was especially concerned about mold and mildew and the recognized health effects associated with environmental contaminants in the home, because of their young children.  For instance, their youngest child typically slept in a little sleeper next to the bed in the master bedroom.  It was right near the place of concern for the smell of the mold and mildew.

302.    While the work took place, the family saw a large amount of insulation and sheetrock removed from the Barlow Road home, in part discolored with mold.  Large parts of the inner East and South walls were removed.  Maintenance also did some landscaping work to ensure rainwater was not flowing back at the house causing moisture.   The mold was not to the family's knowledge tested.  When they raised concerns, they were assured that the company treated all mold as if it were black mold, and that makes it somehow cheaper not to test.  The smell came back shortly after the work was done.  The family also learned after this repair that the neighbor whose living room wall was shared with the Lane's master bedroom wall had to dispose of photos because mold grew through that same wall earlier.

303.    During their approximately two weeks spent in the temporary house, the Lanes noticed that it had some mold growing out of/around the electrical outlet that was on the wall below the sink.  Agent Lane was especially concerned, as he had previously heard of an incident in which a fire at one of the units was reportedly caused or contributed to by virtue of electrical shorting or arcing secondary to mold intrusion.

304.    On September 25, 2017, the Lanes asked maintenance to come back because of the condition of the wall in the master bedroom.  The sheetrock became saturated from the inside and the paint started changing shape and color.   A hole was cut in the wall and "George," the maintenance supervisor, related that it felt dry inside and it was fine.  The inside of the wall was treated with something called "Kilz" and the wall was repainted.   The strong smell of mold remained.  The family was not moved out when this one-day repair was done. The family requested to be moved from the home with only one year left on assignment, but housing would not pay for the move because, according to them, the mold was under control.  These conversations took place with Ms. Mooneyhan, who seemed to be annoyed, and with George, or, with Eddra Romero, Assistant Community Manager-Dogue Creek.

305.    On information and belief, the product used by the workman was "KILZ® ORIGINAL Oil-Based Primer."  Its product information states: "Trusted by pros for over 40 years, excellent sealing and adhesion properties help paint adhere to most interior surfaces leading to better results.  Use on wood, drywall, plaster, paneling, wallpaper, masonry, brick, painted metal and properly prepared glossy surfaces†. Not recommended for mold or mildew-prone surfaces or on flooring."  (Emphasis added).

306.    On March 29, 2018, in preparation for a Spring Break trip and their upcoming move, the Lane family was removing items from the large hall closet closest to the living room and noticed the wall was becoming saturated with a black, fur-like substance that was pushing the paint off the wall.  The family was again asked to leave the house for repairs.  The Lanes left the house a day early and went on their vacation.   While in Niagara Falls, the Lanes made an ICE complaint by phone because housing was again refusing to test the mold of explore the extent of the spreading of it.  The Lanes never received a reply from this complaint.

307.    After their trip, Mr. and Mrs. Lane started sleeping in their children's rooms or the living room because the smell was so strong in the master bedroom.  They then noticed the same

smell in the small bedroom on the South side of the house.  The Lanes continued to get more and more angry over the situation because they could not get their children and belongings out of the house sooner than the PCS date.  The Lanes also made a complaint to Senator Murkowski's office.

308.    The Lanes explained all of these facts to the inspector at the time of their move-out. They were told that the inspector was separate from housing and would ensure that things were handled properly before someone else had to go through the same thing.

309.    Following their move-out, the Lanes were contacted by a neighbor who was aware of their situation.  The neighbor told the Lanes that approximately two weeks after they left, a new family moved in, including a military spouse with a health condition.  This made the Lanes yet more concerned.

310.    Since the time that the family first moved into the military housing unit at Fort Belvoir, the Lane family has had health problems that can be associated with exposure to mold. These have included sinus problems; aggravated autoimmune problems; respiratory issues; sickness in the children; neurological issues with the children; and other adverse health effects.

311.    The Lanes recall that the landlord cleaned the HVAC ducts in the unit on two occasions.  The first time it was said to be part of some routine maintenance.  The second time, the duct blowdown occurred because the family asked for remediation of the mold issues.  Agent Lane recalls that when he came home after the blowdown occurred, there was a noticeable coating of dust over everything they owned.

312.    On one occasion, a landlord representative told the Lanes they could "just use vinegar" to deal with the mold.  Another time, one of the landlord representatives claimed that this was the first the landlord had ever heard of a mold issue.  The Lanes find this not credible.

313.    The Dogue Creek units appear to have been built circa 1956 and are over 60 years old.  There are said to be 270 total housing units in Dogue Creek, consisting of townhouses and

semi-attached bungalows (primarily three-bedroom units, with some two-bedroom units).  Some units were said to be renovated in the 1990s.

314.    The Dogue Creek address was not the only time the family had lived at Fort Belvoir. Years earlier, Agent Lane had been stationed there circa 2010, and they had resided in better community.  At that time, Dogue Creek had a reputation as being more of a "ghetto."  They were thus reluctant to take a home in Dogue Creek when, in 2015, they got ready to return to Belvoir. They went online and sought to choose and reserve a unit to lease that was part of The Villages at Belvoir but in a different community, not Dogue Creek.

315.    The Lanes believed that they had successfully reserved a home.  But then when they arrived after a lengthy drive at Fort Belvoir, the housing office said that home was taken.  The property management tried to convince the family to take a home at Dogue Creek.  The family was at this time in a state of uncertainty, staying in a hotel.  The property manager representatives, however, gave them a sales pitch for Dogue Creek, saying they had renovated units.  Had the family known the actual facts, they would have refused the unit.

316.    On information and belief, during the time frame when the Lanes resided in the Dogue Creek home, the above-identified Ms. Mooneyhan was the Senior Community Manager for The Villages of Belvoir, listing herself as working for Michaels; she held this position from September 2014 until February 2019.

317.    On information and belief, and according to her resume, during that period of time, Ms. Mooneyhan assisted the Community Director in overseeing six communities at Fort Belvoir, comprised of 2,154 homes in total.  She supervised 18 staff members.  She was responsible for conducting training for new hires; for ensuring that all communities are appropriately staffed; for helping to develop and implement new policies; and for ensuring property management software conversion from Yardi to RealPage.  She was the first point of contact for five Community Managers.  In addition to all that, she managed the Dogue Creek community comprised of 265

multifamily town homes, overseeing the office and maintenance staff and contractors. She was obligated to meet budget requirements. She has held out that she conducted weekly property inspections and submitted daily/weekly reports to corporate, audited resident files, was involved in move in walk throughs, and reviewed I.C.E. comment cards.

318.    During the relevant period of time, Ms. Mooneyhan did not have special expertise in assessing or addressing root causes of habitability problems in older structures; nor did she have special expertise in mold safety or mold removal and remediation. On information and belief, she was not authorized to have units or structures condemned, rebuilt, or renovated due to mold or other issues. Had there been management recognition of the mold problems at Dogue Creek, conscientious, accurate and honest assessment, documentation and workup of tenant complaints, and due care taken with regard to the infrastructure duties held by Defendants with regard to military families with infants and children, none of the problems experienced by the Lanes would have occurred.

319.    The Dogue Creek unit in which the Lane family resided was in an older building with five units total. The Lanes are concerned, with a reasonable basis given the fact that they are all in the same old building, that the other units in that building also had mold. As noted, their next-door neighbor did confirm mold that had spread through the connecting wall, and had grown so bad that at one point this neighbor said she had to throw out family photos.

320.    The Lanes are also concerned that other families may have had to go through the nuisance and disruption of being temporarily displaced from their homes, due to the poor housing conditions, in the same manner as the Lanes were. In this regard, it was reported in December 2019 that 30 families were displaced due to poor housing conditions at Fort Belvoir.[24] It was also

---

[24] *See* Angela Woolsey, No home for the holidays: 30 military families still displaced by poor housing conditions at Fort Belvoir, Dec. 6, 2019, Fairfax County Times, https://www.fairfaxtimes.com/articles/no-home-for-the-holidays-30-military-families-still-displaced-by-poor-housing-conditions-at/article_7d86537c-1878-11ea-a5d2-fbd3f210b174.html.

reported that "[n]early all of the family displacements have involved mold in the home, which means persistent moisture."[25]

## Facts Regarding Plaintiffs Jennifer Cocco.

321.    Jennifer Cocco was a career member of the United States Marines and retired in 2021.  Ralph Cocco is member of the United States Marines Reserves.  Jennifer and her Husband Ralph have two minor children (twins), who were 2 years old as of 2017 .  Defendants had actual knowledge of the fact that the family entering the residential unit in the case of the Coccos had young children who therefore, by that very status, had an important need for clean and healthy housing.

322.    From on or about May 2017 through in or about September 2019, Mrs. Cocco and her two minor children resided in military housing at Fort Belvoir at 9627 Barlow Road and 9687 Maloney Road, Fort Belvoir, VA  22060.

**9627 Barlow Road**

323.    The Cocco family, while they lived at 9627 Barlow Road Fort Belvoir, VA 22060 from May 2017 to July 2019, had maintenance at their home multiple times to address mold. Serious concerns over testing and quality of work were not addressed.  Mold in the home was clearly a reoccurring problem and the root cause was never explored, just the visible signs.

324.    Shortly after moving in Ms. Cocco noticed a black substance on the vents.  She requested that the vents be cleaned.

325.    On 1/4/2019, Ms. Cocco reported a water leak in the ceiling of the upstairs mechanical room causing the ceiling to cave in and that paint is peeling off of the bedroom doors.

---

[25] Paul Lara, Industrial hygienist brings purpose, passion to Belvoir housing mission, March 9, 2020,                                          Belvoir                                          Eagle, https://www.army.mil/article/233608/industrial_hygienist_brings_purpose_passion_to_belvoir_housing_mission.

326.    On 3/21/2019, Ms. Cocco reported a flood in the upstairs bathroom and that the toilet leaks constantly.

327.    On 5/26/2019, Ms. Cocco requested the ducts and vents be cleaned due to water damage.

328.    On 6/16/2019, Ms. Cocco reported a musty odor in the home and that the family had headaches and nausea whenever inside the home.  She also reported that she thought the kitchen vent may have water damage.

329.    On 6/17/2019, Ms. Cocco reported visible mold in the bathroom.

330.    On 7/18/2019, Ms. Cocco found mold grown in her HVAC unit, on the walls behind pictures, rotting wet moldy wood at the base of the sink cabinet concealed under rubber molding, rust on the appliances.  She requested a displacement request but was told that no homes were available.  An inspector came to look at the home as she was concerned her items were contaminated and was told that it was dusty.  No inspection was done.  The house was to be "turned by contractor"

**9687 Maloney Road**

331.    On or about 7/24/2019  Ms. Cocco was transferred to 9687 Maloney Road.  During move in inspection, she found paint bubbling on the living room wall outside of the HVAC closet, mold in the HVAC unit, amongst other issues. Ms. Cocco requested a moisture test be done.  A small amount of "SFG" was located on the dehumidifier.  She was advised it would be removed. The HVAC was replaced a few days later without containment being installed.

332.    On 8/28/2019 Ms. Cocco reported a recurring issue with water damage and crystals coming through the wall in the HVAC closet as well as issues with the downstairs bathroom baseboard and living room.  Maintenance found moisture in the wall, discoloration forming along the walls and behind the toilet.  The job was turned over to TNC and PBI to begin remediation.

333.    On 8/31/2019 Ms. Cocco reported bubbling of the wall in the downstairs bath, leaking water and water damage on the well and asked for this issue to be addressed immediately.

334.    On 9/6/2019 maintenance came to the home and ripped out the wall where the bubbling was found, and water spots were present.  Mold was coming through so a containment screen was put up, although backwards.

335.    On 9/7/2019 Ms. Cocco and her family woke up ill and upon entering the first floor noticed that the dryer has blown down the containment and that mold/possible disturbed asbestos tile, and potential lead paint has been blowing directly into the HVAC air intake and spread throughout the house while they slept. She contacted the emergency help desk and had the kids go outside as they had migraines, trouble breathing, rashes and bloodshot eyes.  After having no response from maintenance after reporting this issue again on 9/8/2019 she reached out to Ms. Milton and asked again to be displaced.  At that time, she was displaced to a hotel.

336.    On 9/22/2019, Ms. Cocco notified maintenance that there was an active leak potentially in the closet and asked that containment be installed and notified them that there was cross contamination that happened previously as proper containment procedures were not followed.

337.    While living on Ft. Belvoir Ms. Cocco suffered, nose bleeds, a brain tumor and was diagnosed with an autoimmune disease.  Both children had developmental delays as well as migraines, sleep apnea as well as tonsil and adenoid abnormalities.  The issues stopped after moving from the home.

   

## Facts Regarding Plaintiffs Cody Adams & Gabrielle Adams.

338.    Staff Sergeant Cody Adams is a career member of the United States Army with the enlisted rank of Staff Sergeant (SSG). He and his wife Gabrielle Adams have two minor children, who are three years old and one year old.  Defendants had actual knowledge of the fact that the family entering the residential unit in the case of the Adams had young children who therefore, by that very status, had an important need for clean and healthy housing.

339.    From on or about August 2021 through the present, SSG Adams and his wife, Gabrielle, and their two minor children resided in military housing at Fort Belvoir at 9248 Miller Road, Ft. Belvoir VA 22060. They were not provided a copy of their seven-year work history.

340.    The Adams family, while they lived at 9248 Miller Road, Ft. Fort Belvoir, VA 22060 from August 2021 to September 12, 2022 had maintenance at their home  to address mold, water intrusion, and animals living in the ceiling.  Serious concerns over testing and quality of work were not addressed.  Mold in the home was clearly a reoccurring problem and the root cause was never explored, just the visible signs.

341.    On August 19, 2022, the Adams family Tested bathrooms with a moisture meter and discovered received high readings.

342.    On August 20, 2022, the Plaintiffs Contacted Tom Fagan to get the home checked for mold.

343.    A Dehumidifier was placed in master bathroom that evening and was told an industrial hygienist would be out to the home within the week.

344.    On August 22, 2022, Sheryl Kaiser came to home and inspected each area with a moisture meter. Sheryl noted high readings in 2nd floor bathrooms, and pointed out visible mold in the master. Sheryl let the family know a contractor would be out to inspect every room and preform a scope of work.

345.    There was water leaking into the first-floor bathroom and two inches of water in the neighbor's bathroom. The second-floor bathroom had leaked into the living room. Maintenance had come out to the house three times and said there was no leak, even though a wet spot in the ceiling was clearly visible.



*There are no leaks…*



*Ceiling water spot from bathroom…*

346.    On August 26, 2022, A TMO contractor came to the home without communicating what he was going to be doing. He visually inspected only the 2nd floor bathrooms and stated "I'll do the work" upon exiting my home.

347.    On August 29, 2022, I reached out to Jennifer Hudson asking for another contractor to be scheduled.

348.    On September 12, 2022, a TMO contractor came to the home and did not let Mrs. Adams know what they were doing in advance.   She was anticipating a full scope of work, as described by Sheryl Kaiser. The TMO Contractors opened up the 2nd floor bathroom walls, in which they stated there was "extensive mold damage". Mrs. Adams was not informed that walls would be opened while she and her family were present in the home.  This containment that was attempted was not done to industry standards or IAW IICRC S520 standards.

349.    The Adams family children, the one-year-old and three-year-old were in the home during this process. Sheryl Kaiser came out to the home to view the TMO contractors' findings,

and suggested they begin remediation on the master bathroom while leaving us to use the hallway bathroom and shower during the remediation process. Mrs. Adams refused, and stated her family is not willing to live in the home while it was being remediated for mold.  This was not industry standard.   Mrs. Adams then contacted Jennifer Hudson and explained the day's events. Ms. Hudson then got in touch with Diane Amaoui, who displaced the family to a hotel that day.

350.    Due to the hazardous conditions caused by the opening of the walls, the Adams family were forced to displace in a matter of hours. Another TMO contractor was scheduled to come out and preform a scope of work on September 13, 2022. Mrs. Adams was informed a formal meeting would be scheduled after SOW is complete.  On September 13, 2022, a contractor from True North came to home and preformed SOW, checking each room, and the HVAC as originally expected.

351.    On September 15, 2022, Ms. Adams reached out to Diane Amaoui via text asking when statement of work would be available. She was told an "amended scope of work" was not yet available.

352.    In response, Mike Whitman reached out explaining that Sheryl Kaiser had performed an initial scope of work. Mrs. Adams asked how that was possible, as she had not inspected the entire home, and that she let her know a third-party contractor would perform the scope of work. All questions were left unanswered.

353.    On September 16, 2022 Mrs. Adams reached out to Diane Amaoui to see the document completed by Sheryl Kaiser, as well as an explanation of how she could have performed a scope of work without inspecting the entire home. No answers to her questions, or any documentation was provided by Diane. Mrs. Adams texted Jennifer Hudson to see if she could provide documentation, and she let me know she would try. Hours later, I contacted Alicia Luster who contacted Mike Whitman, who provided me with an email from Sheryl, and the SOW from True North.

354.    On September 17, 2022 Diane scheduled a Scope of Work Meeting at 1300 on September 20, 2022 with Mike Whitman, Diane Amaoui, Jennifer Hudson, and Zach Allen to review course of action based on the SOW.

355.    On September 20, 2022 Neither Jennifer Hudson nor Zach Allen were able to attend meeting.   Mike Whitman was present.   In this conversation it was made clear that industry standards were not followed in multiple instances. This includes but is not limited to walls being opened and exposing mold, as stated by the contractors performing the work.

356.    During this meeting Mike Whitman stated that he was aware walls were going to be opened to check for visible mold. This occurred without proper containment of the  Household Goods (HHG) nor proper/verified containment of the affected areas as stated in the IICRC S520. Neither SGT Adams or Ms. Adams were informed that any work would be done, and proper protocols were not followed. Walls were opened without the Adams family knowledge or consent while Mrs. Adams and the minor children were still in the home and exposed to hazardous materials.

357.    Sheryl Kaiser entered the home to see the work being done, she suggested we remain in the home during remediation, which is against industry standards.  Mrs. Adams asked Mike Whitman if he'd agree that significant mistakes were made and stated he did not disagree.

358.    The Adams family told TMO they were requesting that there HHG s be inspected for contamination of mold by TMO's, a third-party, and QA/IH to ensure the family's HHG  were safe and clean following the exposure to contaminants. The family  requested to be present for this inspection. asked for off-site cleaning of our non-porous materials, thorough testing of semi-porous materials as well as off-site cleaning by professionals, and replacement of porous materials that cannot be properly cleaned, as is in the IICRC S520 14 - 14.2.

359.    September 27, 2022The Adams family  had a meeting with Zach Allen, Diane Amaoui, Jennifer Hudson, and Kaitlyn Oppenheim, and Cody Adams. . The family as told by Zach

Allen that because the home remediation would take longer than the required 30 days, their move and moving costs would be covered. However, Mr. Allen stated that since they did not yet hit the 30-day period they would need an exception to policy to be offered a home. Mr. Allen informed the Adams's family  that a home may not be available for a long period of time, and that they did not come before the 400 some-odd incoming families on the housing list. He also stated they would not agree to get a scope of work (SOW) by a third-party contractor

360.    The Adams family made numerous requests for HHG remediation as required by law and that the remediation be done to industry standards including, including the IICRC S520 standards as referenced in the Virginia mold statutes. Mr. Allen's response to this was that the Michaels Company does not have to follow IICRC standards.  Mr. Allen stated that Virginia statutes  allow that other guidelines  can be used by TMO  in leu of IICRC S520, but refused to explain what those were. Mr. Allen then stated TMOP would not take into consideration any results from independent testing, even if it shows hazardous mold spores where in the home and on their HHG. He stated he would  only decontaminate/replace those items that  the third-party TMO sends out  of it has active colonization of the spores

361.    On September 27, 2022, Ms. Adams took swabs of the master bathroom and HVAC system to send for independent testing of the suspected fungal growth. On September 28, 2022, Mrs. Adams  reached out to April Coleman for a seven-year work history for the new home which was not provided. Ms. Coleman responded that I would have it by end of day the following day on September 29, 2022.

362.    Ms. Adams to Zach Allen again for a further explanation as to why TMO does not have to follow the IICRC S520 and asked for the exact standards that TMO is following in regard to our HHG.  Mr. Allen never replied and/or refused to reply.

363.    Ms. Adams received an email response from April Coleman stating she attached the seven-year work history request.  Mrs. Adams only  received  a five-year history. She then replied requesting the   missing work history for years 2015 and 2016.

364.    Zach Allen replied to Ms. Adams 'email, however, he did not address the specific standards TMO will be following in regard to cleaning of the families' HHG. Mrs. Adams again asked him again for further clarification.  Mr. Allen has to yet to reply.

**Facts Regarding Plaintiffs Jose Berdecia-Hernandez & Kim Melendez.**

365.    Second Lieutenant Jose Berdecia-Hernandez (Hernandez family) is a career member of the United States Army with the current rank of second Lieutenant (LT).  He and his wife Kim Melendez have three minor daughters, who are 1, 4 and 5 years old.  Defendants had actual knowledge of the fact that the family entering the residential unit in the case of the Hernandez family had young children who therefore, by that very status, had an important need for clean and healthy housing.

366.    From on or about August 2020 through the September of 2022, LT Hernandez and his wife, Kim, and their three minor children resided in military housing at Fort Belvoir at 5514 Grist Mill Court N, Ft. Belvoir, VA 22060

367.    The Hernandez family were not provided a copy of their seven-year work history.

368.    The Hernandez family, while they lived at 5514 Grist Mill Court N, Ft. Belvoir, VA 2 from July 14, 2020, to September 12, 2022, had maintenance at their home to address mold, air quality issues, water leaking from the ceiling and leaking from A/C units, along with multiple requests to clean the A/C unit because of air quality issues.  Serious concerns over testing and quality of work were not addressed.  Mold in the home was clearly a reoccurring problem and the

root cause was never explored, just the visible signs.

369.    After less than 60 days in the home, the Hernandez family had to request a work order on 9 September 2020, requesting Maintenance to clean the AC system due to air quality and allergies like symptoms.

370.    During the next 12 months Lt Hernandez's one-year-old daughter became afflicted with a sleep disorder and respiratory issues.  Lt. Hernandez, wife Kim, also become afflicted with respiratory issues and emotional problems due to lack of sleep because of the one-year-old daughter's sleep disorder.

371.    Lt. Hernandez also was suffering from mold symptoms because of air quality issues such as Itchy, red eyes and sleep disorder.

372.    During the period of time between from July 2020 to September 2021 the Hernandez family had experienced water instruction resulting in leaking ceilings and A/C unit and has requested a copy of the record of the past seven years' maintenance work orders and a summary of the work orders/maintenance conducted on 5514 Grist Mill Ct N from July 2020 to September 2022.

373.    During the two-year period of their occupation, the Hernandez family had requested a Work order on 30 July 2021, requesting Maintenance to look at and clean the AC system again.  A work order submitted on 14 August 2021, for water leaking from the AC unit.  A work order submitted on 13 October 2021 for water leaking from the ceiling.      A work order submitted on 30 October 2021, for visible mold in the bathroom.

374.    During the period of time that the Lt Hernandez lived on base housing at Fort Belvoir, he continued to suffer from migraines, hypersomnia, allergic conjunctivitis and hypermetropia.

375.    During the period of time that the Hernandez family lived on base at Fort Belvoir, the 3-year-old child and 5-year-old child suffered from Acute Upper Respiratory Infections.

376.    During the period of time that the Hernandez family lived on base at Fort Belvoir, the 1-year-old child suffered from various mold symptoms such as unexplained diarrhea, fever, vomiting to coughing, decreased appetite and snoring.

377.    During the summer of 2022, the conditions became intolerable. A work order was submitted on June 16 2022, water leaking from the A/C and again on July 1, 2022 for water leaking from the A/C unit. On June 28 2022, a work order was again submitted for water leaking from the ceiling leaking.

378.    During the summer of 2022, Lt. Hernandez was assigned to temporary duty outside of Virginia. Every time he contacted Maintenance, he could not get a clear answer on what is going on with the house.

379.    The Hernandez family was forced to provide their own testing on Monday, 29 August 2022. According to the tests there was mold in both bathrooms.

380.    This information was passed on to TMO and it was recommended to the maintenance/ housing office to displace the Hernandez family due to the mold on both bathrooms.

381.    However, when LT Hernandez returned, he visited the Woodland office, and Ms. Carmen told him that to displace his family, he had to wait to get the results from TMO's contractor True North before he could move out of my family.

382.    Each time that Lt Hernandez made a request to displace his family in order to make these repairs he would get the same response, "we don't make that decision".

383.    It was not until the Fort Belvoir Army Garrison intervened and it was decided to move the Hernandez family from the home

384.     On August 31, 2022, LT. Hernandez explained the situation to the Maintenance supervisors and reminded them about outstanding work orders that had not been fixed in the past 2 months. Today I received a phone call from my wife that she and my one-year-old have allergies.

385.    The Hernandez family decided it was not in the family's best interest to return to 5514 Grist Mill Ct N, Fort Belvoir and LT. Hernandez has now changed permanent station to Texas.

### Facts Regarding Plaintiffs Steven Aguilar & Megan Aguilar.

386.    Sergeant First Class Steven Aguilar (Aguilar family) is a career member of the United States Army with the current enlisted rank of Sergeant First Class (E7)and his wife Megan Aguilar have one minor daughter aged 10 .  Defendants had actual knowledge of the fact that the family entering the residential unit in the case of the Aguilar family because upon information and belief the previous tenants left because of mold related issues. The Aguilar family had a young child who therefore, by that very status, had an important need for clean and healthy housing.

387.    From on or about November 2020 through the present, Sergeant First Class Aguilar and his wife, Megan, and their minor daughter resided in military housing at Fort Belvoir at 5957 Stevens Road, FT. Belvoir VA 22060

388.    The Aguilar family were not provided a copy of their seven-year work history.

389.    The Aguilar family has had continuing and constant water intrusion problems since they moved in. There were and continue to be consistent and unresolved problems with water intrusion through the back door area since the family moved in November 2020.  For example, whenever it rains water leaks through the area where the back door is located and permeates its way into the home.   In May 2020 water intrusion continued into the home and after multiple requests to repair the problem with water, the TMO installed a new back door as well as new carpet.  However, the was not the source of the water intrusion and after every it rained, water continued to leak into the home.

390.    In addition to the leaking in the back door area, there were window that just randomly cracked which allowed for moisture to intrude into the envelope of the home.

391.     The Aguilar family has made multiple requests to fix the windows, however, they gave refused and one Window has been broken with an outstanding work order for 167 days, which has developed a colony of mold. In addition, the HVAC also contains mold.

392.     In addition, there have been multiple blown electrical outlets which TMO refuses to repair and when Ms. Aguilar calls, she is told "it wasn't an emergency."

393.     While the Aguilar family, lived at 5957 Stevens Road, FT. Belvoir VA 22060, they have  constantly been sick and are suffering from allergy like symptoms caused by exposure to mold.  Mrs. Aguilar has had sinus infections and pneumonia requiring the rounds of antibiotics, which was caused as a result of this exposure to mold and the Defendant's failures to repair and maintain the Lowe family's home to address mold and air quality issues.  Serious concerns over testing and quality of work were not addressed.  Mold in the home was clearly a reoccurring problem and the root cause was never explored, just the visible signs.

394.     The Aguilar family never received their past seven years' maintenance work orders.

395.     During the period of the Aguilar family's occupancy, Sergeant First Class Aguilar and his daughter have suffered and continue to suffer from allergy like symptoms, congestion, sneezing and fatigue.

396.     The Defendants take months to respond to maintain and repair issues which has resulted in unsafe living conditions.

397.     The Aguilar family home has been tested for air quality and mold spore and it has been found to have toxic black mold and no scope of work had been properly performed by the defendants.

**Facts regarding Plaintiffs Andrew Armstrong and Leslie Gonzalez.**

398.     Petty Officer Third Class Andrew Armstrong (Armstrong family) is a career member of the United States Army with the current enlisted rank of Petty Officer Third Class (E4) and his wife Leslie Gonzalez have one minor daughter aged 4 and one minor son aged 5 months.

Defendants have actual and/or constructive knowledge of the fact that the family entering the residential unit, in the case of the Armstrong family, is reasonably likely to be subjected to water intrusion, poor air quality and mold related issues because of the current and previous deterioration of housing conditions at Fort Belvoir. TMO has been inadequately repairing and remediating Fort Belvoir housing units which have been affected by water intrusion for the past five years.  The Armstrong family has minor children who therefore, by that very status, had an important need for clean and healthy housing.

399.    The Armstrong family occupied Fort Belvoir residential housing for three (3) years beginning in the fall of 2019.  From on or about September 15  through the present, Petty Officer Armstrong and his wife, Leslie, and their minor children resided in military housing at Fort Belvoir at 8229 Herb Garden Road Fort Belvoir at a Woodlawn Village four (4) bedroom Townhouse.

400.    The Armstrong family has had continuing and constant water intrusion problems since they moved in. There were and continue to be consistent and unresolved problems with water intrusion and HVAC issues since the summer of 2020.    The A/C would stop working.  The drip pan would become full, and the condenser would shut off.  Eventually the A/C would continue to leak water and would flood the downstairs. In addition, the electric breaker was not working property, and the A/C would cut out.

401.    At one point the Armstrong family had to be displaced out of house for a day. The Armstrong family continued to report these problems and request service, however, TMO would never permanently fix the problem and only fix it temporarily. In addition, TMO failed to provide work orders after the maintenance and repairs were requested.

402.    TMO never addressed or repaired the source of the water problems and water continued to leak into the home. As a result, the Armstrong was exposed to poor air quality which contained mold spores because of the faulty A/C.  The Armstrong family constantly been sick and are suffering from severe allergy like symptoms caused by exposure to mold.  Petty Officer

Armstrong' wife, Leslie, has had skin rashes, nose bleeds and both she and the children have had respiratory infections.  These serious concerns over testing and quality of work were not addressed. Mold in the home was clearly a reoccurring problem and the root cause was never explored, just the visible signs.

403.    These problems continued into the summer of 2022.  After making complaints again to TMO, their contractor True North tested the home for mold and left a hole 15" from main air intake exposing all the mold to the occupants of the hone without any property containment barrier pursuant to industry standards.

404.    Once the paint was peeled back mold was visible which was attached to the dry wall. The hole was open for three days even after the Armstrong family adamantly requested that it be covered up.  The family requested relocation but was denied and had to stay three days before being relocated to temporary housing a few blocks away

405.    Petty Officer Armstrong was given a per diem of $5.00 per day to cover relocation costs or expenses and had to move his family out on their own.  Petty Officer Armstrong noticed that during the inspection which was supposed to happen prior to work starting, that the containment area was improperly placed although the contractors had begun  reinstalling drywall.

406.    In fact, the home failed Army Garrison inspection. Since they did not perform proper containment or remediation of household goods there was no way to determine if how much of the Armstrong family's belongings were exposed to mold

407.    TMO then claimed that the home passed inspection the Friday before July 4, 2022,

even though there was still plastic everywhere and a hole in the wall in mall with mold.

 

408.    The family refused to move back in and remained in a guest house for an additional week until all remaining contaminant issues were fixed. By this time, the family had been out of the home for several seeks and Leslie's skin condition had gone away, and the children did not have any more respiratory issues.

409.    TMO told the Armstrong that they return to the home. During the weekend of July 10th weekend, the Armstrong family moved back into the home, relying upon TMO representations that the home was safe and habitable and free of mold.

410.    After the Armstrong family moved back in, within 1.5 weeks, Petty Officer Armstrong's son had to go to the emergency room with double sinus and upper respiratory infection.   Leslie's skin condition began to reoccur, and the family is being tested for mold allergies.

411.    After being in the house one-month TMO's maintenance supervisor came to take moisture readings and said there was no mold.  However, in truth and fact the one of the ceiling paint was sagging due to moisture and when the Armstrong family had private testing there was mold reported throughout the home and inside the AC unit. Both bathrooms were not installed correctly and are not guaranteed to keep out water.  The walls and floors still have high moisture, including both doors and ceilings.  The Garrison confirmed that TMO only repaired 2 feet of

contaminated wall with the initial remediation.

412.    The Armstrong family is currently displaced while a second remediation is being performed to address the continuing mold issues.   Their expected return date is 11/25/2022 if the house passes a final inspection.

**Facts regarding Plaintiffs Zachary Camechis &, Alacia Camechis.**

413.    Navy Chief Zachary Camechis (Camechis family) is a career member of the United States Army with the current enlisted rank of Navy Chief (E7) and his wife Alacia Camechis  have four children ages, 11, 9, 7 and 6, one of which has autism.  Defendants have actual and/or constructive knowledge of the fact that the family entering the residential unit, in the case of the Camechis family, is reasonably likely to be subjected to water intrusion, poor air quality and mold related issues because of the current and previous deterioration of housing conditions at Fort Belvoir. TMO has been inadequately repairing and remediating Fort Belvoir housing units which have been affected by water intrusion for the past five years.  The Camechis family has minor children who therefore, by that very status, had an important need for clean and healthy housing.

414.    The Camechis family occupied Fort Belvoir residential housing from March 2021 through the present.  Zachary Camechis, his wife and minor children resided in military housing at Fort Belvoir at 5322A Smoke House  Fort Belvoir, VA.

415.    The Camechis family were not provided a copy of their seven-year work history.

416.    The Camechis family has had continuing and constant water intrusion problems since they moved in. Mrs. Camechis suffered from respiratory issues, including asthma. There were and continue to be consistent and unresolved problems with water intrusion and HVAC issues.  In 2021 there was a sewage backup into the home which was addressed by TMO.

417.    TMO found mold in the Camechis family home in March of 2021.  The family was not displaced, and the mold remediation was performed while the family remained in the home.

418.    TMO found mold in the Camechis family home again in July of 2021.  The family

was not displaced, and the mold remediation was performed while the family remained in the home.

419.    TMO found mold in the Camechis family home again in November of 2021. At this time the Camechis family was displaced, and the mold remediation was performed.

420.    TMO remediation for mold and mold spores consisted of spraying a solvent on an object or material and then wiping it up in one (1) minute. TMO represented that the home had been remediated and was mold free and habitable.

421.    The Camechis continued to have problems with their HVAC unit where it was not working, and leaking water, which resulting in mold being contained inside the unit. The lack of maintenance and repair created poor air quality and Ms. Camechis continued to suffer from respiratory issues. TMO never addressed or repaired the source of the HVAV water problems and water continued to leak into the home. As a result, the Camechis family was exposed to poor air quality which contained mold spores because of the faulty HVAC. The Camechis family continued to report these problems and request service, however, TMO would never permanently fix the problem and only fix it temporarily.

422.    The Camechis family constantly had power outages and  power surges in the home. A third party electrician came out and stated that the kitchen needed to have the walls opened and rewiring done. TMo did not agree and nothing came of it. TMO then hired their own "master electrician" who came out and changed the breaker. The breaker was replaced twice, every outlet in the home was replaced, and a surge protector was installed in the electrical panel. Yet they still constantly lost power in the garage and inside the home. They had a small electrical fire in an outlet. They have had the kitchen flood multiple times due to the dishwasher motors burning up due to electrical issues and all they did was replace them. Work orders were also deleted showing on the 7-year maintenance report that they didn't have as many electrical issues as they had.

423.    In July 2021 TMO ripped out HVAC and replaced it; however, the Camechis family

was still exposed to mold from the master and upstairs secondary bathrooms.

424. The Camechis family have been constantly sick and are suffering from severe allergy like symptoms caused by exposure to mold. These serious concerns over testing and quality of work were not addressed. Mold in the home was clearly a reoccurring problem and the root cause was never explored, just the visible signs.

### Facts regarding Plaintiffs Samuel Vidot and Rachel Vidot.

425. MSGT Samuel Vidot (Vidot family) is a career member of the United States Air Force with the current enlisted rank of Master Sargent and his wife Rachel Vidot have five (5) minor children a 10-year-old son, 3-year-old son, 2-year-old son, 5-year-old daughter and a 1-year-old daughter . Defendants have actual and/or constructive knowledge of the fact that the family entering the residential unit, in the case of the Vidot family, is reasonably likely to be subjected to water intrusion, poor air quality and mold related issues because of the current and previous deterioration of housing conditions at Fort Belvoir. TMO has been inadequately repairing and remediating Fort Belvoir housing units which have been affected by water intrusion for the past five years. The Vidot family has minor children who therefore, by that very status, had an important need for clean and healthy housing.

### 5509A Boxwood Court

426. The Vidot family and their five minor children occupied Fort Belvoir residential housing since 6/2/2020 to the present. From 6/2/2020 until10/12/2022 the Vidot family lived at 5509 Boxwood Court North, Ft Belvoir, VA 22060 which is in Woodlawn Village.

427. The Vidot family were not provided a copy of their seven-year work history.

428. The Vidot family has had continuing and constant water intrusion problems since they moved in. Within two months of living in home dining room ceiling leaked into dining room from the guest bath above. The water dripped down from the light fixture onto the table. MSGT Vidot called emergency maintenance and they came out the next day.

429.    In 2020, TMO sent out maintenance to investigate leaking. A TMO employee used a moisture meter against the wall.  They said nothing was there and represented there were no signs of leaks and just left.

430.    There were and continue to be consistent and unresolved problems with water intrusion. In June of 2021, MSGT Vidot asked TMO maintenance to do a mold test. TMO came out to the home went into the master bedroom with a moisture meter and tested the walls and said there were no sign of mold in the house and didn't go check anywhere else in the home.

431.    The water leading continued in the living room, which was coming from HVAC. Maintenance came and just cleaned it up and did not do repairs. The HAVC continued to leak. MSGT Vidot called maintenance and told them there is a leak in the floor. Maintenance came out twice and did not repair anything and simply cleaned up the water 2 times.

432.    After calling maintenance again, TMO sent someone out with a shop vacuum and opened up the HVAC unit and cleaned it out.  MSGT Vidot saw mold all over the HVAC lid, walls and vent.  MSGT then asked isn't that mold? The maintenance person for TMO, Richard, said it was mold.

433.    The Vidot family continued to report these problems and request service, however, TMO would never permanently fix the problem and would only either say there were no leaks, and nothing was wrong.

434.    TMO never addressed or repaired the source of the water problems and water continued to leak into the home. As a result, the Vidot family was exposed to poor air quality which contained mold spores because of the water intrusion and faulty HVAC.  The Vidot family was constantly sick and are suffering from severe allergy like symptoms caused by exposure to mold. These serious concerns over testing and quality of work were not addressed.  Mold in the home was clearly a reoccurring problem and the root cause was never explored, just the visible

signs.

435.    The Vidot family children were never sick at their previous residence before they moved to Fort Belvoir on base housing.  The children are constantly sick.  All the children now have respiratory problems. Over the period of time that the Vidot family occupied base housing they have suffered from pneumonia, bronchitis, ear infections, throat infections and laryngitis. MSGT two sons now use respiratory nebulizers and have gotten bronchitis and dizzy spells. While in the home, the children breath heavy when they sleep and are all on allergy medication. Mrs. Vidot also suffers from dizzy spells and headaches. The children's Doctor told them their children were sicker than they were healthy.  The Doctor suggested it was the mold in the house.

436.    These problems continued into the summer of 2022.  After making complaints again to TMO, their contractor True North tested the home for mold on July 8, 20022 because of the main air intake exposing all the mold to the occupants of the home.

437.    When TMO came to the home, MSGT Vidot explained again that mold spores and contaminants were being blown around the home through the faulty HVAC and exposing the family who were getting sick.  TMO employee, Richard, then saw the mold in the HVAC and called his boss, but said he was not trained to handle and left.

438.    MSGT Vidot then had a phone call with Dane from the TMO to schedule an immediate walk through because the mold contained within the HVAC system. Dane is a TMO contractor who performs environmental for maintenance. However, upon arrival at the home, Dane did not test and said mold testing was done and would be send out.

439.    TMO refuses to take any mold testing after visible mold is reported and fails to take responsibility and answer for these failures.

440.    On July 15, 2022, the Vidot family was forced to perform its own mold testing. Mold and moisture were found in all bathrooms, laundry room and HVAC room and inside the HVAC unit itself.

441.    MSgt Vidot requested that his family be relocated.  TMO said there were no houses were available and he would have to wait.

442.    TMO third-party mold contractor True North showed up Friday, July 15, 2022 and did a meter reading and said it was fine.  However, when he pulled up floor in living room and closet door, there was visible mold everywhere.

443.    The Vidot family was finally displaced to a temporary lodging.

444.    The Vidot family was displaced over 90 days from the time they were allowed to move from 5319 Smoke House Court to their current location at 5305 Smoke House Court and during that period of time were required to continue to pay their basic allowance housing payments (BAH). TMO has failed to ensure the habitability of the Vidot's housing unit.  During the pendency of any repairs and remediation, TMO cannot continue to use a tenants' BAH. Moreover, in the case of maintenance and repairs necessary to ensure habitability of a housing unit, the relocation to suitable lodging or other housing will be at no cost to the tenant until the maintenance or repairs are completed. TMO has not only unlawfully used the Vidot's BAH it has also unlawfully charged the Vidot's costs of housing.

445.    TMO began the repairs and remediation of Box Wood Court pursuant to a scope of work they prepared.  However, this scope of work did not contain all of the problem items identified by MSgt Vidot and what was observed by TMO. Multiple items were omitted from the scope of work.

446.    TMO told MSgt Vidot and the Army Garrison that the repairs were completed, and the TMO represented that the home was habitable and free from mold.

447.    However, this was not correct.  The Army Garrison sent a certified industrial hygienist and a safety inspector to inspect the scope of work .  The Army inspectors failed the scope of work and installation done by TMO multiple times. The home was unhabitable.

448.    For example, TMO placed an A/C unit into MSgt Vidot's daughter room. However, this A/C was not inspected before it was placed into the home and contained mold within the unit. This unit then proceeded to blow more mold spores, including Chaetomium, thorough the home. The Army inspector told TMO to remove the unit. However, it was not removed. It was only when the Army inspector came back for another inspection that he saw the A/C unit again, having continued to containment the home, and had it removed.

449.    Zach Allen threatened to charge them "double rent" for the home at 5509A Boxwood Court and the temporary home at 5319 Smoke house Court. The use of "double rent" tactics to force settlement with military families is not only appalling but illegal. This is an unlawful increase in rent and an attempt to unlawfully increase the obligation of a tenant.

450.    TMO failed to provide accurate work orders after the maintenance and repairs were requested by MSgt Vidot, including visible mold. TMO would omit those items identified by MSgt Vidot that were requested to be put on the scope of work. TMO would minimize the reported problems by misrepresenting what scope of work was to be performed by omitting maintenance and/or repairs issues which in turn conceals the true nature of the problems and results in the problems not being repaired.

451.    TMO failed to property remediate the mold pursuant to industry standards and failed to provide proper containment barriers pursuant to industry standards, which resulted in the Vidot family being exposed to toxic mold.

**5319 Smoke House Court**

452.    TMO relocated the Vidot family to temporary housing at 5319 Smoke House Court, Fort Belvoir VA on 7/11/2022.

453.    On September 13, 2022, the Vidot family performed its own mold testing at the temporary housing located at 5319 Smoke House Court, Fort Belvoir VA.

454.    On 9/8/2022, the Vidot's identified there was mold in the HVAC of the Temporary house they were placed in and called the ombudsman for the Fort Belvoir Garrison in which she called maintenance and reported the problem.  A maintenance representative showed up the next day and told Mrs. Vidot "It was discoloration" and placed tape of the identified mold.

455.    This mold testing revealed mold in the kitchen and mold spores in the HVAC room and mold spores contained inside the HVAC unit, which were disbursing containments throughout the home resulting again in poor air quality and an unsafe and unhabitable dwelling unit.

456.    The seven-year history for 5319 Smoke House Court showed multiple maintenance requests and repairs for HVAC problems and pest control.

457.    The Vidot family demanded to be relocated again because the home was unhabitable and had visible mold.

458.    The Vidot were forced to remain in this home from September 8, 2022 to October 13, 2022 when they were permanently relocated to on base housing at 5305 Smokehouse Court Fort Belvoir VA, where they remain today. Since moving into 5305  Smoke House Court, the Vidot's have experienced squirrels nesting in the attic, the flooring in the master bathroom coming unglued and leaving water from the HVAC unit.  The Vidot's had a moisture reading which showed a result of 14; however, they were told that nothing could be done because it isn't considered dangerous until the level is 15.

**Facts regarding Plaintiffs Denzale D' Juan Bragg and Breanna Bragg**

459.    Staff Sergeant Bragg (Bragg family)  is a career member of the United States Army with the current enlisted rank of Staff Sergeant and his wife Breanna have two (2) minor children ages 7 and 1.  Defendants have actual and/or constructive knowledge of the fact that the family entering the residential unit, in the case of the Bragg family, is reasonably likely to be subjected to water intrusion, poor air quality and mold related issues because of the current and

previous deterioration of housing conditions at Fort Belvoir and the seven year history of maintenance and repair on the home.  TMO has been inadequately repairing and remediating Fort Belvoir housing units which have been affected by water intrusion for the past five years. The bragg family has minor children who therefore, by that very status, had an important need for clean and healthy housing.

460.    The Bragg family and their two (2) minor children occupied Fort Belvoir residential housing since December 2020 to the present. From December 2020 until June 25, 2022, the Bragg family lived at 5959 Stevens Road, Fort Belvoir Virginia. As a result of water intrusion, mold and pest related issues the Bragg family was displaced into temporary housing at 9519 Gunston Road, Fort Belvoir VA, where they remain as of the date of this compliant.   The Bragg family has been displaced in temporary housing for over one-hundred and twenty (120) days.

461.    The Bragg family were not provided a copy of their seven-year work history upon the signing of the lease.   Moreover, they were not given the pre-move in inspection report as required and did not receive that report until after they were displaced in October of 2022.  The pre-move reported, given to the Braggs by Jennifer Hudson and not TMO, noted that the HVAC needed to be cleaned.  In an email dated July 26, 2022, an employee for TMO, Jennifer Watkins, represented that the dead animals had been removed.  In truth and fact, the birds nest remains on the front porch as of October 2022. None of the issues identified during the move in inspection and listed on the quality assurance form have been repaired by TMO as of October 2022.

462.    The Bragg family has had continuing and constant water intrusion problems since they moved in. In December 2020 during the move-in inspection the bragg family noticed problems with the back door and request a work order and it be repaired.  The back door was not shutting property and was a source of water intrusion for the past two years.  There continued to

be water and sewage leaks which TMO had knowledge of this defect as it was reported on the seven-year home maintenance history.

463.    During the Bragg family occupancy, the dishwasher flooded kitchen and TMO put in a new dishwasher.

464.    The master bathroom toilet was not flushing properly and was leaking to the floor. The water permeated the subfloor multiple layers, so the trapped moisture produced mold. It became apparent in June of 2022 that TMO had installed new layers of laminate over old layers laminate. The Bragg family had asked TMO a few times regarding the above-mentioned problems and TMO came back but repairs were not adequately made. TMO would never permanently fix the problem and would only either say there were no leaks, and nothing was wrong.

465.    TMO never addressed or repaired the source of the water problems and water continued to leak into the home. As a result, the Bragg family was exposed to poor air quality and two years of plumbing problems, which contained mold spores because of the water intrusion. The Bragg family was constantly sick and are suffering from severe allergy like symptoms caused by exposure to mold. Mrs. Bragg was diagnosed with pneumonia and had dark spots on lungs. In 2021 her seven (7) year-old daughter missed 40 days school because being sick. These serious concerns over testing and quality of work were not addressed. Mold in the home was clearly a reoccurring problem and the root cause was never explored, just the visible signs.

466.    The Bragg family noticed a leak from the dining room ceiling that was flooding the dining room area on 6/24/2022. On the 24th technicians came out and stated that the leak was due to air filters that needed to be changed. On 6/25/2022 when Mr. Bragg flushed the upstairs toilet sewage from master bath again came through the vent in the ceiling of the dining room leaking a bunch of silty water down in ceiling. Ms. Bragg contacted maintenance who came on

6/25/2022 and removed the toilet after her assisting they do so  The issue with the sewage leak of 6/25/2022 was added to the scope of work on that day.

467.    When the toilet was removed the hole around toilet was green and black with what appeared to be mold.  TMO told Mrs. Bragg it was not mold and they were mold certified. Ms. Bragg went downstairs and then back up and saw that they had cleaned it off. Inside ceiling she just saw water.  Mrs. Bragg asked the supervisor about mold they said it would just clear up on its own.

468.    The Bragg family immediately placed a work order and maintenance personal came to the home and represented that the leakage and flooding was due to our air filters needing to be changed. The Bragg family insisted that their theory did not make sense and that the Bragg's believed that there may be in issue with the primary bathroom that is located above the vent.

469.    The TMO maintenance person laughed said that "They would caulk the toilet and bathtub and to make us feel better" and we could use the primary toilet.   On June 25, 2002 after SSG Bragg used the primary bathroom all of the sewage flooded through the dining room ceiling vent into the downstairs dining area where the daughter was eating breakfast.

470.    The Bragg family immediately placed another work order, and the TMO maintenance worker came within an hour and said that he was going to change the air filters again. The Bragg family then demanded to have a supervisor come to the home. About an hour later, Dane Smith entered the home. The Bragg family asked him if he was a supervisor and he replied, "I am not a supervisor, but I should be respected as one." He proceeded to talk to the first maintenance worker about changing the air filters. SSG Bragg said, "Absolutely not, you need to check for a leak in the primary bathroom." The maintenance workers then laughed and told the Bragg family that we did not know what we were talking about. Dane Smith then told the other maintenance worker to go upstairs and flush the toilet. The toilet was flushed, and more

black water gushed out of the vent. Dane Smith then cut a hole in the ceiling and told the other maintenance work to remove the toilet upstairs. Once the hole was cut in the ceiling, black water uncontrollably flooded the downstairs dining area.

471.    Breanna Bragg went upstairs to the primary bathroom and noticed that the area under the toilet that was removed looked like it was moldy. When Dane Smith was questioned if the area was contaminated with mold he replied "No, there is no way that is mold. I am mold certified. If it was mold, I would know."

472.    Within minutes the Bragg family smelled bleach. Mrs. Bragg went back upstairs and the area that she suspected was moldy was "cleaned" and looked significantly different than it had minutes prior. The Bragg family was displaced that evening into temporary housing.

473.    On June 29, 2002 after their family was displaced Ms. Bragg met Zach Allen at the home and directly asked him if there was mold in their house. He would not give a direct answer.

474.     Mrs. Bragg said, "Ok, walk through the house with me. If I lift up the laminate in the bathroom and there's mold underneath, fix it. If not, charge me for the laminate repairs."

475.    In each bathroom under one layer of laminate, there was another layer of laminate. Under all of the layers of laminate was subflooring the was overtaken with mold. Still, Mr. Allen, refused to admit that mold was in the home.

476.    Ms. Bragg than took an at home mold swab tests and within days received results that verified that our family had been living in a home contaminated with mold for 2 years.

477.    Eventually, the scope of work (SOW) was emailed to our family a couple of days later by Zach Allen. The SOW did not cover the sewage leak or state that mold was underneath the laminate in the bathroom.  This was required to be itemized in the SOW so the remediation team would know what repairs to do and whether the area was toxic and needed contamination

barriers. The verbiage that was used on the SOW was Suspected Fungal Growth (SFG).

478.    The Bragg family communicated their position about the SOW not being transparent and thorough. The Bragg family home did not have SFG. It was tested by a laboratory and determined to be mold.  The location of this mold was caused by the continuous sewage leak that had been going on for years as per the seven-year maintenance history. They repeatedly asked Zach Allen to have True North preform a second SOW. He declined. Mr. Allen provided an email from True North that stated that they did not believe additional SOW was necessary.

479.    Zach Allen then stated that if any issues in the home were discovered that were not listed in the SOW that remediation would stop, and another SOW would be created.

480.    TMO third-party contractor, True North did not find all of the moisture intrusions in the Bragg home and the industrial hygienist (IH) never went to the Bragg home.

481.    The Army garrison inspector and the Bragg family had to advocate for this moisture intrusion to be remediated. After many attempts an additional SOW was created, but only for the back door leakage. All of the other issues were ignored by TMO.

482.    Unfortunately, there was no way for the Bragg family or future families to know during the move in inspection that mold was underneath multiple layers of laminate or that previous families have had sewage leaks. Had the Bragg's known, they never would have moved into the home.

483.    The Bragg family maintained that that their home at 5959 Stevens was not adequately remediated because dead animals remained in the vents and/or walls, which caused a pest (maggot) infestation.

484.    During months of September and October the TMO represented that the Bragg home had passed multiple inspections by certified moisture/mold inspectors, licensed pest control inspectors, and by the Garrison's inspectors.  TMO represented that the home was

habitable, and that the Bragg's were required to move back into the home.

485.    However, TMO were misrepresenting the facts and conditions of the home. The inspections that they referenced occurred after June 24, 2022, which were solely based on the incomplete SOW.  TMO intentionally omitted any reference of mold from the SOW, which is a misrepresentation in order to conceal the identification of mold and avoid the required statutory obligations while minimizing any remediation short comings.  In addition, the Bragg's reported the sewage leak on 6/25/2022 which was added to the scope of work on that day.  However, TMO misrepresented the 7-year maintenance history by omitting this repair item from the Bragg's 7-year maintenance history report.

486.    On October 5, 2022, at the last inspection the Army said the SOW was incomplete and concluded that the house was still unhabitable.

487.    TMO claims to have offered the Braggs multiple housing options and that the Braggs have declined.  However, this is a misrepresentation of the housing conditions and issues.

488.    Although the Bragg family was offered a home, and they were willing to accept, the contents of their home, including personal belongings and household goods and furnishings (HHG) were contaminated with mold spores because TMO had yet to remediate the home or the Bragg's personal property as required by Virginia law.

489.    TMO maintains that there was no mold in the home and thus there was no contamination of the home or its contents.  TMO refuses to remediate and decontaminate the personal property of the Bragg family and merely offered to "clean" the items within the home by a simple maid cleaning service.

490.    The Bragg family personal property that was in the home was determined to be contaminated with mold by the Army garrison safety inspector pursuant to the generally accepted mold remediation industry standards called the IICRC S520 guidelines. These guidelines require the Bragg's HHG to be cleaned outdoors or off site in a multi-chamber

facility.

  

491.     Therefore, until the Bragg's HHG are decontaminated they do not have any furniture or personal belongings to move.  TMO knows that military families have strained financial conditions and uses the HHG problem as leverage to force military families into settlements they would otherwise never consider or accept. This offer to relocate without remediating personal property is a calculated response by TMO to use housing leverage to force compliance and settlement putting the Braggs and other military families a tenuous position. TMO uses this leverage to force military families to sign non-disclosure and non-disparaging agreements (NDDA) as part of any settlement and release. The Bragg family, during a phone conversation with Zack Allen, was told that any settlement with TMO would need to involve the signing of a NDDA.

492.     The Bragg family paid out of pocket to have an inspection done on our home by ServPro. ServPro is IICRC certified.  The Braggs were quoted $15,000 to decontaminate the structure of our home, 18,666.43 to remediate contents.

493.     At the time of the filing of this amended complaint, the Bragg family has contacted several government service member affiliated movers who will not move any of the Bragg family's

personal property because they claim its contaminated with mold and unsafe for their workers to move.

494.    Additionally, the remediators that were contracted to remediate their home were not familiar with the industry standards that they were tasked to follow based on the SOW. Specifically, the IICRC S520. Containment continuously failed and the remediators cross contaminated the entire house, despite lab results that were given to TMO for them to understand that the mold remediation in the Bragg's house was Condition 3 mold. Condition 3 mold means an indoor environment is contaminated with the presence of actual mold growth and associated spores and not just SFG.

495.    The Bragg family residence failed all PRV and QA inspections in person. The home failed the PRV two times**.**  The SOW did not cover all of this issues in the home such as sewage leak, dead animals, and infestation.

496.    Zach Allen demanded that the residence received a passing score for the QA inspection. Zach Allen's demands were granted which allowed him to harass the Bragg family by pressuring them to moving back into a home that was unhabitable and unsafe.

497.    Zach Allen threatened to charge them "double rent" for the home at 5959 Steven Road and the temporary home at 9519 Gunston Road.  The use of "double rent" tactics to force settlement with military families is not only appalling but illegal.  This is an unlawful increase in rent and an attempt to unlawfully increase the obligation of a tenant.

498.    The Bragg family has been displaced for over 120 days and have been required to continue to pay their basic allowance housing payments (BAH). TMO has failed to ensure the habitability of the Bragg's housing unit.  Pursuant to the Tenants Bill of Rights, during the pendency of any repairs and remediation, TMO cannot continue to use a tenants' BAH. Moreover, in the case of maintenance and repairs necessary to ensure habitability of a housing unit, the relocation to suitable lodging or other housing will be at no cost to the tenant until the maintenance

or repairs are completed. TMO has not only unlawfully used the Bragg's BAH it has also unlawfully charged the Braggs costs of housing.

499.    The Bragg's home was never habitable since the family moved in. In June, there were two sewage leaks, further rendering the house unhabitable and causing further damage to the House.

500.    TMO misrepresented that the house was habitable throughout September and October of 2022.

501.    On October 5, 2022, the Bragg's had an inspection meeting at the Home. Breanna Bragg, Caleb Trump, David White, Jennifer Lynch (certified industrial hygienist,- attended by video call), Jennifer Hudson (attended by video call), Phillip Goff (Army industrial hygienist), Charise Smith (Army industrial hygienist), Kevin Mott, (structural engineer), Kevin Walter (pest control) were present.

502.    During this meeting, it was confirmed that the damages to the Bragg home had not been properly or fully remediated, notwithstanding TMO's misrepresentations. For example, Ms. Lynch stated that the house was still unhabitable and asked why there was no scope of procedure, why the personal property and HHG contents were still in the home while remediation remained incomplete, and why the materials were put back when the moisture source was not properly identified.  Ms. Lynch also stated that the mold remediation industry standards were not followed and that there were still maggots and fly fragments in the home. She also stated that TMO, who had exclusive access to the home during remediation, had not produced photographic evidence to prove that the dead animals that had been trapped in the exhaust vents had been removed. She also stated that her inspection required by the Army was unnecessary and a waste of time because TMO had not performed the proper remediation and the home remained uninhabitable.

503.    The Braggs have maintained their position until the Home is habitable, they cannot move back until it becomes a safe and healthy environment. As of October 5, 2022, the Garrison

IH, Garrison pest control, and the Bragg's IH have all condemned the house as being unhabitable until Virginia Statutes and industry standards are followed to remediate the entire home and it's the personal property contained therein.

504.    TMO failed to property remediate the mold pursuant to industry standards and failed to provide proper containment barriers pursuant to industry standards, which resulted in the Bragg family and their personal property being exposed to toxic mold.

505.    At present, SSG Bragg is scheduled to be transferred by the Army to his new permanent station in California with orders to report in January 2023.

### Facts regarding Plaintiffs James Jackson and Kaitlin Coe.

506.    Army Specialist James Jackson (Jackson family) is a career member of the United States Army with the current enlisted rank of Army Specialist E-4 and his wife Kaitlin Coe have four minor children. Three minor daughters aged 7, 6 and 2  years old. The family has one son who is 1 years old.  The Jackson family had young children who therefore, by that very status, had an important need for clean and healthy housing.

507.    From on or about August 1, 2021 through the date of this complaint, Army Specialist Jackson and his wife, Kaitlin, and their four minor children resided in military housing at Fort Belvoir at 5304 Smoke House Court, Unit B.

508.    The Jackson family were not provided a copy of their seven-year work history.

509.    The Jackson family, while they lived at 5304 Smoke House Court, Unit B, Ft. Belvoir, VA 2022 August 1, 2021 through the date of this complaint, had constantly suffered from allergy and flu like symptoms, such as stuffiness and congestion, but did not have the flu, which is the result of the Defendant's failures to maintain the Jackson family's home to address mold and air quality issues.  Serious concerns over testing and quality of work were not addressed.  Mold in the home was clearly a reoccurring problem and the root cause was never explored, just the visible signs.

510.    During the period of time between from August 1, 2021 through the date of this complaint, the Jackson family had experienced symptoms of mold exposure such as itchy, red eyes and nosebleeds because of air quality issues.

511.    The Jackson family never received their past seven years' maintenance work orders.

512.    During the period of the Jackson family's occupancy, the 6-year-old and 1 year-old had respiratory issues.

513.    Upon moving into the home, the Jackson's noticed a mouse infestation.    The Jacksons requested treatment for mice on seven different occasions; however, the problem remains.

514.    There was visible mold throughout the home in the HVAC, the ceiling of the mechanical closet, , the kitchen floor, the upstairs hall bathroom and the master bathroom.

515.    There was also visible mold in the cabinetry under the kitchen sink.  Defendant attempted to contain the mold under the kitchen sink by taping plastic over the area and left it in that condition for over two months.

516.    To the left of the tub in the upstairs bathroom, the family noticed an area that had mold that had been painted over.

517.    About the end of  September of 2022,  True North came to evaluate the home and reported water damage to the kitchen sink cabinet and adjacent vinyl floor planks in which water was observed coming out at the seams when stepped on.  The 2nd floor hallway bathroom exhibited water damaged vinyl sheeting and subfloor adjacent to the tub. The master bathroom exhibited water damage on the wallboard on the left-hand side of the tub insert and the vinyl sheeting and subflooring adjacent to the tub.  In addition, mold was found on the HVAC access panel, evaporator coil box, the vertical drip pan insert as well as on the ceiling in the HVAC closet.

**Facts regarding Plaintiffs James Hayward and Danielle Hayward.**

518.    SGT James Hayward III (Hayward family) is a career member of the United States

Army with the current enlisted rank of Sargent and his wife Danielle Hayward have three minor children ages 8 years-old, 3 years-old and 2 years-old. The 3-year-old has Autism and is non-verbal. Defendants have actual and/or constructive knowledge of the fact that the family entering the residential unit, in the case of the Hayward family, is reasonably likely to be subjected to water intrusion, poor air quality and mold related issues because of the current and previous deterioration of housing conditions at Fort Belvoir and the prior complaints from the Hayward family and prior work order request at the Home. TMO has been inadequately repairing and remediating Fort Belvoir housing units which have been affected by water intrusion for the past five years.  The Hayward family has minor children, one with a disability, who therefore, by that very status, had an important need for clean and healthy housing.

519.    The Hayward family and their three minor children occupied Fort Belvoir residential housing from June 4, 2021 to present and are currently living at 8223 Herb Garden Court  Fort Belvoir VA 22060.

520.    The Hayward family were not provided a copy of their seven-year work history at the of the signing of their lease and still have not gotten one to this day.

521.    The Hayward family has had continuing and constant water intrusion problems and poor air quality since they moved in. They have also had maintenance and repair problems regarding blinds, the front door, infestation of flies and pests.  The family's 2-year-old kept getting repeatedly sick with a week hiatus and then sick another week. She would have a runny nose, cough and fatigue. The family's 3-year-old had symptoms of a runny nose and started to progress into constant coughing, sneezing and eczema flare ups.  The hardest part about all of this situation is that he has severe autism and is non-verbal, so he is unable to let Mrs. Hayward know that he isn't feeling well. The 8-year-old started having frequent nose bleeds, which were sometimes as

much as three times a week and he also periodically complained about headaches.

522.    Within a couple of months of moving into the home, Mrs. Hayward noticed a weird dusty feeling at the back of her throat when breathing mainly at night.  She then discovered under my children's toy chest what appeared to her as black mold and took the children to urgent care to make sure nothing was wrong. She then purchased a home amazon mold disk test kit and left it in the spot where she found the mold.  On or about December 30, 2021, it started growing mold.  Mrs. Hayward saw a built up of debris and mold in the HVAC system. She then contacted TMO maintenance who came and immediately represented that they did not see any visible fungal growth and would only refer to it as dirt or debris.

523.    On or about January 2022 the Hayward family was displaced into temp housing pending the cleaning of the HVAC system. On or about January 11, 2022 TMO then represented that everything was cleaned and/or repaired and that they could return to the home. The family relied upon these representations and returned to the home on January 14, 2022.  However, while in the home, their symptoms did not improve.  The Hayward family then checked the HVAC and found visible black fungal growth on it.  TMO misrepresented that they had cleaned and repaired the HVAC.

524.    When Mrs. Hayward reviewed the family's indoor video system during the cleaning and repairs and observed that the garrison, maintenance and contractor were all very unprofessional and had a very rude attitude towards them in the videos. The hayward family confronted TMO maintenance about the videos and the unprofessional behavior they experienced, however there was no apology. Maintenance was abiding by the fact that the family was incorrect about everything. The videos were sent over, and it was concluded by TMO employee Zach Allen from the housing office that the company did not reclean the coils, and he stated he would get a different company to do the cleaning.

525.     In or around March of 2022 TMO sent another contractor to clean and repair the HVAC.  TMO represented that HVAC was cleaned and/or repaired and represented that the Hayward family could move back into their Home. However, after a few nights Mrs. Hayward was still coughing and experiencing fatigue. SGT Hayward experienced cold-like and allergy symptoms, including sneezing and coughing.  The family's 3-year-old began to have skin rashes. The other children continue to cough, runny nose and sneezing while in the Home.

526.     There continued to be a constant leak and pooling of water for weeks because maintenance could be not figure out why the pipe was leaking in the HVAC room and the AC was not cooling.  Mrs. Hayward checked the HVAC, and the fiberglass material was soaked inside the unit with more mold growth on the rim before the coils and they have been experiencing the same symptoms. On April 25, 2022, Mrs. Hayward contacted TMO who represented that it was only dirt, and they would just fix the AC. Mrs. Hayward has been complaining to TMO since April 25 2022 about the HVAC having visible mold. However, TMO kept representing time and time again that it was not mold and it was only dirt.

527.     The Hayward family was constantly sick and continued to suffer from cold and severe allergy like symptoms caused by exposure to mold. These serious concerns over misrepresenting viable mold, failure to test and quality of work were not addressed.  Mold in the home was clearly a reoccurring problem and the root cause was never explored, just the visible signs.

528.     On June 13, 2022, Mrs. Hayward noticed water seeping through the floor and pooling in the HVAC closet. She advised maintenance of the problem, and they came out and said it was coming from the main pipe. TMO did something to stop the leak, however, June 16, 2022 it started leaking again. TMO came out and stopped the leaking, but the floors and floorboards were still wet. On June 19, 2022, the AC went out again, but it was temporarily repaired and on June 28, 2022 the leak reoccurred again. Finally, a plumbing contractor come out and changed a

part, so it was fixed.

529.    During this time, Mrs. Hayward started noticing what she thought were fruit flies throughout the home. On June 29, 2022, she asked for the Home to be treated for flies, which TMO represented they did.  However, there was no change in the number of flies, and it progressed with time and the flies rapidly took over their home. It got to the point where the family could no longer cook indoors, and if they wanted to actually relax, they had to leave their home and stay outside or relax in the car. Upon information and belief, the flies were fungus gnats who thrive in moisture rich environments as a result of the failure of TMO to repair the constant pooling of water on the floor in the home for weeks  since June 13, 2022.

530.    As a result, the family had to spend most its money eating out every day because the flies would just constantly fly in your mouth, ears, and nose. Dining out for a family of five every day is not an easy task on a limited military budget.  The family became depressed  having to live under these conditions, and could not enjoy the basic pleasures of life.  This fly situation really terrified SGT Hayward's daughter who would constantly cry about bugs on her or flying on her snacks. She would even wake up with nightmares screaming "bugs, bugs, bugs!" at night.

531.    Mrs. Hayward promptly called the housing office and asked if they could please transfer homes or move into temporary housing until the visible mold and fly problems were fixed. TMO told the family they could not fulfill that request. TMO stated that as long as they are working on the problem there was no grounds for a transfer or temporary housing. The family could not afford to pay for a hotel due to their limited budget, so they had to endure the flies, viable mold, and poor air quality the home. SGT Hayward had to leave for a military tour overseas and was very worried that he had to leave his family in the conditions they were living in.

532.    On July 6, 2022, Mrs. Hayward put in a work order for their floorboards to be replaced because they were still wet from when the pipe was leaking in the home on June 13, 2022. TMO had fans running all weekend to try and dry the floor. TMO continued to refuse to displace

the family and the fans were a big nuisance because they were insanely loud, and the children were tripping over each other in the hallway.  The floors did not dry, so maintenance came out and pulled up the floorboards and set the fans out again to dry the floor over the weekend. This was again a nuisance because of the flies and noise of the loud fans.  During this period of time the family was experiencing the same symptoms and had to dine out and stay outside as long as they could stand it to get a break from the flies.

533.    On 08/10/2021, Mrs. Hayward was forced to do her own research on how to get rid of fungus gnats and contacted maintenance again on how to treat for fungus gnats.  TMO came and sprayed on the August 12, 2022.  Mrs. Hayward had found a solution, so the family was relieved to finally see a decline in the gnats, but her daughter was still traumatized.

534.    In the month of October 2022, Mrs. Hayward started seeing mice. On October 3, 2022 she called maintenance to treat for mice and treat for mold because the viable mold in the HVAC was spreading.  TMO again represented that what Mrs. Hayward saw was dirt in the HVAC system and not mold.

535.    Mice were still infesting the home and on or about October 04, 2022, Mrs. Hayward observed a hole in her downstairs bathroom, which Maintenance fixed, however, she continued to see mice daily. On October 12, 2022, she called maintenance to do a thorough inspection to find the entry points of the mice. On October 18, 2022, she called again because the pest control came by to check on our bait traps, and noticed the weather seals on both entry doors were bitten by mice and needed to be replaced because the mice were coming out during the day. She called the housing office that day to see if they could again be transferred because it was very unsanitary to live this way. TMO represented that they were working on the problem, and they do not have to relocate the family to a temporary home.

536.    Mrs. Hayward kept finding mice so on October 20, 2022 she was forced to find the entry point herself and pulled out the stove. There was a big hole in the wall, so maintenance came

out and closed the hole.  There was a weird smell coming from her 3-year old's room and she found a decomposing mouse under the child's dresser. Again Mrs. Hayward was forced to address TMO maintenance obligation herself.  On 11/03/2022, Mrs. Hayward requested maintenance to come pull out her dishwasher to make sure there was no hole behind it. Eventually they came out and found there was a hole behind it, so they sealed it.

537.    The Hayward family is seeking to move into an American Disability Act (ADA) home for their autistic child.  The autistic child learned to take off his diaper and smeared the carpet on two occasions.  Mrs. Hayward contacted the housing office to see if  they could remove the carpet in his room because it is unsanitary and impossible to remove all fecal particles out of the carpet.  TMO told her "That is not an option because the next tenants would want carpet." Mrs. Hayward then contacted her military representative with the Exceptional Family Member Program (EFMP) who was able to provide a medical waiver for the Hayward family to not have carpet.  The representative also approved the Hayward transfer to an ADA home.  However, TMO has refused to allow the Hayward family to move into this ADA home until they pay for the two stains to be repaired. The family cannot afford to pay $1,170.29 that TMO is demanding because of their limited budget and SGT Hayward's expenses overseas so they are on the waiting list. This situation would have been avoid had TMO met it's Virginia Statutory obligation to relocate the family once visible mold was identified several months before.

538.    The Tenant Bill of Rights expressly states that "tenants have a right to property management services that meet or exceed industry standards." Industry standards for mold remediation include removing effected items from the home to be decontaminated for proper remediation to be completed. The Michaels Organization has failed to properly remediate and relocate the Hayward family.

539.    On October 27, the Hayward family had an independent mold inspection. The results indicated that visible mold was present in the home.  There were high counts of

Aspergillus and Penicillin, and the sample of the drywall in the HVAC closet came back positive

for Stachybotrys.  Mrs. Hayward informed TMO.

540.    TMO refuses to take any mold testing after visible mold is reported and fails to

take responsibility and answer for these failures.

541.    On November 3, 2022, TMO had their contractor, APEX, perform a "moisture

and mold assessment" inspection at the Home.  This was a visual assessment only and no spore

or air quality testing was performed.

542.    The Scope of Work (SOW) report prepared by TMO's contractor, APEX,

represented that there was "suspect mold" in the home.  This is a misrepresentation. This does

not address the visible mold identified in the home pursuant to Virginia law and industry

standards. This scope of work did not contain the mold problem as identified by the Hayward

family. TMO via its agent, APEX, failed to provide a true SOW after the visible mold was

identified which misrepresents the remediation and repairs that will be necessary in the Hayward

family's home.

543.    TMO omitting those items identified by the Hayward family, including visible

mold, which were requested and/or required to be put on the scope of work. TMO minimized the

reported problems by misrepresenting what scope of work was to be performed by omitting

remediation and /or repairs issues which in turn conceals the true nature of the problems and

results in the problems not being repaired.

544.    A TMO tech came to replace the screen door on November 06, 2022 and to check

on the HVAC pooling water, but Mrs. Hayward told them, for their own safety, the laboratory

tests came back for Stachybotrys, so you should not be working while the family is still in the

home.

545.    On 11/11/2022, Mrs. Hayward put in a work order for remediation because of the

high mold count and visible mold inside the HVAC and on the wet drywall that had the

Stachybotrys mold spores. TMO represented that they still have to follow their chain and have a maintenance tech come out to see if there is even a concern, then go up from there. A tech came out that day and sprayed microban on the mold and taped it up. He said due to the weekend and holiday, it won't be addressed until Monday. So, on 11/14/2022, a woman from TMO came to inspect, and no further action was taken.

546.    During the pendency of any repairs and remediation, TMO cannot continue to use the Hayward's  BAH. Moreover, pursuant to the Tenant's Bill of Rights, in the case of maintenance and repairs necessary to ensure habitability of a housing unit, the relocation to suitable lodging or other housing will be at no cost to the tenant until the maintenance or repairs are completed. TMO has not only unlawfully used the Hayward's BAH it has also unlawfully charged the Hayward costs of housing.

547.    The Haywards have maintained their position that they should not be in the home pending any investigation after an independent laboratory has confirmed there is visible mold present in the home.  The Hayward's have repeatedly asked to be displaced; however, they have been told by TMO employee Michael Whitman that until the SOW for suspected fungal growth is confirmed by their contractor APEX they have to remain in the home.  Under the IICRC mold guidelines and industry standard the Haywards should not remain in the home.  Moreover, under Virginia law now that visible mold has been identified TMO is required to pay for all relocation costs and move the Haywards to temporary housing pending any remediation.  Therefore, the Home is not habitable and is not a safe and healthy environment for this military family. TMO have again failed to follow Virginia Statutes and industry standards to remediate the entire home and it's the personal property contained therein.

548.    TMO failed to property remediate the mold pursuant to industry standards and failed to provide proper remediation pursuant to industry standards, which resulted in the Hayward family and their personal property being exposed to toxic mold.

**Facts regarding Plaintiffs Bryson Hunt and Abnie Hunt**

549.    Tech Sergeant  Bryson Hunt (Hunt family) is a career member of the United States Air Force with the current enlisted rank of Tech Sergeant  and his wife Abnie Hunt have two minor children ages 12 and 7.   Defendants have actual and/or constructive knowledge of the fact that the family entering the residential unit, in the case of the Hunt family, is reasonably likely to be subjected to water intrusion, poor air quality and mold related issues because of the current and previous deterioration of housing conditions at Fort Belvoir. TMO has been inadequately repairing and remediating Fort Belvoir housing units which have been affected by water intrusion for the past five years.   The Hunt family had young children who therefore, by that very status, had an important need for clean and healthy housing.

550.    From on or about June 2014 through February 2021,  Staff Sergeant  Hunt and his wife, Abnie, and their two minor children resided in military housing at Fort Belvoir at 9516 Hannah Lane, 9637 Barlow Road and 8717 Abert Drive.

551.    The Hunt family were not provided a copy of their seven-year work history at the time of the signing of the lease.

**9516 Hanna Lane**

552.    During the period between June 23, 2014, through June 2019, the Hayward family has had continuing and constant water intrusion problems resulting in mold and poor air quality since they moved in.

553.    During the period between from June 2014 through February 2021, while the Hunt family lived at Ft. Belvoir, they experienced health related problems because of their exposure to mold.  For example, Ms. Hunt started having issues after they moved into the house. She started having migraines, headaches, sore throats, swollen lymph nodes, high blood pressure, dizziness, fatigue, none of which she had before moving into the house. In 2017 Mrs. Hunt developed an autoimmune disease called Interstitial Cystitis, which is a permanent condition that

she take medicine and treatment for life. She also has back issues that seem to be nerve related and possibly stemming from the autoimmune disease and started having chronic yeast infections on her skin (arms). Mrs. Hunt also developed anxiety which has intensified over the years due to the mold and the displacement, which she is still suffering from on a daily basis because of the emotional impact this situation has had on her life and the Hunt family.

554.    TSgt Hunt started having chronic headaches in the house daily and chronic sinusitis. The children had constant and recurring fevers, headaches, sore throats, and earaches. TSgt Hunt's daughter also developed acute immune thrombocytopenia (ITP), which was believed to have developed from an ear infection and weakened immune system, however, after moving away from Ft. Belvoir it was an isolated incident.

555.    The Hunt family discovered mold when our AC unit broke and needed replaced.

556.    Right after the mold was found and we took pictures inside of the main plenum and both my wife and I were seen at the ER and given breathing treatments and inhalers for severe bronchitis. We never had any breathing issues or lung issues.

557.    Vents were loosely covered, and the family was displaced (total of 8 Months). Remediation included the encapsulation of duct work in HVAC. There was remediation of the bathrooms as well. Although containment was set up TMO left most of the Hunt family belongings uncovered and were filled with dust, drywall and mold spores. As a result of improper remediation, the mold grew back through the encapsulation and throughout the home.

558.    The Hunt family requested post remediation sampling for the mold remediation done by PBI on 7/24/2019.

559.    On July 24, 2019, True North inspected the remediated areas and performed "white glove" visual inspection and determined that the areas were clear of visible dust and did not contain any materials with elevated moisture content and no visual suspect mold growth was observed on any building materials at the time of the inspection.

560.    However, the on July 24, 2019 samples showed varying levels of mold growth and mold spore deposition.  Moreover, subsequent testing on August 16, 2019 showed incidental mold growth on the HVAC supply vent boot interior (fabric insulation) of the second-floor master and guest bedrooms and water intrusion indicator mold species Chaetomium on each surface sampled.

561.    On December 9, 2019, the second-floor HVAC supply vent boots were removed and replaced with new boots and the interior vertical surfaces of the return plenum box were HEPA vacuumed and encapsulated. True North inspected this work on December 13, 2019 and confirmed that the second floor HVAC supply vent boots had been replaced and interior surfaces of the return plenum box were cleaned and encapsulated.

**9637 Barlow Road**

562.    The Hunt family was relocated to 9637 Barlow Road, Ft. Belvoir VA from July 2019 through October of 2019. After a couple days the fabric shower curtain, TMO provided was covered in mold with a source unknown. The family started to notice there was a German cockroach issue as well.

563.    During the Hunt family occupation of this home, mold was found in HVAC with no identifiable source found. There was mold found in hood vent above stove, again from an unknown source. The bathroom upstairs had mold under vinyl sub-floor, around tub, around tiles with an unidentified source being the tub and toilet leaks under floor and behind toilet.

564.    The Hunt family requested to be moved to a hotel and was Displaced to a hotel from October 2019 through February 2020.

**8717 Abert Drive**

565.    The Hunt family was relocated to 8717 Albert Drive, Ft. Belvoir 22060 from February 2020 through 2021.

566.    During the Hunt family occupation, mold was found in bathrooms, specially under the vinyl sub-floor and behind the dry wall. This was remediated upon the family's request prior to move in, the source being a tub leak in the subfloor. Cockroaches migrated over from a connecting neighbor's home from their infestation in their home that housing did not properly handle.

567.    Every time TMO cleaned our stuff within the contaminated home the tests proved there was still mold on the families' belongings. All throughout the process that took 8 months the TMO lied to the family and hid facts from them. TMO failed to set up proper containment and lied about the results of testing. TMO brought people into the Hunt family home without permission and at times they shouldn't have been there.

568.    During the pendency of any repairs and remediation, TMO cannot continue to use the Hunt's BAH. Moreover, pursuant to the Tenant's Bill of Rights, in the case of maintenance and repairs necessary to ensure habitability of a housing unit, the relocation to suitable lodging or other housing will be at no cost to the tenant until the maintenance or repairs are completed. TMO has not only unlawfully used the Hunt's BAH it has also unlawfully charged the Hunts costs of housing.

569.    Therefore, the Homes were never habitable and were not a safe and healthy environment for this military family. TMO has again failed to follow Virginia Statutes and industry standards to remediate the entire home and the personal property contained therein.

570.    TMO failed to property remediate the mold pursuant to industry standards and failed to provide proper remediation pursuant to industry standards, which resulted in the Hunt family and their personal property being exposed to toxic mold.

**Facts regarding Bradley Shirley**

571.    Staff Sergeant Shirley (Shirley family) is a career member of the United States Army with the current enlisted rank of 509.  Staff Sergeant and his life partner Shamim Bruner

have two minor children ages 3 years-old and 7 months-old.  Defendants have actual and/or constructive knowledge of the fact that the family entering the residential unit, in the case of the Shirley family, is reasonably likely to be subjected to water intrusion, poor air quality and mold related issues because of the current and previous deterioration of housing conditions at Fort Belvoir and the prior complaints from the Shirley family and prior work order request at the Home. TMO has been inadequately repairing and remediating Fort Belvoir housing units which have been affected by water intrusion for the past five years.  The Shirley family has minor children who therefore, by that very status, had an important need for clean and healthy housing.

572.    The Shirley family and their two minor children occupied Fort Belvoir residential housing from January 15, 2021, to the present. From January 15, 2021 until date of displacement of August 12, 2022, the Shirley family lived at 5318 Fenner Road, Fort Belvoir VA.

573.    The Shirley family were not provided a copy of their seven-year work history at the time of the signing of their lease.

574.    The Shirley family has had continuing and constant water intrusion problems, poor air quality, suspected mold, leak in ceiling, and leak in HVAC since they moved in. During the period of time between 2021 through 2022, the Shirley's requested work orders for these problems.

575.    These were the same or similar problems included in the seven (7) year maintenance record for the home at 5318 Fenner Road / Ft. Belvoir, VA 22060 that showed a history of water leaks and mold that were never properly addressed by the Defendant:

a.    On August 12, 2015, the former resident noticed moisture and discoloration on the kitchen ceiling."

b.    On August 14, 2015, the former resident reported water intrusion and discoloration.

c.      On March 31, 2016, it was documented that mold remediation was reported needed in the laundry room, bath and closet, could be needed in HVAC room. Replace drywall: hall, downstairs bath, kitchen, HVAC room, laundry room and under stairs due to mold remediation.

d.      On April 5, 2019, the former resident reported water damage.

e.       On February 3, 2020 the former resident requested "would like the home checked for water damage due to health issues they are having".

f.      On April 16, 2020, the former resident put in an emergency request for "mold in the home".

g.      On April 24, 2020, the former resident is asking to have "the HVAC ducts cleaned due to intense coughing they are having".

576.    The Shirley family was constantly sick and are suffering from severe allergy like symptoms caused by exposure to mold, including being constantly sick with respiratory issues. Shamim Bruner was experiencing dizziness, a burning sensation in her nostrils and throat, and was experiencing migraine headaches. Ms. Bruner was prescribed an inhaler, while the children continued to be treated with an allergist. These serious concerns and quality of work were not addressed.  Mold in the home was clearly a reoccurring problem and the root cause was never explored, just the visible signs.

577.    TMO never addressed or repaired the source of the water problems and water continued to leak inside the home. As a result, the Shirley family was exposed to poor air quality which contained mold spores because of the water intrusion and faulty HVAC.

578.    These problems continued into the summer of 2022.  After making complaints again to TMO, their contractor True North tested the home for mold on July 8, 2022 because of the main air intake exposing all the mold to the occupants of the home.

579.    On June 7, 2022, and June 13, 2022, the Shirley family reported water intrusion

into the laundry room

580.    On July 25, 2022 regular maintenance mold inspector came by and represented that the black residue on everything was from burning candles and was not mold and their HVAC needed to be cleaned.

581.    On July 28, 2022 a TMO Contractor came by at 9:00 am to clean the HVAC system and vents. This contractor did not replace any of the damaged vents and did not clean system properly and it remained dirty.

582.    On August 1, 2022 the Shirley family went to maintenance and spoke with George Conley about black residue being on everything in home and the damaged vents.

583.    On Tuesday, August 2, 2022 George Boomer listened to the Shirley family's concerns and said he would pass the information to TMO employee Mike Whitman.

584.    On or about August 12, 2022 Mike Whitman came by the house and conducted moisture reading. He represented that "there were no issues."  He said the contractor would be back to replace vent covers. When Ms. Bruner asked about the cracks in the ceiling, he represented that it was from the house setting.

585.    On Thursday, August 4, 2022 TMO did an inspection and represented that the dryer vent needed to be cleaned, which was causing the black residue on everything.

586.    During the three-week period between July 18, 2002 through the displacement date of August 12, 2022, the Shirley family requested to be relocated but was denied.

587.    On August 8, 2022, the Shirley family reported "there was mold under the sink" and "mold forming on the dryer vent."

588.    On August 8, 2022, the Shamim Bruner had to go to the emergency room for respiratory issues.

589.    A few days prior to August 8, 2022, the Shirley family reported "there may be mold

in the unit."

590.    On August 10, 2022, the Shirley family had their own professional testing which revealed mold was present in the home.

591.    The family was displaced and moved into a hotel  pending the remediation.

592.    On August 18, 2022 TMO presented the family with a Scope of Work confirming suspected fungal growth "SFG" in the HVAC and other areas of the home. They refused to call it mold or use the word mold in the scope of work (SOW).

593.    On July 26, 2022 and August 8, 2022, the Shirley family performed private testing and mold was determined to be present in the home.

594.     However, the home remained unsafe as they continued to be exposed to mold.

595.    The IICRC standards and guidelines for mold remediation are the industry standard for guide for mold remediation. A "condition 1" represents small mold less than 10 square feet. A "condition 2" represents incomplete project execution and that residual mold is unacceptable as a result of inadequate clearing or insufficient preliminary determination.  A "condition 3" represents an indoor environmental contamination with the presence of actual mold growth and associated spores.

596.    Based on a safety inspection by the Army Garrison, during the remediation process TMO improperly moved items from condition two and three areas to condition one area, which is also a violation of the Fort Belvoir Safety Office IH Household Goods Assessment, rendering those areas cross contaminated.   TMO failed the post remediation evaluation.

597.    The Tenant Bill of Rights expressly states that "tenants have a right to property management services that meet or exceed industry standards." Industry standards for mold remediation include removing effected items from the home to be decontaminated for proper remediation to be completed. The Michaels Organization has failed to complete the remediation of 5318 Fenner Road, Ft. Belvoir, VA 22060.

598.    TMO refuses to take any mold testing after visible mold is reported and fails to take responsibility and answer for these failures.

1.    The SOW did not cover all of the problems requested to be repaired or remediated such as various leaks, replacement of dishwasher, 2nd layer of mold contaminated laminate flooring, plumbing, mold and infestation.  TMO began the repairs and remediation pursuant to a scope of work they prepared.  However, this scope of work did not contain all of the problem items identified by the Shirley family and was never updated. Multiple items were omitted from the scope of work.

2.    TMO failed to provide true work orders after the maintenance and repairs were requested by Ms. Bruner, including visible mold. TMO would omit those items identified by the Shirley family that were requested to be put on the scope of work. TMO would minimize the reported problems by misrepresenting what scope of work was to be performed by omitting maintenance and/or repairs issues which in turn conceals the true nature of the problems and results in the problems not being repaired.

599.    The Scope of Work (SOW) report prepared by TMO's contractor, APEX, represented that there was "suspect mold" in the home.  This is a misrepresentation. This does not address the visible mold identified in the home pursuant to Virginia law and industry standards. This scope of work did not contain the mold problem as identified by the Hayward family. TMO via its agent, APEX, failed to provide a true SOW after the visible mold was identified which misrepresents the remediation and repairs that will be necessary in the Hayward family's home.

600.    The Shirley' s maintained their position that the Home is not habitable and did not move back.  The family his waiting to relocated to another housing unit on Fort Belvoir.

601.    TMO failed to property remediate the mold pursuant to industry standards and failed to provide proper containment barriers pursuant to industry standards, which resulted in the Shirley family being exposed to toxic mold.

### Facts regarding Raymond Warden and Tabitha Warden

602.    SSG Raymond Warden (Warden family) is a career member of the United States Army with the current enlisted rank of Staff Sergeant and his wife Tabitha Warden have five minor children ages twin girls ages 12, twin boys ages 14 and daughter aged 16.   Defendants have actual and/or constructive knowledge of the fact that the family entering the residential unit, in the case of the Warden family, is reasonably likely to be subjected to water intrusion, poor air quality and mold related issues because of the current and previous deterioration of housing conditions at Fort Belvoir. TMO has been inadequately repairing and remediating Fort Belvoir housing units which have been affected by water intrusion for the past five years.   The Hunt family had young children who therefore, by that very status, had an important need for clean and healthy housing.

603.    From on or about August 2018 through present, Staff Sergeant Warden and his wife, Tabitha and their five minor children have resided in military housing at Fort Belvoir at 5362A Orchard Court S. Ft. Belvoir 22060.

604.    The Warden family were not provided a copy of their seven-year work history at the time of the signing of the lease.

605.    During the period of time between August 2018 through the present, the Warden family has had continuing and constant water intrusion problems resulting in mold and poor air quality since they moved in. The family experienced vent clogging, AC no working, broken refrigerator, AC leaking, HVAC ceiling cracks and mold; mold in the kitchen and master bath, and mold in the HVAC and on caulking downstairs.

606.    During the time period between from August 2018 through present, while the Warden family lived at Ft. Belvoir, they experienced health related problems because of their exposure to mold.  For example, SSG Warden has experienced headaches, allegories like symptoms, migraines, sleep apnea and anxiety.  Mrs. Warden has experienced asthma, headaches/migraines, allergy like symptoms, lower lung damage, postnasal drip constant depression and anxiety.  All the children have experienced allergy like symptoms, sinus issues, sneezing and mental issues and one child was diagnosed with bronchitis and prescribed an inhaler.

1.    The Warden family has made the following work order requests

a.    11/27/2018 – Interior Door Seal

b.    12/14/2018- Exterior door other problem

c.    6/15/2019 – water leaking from laundry area – hallway ceiling between the living and dining room bubbling up. / constant leak under kitchen sink.

d.    6/16/2019 – when washing machine on 2nd floor drains the hose attached to wall leaks down to the 1st floor causing the ceiling to bubble.

e.    7/13/2019 – Air Gap for dishwasher/garbage disposal is pouring water out when dishwasher is running

f.    7/25/2019 – Standing water – backyard floods and smells

g.    7/25/2019 – floor in kitchen is bubbling and vinyl is coming up

h.    8/27/2019 – flooring in front of children's room on second floor seems to be sinking

i.    10/1/2019 – Carpet coming apart near master bedroom and kids' room

j.    3/11/2020 – low water presser in all bathroom sinks when using downstairs bathroom.

k.    7/3/2020 – Frig/freezer/ice maker leak

l.    10/18/21 – vents/ducts dirty/odor

m.    5/16/22 – Treatment for misc. bugs

n.    7/12/22 – Ac Leak – subunit not draining – resident has to use shop vac

o.    7/16/22 – Ac Leak – kitchen floor is flooded because of AC is leaking water – states water coming from central AC in upstairs area of the unit (1B)

p.    7/26/22 – Inspect Duct – HVAC Mold Concern – reported mold in both upstairs bathroom

q.    10/9/2022 – Suspected HVAC mold and suspected mold in master

607.    The Warden family has reported visible mold and is waiting for TMO to follow Virginia law and relocate the family at no cost and remediate the Home and all of the family's personal property.

608.    On November 8, 2022, the Warden family had an independent air quality and test swabs performed on the home and the result were that there was visible mold in the home with slightly higher levels of mold spores.

609.    On October 14, 2022, TMO sent its contractor and agent True North to inspect the home for water intrusion and mold.  The Scope of Work (SOW) report prepared by TMO's contractor, True North, represented that there was "suspect fungal growth" (SFG) in the kitchen, 1st floor bathroom, mechanical closet and master bathroom.  This is a misrepresentation. This does not address the visible mold identified in the home pursuant to Virginia law and industry standards. This scope of work did not contain the mold problem as identified by the Warden family. TMO via its agent, True North, failed to provide a true SOW after the visible mold was identified which misrepresents the remediation and repairs that will be necessary in the Warden family's home.



610.     TMO omitting those items identified by the Warden family, including visible mold, which is required to be put on the scope of work. TMO minimized the reported problems by misrepresenting what scope of work was to be performed by omitting visible mold and which in turn conceals the true nature of the problems and results in the problems not being repaired.

611.     During the pendency of any repairs and remediation, TMO cannot continue to use the Warden's BAH. Moreover, pursuant to the Tenant's Bill of Rights, in the case of maintenance and repairs necessary to ensure habitability of a housing unit, the relocation to suitable lodging or other housing will be at no cost to the tenant until the maintenance or repairs are completed. TMO has not only unlawfully used the Warden's BAH it has also unlawfully charged the Warden costs of housing.

612.     TMO refuses to take any mold testing after visible mold is reported and fails to take responsibility and answer for these failures.

613.     Moreover, under Virginia law now that visible mold has been identified TMO is required to pay for all relocation costs and move the Wardens to temporary housing pending any remediation.  Therefore, the Home is not habitable and is not a safe and healthy environment for this military family. TMO have again failed to follow Virginia Statutes and industry standards to

remediate the entire home and it's the personal property contained therein. Therefore, the Home was never habitable and was not a safe and healthy environment for this military family.

614.    TMO failed to follow Virginia law and the mold guidelines pursuant to industry standards which resulted in the Warden family and their personal property being exposed to toxic mold.

### Facts regarding James Wayenberg and Christine Wayenberg

615.    Staff Sergeant Wayenberg (Wayenberg family) is a career member of the United States Army with the current enlisted rank of Staff Sergeant and his wife Christine Wayenberg have three minor children ages 11 years-old, 9 years-old and 8 years-old.  Defendants have actual and/or constructive knowledge of the fact that the family entering the residential unit, in the case of the Wayenberg family, is reasonably likely to be subjected to water intrusion, poor air quality and mold related issues because of the current and previous deterioration of housing conditions at Fort Belvoir and the prior complaints from the Wayenberg family and prior work order request at the Home. TMO has been inadequately repairing and remediating Fort Belvoir housing units which have been affected by water intrusion for the past five years.  The Wayenberg family has minor children who therefore, by that very status, had an important need for clean and healthy housing.

616.    The Wayenberg family and their three minor children occupied Fort Belvoir residential housing from October 2017 to the present. From October 2017 until August 12, 2022, the Wayenberg family lived at 9536 Kezia Trail, Fort Belvoir VA.

617.    The Wayenberg family were not provided a copy of their seven-year work history at the of the signing of their lease.

618.    The Wayenberg family has had continuing and constant water intrusion problems, poor air quality since they moved in. During the period of time between 2017 through 2022, the Wayenberg' s requested work orders for gaps in the front door, vinyl floor coming up, electrical issues, HVAC problems, air vents and duct problems, pest problems, water heater, plumbing

problems, and requests to test for mold.  These were the same or similar problems included in the seven (7) year maintenance record for the home.

619.    The Wayenberg family was constantly sick and are suffering from severe allergy like symptoms caused by exposure to mold. These serious concerns over testing and quality of work were not addressed.  Mold in the home was clearly a reoccurring problem and the root cause was never explored, just the visible signs.

620.    SSG Wayenberg' s sons, age 8 and 9, have experienced unexplained nose bleeds and rashes across their bodies since approximately 2019. This prompted the Wayenberg family to contact TMO maintenance to inspect their HVAC system for mold. On July 1, 2019, the Wayenberg family complained of "possible mold and her children's health". MO represented that there was nothing significant to act upon.



**CHILDREN'S SKIN RASHES**

621.    TMO never addressed or repaired the source of the water problems and water continued to leak into the home. As a result, the Wayenberg family was exposed to poor air quality which contained mold spores because of the water intrusion and faulty HVAC.

622.    On December 3, 2015, the previous tenants had made complaints of water intrusion.

623.    On November 14, 2019, the Wayenberg family requested that "the entire home checked for water damage as they are in between two houses that have water damage."   On April 13, 2021, the Wayenberg family complained of "extreme black water damage, it keeps coming back even if they keep on cleaning it."

624.    In 2020 made complaints about the HVAC system not working properly. The Wayenberg family continued to report these problems and request service, however, TMO would never permanently fix the problem and would only either say there were no leaks or that there was no mold, or nothing was wrong.

625.     These problems continued into the summer of 2022.  After making complaints again to TMO, their contractor True North tested the home for mold on July 8, 20022 because of the main air intake exposing all the mold to the occupants of the home.

626.    The continued health issues with SSG Wayenberg' s sons led them to again contact TMO and demand an inspection of the HVAC system. On July 8th, 2022, TMO conducted an inspection of the HVAC system and mold was discovered.  The family had been breathing air contaminated with mold spores for years. On July 8th, 2022, TMO promptly shut down the HVAC with no explanation in the middle of the day and the family had not been contacted by TMO to explain the issue.

627.    Mrs. Wayenberg had to reach out to her neighborhood to facilitate getting some sort of AC system in the home. In the middle of the summer heat, two weeks went by before TMO addressed the issue and presented the family with a Scope of Work confirming suspected fungal growth "SFG" in the HVAC and other areas of the home. They refused to call it mold or use the word mold in the scope of work (SOW).

628.    Alicia (the Fort Belvoir Ombudsman) disclosed they were going to start demo tomorrow at on 9536 Kezia Trail.  Pursuant to Virginia law, the Landlord is required to pay for

relocation costs, costs of lodging during relocation and remediation of the home and personal property.

629.    TMO did not do a containment inspection and only sectioned off the laundry room and dishwasher/ fridge and did not cover any furniture.

630.    The Wayenberg family was forced to live inside their residence at 9536 Kezia Trail, beginning when the HVAC was shut off due to mold on July 8,2022 through August 12, 2022.

631.    TMO represented that the Wayenberg family would have a report given to them on the mold damage within two days.  Nobody contacted the family until July 21, 2022. TMO told the Wayenberg family that they would have to move their own household goods into a new home until they assessed the damage.

632.    On July 26, 2022 and August 8, 2022, the Wayenberg family performed private testing and mold was determined to be present in the home.

633.    Housing called back on July 27, 2022 and offered to come test the Wayenberg family's household goods but made no mention of moving then into temporary housing.  The family was living in the home with no ventilation and were given three-window a/c units for the entire home.

634.    However, the home remained unsafe as they continued to be exposed to mold.

635.    It wasn't until August 12th, over a month later, before the Wayenberg family was presented with the keys to a temporary home while 9536 was remediated.

636.    The IICRC standards and guidelines for mold remediation are the industry standard for guide for mold remediation. A "condition 1" represents small mold less than 10 square feet. A "condition 2" represents incomplete project execution and that residual mold is unacceptable as a result of inadequate clearing or insufficient preliminary determination.  A "condition 3" represents

an indoor environmental contamination with the presence of actual mold growth and associated spores.

637.    Based on a safety inspection by the Army Garrison, during the remediation process TMO improperly moved items from condition two and three areas to condition one area, which is also a violation of the Fort Belvoir Safety Office IH Household Goods Assessment, rendering those areas cross contaminated.   TMO failed the post remediation evaluation.

638.    The Tenant Bill of Rights expressly states that "tenants have a right to property management services that meet or exceed industry standards." Industry standards for mold remediation include removing effected items from the home to be decontaminated for proper remediation to be completed. The Michaels Organization has failed to complete the remediation of 9536 Kezia Trail.

639.    MSGT Wayenberg then had a phone call with Dane from the TMO to schedule an immediate walk through because the mold contained within the HVAC system. Dane is a TMO contractor who performs environmental for maintenance. However, upon arrival at the home, Dane did not test and said mold testing was done and would be sent out.

640.    TMO refuses to take any mold testing after visible mold is reported and fails to take responsibility and answer for these failures.

641.    The SOW did not cover all of the problems requested to be repaired or remediated such as various leaks, pests, plumbing, flooring, mold and infestation.  TMO began the repairs and remediation pursuant to a scope of work they prepared.  However, this scope of work did not contain all of the problem items identified by the Wayenberg family. Multiple items were omitted from the scope of work.

642.    TMO failed to provide accurate work orders after the maintenance and repairs were requested by Mrs. Wayenberg, including visible mold. TMO would omit those items identified by the Wayenberg family that were requested to be put on the scope of work. TMO

would minimize the reported problems by misrepresenting what scope of work was to be performed by omitting maintenance and/or repairs issues which in turn conceals the true nature of the problems and results in the problems not being repaired.

643.    TMO threatened to charge the Wayenberg "double rent" for the home at 5959 Steven Road and the temporary home at 9536 Kenzia Trail.  The use of "double rent" tactics to force settlement with military families is not only appalling but illegal.  This is an unlawful increase in rent and an attempt to unlawfully increase the obligation of a tenant.

644.    The Wayenberg family has been displaced for over 90 days and have been required to continue to pay their basic allowance housing payments (BAH). TMO has failed to ensure the habitability of the Wayenberg' s housing unit.  During the pendency of any repairs and remediation, TMO cannot continue to use a tenants' BAH. Moreover, in the case of maintenance and repairs necessary to ensure habitability of a housing unit, the relocation to suitable lodging or other housing will be at no cost to the tenant until the maintenance or repairs are completed. TMO has not only unlawfully used the Wayenberg's BAH it has also unlawfully charged the Wayenberg' s costs of housing.

645.    The Wayenberg' s maintained their position that the Home is not habitable and did not move back.  The family has since relocated to another housing unit on Fort Belvoir.

646.    TMO failed to property remediate the mold pursuant to industry standards and failed to provide proper containment barriers pursuant to industry standards, which resulted in the Wayenberg family being exposed to toxic mold.

**Additional facts regarding general background and the MHPI.**

647.    In 1996, Congress enacted the MHPI in response to DOD concerns about the effect of poor-quality housing on servicemembers and their families.    Being a landlord is not a core competency of the military.    Under the MHPI, responsibility was transferred to private-sector developers for construction, renovation, maintenance, and repair of housing.    The formal entity

owning the housing and acting as the landlord is an LLC like FBRC here, which follows a business model of having a secondary, minority, passive member which is the Army or another military branch, and a primary, active, lead managing member who is one of the private sector developers. The LLC itself that is the landlord, FBRC here, is not a governmental agency and is not covered by governmental immunity or by the enclave doctrine,[26] as the federal government itself has emphasized in past Court submissions.[27]

648.    Since 1996, private-sector developers and property management companies assumed primary responsibility for military family housing and became responsible for the construction, renovation, maintenance, and repair of about 99 percent of domestic military family housing in the United States.

649.    Under the MHPI, the private company (through appropriate subsidiaries, and subleases, as with FBRC here which is the liable landlord/owner Defendant) enters into a 50-year ground lease with the applicable department of the military.  These ground leases share generic similarities.  Under the ground lease terms, the relevant branch of the military is not involved in the day-to-day operations pertaining to the construction or management of the housing units.

650.    After the MHPI public-private partnership program in the late 1990s, Defendants and/or their subsidiaries and related entities won bids for privatization projects to operate housing on multiple military bases.

651.    In order to win the bids for bases, including for the Fort Belvoir base, Defendants

---

[26] *See Page v. Corvias Grp., LLC*, No. 5:20-CV-336-D,2021 U.S. Dist. LEXIS 172968, 2021 WL 4163562 (E.D.N.C. Sept 13, 2021) (unpub.) (enclave doctrine did not apply to set substantive law for similar military family claims brought regarding housing at Fort Bragg; *Burn v. Lend Lease (US) Pub. P'ships LLC*, No. 7:20-CV-174-D, 2021 U.S. Dist. LEXIS 172963, 2021 WL 4164685 (E.D.N.C. Sept. 13, 2021) (same, Camp Lejeune).
[27] *Beck v. Camp Pendleton and Quantico Housing LLC*, No. 3:20-cv-00579-LAB-WVG (S.D. Cal.), Doc. 39 (United States' Statement of Interest filed in that case). *And see Whatley v. Atlantic Marine Corps Communities, LLC,* No. 9:17-cv-02716-DCN (D.S.C.), Doc. 24 (Statement of Interest regarding Tri-Command privatized housing).

and/or their predecessors made promises and representations to the U.S. Army and the U.S. Government to the effect that if awarded the work at Belvoir, Defendants would provide excellent, gold-standard housing to military families.

652.    At the time that Defendants or their predecessors were awarded the Belvoir housing under the 50-year ground lease in 2003, some of the housing inventory consisted of residential units in poor and aged condition that should have been replaced entirely by new housing, or extensively renovated, before it was rented out to military families with young children.

653.    However, despite being paid many millions of dollars to design, build, renovate, repair, maintain, manage and to lease out the housing units at Fort Belvoir, and despite having the ability to renovate or replace units at any time, Defendants failed to take the problem units out of the inventory of actively leased housing.

654.    Solely for cost reasons, during the pertinent times, Defendants allowed many of the housing units at Fort Belvoir to remain in legally unhabitable conditions, and yet to continue to be rented out to families with infants and young children whose health status was inherently vulnerable.

655.    During the pertinent times, in the years after being awarded the ground lease, Defendants failed to pay the costs associated with renovating and replacing problem homes at Belvoir.  Defendants also cut costs with regard to staffing, customer service and repair and maintenance.  Many of the families who were thereby placed in substandard housing conditions, did not complain, due to their lack of power, their concern over chain of command / career repercussions, due to the fact that they had no control over paying their own rent and could not hold it back until problems were fixed; and due to the fact that on average within a year or two of being sent to Fort Belvoir, it was likely the lower enlisted servicemembers in particular would be posted over to a new station and would therefore leave Belvoir.

656.    During the pertinent times and the last five years, any reasonable and competent

operation of the rental housing at Fort Belvoir, would have included a general practice of truthfulness to tenants, a no-tolerance policy for dangerous mold, and that problem homes would have immediately been taken out of the rental home inventory. However, over the years from 2003 until 2018, Defendants allowed the housing and their tenant care to deteriorate. Defendants used an unreliable work order system and a slanted customer survey process to hide the problem from the government. Top military commanders, including base-level commanders who lived in special officer housing excluded from this lawsuit, knew little or nothing of the true conditions.

657.    FBRC was established to be the Landlord of military housing units leased under the MHPI Contract.

658.    Under the pertinent management and other agreements, one or both Defendants during the pertinent times while Plaintiffs resided at Fort Belvoir had a duty to manage and maintain the military family housing at Fort Belvoir, including the residences for the named plaintiff families. Management of the military family housing on Fort Belvoir was without direct supervision or control by the Army.

## The Fort Belvoir Ground Lease

659.    Under the December 1, 2003, 50-Year Ground Lease, Defendants collect rents equivalent to the BAH. The BAH amount is set by the military to reflect a rental amount that would obtain reasonable quality housing in the region. The BAH amount varies according to rank.

660.    Paragraph 7 of the ground lease requires the Lessee (Defendants) to "faithfully observe and comply with all applicable Federal, State and local laws, regulations, orders, ordinances, permits and all covenants of Lessee under the Deeds…."

661.    Read in its entirety, the 50-Year Ground Lease placed a duty on Defendants to provide Plaintiffs with safe and clean housing.

662.    During the class period within the last five years, Plaintiffs and other servicemember families did not receive safe, clean housing. Rather, the rental housing offered by

Defendants was plagued by water intrusion, mold, mildew, filth, insect pests, broken and unreliable HVAC and appliances, and other problems such as dirty carpets, loose door boards, rust, holes in walls and outlets, and cracks in window screens and windowsills.

### Lease Agreements with Servicemembers.

663.    During the pertinent times, the Defendants have promulgated generic form lease agreements with take-it-or-leave-it terms.  The form leases of the named Plaintiff servicemember lessees are substantially similar.  The terms of the form lease and incorporated materials reflect that Defendants were obligated to provide quality housing and property management.  The terms also reflect that servicemember families were effectively captive to the lease over its term.

664.    The terms of the form lease represented that the Tenant's monthly rent shall equal the service members' BAH amount.

665.    The form lease reflects that normal state law applies, including state landlord-tenant law.  See lease section 24(a):  "Landlord may terminate this Agreement and may commence <u>an eviction action</u> against the Tenant in accordance with federal, <u>state and local law</u> for Tenant's failure to pay rent or for one or more violations by Tenant of this Agreement, including the Resident Responsibility Guide, that affect or threaten to affect the health or safety of other residents in the community or substantially interfere with the right to quiet enjoyment of other residents." (Emphasis added).

666.    The form lease expressly incorporated by reference a "Resident Responsibility Guide" ("RRG"), which formed part of the form lease and was also a generic document.

667.    The RRG that was expressly incorporated into the form lease defined "Landlord" as "Fort Belvoir Residential Communities, LLC (FRBC)".

668.    The RRG clearly contemplated that state and local laws and building codes apply to the housing.  *See, e.g.,* RRG § 2.2: "<u>Landlord agrees to maintain all electrical, plumbing, heating, ventilating, air conditioning, appliances and other facilities and common areas in good and safe</u>

<u>working condition</u>, subject to the covenants and duties undertaken by Resident(s) below. Landlord further agrees to comply with <u>all applicable building and housing code requirements governing residential rental property in the Commonwealth of Virginia</u>."  (Emphasis added).

669.    The "Resident Responsibility Guide" provided in part in the introduction section to that document:

> Welcome to your new home and to The Villages at Belvoir!  **Recognizing how much you and your family sacrifice for our country, we are deeply honored and proud to have the privilege of serving you at home.**
>
> We know that **your quality of life** is not just impacted by your home here at The Villages at Belvoir, but also by the quality of the community in which you live and the services you receive as a resident. To ensure that **your time with us as a resident is enjoyable and stress free**, our team is dedicated to providing you and your family with **a level of quality services that exceed your expectations**. For example, your community features an on-site community management team, and we provide you with lawn care, leaf removal, and a 24-hour emergency and routine maintenance request line….
>
> The Villages at Belvoir community offers military families new, renovated and traditional homes along with five new community centers and offices, each of which features numerous amenities available to you and **for the enjoyment of family** and friends. Fort Belvoir Residential Communities, LLC (FRBC) continues to enhance and add to the many amenities located throughout our community, and your ideas and suggestions are always welcome.
>
> This Resident Responsibility Guide (RRG) is a legal part of the Resident Occupancy Agreement (Agreement)….

(Emphasis added).  The emphasized language clearly shows that the company was aware of the family quality of life aspect of the leased-housing product that they offered.

670.    The RRG goes on to have FBRC promise "the highest standards pf family housing":

> The Fort Belvoir Residential Communities, LLC (FBRC) partnership officially began operations at Fort Belvoir on 1 December 2003, and our team has been working ever since to **rebuild, renovate, and maintain to the highest standards of family housing at Fort Belvoir….**

(Emphasis added).

671.    The RRG also touted Defendants' repair and maintenance services as being first-rate:

Key features of the Property Management and Operations Plan include:

- Five Neighborhood Centers with Community Management Offices that are open to serve Residents Monday through Friday from 8:30 a.m. until 5:30 p.m.
- **A response time of 72 hours for routine service requests, a four (4) hour response time for urgent service requests, and immediate (no more than one hour) response time for emergency situations.**
- Hosting Resident social programs, community events, and participating in Army family services and programs.

(Emphasis added).

Clearly this language among other things was meant to make family members believe that if they moved to The Villages at Belvoir, if they needed a repair, they would receive it quickly at their unit. Defendants' representations also reasonably implied that the repairs would be performed competently, and that if there was a problem, it would be repaired. The document also represents:

"**The FBRC mission is simple: To improve the quality of life for members of the armed forces and their families.**" (Emphasis added). The RRG also implies that that FBRC delivers the unit to the tenant in excellent condition by adding that: "When vacating, the Resident must leave the Premises in **the same high standard of cleanliness and repair that it was received**." (Emphasis added).

672.    The RRG expressly incorporated into the form lease further provided as follows, that Defendants would automatically receive the BAH:

Each Resident senior service member will receive a monthly Basic Allowance for Housing (BAH) for the Fort Belvoir duty station based on the Resident's rank and family status. At the time of move in, the senior-ranking service member must establish an allotment to FBRC with the Defense Finance and Accounting Service (DFAS) using the Military Assistance Company (MAC) in order **for Landlord to receive rent automatically.** Proof of such action must be provided to Landlord at the time of Agreement signing, by submission of DD Form 5960 accompanied by a copy of the Resident's military assignment orders.

673.    The RRG further provides, under section 5.2, Exterior Condition/Appearance, that "Landlord is **responsible for all exterior repairs and maintenance**…." (Emphasis added). Importantly, in this regard, while the tenant owned the occupancy interest in the home, the landlord

owned the home itself, under the 50-Year Ground Lease.  When residential units had water intrusion issues and gaps and openings in the exterior surface, this was the landlord's duty to monitor and correct.  By not taking adequate care of the homes, the landlord, here FBRC, unreasonably and substantially impaired and intruded upon the tenants' occupancy interest, and violated its contractual and landlord-tenant statutory duties.

674.    The RRG further provides, under Section 5.5, Maintenance and Repair, that the "Landlord agrees to" among other things "Keep common areas clean", to "Provide pest control services as needed;" "**Maintain fixtures, furnaces, water heaters, and appliances in good and safe working condition; and" "Make all reasonable repairs**." (Emphasis added).  The landlord this promised to provide effective pest control, to maintain and repair fixtures and appliances such as HVAC, and to make all reasonable repairs.

675.    The RRG further provides under section 11.12, that the "**Landlord has a duty to repair or remedy a condition that materially affects the physical health or safety of a Resident**." (Emphasis added).

676.    During the class period, as a result of Defendants' uniform property management policies, practices, and funding, the Defendants' representations described above were false and contractual promises were breached for Plaintiffs and class members.

677.    Under the form lease, the servicemember tenant agrees to pay monthly rent equal to the Basic Allowance for Military Housing and their allotted dependent rate (the "BAH") at the Resident's duty station of the pay grade of the Resident service member.

678.    There is no ability for a service member to negotiate the price of this housing; the service member is required to pay the rent in full.  A service member must forfeit the entire BAH upon acceptance of housing. Service members have no discretion or choice.

679.    The Plaintiffs and class members singed a generic form lease with take-it-or-leave-it terms. They were forced to accept the conditions of the lease, which is a contract of adhesion

because military members are transferred under orders for Permanent Change of Station (PCS), because families have very limited resources, and for other reasons. The Plaintiffs and class members were effectively held captive to the leases. Plaintiffs and class members detrimentally relied on the Defendants to provide reasonable, quality housing.

680.    The BAH program provides an in-kind, tax-free benefit to service members in recognition of the fact that the average military assignment of three years makes purchasing a home untenable.  By obtaining automatic assignment of the BAH through the provisions of the form lease, Defendants treat the BAH as a guaranteed revenue stream.

681.    The lease agreement during some or all of the pertinent times prohibited the residents from taking many self-help measures.

682.    Defendants were aware when agreeing to perform privatized military housing construction, repair and maintenance services at Fort Belvoir that the base was located in a warm, wet, southern climate and environment, in low-lying lands near the ocean and its inlets, and subject to periodic hurricanes and weather events. The climate and environmental conditions of Fort Belvoir are conducive to water intrusion and the growth of mold.  During the class period, Defendants breached their contractual and landlord-tenant duties to provide safe housing and responsible property management for Plaintiffs and class members pertaining to mold.

683.    In light of the significant issues with mold, Defendants inserted a "Mold/Mildew Addendum" in their lease documents.  While much of it is self-serving, the document nonetheless does not modify, reduce, or negate the Landlord's maintenance and repair obligations under the form lease and incorporated in the "Resident Responsibility Guide".

684.    Service members and their families reasonably expect housing that is safe, habitable and properly maintained.  Defendants are required to provide such housing.

685.    Military families need and deserve safe and healthy homes at their assigned installations to sustain military and family readiness, recruitment and retention.

686.    Defendants are required to operate the housing at Fort Belvoir in good order and in a clean, safe condition at their expense, in accordance with their marketing representations that they offer first-class residential rental housing for tenants.

687.    Many military families are young families with infants or young children.  The servicemember parent is often deployed, far away from home for an extended period, or busy with demanding assignments on base. Due to these circumstances, it is important that servicemember families receive safe housing and effective service.

688.    During the last five years, Defendants' conduct has substantially and unreasonably interfered with Plaintiffs and class members' ability to use and enjoy their homes and has materially affected their health, safety and well-being in their homes, and has resulted in unacceptable, unsanitary, unsafe, unhealthy and intolerable conditions at the military housing owned and operated by Defendants at Fort Belvoir and elsewhere.   The specific facts of the named Plaintiffs, described above, reflect these unacceptable and intolerable conditions.

689.    Defendants, by virtue of their course of administering, leasing, building, and repairing the houses at Fort Belvoir, were uniquely aware, by common knowledge, of the substandard conditions of the houses, including the existence of mold, electrical, plumbing, insect, water intrusion, and HVAC issues associated with the houses they manage. Nevertheless, Defendants knowingly and intentionally leased houses to Plaintiffs, misrepresenting that they were habitable, and that appropriate repair and remedy work had been undertaken in the past and would be undertaken in the future.

**Congressional and Other Investigations.**

690.    After the military housing scandal first hit the news in November 2018 due to Reuters investigative news reporting, some of the largest of the private housing companies, in an attempt to lobby for their cause and inflect the tide of negative PR, formed their own industry association.  That association was entitled the "Military Housing Association" and has a website,

www.militaryhousingassociation.org. The members of the association include "The Michaels Organization."

691.    The identities of problem units and affected tenants is internal information uniquely known to Defendants.  The identities of such tenants within the class period are ascertainable from Defendants' business records, and/or, Plaintiffs are entitled to an appropriate inference in their favor due to the unreliability of those records due to Defendants' reckless and intentional conduct. While individual facts will vary by family, the case may appropriately be certified on a common issue, under Fed. R. Civ. P. 23(c)(4),[28] under the circumstances, which include a partial admission of liability by the landlord.

692.    Common factors underlying Defendants' conduct that support the certification of a "predominance/superiority" class or an issue class under Rule 23(b)(4), include:

a.    prior knowledge of the unacceptable housing conditions; the management was aware that homes were in unacceptably subpar conditions or was willfully blind to that fact; which is part of what led to the public outcry.

b.    promises to the government that they would provide "gold standard" housing; Defendants made ironclad promises and representations to the government that they would provide excellent, top-quality leased housing; the problem housing conditions utterly belied these promises.

c.    Defendants' knowledge that the soldiers and their families were in no position to do more than complain fruitlessly to the landlord – they could not withhold rent, they were fearful to complain to their chain of command, military attorneys could not help them, they lacked the money to break the lease and move, they lacked the money to sue civilly (if asked, Defendants would have said any claim was barred under the (inapplicable) "enclave" doctrine).

d.    Defendants knew on average all families would be relocated away from the base within one or two years, meaning the landlord could simply wait out a complaining family.

e.    Defendants' knowledge that they could allow numerous problem units to remain in the active housing inventory with impunity.  Top officers were given boutique homes and had no knowledge how poor the conditions were for lower rank soldier families in the problem units.  The property manager could ignore complaints, address them with superficial "paint over the mold" maintenance, bank on soldiers' inherent stoicism or young mothers' naivete or feelings of being overwhelmed, and wait until the complaining tenant left.  If the Army raised questions, Defendants

---

[28] "(4) *Particular Issues.* When appropriate, an action may be brought or maintained as a class action with respect to particular issues."  Fed. R. Civ. P. 23(c)(4).

could point to supposedly glowing customer surveys – in fact once a truly fair, neutral survey was conducted, it showed that tenants found the housing repair and maintenance poor. A 2021 U.S. Army survey reported 27.9% of tenants were dissatisfied with housing.[29]

     f.    Defendants deliberately used a work order system that made it appear that tenant requests were being handled properly and that units were in good condition, when in fact the housing inventory included problem units. Defendants knowingly kept renting those units without performing the root cause assessment needed to address their problems or the renovation or replacement required to fix the problems.

     g.    Defendants profited off and continue to profit off their 50-year ground leases and have no defense that they were not paid enough to take the problem units out of inventory, properly assess them, repair or replace them.

     h.    Defendants contracted to own, build, assess, renovate, repair, maintain, and manage the properties under their 50-year ground leases and have no defense that they were not responsible for determining which units needed a root cause analysis or needed to be renovated or replaced.

     i.    Defendants profited off and continue to profit off their 50-year ground leases and have no defense that they were not paid enough to treat the Plaintiffs and other affected military families responsibly, properly and honestly.

693.    Given these aggravating factors, Defendants should proactively assist Plaintiffs in identifying prospective class members, and/or, the Court may certify a class on one or more defined merits issues of importance to any liability claim.

694.    In the fiscal year 2019 Defense Appropriations Act, Congress included a provision asking the Government Accountability Office ("GAO") to look at how the MHPI was working. The reason that they wanted the GAO to do that was that Congress was increasingly hearing from servicemembers and their families who were very concerned about the condition of their privatized housing, complaints about things like mold and pest infestation, and a concern that the Department of Defense was not doing enough to help them address those problems.[30]

---

[29] 2021 Summary, DoD Tenant Satisfaction Survey for the Headquarters Department of The Army, Residential Communities Initiative "RCI" Projects, p. 13, Available online at https://www.army.mil/e2/downloads/rv7/qualityoflife/army_rci_2021_dod_tenant_satisfaction_survey_summary.pdf.

[30] *See generally* Statement of Elizabeth A. Field, Director, Defense Capabilities and Management, GAO, Preliminary Observations on DOD's Oversight of the Condition of Privatized Military Housing, Dec. 3, 2019, No. GAO-20-280T.

695.    In March 2020, Elizabeth Field, Defense Capabilities and Management director with GAO, stated that when her group investigated tenant complaints as to military housing, "we really found problems related to privatized housing at every location that we visited." GAO issued reports regarding the military housing, which reports on information and belief were based on part on review of Fort Belvoir records and/or records of the companies involved with the housing at Belvoir. See GAO-20-281, DOD Needs to Strengthen Oversight and Clarify Its Role in the Management of Privatized Housing (March 2020), p. 1: "The Department of Defense (DOD) is expanding its use of work order data to monitor and track the condition of privatized housing. However, based on GAO's analysis of data provided by all 14 private partners, these data cannot reliably be used for ongoing monitoring of privatized housing because of data anomalies and inconsistent business practices in how these data are collected."[31]

696.    On March 10, 2021, the House Armed Services Committee on military personnel conducted a hearing as part of their investigation of military housing. Clark Realty Capital declined to participate in the hearing, drawing the ire of top committee members. Committee Chairwoman Speier stated "We have heard and seen firsthand horror stories in these houses, from mold, to water leaks to incorrect lead abatement that has directly affected the health and safety of these families."[32] At the hearing, Speier and other lawmakers said that they were recently briefed by housing advocates from Fort Belvoir who described "disturbing conditions" at housing on the post.[33] Representative Speier further stated: "I want to call out the irresponsible conduct of Clark Realty. I want to convey to them that you can run, but you can't hide."[34] She noted that in the

---

[31] https://www.gao.gov/assets/gao-20-281.pdf
[32] Dickstein, Corey (2021)", "Lawmakers Say They Still Hear Reports of 'Horror Stories' in On-Post Housing, Blast Company for Declining to Testify," Stars And Stripes (March 10, 2021), accessed at https://www.stripes.com/news/us/lawmakers-say-they-still-hear-reports-of-horror-stories-in-on-post-housing-blast-company-for-declining-to-testify-1.665315.
[33] Id.
[34] Jowers, Karen (2021), "Lawmaker: Base Commanders Should Be Held Responsible for Enforcing Tenants' Rights", Military Times (March 10, 2021), accessed at

closed session with military family advocates, lawmakers heard serious complaints about some of the Clark properties, including continued resident dissatisfaction at Fort Belvoir "due to shoddy maintenance and improper remediation of environmental hazards."[35]

697.    Since taking control of housing at Fort Belvoir, Defendants have received numerous complaints and repair requests, including those from Plaintiffs and other members of the class, evidencing the defects in the housing. However, Defendants have systematically failed to promptly and permanently repair and remediate the housing.

698.    With regard to water intrusion and mold, the Defendants' failures have caused a reasonable fear among servicemember families that they have suffered mold-related illness and adverse health effects.   In many instances Defendants have simply "painted over" mold which is discovered at Fort Belvoir military housing.

699.    On information and belief, on or about March 21, 2021, the Fort Belvoir Fire and Emergency Services inspected over 25 homes in Fairfax Village for gas leaks and discovered that ten (10) of the homes suffered from gas leaks.

700.    These changes necessary to remedy intolerable and unacceptable conditions should have occurred years ago.  However, Defendants have failed to refund BAH amounts or otherwise compensate servicemember families left injured and damaged by the unacceptably poor residential conditions.

**CONDITIONS PRECEDENT**

701.    All conditions precedent to Plaintiffs' recovery have occurred or have been waived, excused, or otherwise satisfied. All required notices have been or will be provided or were waived, excused, or otherwise satisfied.

---

https://www.militarytimes.com/pay-benefits/2021/03/11/base-commanders-should-be-held-responsible-for-enforcing-tenants-rights-lawmaker-says/.
[35] *Id.*

## NO GOVERNMENTAL IMMUNITY OR ENCLAVE DEFENSE

702.    Defendants are not persons or entities acting under a federal officer so as to give rise to a defense of qualified immunity, nor are Defendants subject to any sovereign immunity, derivative sovereign immunity, governmental immunity, federal enclave or government contractor defense.

703.    None of the named Defendants are governmental officials entitled to raise the defense of qualified immunity.

704.    With regard to its involvement in one or more Clark/Pinnacle/Fort Belvoir privatized military housing projects, the United States has denied that it was controlling, supervising or managing the project.

705.    Defendants are not private individuals engaged in public service, and the Defendants violated basic landlord-tenant duties and other rights of the Plaintiffs and class members that were clearly established at the time of suit.

706.    Plaintiffs have pled no claim against the government, or one of its departments or agencies, or against a government officer or agent based on the performance of governmental duties, within the scope of sovereign immunity.

707.    Defendants are not entitled to derivative governmental immunity because they violated the government's explicit instructions in the form of the requirements and obligations set forth in the operative agreements, and the Plaintiffs and class members are persons adversely affected by the violation.

708.    Plaintiffs are not alleging a failure to warn or design defect product liability claim.

709.    The government did not exercise its discretion and approve the relevant service, repair and maintenance practices used by the Defendants. Further, Defendants were aware of dangers in their repair and maintenance practices that were known to them but not to the government.

710.    The Defendants' obligations to the government do not conflict with the state law duties alleged herein such that they may not comply with both government and state law directives.

711.    Plaintiffs do not argue that the agreements and plans that Defendants entered into with the Army were defective, but rather, that Defendants did not comply with those agreements and plans or with their own internal plans with regard to the communities.

## CLASS ALLEGATIONS

712.    Pursuant to the Fed. R. Civ. P. 23(b)(2) and (b)(3), and 23(c)(4), Plaintiffs respectfully request that the Court certify a class defined as follows:

**Class:** All servicemember tenants based at Fort Belvoir who have entered into lease agreements with Defendants for residential housing units during the five years prior to the date of filing of the complaint, and all authorized adult family member spouses or other occupants.

**Rule 23(c)(4) Issues:**

1.    Did Defendants have a duty to undertake a root cause analysis of homes in the active inventory at Fort Belvoir, with regard to moisture intrusion, mold, environmental dangers, HVAC problems or general decrepitude, prior to when the homes were rented to Plaintiffs and class members?

2.    Did Defendants engage in creation of a private nuisance, unfair and deceptive repair and maintenance practices, or a breach of their express or implied landlord-tenant duties, with regard to a group of the privatized Belvoir housing units that can be identified as Problem Units, for a subgroup of the tenants who can be identified as Complaining Families, over the last five years?[36]

3.    Did Defendants have an obligation to ensure that the personal belongings and household goods and furnishings of Plaintiffs and class members were remediated and decontaminated following exposure to contaminants in accordance with industry standards including the IICRC S520 standards as referenced in the Virginia mold statutes?

---

[36] "Problem Units" are defined as housing units with mold, moisture, HVAC or other relevant documented issues in the work orders and other applicable business records, as per examination of those records. "Complaining Families" are defined to include any families, who were tenants or adult occupants, of Belvoir housing, who are documented to have complained about housing conditions, under identification criteria including that they have complained publicly about poor housing conditions or complained as per examination of applicable Defendants' business records or complaints to military branches or watchdog agencies. Plaintiffs reserve the right to amend this class definition as investigation and discovery proceeds.

Plaintiffs further request certification of two subclasses defined as follows:

**Displaced Families subclass:** All persons in the Class who were displaced out of their original housing unit before the normal lease expiration date.

**Injunctive relief subclass:** All servicemember tenants based at Fort Belvoir who currently have ongoing lease agreements with for the privatized military housing residential housing units with FBRC.

713.    Excluded from the Class are Defendants' legal representatives, officers, assigns, directors, successors, and other individuals as is normal and customary in class certification.  Also excluded are all persons who make a timely election to be excluded from the Class and any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff.  Also excluded are upper-level officers residing in the highest-level homes offered by FBRC, as these residential units are outliers.

714.    This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements. Plaintiffs seek to represent an ascertainable class, as determining inclusion in the class can be done through review of Defendants' own records.

715.    Fed. R. Civ. P. 23(a)(1) (numerosity):  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class Members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  The disposition of claims of these Class Members is a single action will provide substantial benefits to all and an efficient means to adjudication.  If many individuals were to proceed the courts would be overrun with claims and also enables litigation where it might otherwise not occur if individual claims are small and/or class members are financially unable to fund litigation themselves, individual joinder is practically impossible. Members of the Class may be notified of the pendency of this action by both regular and electronic mail using a form of notice customarily used in class actions.

716.    Fed. R. Civ. P. 23(a)(2) (common issues):  Questions of law and fact common to the Class exist, which predominate over any questions affecting only individual Class Members. These common questions of law and fact are shared among the Class Members as the deficiencies claimed herein have affected all Class Members, including, inter alia:

A.    Whether, during the class period, some or all of the Defendants were subject to contractual duties under the terms of the form lease;

B.    Whether, during the class period, the Defendants breached their contractual duties under the leases entered into with Plaintiffs and class members;

C.    Whether, during the class period, the Defendants violated the Virginia Residential Landlord/Tenant Act;

D.    Whether Defendants breached the implied warranty of habitability;

E.    Whether class members have suffered impairment of their occupancy interest in their leaseholds rising to the level of breach of the warranty of habitability;

F.    Whether Defendants have caused Plaintiffs and class members to experience substantial and unreasonable loss of use and enjoyment of their occupancy interests causing Defendants to be liable for temporary recurrent private nuisance;

G.    Whether, during the class period, the Defendants caused there to be unacceptably bad housing conditions for an unreasonably high number of servicemember families at Fort Belvoir;

H.    Whether, during the class period, the Defendants engaged in unfair and deceptive trade practices in connection with Plaintiffs and class members proscribed by Virginia's Consumer Protection Act ("VCPA");

I.    Whether, during the class period, the Defendants engaged in unfair and deceptive service, repair and maintenance policies and procedures with regard to the residential housing at Fort Belvoir;

J.    Whether Defendants overcharged Plaintiffs and class members for repair and maintenance items or obligated Plaintiffs and class members to pay out-of-pocket for services or products for which Defendants should have paid;

K.    Whether the capital expenditures and structural reforms announced by Defendants only after congressional hearings should have been implemented years ago;

L.    Whether, due to the structural inadequacy of Defendants' uniform customer service, repair and maintenance policies during the class period, the Plaintiffs and class members did not receive the rental housing they were promised or that their BAH was to pay for;

M.    Whether Plaintiffs and class members have sustained damages and, if so, what is the proper measure of damages;

N.    Whether the circumstances giving rise to a private nuisance are abatable;

O.    Whether the Court should order full or partial refunds or disgorgement of BAH revenues obtained over the class period; and

P.    Whether the Court should award other declaratory, injunctive or equitable relief.

717.    <u>Fed. R. Civ. P. 23(a)(3) (typicality)</u>:  Plaintiffs are members of the putative class. Plaintiff's claims are typical of those of other Class Members because they are or have been all residents of Ft. Belvoir base housing. All such claims arise out of the same course of events and each class member has similar legal claims and arguments that prove the Defendants liability under the causes of actions alleged herein and are like that of every other Class Member.  All of the Plaintiffs and the Class Members were directly affected by the deficiencies claimed herein, which resulted in damages to the Plaintiffs and Class Members who have all suffered and will continue to suffer harm and damages as a result of the Defendants unlawful and wrongful conduct, the factual basis of which is common to all Class Members. The claims asserted by the Plaintiffs are typical of the claims of the members of the putative class, as the claims arise from the same course of conduct by Defendants and the relief sought is common.

718.    <u>Fed. R. Civ. P. 23(a)(4) (adequacy)</u>:  Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative class, as their interests coincide with, and are not antagonistic to, the other members.  Plaintiffs have retained counsel competent and experienced in both military housing and class action litigation.

719.    <u>Fed. R. Civ. P. 23(b)(1)(A)</u>:  A class action is appropriate because prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

720.    <u>Fed. R. Civ. P. 23(b)(1)(B)</u>: A class action is appropriate because adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

721.    <u>Fed. R. Civ. P. 23(b)(2)</u>:  A class action is appropriate because Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

722.    <u>Fed. R. Civ. Pro. 23(b)(3) (Predominance and Superiority)</u>:  Certification of a class is appropriate because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affection only individual members.  The Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members and the deficiency issues arising from the Defendants' conduct that affected the Plaintiffs was common to all Class Members.  This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications and to avoid piecemeal litigation.

723.    Absent a class action it would be highly unlikely that the members of the class would be able to protect their own interests.  This is not necessarily because the cost of litigation through individual lawsuits might exceed the expected recovery and the individual claimant would therefore have no effective remedy.[37]  Rather, it is because most families do not know they have potential legal recourse.

724.    A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous

---

[37] (In fact, a temporary private nuisance verdict, if the facts are particularly compelling, can be significant).

individual actions and the duplication of discovery, effort, expense, and the burden of the courts that individual actions would create. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that may not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of the class action.

725.   Fed. R. Civ. P. 23(c)(4):[38]  In addition, or in the alternative, the certification of a class limited to one or more of the common issues is appropriate because proof of one or more common issues of general relevance to all class members would substantially simplify their ability to proceed further with individual claims.

726.   Defendant has acted on grounds that apply generally to the Classes as a whole, so that class certification and monetary damages are appropriate on a class-wide basis.

## FIRST CLAIM FOR RELIEF
### VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT
### CHAPTER 17 § 59.1-196 THROUGH § 59.1-207

727.   Plaintiffs re-allege the above referenced paragraphs as if fully set forth herein.

728.   This claim is brought by Plaintiffs individually and on behalf of the Class.  At all times relevant herein, Defendants were engaged in a consumer transaction in the Commonwealth of Virginia and are otherwise proper defendants under the Virginia Consumer Protection Act ("VCPA").

729.   Plaintiffs and class members are members of the consuming public as defined by the VCPA, as they sought to acquire goods and services by lease for personal, family, and residential purposes.

---

[38] Fed. R. Civ. P. 23(c)(4) ("(4) *Particular Issues.* When appropriate, an action may be brought or maintained as a
class action with respect to particular issues.").

730.    Defendants are suppliers as defined by the VCPA in that they are lessors and professionals who advertised, solicited, and engaged in consumer transactions with the Plaintiffs and members of the Class.

731.    "Supplier" as defined by Virginia Code §59.1-198 "means a seller, lessor, licensor, or professional who advertises, solicits, or engages in consumer transactions, or a manufacturer, distributor, or licensor who advertises and sells, leases, or licenses goods or services to be resold, leased, or sublicensed by other persons in consumer transactions."

732.    The consumer transactions in this action are defined by Virginia Code §59.1-198 to include the "advertisement, sale, lease, license or offering for sale, lease or license, of goods or services to be used primarily for personal, family or household purposes."

733.    "Goods" are defined by Virginia Code §59.1-198  to mean "all real, personal or mixed property, tangible or intangible."

734.    "Services" as defined by Virginia Code §59.1-198 "includes but shall not be limited to (i) work performed in the business or occupation of the supplier, (ii) work performed for the supplier by an agent whose charges or costs for such work are transferred by the supplier to the consumer or purchaser as an element of the consumer transaction, or (iii) the subject of an "access contract" as defined in § 59.1-501.2."

735.    As stated by Virginia Code §59.1-197, the VCPA is intended to be applied as remedial legislation to promote fair and ethical standards of dealings between suppliers and the consuming public.

736.    Under Virginia Code § 59.1-199, a lessee may bring an action under the VCPA if the act or practice of a landlord constitutes a misrepresentation or fraudulent act or practice under Virginia Code § 59.1-200.

737.    Virginia Code § 59.1-199 states "Nothing in this chapter shall apply to: … E. Any aspect of a consumer transaction which is subject to the Virginia Residential Landlord and Tenant

Act (§ 55.1-1200 et seq.) or Chapter 14 (§ 55.1-1400 et seq.) of Title 55.1, <u>unless the act or practice</u> <u>of a landlord constitutes a misrepresentation or fraudulent act or practice under § 59.1-200.</u> (emphasis added).

738.    Under Virginia Code § 59.1-200(A), the following fraudulent acts or practices committed by a supplier in connection with a consumer transaction are hereby declared unlawful in the following subparagraphs:

"2. Misrepresenting the source, sponsorship, approval, or certification of goods or services;"

"5. Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;"

"6. Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model;"

"10. Misrepresenting that repairs, alterations, modifications, or services have been performed or parts installed;"

"13. Using in any contract or lease any liquidated damage clause, penalty clause, or waiver of defense, or attempting to collect any liquidated damages or penalties under any clause, waiver, damages, or penalties that are void or unenforceable under any otherwise applicable laws of the Commonwealth, or under federal statutes or regulations;"

"13a. Failing to provide to a consumer, or failing to use or include in any written document or material provided to or executed by a consumer, in connection with a consumer transaction any statement, disclosure, notice, or other information however characterized when the supplier is required by 16 C.F.R. Part 433 to so provide, use, or include the statement, disclosure, notice, or other information in connection with the consumer transaction;:

"14. Using any other deception, fraud, false pretense, false promise, or

misrepresentation in connection with a consumer transaction;"

"17. If a supplier enters into a written agreement with a consumer to resolve a dispute that arises in connection with a consumer transaction, failing to adhere to the terms and conditions of such an agreement;" and

"46. Violating the provisions of clause (i) of subsection B of § 54.1-1115".

739.    Defendants violated the foregoing prohibited practices by their acts and practice as a landlord by misrepresentation or fraudulent act or practice in the course of leasing and repairing the military housing to the Plaintiffs and the members of the class.

740.    Defendants were each directly and materially involved in providing the leased residential housing herein, or in providing property management services, such that each is jointly and severally liable for violations of the VCPA.

741.    Defendants during the pertinent times have engaged in unfair and deceptive trade practices and prohibited practices under § 59.1-200 using misrepresentation, fraudulent acts or practice in connection with Plaintiffs and class members including as follows:

a.        By offering, marketing and leasing residential housing to Plaintiffs and class members that had defects and deficiencies far in excess of what was acceptable and reasonable under the circumstances which include and included: a) the promises and representations made by the Defendants or their predecessors to the U.S. Government in order to obtain the housing contract, b) the amounts of money the Defendants and their predecessors were paid, c) the nature of military families as including infants and young children who need safe and healthy home environments, d) the testimony of the Plaintiff families reflecting actual housing circumstances as they existed for their units, and e) the testimony of other fact witnesses including tenant families and employees and vendors of Defendants.

b.        By offering, marketing and leasing residential housing to Plaintiffs and class members that had water intrusion and mold contamination incidences far in excess of what was acceptable and reasonable;

c.        By unfairly and deceptively marketing lease offerings as coming with excellent customer service, repair and maintenance, when in fact that was not the case;

d.        By receiving payment in the form of the BAH for Plaintiffs and Class Members, where the BAH was calculated based on an assumption that it was paying for reasonable and safe housing, when in fact that was not the case;

e.         By conducting, sponsoring, or participating in resident satisfaction surveys that were inaccurate and misleading, and by using those inaccurate and misleading surveys to avoid oversight of their unacceptable housing practices;

f.         By maintaining customer service, repair and maintenance records and data that were inaccurate, incomplete, and unreliable, and by using that inaccurate and incomplete repair and maintenance data to avoid oversight of their unacceptable housing practices;

g.         By breaching the implied warranty of habitability, or other law, including as alleged in the other claims for relief; and

h.         By violating provisions and tenant protections stated by the Tenant Bill of Rights[39] by which Defendants were required to abide pursuant to 10 U.S.C. 10 U.S.C.A. § 2890, including subparts (1) to (18):

(1) The right to reside in a housing unit and community that meets applicable health and environmental standards.

(2) The right to reside in a housing unit that has working fixtures, appliances, and utilities and to reside in a community with well-maintained common areas and amenity spaces.

(3) The right to be provided with a maintenance history of the prospective housing unit before signing a lease, as provided in section 2892a of this title.

(4) The right to a written lease with clearly defined rental terms to establish tenancy in a housing unit, including any addendums and other regulations imposed by the landlord regarding occupancy of the housing unit and use of common areas.

(5) The right to a plain-language briefing, before signing a lease and 30 days after move-in, by the installation housing office on all rights and responsibilities associated with tenancy of the housing unit, including information regarding the existence of any additional fees authorized by the lease, any utilities payments, the procedures for submitting and tracking work orders, the identity of the military tenant advocate, and the dispute resolution process.

(6) The right to have sufficient time and opportunity to prepare and be present for move-in and move-out inspections, including an opportunity to obtain and complete necessary paperwork.

(7) The right to report inadequate housing standards or deficits in habitability of the housing unit to the landlord, the chain of command, and housing management office without fear of reprisal or retaliation, as provided in subsection (e), including reprisal or retaliation in the following forms:

(A) Unlawful recovery of, or attempt to recover, possession of the housing unit.

(B) Unlawfully increasing the rent, decreasing services, or increasing the obligations of a tenant.

---

[39] The Tenant Bill of Rights is also available on the Villages at Belvoir website: https://www.villagesatbelvoir.com/document-center.

(C) Interference with a tenant's right to privacy.

(D) Harassment of a tenant.

(E) Refusal to honor the terms of the lease.

(F) Interference with the career of a tenant.

(8) The right of access to a military tenant advocate, as provided in section 2894(b)(4) of this title, through the housing management office of the installation of the Department at which the housing unit is located.

(9) The right to receive property management services provided by a landlord that meet or exceed industry standards and that are performed by professionally and appropriately trained, responsive, and courteous customer service and maintenance staff.

(10) The right to have multiple, convenient methods to communicate directly with the landlord maintenance staff, and to receive consistently honest, accurate, straightforward, and responsive communications.

(11) The right to have access to an electronic work order system through which a tenant may request maintenance or repairs of a housing unit and track the progress of the work.

(12) With respect to maintenance and repairs to a housing unit, the right to the following:

(A) Prompt and professional maintenance and repair.

(B) To be informed of the required time frame for maintenance or repairs when a maintenance request is submitted.

(C) In the case of maintenance or repairs necessary to ensure habitability of a housing unit, to prompt relocation into suitable lodging or other housing at no cost to the tenant until the maintenance or repairs are completed.

(13) The right to receive advice from military legal assistance on procedures involving mechanisms for resolving disputes with the property management company or property manager to include mediation, arbitration, and filing claims against a landlord.

(14) The right to enter into a dispute resolution process, as provided in section 2894 of this title, should all other methods be exhausted and, in which case, a decision in favor of the tenant may include a reduction in rent or an amount to be reimbursed or credited to the tenant.

(15) The right to have the tenant's basic allowance housing payments segregated, with approval of a designated commander, and not used by the property owner, property manager, or landlord pending completion of the dispute resolution process.

(16) The right to have reasonable, advance notice of any entrance by a landlord, installation housing staff, or chain of command into the housing unit, except in the case of an emergency or abandonment of the housing unit.

(17) The right to not pay non-refundable fees or have application of rent credits arbitrarily held.

(18) The right to expect common documents, forms, and processes for housing units will be the same for all installations of the Department, to the maximum extent applicable without violating local, State, and Federal regulations.

742.    The conduct of Defendants as set forth herein was against established public policy of the State; was unethical, oppressive, unscrupulous, and substantially injurious to consumers; and had the capacity and tendency to deceive the average consumer.

743.    For example, Defendants require Plaintiffs and class members to sign a mold information and prevention addendum that seeks to shifting the landlord's obligation under VRTLA and Virginia statutes, and violate the Tenant Bill of Rights described above.

744.    Defendants unlawfully are increasing the obligations of a tenant and not using common documents and forms as required by the Tenant Bill of Rights in housing installations within the Department of Defense.

745.    Defendants have misrepresented the required scope of work for mold remediation and other maintenance and repairs.

746.    Defendants have omitted items from the scope of work after representing to the Plaintiffs and the class members that they would perform said work.

747.    Defendants have omitted prior instances of maintenance and repairs in the seven-year maintenance history for housing unit.

748.    Defendants are concealing by omission that prior confirmed mold tests showed the presence of toxic mold but was either omitted entirely or minimized.

749.    Defendants failed to properly remediate the housing units and misrepresented that the remediation was complete when they knew it had not been properly performed.

750.    For example the Defendants are required to supply a seven-year maintenance records at the time of the signing of the lease and upon request.  Defendants have failed to provide

the seven-year maintenance request to all Plaintiffs and class members.

751.    For example, the Defendants engaged in conduct which unlawfully increased the rent of the Plaintiffs and class members by demanding "double rent" when Plaintiffs and class members were displaced and also were waiting on remediation of their housing units.

752.    For example, the Defendants engaged in conduct which unlawfully increased the obligations of the Plaintiffs and class members by shifting the obligations of the landlord to the tenant to remediate mold in their own unit because of the new mold amendments required by TMO.

753.    For example, the Defendants were obligated in the case of maintenance or repairs necessary to ensure habitability of a housing unit to promptly relocate the Plaintiffs and class members to suitable lodging or other housing at no cost the Plaintiffs and class members until the maintenance or repairs were completed.  The Defendants engaged in conduct which was unlawful because they continued to charge the Plaintiffs and class members housing costs while maintenance or repairs were pending the habitability of the housing unit.

754.    For example, the Defendants engaged in conduct which was unlawful because during formal dispute resolution the Defendants failed to hold allotments of rental payments.

755.    For example, the Defendants engaged in conduct which was unlawful because during the Plaintiffs and class members pending resolution of the dispute process the Defendants failed to segregate the housing payments.

756.    For example, the Defendants engaged in conduct which was unlawful because the Defendants failed to give reasonable and advanced notice of entrance by the landlord upon the Plaintiffs and or class members housing unit.

757.    For example, the Defendants engaged in conduct which was unlawful because they failed to use common documents and forms which were the same for all installations of the department.

758.    During the pertinent times, Defendants were intentionally and systematically

"[m]isrepresenting that repairs, alterations, modifications, or services have been performed or parts installed" at the relevant residential units.  Va. Code § 59.1-200(A)(10)

759.    In fact, while the landlord expressly or impliedly represented that every home for rent was clean and safe for families with babies, the landlord knew that many of the homes were not.

760.    Under the circumstances the finder of fact could find that the landlord uniformly represented that all necessary repairs, alterations, modifications, or services have been performed for the homes to be clean and safe and suitable for military families, but for many of the homes this was false.

761.    During the class period, Defendants received numerous complaints and repair requests, including from Plaintiffs and class members.

762.    Many of the conditions complained of were the same unfit conditions identified by prior servicemember tenants of the same properties, units and buildings.

763.    Defendants had knowledge of this historical information regarding the rental properties, while the incoming new tenants did not.

764.    Defendants, by virtue of their course of administering, leasing, building and repairing units at Fort Belvoir, were uniquely aware of the condition of them, including the unacceptable and unsafe conditions and the existence of conditions likely to cause a substantial and unreasonable interference with the occupants' ability to use and enjoy the leased properties.

765.    Nevertheless, Defendants knowingly leased those units to Plaintiffs and class members, marketing and representing the communities to the Plaintiffs and class members as being safe, habitable, and well-serviced by the property managers.

766.    Had Plaintiffs and class members known in advance of the actual nature of the Defendants' leasing and property management practices and the actual condition of the units, they would not have entered into the leases on the terms proposed by Defendants.

767.    Defendants have used their 50-year ground lease business structure, the disparity in information available to the servicemembers and their families, the lack of transparency afforded to the servicemembers as well as regulators, the servicemembers' weaker economic position, and the limitations on families being able to break the lease and move, to effectively hold Plaintiffs' hostage in their leases until they received orders stationing them elsewhere.

768.    During the pertinent times, Defendants collected the full amount of the BAH, as income otherwise payable to the servicemember Plaintiffs, giving those Plaintiffs no discount for the size, quality, or condition of their house, nor for the inadequate repair and maintenance.

769.    During the class period, Defendants underpaid outside repair, maintenance and service vendors, chose ill-equipped and poorly trained vendors on the basis of cost, and imposed limits on the abilities of outside vendors to engage in repair and maintenance services, such that problems such as moisture intrusion and mold were likely to occur and once "repaired," were likely to recur.

770.    During the class period, Defendants engaged in arrangements with outside service vendors and used policies and procedures that resulted in unfairly transferring service, repair and maintenance costs off of the Defendants and onto the Plaintiffs and class members.

771.    Plaintiffs and class members suffered actual injury as a direct and proximate result of Defendants' unfair and deceptive conduct, including out-of-pocket costs for repair, service, maintenance, diagnostic, sampling, mold assessment, or cleaning products, and the overpayment of their BAH rent by comparison with the quality of the homes provided during the class period.

772.    Plaintiffs assert their claims within the statute of limitations to bring a claim under the VCPA within two years of accrual. Va. Code § 59.1-204.1.

773.    Accrual for actions for violations of the VCPA (§ 59.1-196 *et seq.*), when based upon any misrepresentation, deception, or fraud, is "when such fraud, mistake, misrepresentation, deception, or undue influence is discovered or by the exercise of due diligence reasonably should

have been discovered." Va. Code Ann. § 8.01-249(1).

774.    The time of accrual of the two-year statute of limitations only accrues when it reasonably should have been discovered and should be tolled under the circumstances due to the concealed aspects of certain of Defendants' fraudulent practices.[40]

775.    Plaintiffs and class members only recently discovered Defendants fraudulent practices, misrepresentation, and violations of the VCPA.

776.    Defendants violated the obligations set forth in the Tenant Bill of Rights and misrepresented their compliance thereof which is a further violation of the VCPA.

777.    All of these foregoing acts of Defendants as well as such other concealment, misrepresentations, and deception by Defendants that may be discovered during litigation of this case are violations of the Virginia Code § 59.1-200(A), including subparts (2), (5), (6), (10), (13), (13a), (14), (17), and (46).

778.    As a direct and proximate result of Defendants' violation of the VCPA, Plaintiffs and the class members have suffered damages. Any person who suffers loss as the result of a violation of the VCPA is entitled to recover actual damages, or $500, whichever is greater. If the trier of fact finds that the violation was willful, such person is entitled to recover increased damages to an amount not exceeding three times the actual damages sustained, or $1,000, whichever is greater. Virginia Code § 59.1-204(A).

779.    Pursuant to Virginia Code § 59.1-204(B), Plaintiffs are entitled to an award of reasonable attorneys' fees and Court costs because of Defendants' violation of the VCPA.

---

[40] *See* Va. Code § 8.01-230; *cf*. Va. Code § 8.01-243 ("every action for damages resulting from fraud, shall be brought within two years after the cause of action accrues."); Va. Code § 59.1-204.1 ("Any individual action pursuant to § 59.1-204 for which the right to bring such action first accrues on or after July 1, 1995, shall be commenced within two years after such accrual. The cause of action shall accrue as provided in§ 8.01-230."). *See also Broadnax v. Dep't of Veteran Affairs Washington Mut. Bank*, No. 2:04CV693, 2005 WL 1185809, at *6 (E.D. Va. May 19, 2005) (discussing the statutes of limitations for common law and statutory fraud).

780.    Plaintiffs and class members have been damaged and are entitled to recover compensatory damages, treble damages and reasonable attorney's fees and expenses.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF THE VIRGINIA RESIDENTIAL LANDLORD/TENANT ACT
## CHAPTER 12 § 59.1-1200 THROUGH § 59.1-1262

781.    Plaintiffs re-allege the above referenced paragraphs as if fully set forth herein.

782.    This claim is brought by Plaintiffs individually and on behalf of a subclass of all class members who were occupants of residential units at Fort Belvoir for which Defendants, or any one of them, were the owner or property manager within the last three years.

783.     During the pertinent times, Defendants had a duty to provide fit and habitable housing under the Virginia Residential Landlord and Tenant Act and/or Virginia common law.

784.    Virginia Code § 55.1-1220 provides that landlords shall, in part:

A.    Comply with the requirements of applicable building and housing codes materially affecting health and safety;

B.    Make all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition;

C.    Keep all common areas shared by two or more dwelling units of a multifamily premises in a clean and structurally safe condition;

D.    Maintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating, air-conditioning, and other facilities and appliances, including elevators, supplied or required to be supplied by him;

E.    Maintain the premises in such a condition as to prevent the accumulation of moisture and the growth of mold and promptly respond to any notices from a tenant as provided in subdivision A 10 of § 55.1-1227 and § 55.1-1220. Where there is visible evidence of mold, the landlord shall promptly remediate the mold conditions in accordance with the requirements of subsection E of § 8.01-226.12 § 55.1-1231 and reinspect the dwelling unit to confirm that there is no longer visible evidence of mold in the dwelling unit. The landlord shall provide a tenant with a copy of a summary of information related to mold remediation occurring during that tenancy and, upon request of the tenant, make available the full package of such information and reports not protected by attorney-client privilege. Once the mold has been remediated in accordance with professional standards, the landlord shall not be required to make disclosures of a past incidence of mold to subsequent tenants;

F.      Provide and maintain appropriate receptacles and conveniences for the collection, storage, and removal of ashes, garbage, rubbish, and other waste incidental to the occupancy of dwelling units and arrange for the removal of same;

G.      Supply running water and reasonable amounts of hot water at all times and reasonable air conditioning if provided and heat in season except where the dwelling unit is so constructed that heat, air conditioning, or hot water is generated by an installation within the exclusive control of the tenant or supplied by a direct public utility connection; and

H.      Provide a certificate to the tenant stating that all smoke alarms are present, have been inspected, and are in good working order no more than once every 12 months. The landlord, his employee, or an independent contractor may perform the inspection to determine that the smoke alarm is in good working order.

785.    Virginia Code Section 55.1-1215 states:

"As part of the written report of the move-in inspection required by § 55.1-1214, the landlord shall disclose whether there is any visible evidence of mold in areas readily accessible within the interior of the dwelling unit. If the landlord's written disclosure states that there is no visible evidence of mold in the dwelling unit, this written statement shall be deemed correct unless the tenant objects to it in writing within five days after receiving the report. If the landlord's written disclosure states that there is visible evidence of mold in the dwelling unit, the tenant shall have the option to terminate the tenancy and not take possession or remain in possession of the dwelling unit. If the tenant requests to take possession, or remain in possession, of the dwelling unit, notwithstanding the presence of visible evidence of mold, the landlord shall promptly remediate the mold condition but in no event later than five business days after the tenant's request to take possession or decision to remain in possession, reinspect the dwelling unit to confirm that there is no visible evidence of mold in the dwelling unit, and prepare a new report stating that there is no visible evidence of mold in the dwelling unit upon reinspection."

786.    During all relevant times, Defendants were the owners and a contracting party pursuant to the leases and otherwise subject to the coverage of the Virginia Residential Landlord/Tenant Act.

787.    During all relevant times, Defendants acted as the property manager and a contracting party pursuant to the leases, an agent of the owner, or otherwise were materially involved in providing property management services under the leases and subject to the coverage of the Virginia Residential Landlord/Tenant Act.

788.    During all relevant times, some or all of the Defendants had actual or apparent

authority to perform the landlords' obligations under the leases and the Virginia Residential Landlord/Tenant Act and did perform such duties, or otherwise were subject to the coverage of the Virginia Residential Landlord/Tenant Act.

789.    During all relevant times, Virginia Residential Landlord/Tenant Act required Defendants to comply with the current applicable codes governing residential construction, required Defendants to make all repairs and do whatever necessary to put and keep the tenants' premises in a fit and habitable condition, required Defendants, within a reasonable period of time based upon the severity of the condition, to repair or remedy any imminently dangerous condition after acquiring knowledge or receiving notice.

790.    During the pertinent times, Defendants had knowledge regarding the recurrent problems of all of the housing units at Fort Belvoir.  Plaintiffs and class members did not.  During the pertinent times, Defendants received numerous tenant complaints regarding residential problems and defects.  Under the facts and circumstances, Plaintiffs and class members should be deemed to have satisfied any applicable notice requirement for purposes of triggering any Virginia Residential Landlord/Tenant Act duties that had a notice prerequisite.

791.    During the class period, Defendants impliedly warranted to Plaintiffs and class members that the premises available for lease were in fit and habitable condition.  In fact, Defendants knew that an unacceptably high proportion of units had mold, insects, defective HVAC systems or other deficiencies.  Nonetheless, Defendants held out their privatized housing at Fort Belvoir to be high-quality and safe.

792.    The units leased by Plaintiffs and class members have had moisture intrusion, mold, insects, defective HVAC systems and other conditions which threatened the health and safety of family members.  Defendants had adequate time to repair and remedy the unsafe and unsanitary conditions after years of complaints and repair requests but failed to make a reasonable effort to repair and remedy the defective conditions.

793.    During the pertinent times Defendants violated Virginia Residential Landlord/Tenant Act and the implied warranty of habitability as to Plaintiffs and class members, thereby proximately causing injury to the Plaintiffs and class members.

794.    As a direct and proximate result of Defendants' breaches of the implied warranty of habitability, Plaintiffs and class members were injured, and are entitled to damages and declaratory, injunctive or equitable relief to the extent available.

795.    Under Va. Code § 55.1-1220(B), "[t]he landlord shall perform the duties imposed by subsection A in accordance with law; however, the landlord shall only be liable for the tenant's actual damages proximately caused by the landlord's failure to exercise ordinary care."

796.    Here, under the circumstances, the "actual damages" should be allowed to include damages for loss of use, discomfort, irritation, annoyance and emotional distress damages.[41]  In addition, "actual damages" should be deemed to include all of Plaintiffs' BAH payments.    In addition, or in the alternative, Plaintiffs' evidence that Defendants violated their duties under the landlord and tenant statute goes to support Plaintiffs' claims for breach of contract and for restitution of all BAH monies, and for private nuisance.

797.    Defendants breached their implied warranty of habitability thereby proximately causing damages to Plaintiffs and class members, including out-of-pocket costs, costs representing the labor value of needless time consumed by residents seeking to repair and maintain units themselves, and monies representing the overpayment of BAH rent amounts in whole or in part exceeding the reasonable rental value of the units during the period of occupancy.

### THIRD  CLAIM FOR RELIEF
### BREACH OF CONTRACT

798.    Plaintiffs re-allege the above referenced paragraphs as if fully set forth herein.

---

[41] See Restatement (Second) of Torts § 929 & comment e (home occupant entitled to damages for discomfort and annoyance).

799.    This claim is brought by Plaintiffs individually and on behalf of a subclass of all class members who were servicemember lessees under leases with Defendant FBRC as owner, lessor and property manager, with regard to residential units at Fort Belvoir within the last five years.  During the pertinent times, servicemember Plaintiffs and class members entered into valid contracts with Defendant in the form of residential leases.

800.    This claim is brought within Virginia's five-year statute of limitations.[42]

801.    The leases and incorporated materials imposed explicit and implicit duties on Defendant, as owner, to perform the contract so as to ensure the units were fit for human habitation. During the pertinent times, Defendant warranted that units were reasonably safe and habitable for occupancy.

802.    During the pertinent times, Defendant failed to comply with the material terms of the leases by failing to ensure the houses were fit for human habitation and by failing to diligently repair and remedy the conditions affecting habitation.  Defendant breached provisions of the form lease and incorporated materials including by failing to provide adequate repair and maintenance services to residents.

803.    A contract carries with it an implied covenant by the parties to act fairly and in good faith in carrying out the agreement.   Defendant here had a duty to act fairly and in good faith in

---

[42] Under Virginia law, an action based upon a written contract must be filed within five years of accrual.  *See* Va. Code § 8.01-246(2) ("Subject to the provisions of § 8.01-243 regarding injuries to person and property and of § 8.01-245 regarding the application of limitations to fiduciaries, and their bonds, actions founded upon a contract, other than actions on a judgment or decree, shall be brought within the following number of years next after the cause of action shall have accrued: … 2. In actions on any contract that is not otherwise specified and that is in writing and signed by the party to be charged thereby, or by his agent, within five years whether such writing be under seal or not…."  Under Va. Code § 8.01-230, "In every action for which a limitation period is prescribed, the right of action shall be deemed to accrue and the prescribed limitation period shall begin to run from the date the injury is sustained in the case of injury to the person or damage to property, when the breach of contract occurs in actions ex contractu and not when the resulting damage is discovered, except where the relief sought is solely equitable or where otherwise provided under § 8.01-233, subsection C of § 8.01-245, §§ 8.01-249, 8.01-250 or other statute."

connection with performance under the residential leases herein.

804.    Defendants further violated the tenant protections stated by the Tenant Bill of Rights which protections are expressly included and/or implied into the landlord-tenant contract.

805.    Defendants also materially breached the landlord-tenant contract by the numerous acts that constitute violations of the VCPA and VRTLA as previously alleged herein.

806.    Defendant had an implicit obligation to act in good faith and make reasonable efforts to perform their obligations under the leases including, but not limited to, keeping the units safe and habitable, providing adequate repair and maintenance services, providing honest information to the tenants, and not using Defendant's vastly more powerful economic position to oppress and intimidate families.  During the pertinent times, Defendant breached the implied covenant of good faith and fair dealing.

807.    Plaintiffs sustained damages as a result of Defendant's breaches of contract including the overpayment of rent, as well as incurring of out-of-pocket expenses and other consequential and special damages in an amount to be proven at trial.

808.    As a proximate and legal result of Defendant's breaches of contract, Class Plaintiffs and Class Members are entitled to an award of all their actual and consequential damages including, any applicable attorneys' fees and costs, in amounts to be proven at trial.

**FOURTH CLAIM FOR RELIEF**
**TEMPORARY RECURRENT PRIVATE NUISANCE**

809.    Plaintiffs re-allege the above referenced paragraphs as if fully set forth herein.

810.    This claim is brought by Plaintiffs individually and on behalf of a subclass of all class members who were occupants of residential units at Fort Belvoir within the last five years. The claim is brought solely against Defendant FBRC.

811.     The Plaintiffs and class members who occupied the residential units during the pertinent times have standing to bring this claim due to their possessory and occupancy interests.

812.    During the pertinent times, the Defendant proximately caused the Plaintiffs and class members to incur a substantial and unreasonable interference with their ability to use and enjoy their leasehold properties.

813.    As a direct and proximate result of Defendant's creation and maintenance of a temporary and recurrent private nuisance, the Plaintiffs and Class Members have each been injured and/or will continue to suffer the particular damages and injuries alleged herein.

814.    Plaintiffs bring their private nuisance claim within the applicable five-year statute of limitations.[43]

815.    The nuisance conditions herein are abatable, but Defendant unreasonably refused to abate them.  Therefore, these nuisance conditions were under the control of the Defendant, which injuriously affected each of the Plaintiffs and Class Members individually who occupied the premises resulting in continuous interference with the enjoyment and occupation of the premises. As a result of the Defendant's creation and maintenance of a private nuisance, the Plaintiffs and class members are entitled to compensatory damages and to injunctive relief in the form of an order requiring Defendant to abate the further persistence of the private nuisance.

## **JURY DEMAND**

Plaintiffs respectfully demand a trial by jury of all claims so triable.

---

[43] *See Adams v. Star Enterprise*, 851 F. Supp. 770, 771 n.1 (E.D. Va. 1994).  That court explained: Virginia's five-year statute of limitations covers "every action for injury to property." Va. Code Ann. § 8.01-243(B).  The court said that the essence of plaintiffs' action was that the potential spread of an oil plume depressed their property values. The action had "as its focus not relief from injury to the plaintiffs' persons, but to their property, and thus is subject to a five-year limitation under Virginia law." *Id.*, citing *Chesapeake Bay Found., Inc. v. Virginia State Water Control Bd.*, 501 F. Supp. 821, 825 (E.D. Va. 1980).  Here, the Plaintiffs claim both injunctive and damages relief.  While the Plaintiffs claim that one result of Defendants' misconduct was to make them fear adverse health effects, and in fact some family members claim they ***have*** had negative health effects, Plaintiffs do not seek the type of damages that would obligate them to put on individualized medical causation experts.  Rather, they seek damages connected with their home and property interest – the homestead is traditionally afforded special legal protection, and ***loss of use and enjoyment*** can be accounted for in a private nuisance verdict.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in their favor against Defendants as follows:

1.      For designation of the Plaintiffs as class representatives;

2.      For appointment of the undersigned counsel as class counsel;

3.      For certification of a class and specified subclasses with regard to the Plaintiffs' stated claims for relief, and/or with regard to one or more common issues under Rule 23;

4.      For an award of actual, compensatory, special, and consequential damages in an amount to be proven at trial;

5.      For an award of treble damages;

6.      For an award of rent abatement, in whole or in part, restitution, or disgorgement of monies;

7.      For an award of reasonable attorneys' fees and costs;

8.      For an award of punitive damages;

9.      For equitable relief to abate a nuisance; and

10.     For such other and further relief as the Court may deem just and proper.


DATED: December 9, 2022          Respectfully submitted,


/s/ David Hilton Wise
David Hilton Wise, VA Bar No. 30828
Joseph M. Langone, VA Bar No. 43543
WISE LAW FIRM PLC
10640 Page Avenue, Suite 320
Fairfax, Virginia 22030
Phone: 703-934-6377
dwise@wiselaw.pro
jlangone@wiselaw.pro
*Counsel for Plaintiffs*

Joel R. Rhine, NC State Bar No. 16028
Martin A. Ramey, NC State Bar No. 33617

Ruth A. Sheehan, NC State Bar No. 48069
RHINE LAW FIRM, P.C.
1612 Military Cutoff Rd., Suite 300
Wilmington, NC 28403
Phone: 910-772-9960
jrr@rhinelawfirm.com
mjr@rhinelawfirm.com
RAS@rhinelawfirm.com
*Counsel for Plaintiffs*

Mona Lisa Wallace, NC State Bar No. 009201
John Hughes, NC State Bar No. 22126
WALLACE AND GRAHAM, PA.
525 N. Main Street
Salisbury, NC 28144
Phone: 704-633-5244
mwallace@wallacegraham.com
jhughes@wallacegraham.com
*Counsel for Plaintiffs*

John A. Yanchunis, FL Bar No. 324681
Kenya Reddy, FL Bar No. 459933
MORGAN & MORGAN LAW FIRM
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Phone: 813-223-5505
JYanchunis@ForThePeople.com
KReddy@ForThePeople.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of December, 2022, a copy of the foregoing *Stipulation* was served electronically through CM/ECF on:

Kathryn E. Bonorchis #80007
Joseph Doukmetzian, 91685
Lewis, Brisbois, Bisgaard & Smith, LLP
100 Light Street, Suite 1300
Baltimore, Maryland, 21202
Telephone: 410-525-6409
Fax: 410-779-3910
Kathryn.Bonorchis@lewisbrisbois.com
Joseph.Doukmetzian@lewisbrisbois.com
*Attorneys for Defendants*

/s/ David Hilton Wise
David Hilton Wise, VA Bar No. 30828
Joseph M. Langone, VA Bar No. 43543
WISE LAW FIRM PLC
10640 Page Avenue, Suite 320
Fairfax, Virginia 22030
Phone: 703-934-6377
dwise@wiselaw.pro
jlangone@wiselaw.pro
*Counsel for Plaintiffs*