**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| Chief Petty Officer JOHN FISCHER and ASHLEY FISCHER, *et al.* | * | |
| | * | |
| | * | |
| *Plaintiffs*, | * | |
| | * | |
| v. | * | Case No. 1:22-cv-00286 |
| | * | |
| FORT BELVOIR RESIDENTIAL COMMUNITIES LLC, *et al.* | * | |
| | * | |
| | * | |
| *Defendants.* | * | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS VCPA CLAIM, OR IN THE ALTERNATIVE, MOTION TO STRIKE PORTIONS OF PLAINTIFFS' THIRD AMNEDED COMPLAINT**

Pursuant to LCVR 7, Plaintiffs hereby file their opposition to the Motion to Dismiss Plaintiffs' Virginia Consumer Protection Act ("VCPA") claims, or in the alternative, Motion to Strike portions of the Third Amended Complaint [ECF 62] filed by Defendants, Fort Belvoir Residential Communities LLC ("FRBC"), Michaels Management Services, Inc. ("Michaels"), and MMS Army, LLC ("MMS")[1], stating as follows:

## I.    INTRODUCTION

Defendants contend that the claim for violation of the VCPA claim should be dismissed because the exception making a landlord liable under the VPCA has not been met.  The Defendants ignore the clear allegations regarding the Defendants' actions and practices as a landlord which constitute misrepresentations or fraudulent acts or practices under the VCPA.  Virginia Code §59.1-199(E) excludes from the VCPA "[a]ny aspect of a consumer transaction which is subject to the Virginia Residential Landlord and Tenant Act ["VRTLA"] unless the "*act or practice of a*

---

[1]    Defendants are also collectively referred to herein as "TMO."

Page 1

*landlord constitutes a misrepresentation or fraudulent act or practice under § 59.1-200."* Va. Code Ann. § 59.1-199 (emphasis added). The Plaintiffs have alleged such misrepresentations and fraudulent acts and practices on the part of the Defendants.

Next, Defendants argue, incorrectly, that Plaintiffs have not alleged with particularity the misrepresentation, reliance, and damages. Even a causal reading of the complaint demonstrates that Plaintiffs have fully informed the Defendants of the basis of the VCPA claims and the damages claimed as a result. Finally, Defendants argue that the VCPA claims by fifteen (15) of the Plaintiffs are time barred by the two-year statute of limitation for VCPA claims. This argument seeks only partial dismissal of the VCPA claims as the Defendants concede, as they must, that the VCPA claims by the remaining seventeen (17) other Plaintiffs are not time barred. The Defendants fail to acknowledge, however, that the statute of limitations for a VCPA claim is subject to the discovery rule, which is beyond the scope of a motion to dismiss. Such an issue may only be resolved by the trier of fact if there is any dispute. Here, all Plaintiffs contend that the VCPA claims are timely. Accordingly, the entire motion to dismiss must be denied in its entirety.

Finally, Defendants make an alternative motion to strike paragraph 696 of third amended complaint because it involves a "non-party." The alleged non-party is Clark Realty, who was FBRC's prior property manager at Ft. Belvoir. Clark Realty, like the subsequent property managers who are named Defendants in this case, Michaels and MMS, are all agents of the landlord, FBRC, whose actions and knowledge are all imputed to the landlord. There is no justification to strike a single paragraph of the third amended class action complaint involving FBRC's prior property manager.

## II.    PROCEDURAL HISTORY

On December 9, 2022, the Court entered an order [ECF 53] granting Plaintiffs' motion for

leave to file a third amended complaint [ECF 45]. Defendants now contend that Plaintiffs were not granted leave to include paragraph 696 in the third amended complaint. The Defendants fail to acknowledge that the motion for leave to file the third amended complaint, filed on November 16, 2022, attached as an exhibit a proposed copy of the third amended complaint which included the same paragraph 696. [*See* ECF 45-1, ¶696, pp. 129-130]. The Court rejected Defendants argument that "Plaintiffs previously agreed to dismiss" paragraph 696, which was not true, when it granted Plaintiffs' motion to file the third amended complaint in the form attached as an exhibit thereto. As ordered by the Court, Plaintiffs filed the same version of the third amended class action complaint as a separate docket entry on December 9, 2022. [ECF 53].

Defendants also fail to acknowledge that one of the reasons Plaintiffs sought to include the VCPA claim was because other federal courts have recognized that a VCPA claim can proceed as a class action claim and that the facts of this case are perfectly suited for a class action VCPA claim. In their motion for leave to amend, the Plaintiffs cited a number of federal cases that held a plaintiff could pursue a VCPA claim as a class action:

> By contrast, Virginia's prohibition is in Virginia's procedural law, not the substantive VCPA. *In re Hardieplank Fiber Cement Siding Litig.*, No. 12-MD-2359, 2013 U.S. Dist. LEXIS 98277, 2013 WL 3717743, at *17 (D. Minn. July 15, 2013) ("The absence of a class action right under the VCPA is the 'default' position under Virginia law, rather than a provision of the VCPA itself. Thus, [the] Court concludes that the lack of a class action mechanism is a procedural matter, rather than a substantive law . . . ."). Because Virginia's class action ban is not part of the VCPA, and applies outside the context of the VCPA, it is procedural rather than substantive, and is precluded by Rule 23. Virginia's ban on class actions therefore does not apply here…. The Court will certify Plaintiffs' claim for … violation of the Virginia Consumer Protection Act.

*In re MyFord Touch Consumer Litig.,* No. 13-CV-03072-EMC, 2016 WL 7734558, at *27 (N.D. Cal. Sept. 14, 2016); *see also Fishon v. Mars Petcare US, Inc.*, 501 F. Supp. 3d 555 (M.D. Tenn. 2020) (finding Fed. R. Civ. P. 23 preempts Virginia law prohibiting class action treatment of

claims under the VCPA); *Milisits v. FCA US LLC*, No. 20-CV-11578, 2021 WL 3145704, at *12 (E.D. Mich. July 26, 2021) (same); *In re Hardieplank Fiber Cement Siding Litig.*, , 2013 WL 3717743, at *17 (Federal Rule of Civil Procedure 23 governs the availability of a class action under the VCPA).

The third amended class action complaint asserts six separate causes of action on behalf of thirty-two (32) named Plaintiffs, who assert the claims on their own behalf and on behalf of a class of others similarly situated.  The pending motion to dismiss [ECF 62] and supporting memorandum [ECF 62-1] seek dismissal of only one of the class action counts:  Count I for violation of the VCPA.  For the reasons set forth herein Defendants' motion should be dismissed in its entirety.

### III.   LEGAL STANDARD

#### A.   Standard of review under a Rule 12(b)(6) Motion to Dismiss.

A well-pleaded complaint must contain only "a short, plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When considering a 12(b)(6) motion, "[t]he [c]ourt must assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations, and construe the facts in the light most favorable to the plaintiff." *State Analysis, Inc. v. Am. Fin. Services Assoc.*, 621 F. Supp. 2d 309, 315, 2009 WL 855793 (E.D. Va. 2009) (internal citations omitted).  In addition to viewing the facts in the light favorable to the nonmovant, courts must "draw all reasonable inferences in favor of the plaintiff." *Ridenour v. Multi-Color Corp.*, 147 F.Supp.3d 452, 455 (E.D. Va. 2015) (quoting *Kensington Volunteer Fire Dep't v. Montgomery Cnty*, 684 F.3d 462, 467 (4th Cir. 2012)).

#### B.   Standard of review under a Rule 12(f) Motion to Strike

The court should use Rule 12(f) sparingly, as motions to strike are generally viewed with

disfavor. *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001). A motion to strike should only be granted when the allegations have "no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action." *Bailey v. Fairfax Cty.*, No. 1:10-cv-1031, 2010 WL 5300874, *4 (E.D. Va. Dec. 21, 2010) (quoting Wright & Miller, supra);*see also Augustus v. Bd. of Pub. Instruction of Escambia Cry., Fla.*, 306 F.2d 862, 868 (5th Cir. 1962) ("[A motion to strike] is a drastic remedy to be resorted to only when required for the purposes of justice [and] should be granted only when the pleading to be stricken has no possible relation to the controversy."). Furthermore, "[a] disputed question of fact cannot be decided on motion to strike." *Id.* In such circumstances, the court should defer action on the motion and leave the sufficiency of the allegations for determination on the merits. Thus, the movant under Rule 12(f) faces a "sizeable burden." *Clark v. Milam*, 152 F.R.D. 66, 70 (S.D. W. Va. 1993).

**IV.    ARGUMENT.**

**A.    Plaintiffs have alleged acts and practices of a landlord that constitutes misrepresentation or fraudulent acts or practices under the VCPA.**

Defendants seek to dismiss the VCPA claim because the claims are also subject to the Virginia Residential Landlord and Tenant Act ("VRLTA"). Plaintiffs' VCPA claims in the Third Amended Class Action Complaint are based on the acts and practice of a landlord that constitutes a misrepresentation or fraudulent act or practice, which is expressly permitted under the VCPA. Virginia Code §59.1-199(E).  Thus, if an aspect of a consumer transaction otherwise subject to the VRTLA constitutes a misrepresentation or fraudulent act or practice by a landlord, the tenant can bring both a VCPA and VRTLA claim.  Plaintiffs are allowed to plead both VRTLA and VCPA claims based on fraud. Fed. R. Civ. P. 8(a)(3) (alternative relief) and 8(d)(2) (alternative statements).

As recognized by the Fourth Circuit, a claim otherwise governed by the Virginia Residential Landlord and Tenant Act may also proceed under the Consumer Protection Act where allegations of fraud exist. *Miller v. Charles E. Smith Mgmt., Inc.*, No. 96-2636, 1999 U.S. App. LEXIS 1013, *8-9 (4th Cir. Jan. 26, 1999) (reversing dismissal of VCPA claim against a landlord when fraud alleged satisfied the exception included in Virginia Code § 59.1-199(E)).  This Court made the same finding regarding a VCPA claim brought by a military family against the same landlord Defendants in this case and who were represented by the same counsel. "Although the VCPA does not generally apply to transactions subject to the VRLTA, it does apply when 'the act or practice of a landlord constitutes a misrepresentation or fraudulent act or practice.'" *Finney v. Clark Realty Capital, LLC*, No. 1:20-CV-93, 2020 WL 6948181, at *12 n.6 (E.D. Va. Aug. 6, 2020) (quoting Va. Code §59.1-199(E)).

The VCPA is remedial legislation, intended to promote fair and ethical standards of dealings between suppliers and the public. Va. Code § 59.1-197. "Proof of fraud in a consumer transaction is alone sufficient to establish a violation of the VCPA," but the statutory cause of action extends beyond fraud as well.  *Id.,* 2020 WL 6948181 at *10 (citing *Owens v. DRS Auto. Fantomworks, Inc.*, 288 Va. 489, 497, 764 S.E.2d 256, 260 (2014)); *Interbuild, Inc. v. Sayres*, 94 Va. Cir. 261, 267 (Fairfax Cir. Ct. 2016) (VCPA was enacted with the intent that shall be applied as remedial legislation to promote fair and ethical standards of dealings between suppliers and the consuming public).

To state a claim under the VCPA, a plaintiff must allege, "fraudulent acts or practices committed by a supplier in a consumer transaction." Va. Code § 59.1-200(A); *Nahigian v. Juno Loudoun, LLC*, 684 F. Supp. 2d 731, 741 (E.D. Va. 2010). "Consumer transaction" is a statutorily defined term as "[t]he advertisement, sale, lease, license or offering for sale, lease or license, of

goods or services to be used primarily for personal, family or household purposes." Va. Code § 59.1-198. Prohibited acts include the use of "deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va.Code § 59.1-200(A)(14). "The VCPA clearly does not require the consumer to prove in every case that misrepresentations were made knowingly or with the intent to deceive." *Owens,* 288 Va. at 497, 764 S.E.2d at 260. In *Finney*, this Court denied the landlord's motion to dismiss the VCPA claims because the Court properly found that the plaintiffs alleged misrepresentations that were made in connection with the sale of mold remediation services which occurred for household purposes, noting that the "remediation occurred in relation to Plaintiffs' residence, where they lived, breathed, and lawfully maintained their property." *Finney,* 2020 WL 6948181 at *10.

In *Interbuild,* the plaintiff asserted a VCPA claim against a contractor. The trial court found that the allegations that the contractor misrepresented that it would supply 4,000 PSI concrete, that the goods or services contracted for would be provided for the price advertised, that the contractor would provide appropriate full-time supervision of the work, that the Project would be completed within 16 weeks by the end of the summer, and that the Project would be located in the agreed-upon area depicted were among the unlawful misrepresentations contemplated by Code § 59.1-200 and support the type of misrepresentations that are actionable under the VCPA. *Interbuild,* 94 Va. Cir. at 267.

### B. Plaintiffs' VCPA Claims Are Plead with Sufficient Particularity.

Defendants argue that Plaintiffs have failed to adequately allege the circumstances of misrepresentation or fraud with particularity. Defendants cite to two Fairfax Circuit opinions, *Johnston v. Stephan*, 97 Va. Cir. 115, 122 (Fairfax Cir. Ct. 2017), and *Weiss v. Cassidy Dev. Corp*., 63 Va. Cir. 76, 78 (Fairfax Cir. Ct. 2003), for the proposition that a claim under the VCPA requires

allegations with "requisite specificity, including identification of the agents, officers and employees of the entities who are alleged to have perpetrated the fraud and the details of time and place of the fraudulent acts."   Both of these state trial court decisions are distinguishable and did not involve the same type of systematic concealment and fraudulent practices that are being asserted against the landlord Defendants in this case.   In *Johnson,* the trial court found that the homeowner's did not allege that the contractor "misrepresented a material fact or that Defendant knowingly made a misrepresentation" and had "not alleged all of the required elements for this cause of action." *Johnston v. Stephan*, 97 Va. Cir. 115, 122 (Cir. Ct. 2017).  In *Weiss v. Cassidy Dev. Corp*., 63 Va. Cir. 76, 78 (Cir. Ct. 2003), the Fairfax Circuit Court relied on *Tuscarora v. B.V.A*., 218 Va. 849, 858, 241 S.E.2d 778, 783 (1978), which was a fraud case, not a VCPA case. In *Tuscarora*, the Virginia Supreme Court held that for fraud, the allegations must contain the "requisite specificity, including identification of the agents, officers and employees of the entities who are alleged to have perpetrated the fraud and the details of time and place of the fraudulent acts," all of which are required to be proven by clear and convincing evidence. *Tuscarora* involved claims of actual or constructive fraud, not VCPA, and the allegations for fraud require specificity required to make out a case of fraud, including the "identities of the agents, officers, and employees of BVA who are alleged to have perpetrated the fraud are not revealed, or the details of the time and place where the fraudulent acts occurred." *Tuscarora,* 218 Va. at 858, 241 S.E.2d at 783.

The claims of fraud and misrepresentation made under the VCPA (§59.1–200(A)(14)) are vastly distinct from claims for fraud and misrepresentations made under the common law. First, the misrepresentations providing the basis of a VCPA claim need not be plead with the same kind of particularity as common law fraud claims. *Nigh v. Koons Buick Pontiac GMC, Inc*., 143 F. Supp. 2d 535, 553 (E.D. Va. 2001).

The proof required at trial is different between these claims.  A plaintiff asserting a VCPA claim need only prove a violation of the VCPA by a preponderance of the evidence rather than by clear and convincing evidence as required by common law fraud.  *Ballagh v. Fauber Enterprises, Inc.*, 290 Va. 120, 124, 773 S.E.2d 366, 367 (2015). The legislative purpose of the VCPA was, in large part, to expand the remedies afforded to consumers and to relax the restrictions imposed upon them by the common law.... Therefore, [it] extends considerably beyond fraud. *Id.; Owens,* 288 Va. at 497, 764 S.E.2d at 260) (General Assembly's purpose in passing the VCPA was largely to expand the remedies afforded to consumers and to relax the restrictions the common law imposed on them). The elements of common law fraud and claims under the VCPA are different. *Ballagh at 124*; *Wilkins v. Peninsula Motor Cars,* 266 Va. 558, 562, 587 S.E.2d 581, 584 (2003). Thus, a VCPA claim must be liberally construed in favor of consumers. *Ballagh,* 290 Va.at 124.

Plaintiffs acknowledge that the Fourth Circuit has held a "proposed VCPA claim would be governed by the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure." *Wynn's Extended Care, Inc. v. Bradley*, 619 F. App'x 216, 220 (4th Cir. 2015).  Under Fed. R. Civ. P. 9(b), Bradley was "required to state with particularity the circumstances constituting fraud or mistake," including "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Id.* Here, Plaintiffs have pled with particularity the circumstances that constitute the landlord's liability under the VCPA for their misrepresentation and deceptive practice as required by Rule 9(b).

"Virginia courts have routinely held that concealment or withholding information can be considered a fraudulent act." *Finney*, 2022 WL 303245, at *5 (citing *Guy v. Tidewater Inc. Props.*, 41 Va. Cir. 218, 230 (Va. Cir. Ct. 1996) (collecting cases) (in a claim brought under the VCPA,

the concealment is the equivalent of an express misrepresentation.). A "number of courts have held that Rule 9(b)'s particularity requirements are less formulaic with fraud claims based on omissions of material fact." *Fravel v. Ford Motor Co.*, 973 F. Supp. 2d 651, 656-57 (W.D. Va. 2013) (citing *Ademiluyi v. PennyMac Mortgage Inv. Trust Holdings I, LLC*, 929 F. Supp. 2d 502, 533 (D. Md. 2013) (holding that Rule 9(b) is "less strictly applied" with respect to claims of fraud by omission of material facts, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation'"); *Piotrowski v. Wells Fargo Bank, N.A.*, CIV.A. DKC 11–3758, 2013 WL 247549, at *5 (D. Md. Jan. 22, 2013) ("In cases involving concealment or omissions of material facts ... meeting Rule 9(b)'s particularity requirement will likely take a different form.")).

As another district court explained in *Scott v. GMAC Mortgage, LLC*, there are "four purposes for the heightened requirements that serve to guide a court's consideration of whether the Rule 9(b) standard has been met." *Scott v. GMAC Mortgage, LLC*, No. 3:10-CV-00024, 2010 WL 3340518, at *8 (W.D. Va. Aug. 25, 2010). The rule (1) "ensures that defendants have sufficient information to formulate a defense"; (2) "offers protection to defendants from frivolous suits"; (3) "eliminates fraud actions in which all the facts are learned after discovery"; and (4) "protects defendants' reputations." *Id.* (citing *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir.1999)). On this basis, the *Scott* court held that the plaintiffs, who alleged that the defendant's loan officer had made fraudulent misrepresentations during the provision of their mortgage, had plead their case with sufficient particularity to satisfies Rule 9(b) and to allow the defendant to raise a defense. *Id.* at *3. The court held that it was not necessary to name the specific representative of the defendant that made the misrepresentations, nor the precise location, date, and hour at which the representative allegedly made the misrepresentations. *Id.* Instead, it was

sufficient to merely identify the defendant corporate entity and provide general allegations of when and where the misrepresentations were made. *Id.*; *see also Nahigian v. Juno Loudoun, LLC*, 684 F.Supp.2d 731 (E.D.Va.2010) (upon which the *Scott* court relied in reaching its conclusion).

Plaintiffs specifically plead and name fraudulent acts and practices that the Defendants committed in ¶¶741-760 in ECF 56. Defendants violated the VCPA by their misrepresentations and fraudulent acts and practices in the course of leasing, maintaining, and repairing the military housing to the Plaintiff service members and class members. ECF 56, ¶739.

"Defendants were engaged in a consumer transaction" against Plaintiffs and class members who are "members of the consuming public as defined by the VCPA, as they sought to acquire goods and services by lease for personal, family, and residential purposes." ECF 56, ¶¶728-729. Defendants meet the definition of "supplier" as defined by the VCPA in that they are lessors and professionals who advertised, solicited, and engaged in consumer transactions with the Plaintiffs and class members. ECF 56, ¶¶730-734.

A tenant may bring an action under the VCPA under Virginia Code § 59.1-199 if the act or practice of a landlord constitutes a misrepresentation or fraudulent act or practice under Virginia Code § 59.1-200. ECF 56, ¶¶736-737.

The specific fraudulent acts and practices of the Defendants were listed in detail in paragraph 741 of the third amended class action complaint:

> 1.   By offering, marketing and leasing residential housing to Plaintiffs and class members that had defects and deficiencies far in excess of what was acceptable and reasonable under the circumstances . . . .

> 2.   By offering, marketing and leasing residential housing to Plaintiffs and class members that had water intrusion and mold contamination incidences far in excess of what was acceptable and reasonable;

> 3.   By unfairly and deceptively marketing lease offerings as coming with excellent customer service, repair and maintenance, when in fact that was not the case;

4.      By receiving payment in the form of the BAH for Plaintiffs and Class Members, where the BAH was calculated based on an assumption that it was paying for reasonable and safe housing, when in fact that was not the case;

5.      By conducting, sponsoring, or participating in resident satisfaction surveys that were inaccurate and misleading, and by using those inaccurate and misleading surveys to avoid oversight of their unacceptable housing practices;

6.      By maintaining customer service, repair and maintenance records and data that were inaccurate, incomplete, and unreliable, and by using that inaccurate and incomplete repair and maintenance data to avoid oversight of their unacceptable housing practices;

7.      By breaching the implied warranty of habitability, or other law, including as alleged in the other claims for relief; and

8.      By violating provisions and tenant protections stated by the Tenant Bill of Rights[2] by which Defendants were required to abide pursuant to 10 U.S.C. 10 U.S.C.A. § 2890, including subparts (1) to (18):

(1) The right to reside in a housing unit and community that meets applicable health and environmental standards.

(2) The right to reside in a housing unit that has working fixtures, appliances, and utilities and to reside in a community with well-maintained common areas and amenity spaces.

(3) The right to be provided with a maintenance history of the prospective housing unit before signing a lease, as provided in section 2892a of this title.

(4) The right to a written lease with clearly defined rental terms to establish tenancy in a housing unit, including any addendums and other regulations imposed by the landlord regarding occupancy of the housing unit and use of common areas.

(5) The right to a plain-language briefing, before signing a lease and 30 days after move-in, by the installation housing office on all rights and responsibilities associated with tenancy of the housing unit, including information regarding the existence of any additional fees authorized by the lease, any utilities payments, the procedures for submitting and tracking work orders, the identity of the military tenant advocate, and the dispute resolution process.

(6) The right to have sufficient time and opportunity to prepare and be present for move-in and move-out inspections, including an opportunity to obtain

---

[2]  The Tenant Bill of Rights is also available on the Villages at Belvoir website: https://www.villagesatbelvoir.com/document-center.

and complete necessary paperwork.

(7) The right to report inadequate housing standards or deficits in habitability of the housing unit to the landlord, the chain of command, and housing management office without fear of reprisal or retaliation, as provided in subsection (e), including reprisal or retaliation in the following forms:

(A) Unlawful recovery of, or attempt to recover, possession of the housing unit.

(B) Unlawfully increasing the rent, decreasing services, or increasing the obligations of a tenant.

(C) Interference with a tenant's right to privacy.

(D) Harassment of a tenant.

(E) Refusal to honor the terms of the lease.

(F) Interference with the career of a tenant.

(8) The right of access to a military tenant advocate, as provided in section 2894(b)(4) of this title, through the housing management office of the installation of the Department at which the housing unit is located.

(9) The right to receive property management services provided by a landlord that meet or exceed industry standards and that are performed by professionally and appropriately trained, responsive, and courteous customer service and maintenance staff.

(10) The right to have multiple, convenient methods to communicate directly with the landlord maintenance staff, and to receive consistently honest, accurate, straightforward, and responsive communications.

(11) The right to have access to an electronic work order system through which a tenant may request maintenance or repairs of a housing unit and track the progress of the work.

(12) With respect to maintenance and repairs to a housing unit, the right to the following:

(A) Prompt and professional maintenance and repair.

(B) To be informed of the required time frame for maintenance or repairs when a maintenance request is submitted.

(C) In the case of maintenance or repairs necessary to ensure habitability of a housing unit, to prompt relocation into suitable lodging or

other housing at no cost to the tenant until the maintenance or repairs are completed.

(13) The right to receive advice from military legal assistance on procedures involving mechanisms for resolving disputes with the property management company or property manager to include mediation, arbitration, and filing claims against a landlord.

(14) The right to enter into a dispute resolution process, as provided in section 2894 of this title, should all other methods be exhausted and, in which case, a decision in favor of the tenant may include a reduction in rent or an amount to be reimbursed or credited to the tenant.

(15) The right to have the tenant's basic allowance housing payments segregated, with approval of a designated commander, and not used by the property owner, property manager, or landlord pending completion of the dispute resolution process.

(16) The right to have reasonable, advance notice of any entrance by a landlord, installation housing staff, or chain of command into the housing unit, except in the case of an emergency or abandonment of the housing unit.

(17) The right to not pay non-refundable fees or have application of rent credits arbitrarily held.

(18) The right to expect common documents, forms, and processes for housing units will be the same for all installations of the Department, to the maximum extent applicable without violating local, State, and Federal regulations.

ECF 56, ¶741.

Defendants' conduct was unethical, oppressive, unscrupulous, and substantially injurious to consumers, and "had the capacity and tendency to deceive the average consumer."   ECF 56, ¶742.  Defendants require Plaintiffs and class members to sign a mold information and prevention addenda that sought to shift the landlord's obligation under VRTLA and Virginia statutes to the tenants, thereby unlawfully increasing the tenant's obligations under Virginia law, and by not using common documents and forms as required by the Tenant Bill of Rights in housing installations within the Department of Defense. ECF 56, ¶¶743-744.

Defendants have engaged in a fraudulent practice of misrepresenting the required scope of work for mold remediation and other maintenance and repairs in the individual homes, then

omitting items from the scope of work after representing to the Plaintiffs and the class members that they would perform such work, and concealing prior mold tests that showed the presence of toxic mold. ECF 56, ¶¶745-746 and 748.

Defendants have omitted prior instances of maintenance and repairs in the seven-year maintenance history for housing units, which is required to be provided to tenants at the time of the signing of the lease and upon tenant's request. ECF 56, ¶¶747 and 750. Defendants failed to properly remediate the housing units and misrepresented that the remediation was complete when they knew it had not been properly performed. ECF 56, ¶749.

Defendants also engaged in illegal activity by demanding "double rent" from the Plaintiffs and class members when they were displaced and waiting on the completion of the remediation of their housing units. ECF 56, ¶751. The use of "double rent" tactics to force settlement with military families is not only appalling but illegal. This is an unlawful increase in rent and an attempt to unlawfully increase the obligation of a tenant. By way of example, Defendant's senior project manager, Zach Allen, threatened numerous Plaintiffs with double rent as alleged in the third amended class action complaint:

(a)     Zach Allen threatened to charge MSgt Samuel Vidot and his family with "double rent" for the home at 5509A Boxwood Court and the temporary home at 5319 Smoke house Court.  ECF 56, ¶449.

(b)     Zach Allen threatened to charge Staff Sergeant Bragg and his family with "double rent" for the home at 5959 Steven Road and the temporary home at 9519 Gunston Road.  ECF 56, ¶497.

(c)     TMO threatened to charge Staff Sergeant Wayenberg and his family with "double rent" for the home at 5959 Steven Road and the temporary home at 9536 Kenzia

Trail.  ECF 56, ¶643.

The Defendants engaged in conduct which unlawfully increased the obligations of the Plaintiffs and class members by shifting the obligations of the landlord to the tenant to remediate mold in their own unit because of the new mold amendments required by TMO. ECF 56, ¶752. The Defendants engaged in conduct which was unlawful because they continued to charge the Plaintiffs and class members housing costs while maintenance or repairs were pending the habitability of the housing unit.   ECF 56, ¶753.

The Defendants engaged in an intentional and systematic practice of "[m]isrepresenting that repairs, alterations, modifications, or services have been performed or parts installed" at the relevant residential units in violation of Va. Code § 59.1-200(A)(10).  ECF 56, ¶758.  While the landlord uniformly represented that all necessary repairs, alterations, modifications, or services have been performed for the homes and that the homes were represented as being clean and safe and suitable for military families, including those with infants, these representations were false. ECF 56, ¶¶759-760.  Defendants received numerous complaints and repair requests from Plaintiffs and class members that involved the same type of complaints made by prior servicemember tenants of the same properties.  ECF 56, ¶¶761-762.  Defendants had knowledge of this historical information regarding complaints of the rental properties, while the incoming tenants did not.  ECF 56, ¶763.

Plaintiffs and class members detrimentally relied upon the false representations and active concealment by the Defendants as to true unsafe condition of the properties and entered into their leases – had they known in advance of the actual nature of the Defendants' leasing and property management practices and the actual condition of the units, they would not have entered into the leases on the terms proposed by Defendants.  ECF 56, ¶766.

Defendants have used their 50-year ground lease business structure, the disparity in information available to the servicemembers and their families, the lack of transparency, the servicemembers' weaker economic position, and the limitations on families being able to break the lease and move, which effectively hold Plaintiffs' hostage in their leases until they received orders stationing them elsewhere. ECF 56, ¶767.  Meanwhile, Defendants collect the full amount of the BAH without giving those Plaintiffs any discount for the quality or condition of their housing or for the inadequate repair and maintenance of the same. ECF 56, ¶768.

Plaintiffs and class members suffered actual injuries as a direct and proximate result of Defendants' unfair and deceptive conduct, including out-of-pocket costs for repair, service, maintenance, diagnostic, sampling, mold assessment, cleaning products, and the overpayment of their BAH rent by comparison with the quality of the homes provided during the class period. ECF 56, ¶771. Defendants violated the obligations set forth in the Tenant Bill of Rights and misrepresented their compliance thereof which is a further violation of the VCPA.  ECF 56, ¶776.

As a direct and proximate result of Defendants' violation of the VCPA, Plaintiffs and the class members have suffered damages, including statutory minimum damages.  Any person who suffers loss as the result of a violation of the VCPA is entitled to recover actual damages, or $500, whichever is greater, per violation. If the jury finds that any violation was willful, the plaintiff is entitled to recover "three times the actual damages sustained, or $1,000, whichever is greater." Virginia Code § 59.1-204(A). ECF 56, ¶778.

Plaintiffs have alleged that "Plaintiffs and class members suffered actual injury as a direct and proximate result of Defendants' unfair and deceptive conduct, including out-of-pocket costs for repair, service, maintenance, diagnostic, sampling, mold assessment, or cleaning products,

and the overpayment of their BAH rent by comparison with the quality of the homes provided during the class period. ECF 56, ¶771.

Plaintiffs have alleged that the Ft. Belvoir Defendants concealed and made misrepresentations of material facts.[3] Defendants knew of the true condition of the units and did not disclose such information to the Plaintiffs and class members for the purposes of misleading the Plaintiffs and class members into entering such leases.

There are many examples of the misrepresentations and omissions that support Plaintiffs' claim for violations of the VCPA. The following are just an example for a few of the Plaintiffs.

*Chief Petty Officer Fischer and his wife, Ashley Fischer*

- Work orders regarding to the HVAC were placed on October 1, 2018 (the home felt "warm and muggy"), and it was eventually discovered that this condition had caused mold to form in the area. On January 21, 2019, the home's heating unit went entirely out and would not operate. (ECF 56, ¶101). Each time [FRBC's] representatives who filled the work order would advise the Fischers that the issues with the HVAC were normal, and that the observed excessive dirt and humidity at the home were no cause for concern. These statements were false and fraudulent. (ECF 56, ¶102).

- An average military family would have been duped at worst by this advice, and confused at best. In fact, if the promises made by the Defendants to the Army when they were awarded this 50-year ground lease are to be believed, Defendants were to provide top-quality, excellent, clean, and safe military housing at Ft. Belvoir. (ECF 56, ¶103).

- In June 2019, a work order was submitted that there was "a hole in the ceiling, with potential water damage, above the sink..." Defendants inspected the hole, and falsely advised the Fischers that there was no water damage, and simply cosmetically repaired the hole without addressing the water damage or determining its root cause. This was once again unfair, deceptive, false, and fraudulent conduct, all of which is documented in Defendants' work orders. (ECF 56, ¶105).

---

[3] Defendants had knowledge or historical information regarding the rental properties, which was not shared with tenants. ECF 56, ¶763. Defendants also knew that the rental units were unsafe, and knowingly leased those units to Plaintiffs and class members, marketing and representing to the Plaintiffs and class members that the housing units were safe, habitable, and well serviced. ECF 56, ¶764-765. If the Plaintiffs would have known the truth, they would not have entered into leases. ECF 56, ¶766. Thus, the misrepresentations are material.

- Defendants conducted a cursory inspection of the property and improperly painted over the moldy subfloor, leaving the damaged and unsanitary carpet in place. They once again did not investigate or repair the cause of the mold. They advised the Fischers that the home was now safe to live in. This representation was false and unfair and deceptive because the house was still unsafe and Defendants had failed to perform the analysis required to start the process of truly correcting the problem in the unit. (ECF 56, ¶113).

### Chief Warrant Officer 3 Jorge Roman (CW3) and his wife Raven Roman

- On August 28, 2018 (3rd report), the Romans reported "moisture under the kitchen sink and dishwasher." (ECF 56, ¶198). Defendants' maintenance supervisor came to the home, got a positive reading for moisture under the sink, and then sprayed the area with an antimicrobial spray and reported (falsely) that everything was fine. (ECF 56, ¶¶199-200).

- Defendants knew everything was not fine at the Roman's house.  They had previously received tenant complaints and whose business model of sending a "low-paid service person to take the quickest, lowest-cost, most temporary and superficial approach – wiping off mold, painting over mold, wiping off moisture, spraying for insects – was a business practice that increased risks of adverse health effects to infants and children, as well as pregnant mothers among the tenant census at any given time. (ECF 56, ¶201).

### Staff Sergeant Cody Adams (E6) and his wife Gabrielle Adams

- During a meeting at the house, Mike Whitman stated that he was aware walls were going to be opened to check for visible mold. This occurred without proper containment of the Household Goods (HHG) nor proper/verified containment of the affected areas as stated in the IICRC S520. Neither SGT Adams or Ms. Adams were informed that any work would be done, and proper protocols were not followed. Walls were opened without the Adams family's knowledge or consent while Mrs. Adams and the minor children were still in the home and exposed to hazardous materials. (ECF 56, ¶356).

- The Adams family made numerous requests for HHG remediation as required by law and that the remediation be done to industry standards including, including the IICRC S520 standards as referenced in the Virginia mold statutes. [Zack] Allen's response to this was that the Michaels Company does not have to follow IICRC standards. Mr. Allen stated that Virginia statutes allow that other guidelines can be used by TMO in lieu of IICRC S520, but refused to explain what those were. Mr. Allen then stated TMO would not take into consideration any results from independent testing even if it showed hazardous mold spores in the home and on their HHG. (ECF 56, ¶306).

### Staff Sergeant Denzale Bragg (E6) and his wife Breanna Bragg

- Defendants have actual and/or constructive knowledge of the fact that the Bragg family is reasonably likely to be subjected to water intrusion, poor air quality and mold related issues because of the current and previous deterioration of housing conditions at Fort Belvoir and the seven-year history of maintenance and repair on the home. TMO has been inadequately

repairing and remediating Fort Belvoir housing units which have been affected by water intrusion for the past five years. (ECF 56, ¶459).

- The Bragg family was not provided with a copy of their seven-year work history upon the signing of the lease. Moreover, they were not given the pre-move in inspection report as required and did not receive that report until after they were displaced in October of 2022. The pre-move reported, given to the Braggs by Jennifer Hudson and not TMO, noted that the HVAC needed to be cleaned. In an email dated July 26, 2022, an employee for TMO, Jennifer Watkins, represented that the dead animals had been removed. In truth and fact, the birds nest remains on the front porch as of October 2022. None of the issues identified during the move in inspection and listed on the quality assurance form have been repaired by TMO as of October 2022. (ECF 56, ¶ 461; *see also* ECF 56, ¶¶ 467-485).

- TMO misrepresented that the house was habitable throughout September and October of 2022. (ECF 56, ¶500).

- On October 5, 2022, the Bragg's had an inspection meeting at their Home. Breanna Bragg, Caleb Trump, David White, Jennifer Lynch (certified industrial hygienist who attended by video call), Jennifer Hudson (attended by video call), Phillip Goff (Army industrial hygienist), Charise Smith (Army industrial hygienist), Kevin Mott, (structural engineer), and Kevin Walter (pest control) were present. (ECF 56, ¶501).

- During this meeting, it was confirmed that the damages to the Bragg home had not been properly or fully remediated, notwithstanding TMO's misrepresentations. For example, Ms. Lynch stated that the house was still unhabitable and asked why there was no scope of procedure, why the personal property and HHG contents were still in the home while remediation remained incomplete, and why the materials were put back when the moisture source was not properly identified. Ms. Lynch also stated that the mold remediation industry standards were not followed and that there were still maggots and fly fragments in the home. She also stated that TMO, who had exclusive access to the home during remediation, had not produced photographic evidence to prove that the dead animals that had been trapped in the exhaust vents had been removed. She also stated that her inspection required by the Army was unnecessary and a waste of time because TMO had not performed the proper remediation and the home remained uninhabitable. (ECF 56, ¶502).

*Sergeant James Hayward and his wife Danielle Hayward*

- On or about January 2022 the Hayward family was displaced into temp housing pending the cleaning of the HVAC system. On or about January 11, 2022 TMO then represented that everything was cleaned and/or repaired and that they could return to the home. The family relied upon these representations and returned to the home on January 14, 2022. However, while in the home, their symptoms did not improve. The Hayward family then checked the HVAC and found visible black fungal growth on it. TMO misrepresented that they had cleaned and repaired the HVAC. (ECF 56, ¶523).

Similar to the plaintiffs' allegations in *Fravel*, *Scott*, and *Nahigian*, Plaintiffs allegations

are sufficient to ensure that Defendants have enough information to formulate a defense, thus satisfying Rule 9(b), even if Plaintiffs have not alleged the specific representative who made a false misrepresentation or omission or the precise location, date, and hour at which the misrepresentation or omission was made.

A decision from the Virginia Circuit Court in *Guy v. Tidewater Investment Properties*, 41 Va. Cir 218, 230 (1996), is instructive. There, the court addressed similar VCPA claims asserted by a tenant against a landlord in which the tenant alleged violations of the VCPA by the landlord in using deception, fraudulent misrepresentations, and/or omissions which mislead the tenant into believe her apartment was fit and habitable and that it was in full compliance with housing and house codes. The Defendant in *Guy*, like the Ft. Belvoir Defendants, argued that these allegations were deficient because they failed to allege the facts necessary to establish violations under the VCPA. *Id.* at 230.

The *Guy* court stated that Plaintiff was entitled to rely upon Virginia Code §59.1-200(10) which refers to misrepresentations that "repairs, alternations, modifications, or services have been performed or parts installed and §59.1-200(14) which refers to "using any other deception, fraud, false pretense, false promise or misrepresentation in connection with a consumer transaction." *Id.* at 230. Plaintiffs in this case have plead the same two sections of the VCPA, among others. Like the allegations in the third amended class action complaint, the *Guy* court found that the landlord's "concealment can satisfy the misrepresentations provisions of the Virginia Consumer Protection Act" and that there were sufficient allegations that the landlord either misrepresented or concealed from the plaintiff facts regarding repairs or services performed on the lead paint in the apartment that the plaintiff had sufficiently pleaded facts alleging a violation of the VCPA. *Id.*

**C.    The Statute of Limitations Does Not Bar any of Plaintiffs' VCPA Class Action Claims.**

Defendants argue that fifteen (15) of the Plaintiffs' VCPA claims are barred by the statute of limitations because they discovered the mold and "wrongdoing" by Defendants more than two years before the filing of the original complaint. A claim under the VCPA must be brought within two years of the action's accrual, Va. Code Ann. §59.1–204.1.  A claim under the VCPA based on misrepresentation, deception, or fraud is deemed to accrue upon discovery of such fraud or deception.  Va. Code Ann. §8.01-249(1).  *Alexander v. Se. Wholesale Corp.*, 978 F.Supp.2d 615, 620 (E.D.Va. 2013) ("The VCPA statute of limitations requires a cause of action to be brought within two years of when it accrues" which occurs when it is "discovered or by exercise of due diligence reasonably should have been discovered.") (*citing* Virginia Code §59.1-204.1 and §8.01-249(1)). The discovery rule is set out in Virginia Code §8.01-249(1), which states:

> In actions for fraud or mistake, in actions for violations of the Consumer Protection Act (§59.1-196 *et seq.*) based upon any misrepresentation, deception, or fraud, and in actions for rescission of contract for undue influence, when such fraud, mistake, misrepresentation, deception, or undue influence is *discovered or by the exercise of due diligence reasonably should have been discovered[.]*

*Id.* (emphasis added).

Plaintiffs have filed their claims well within two years of discovery. The Plaintiffs and the putative class by the exercise of due diligence did not discover the Defendants' concealment, misrepresentations, and deceptions any sooner. As the original complaint in this action was filed on March 16, 2022, Defendants contend that any viable VCPA claims would have to accrue on or after March 16, 2020.  Defendants argue that the VCPA claims of the following fifteen Plaintiffs are time barred under the VCPA:

  1)  Chief Petty Officer John Fischer (CPO, E-7) and his wife Ashley Fischer;

  2)  Chief Warrant Officer 3 Jorge Roman (CW3) and his wife Raven Roman;

  3)  Supervisory Special Agent John Lane and his wife Cassandra Lane;

4)  Jennifer Cocco (Retired);

5)  Tech Sergeant Bryson Hunt and his wife Abnie Hunt;

6)  Petty Officer Andrew Armstrong and his wife Leslie Gonzalez;

7)  Staff Sergeant Raymond Warden and his wife Tabitha Warden; and

8)  Staff Sergeant James Wayenberg and his wife Christine Wayenberg.[4]

Defendants ignore the application of the discovery rule relating to the VCPA claims of these Plaintiffs. The time of accrual of the two-year statute of limitations only accrues when it reasonably should have been discovered and should be tolled under the circumstances due to the concealed aspects of certain of Defendants' fraudulent practices.  ECF 56, ¶774. <u>As alleged in the third amended class action complaint, Plaintiffs and the class members only recently discovered Defendants systemic fraudulent practices, misrepresentations, and violations of the VCPA relating to the Defendants' management of the military housing at Fort Belvoir</u>. ECF 56, ¶775.  For purposes of a motion to dismiss, this allegation must be deemed true. *State Analysis, Inc.,* 621 F. Supp. 2d at 315.

**1. Seventeen Class Representatives clearly have asserted a timely VCPA claim as they moved into the Ft. Belvoir military housing within the last two years.**

This class action seeks certification of a VCPA subclass against Defendants for their practice and acts as a landlord to deceive and mislead tenants at the Fort Belvoir base. There are admittedly at least seventeen (17) proposed Plaintiff class representatives whose VCPA claims

---

[4]  Defendants do not contend and by their omission from the pending motion to dismiss, admit that the VCPA claims of the remaining *seventeen* Plaintiffs <u>are not time barred</u>: (1) Staff Sergeant Denzale Bragg (E6) and his wife Breanna Bragg; (2) Master Sergeant Samuel Vidot and his wife Rachel Vidot; (3) Staff Sergeant Cody Adams (E6) and his wife Gabrielle Adams; (4) Sergeant First Class Steven Aguilar and his wife Megan Aguilar; (5) Second Lieutenant Jose Berdecia-Hernandez and his wife Kim Melendez; (6) Navy Chief Zachary Camechis and his wife Alacia Camechis; (7) Army Specialist James Jackson and his wife Kaitlin Coe; (8) Sergeant James Hayward and his wife Danielle Hayward; and (9) Staff Sergeant Bradley Shirley.

are not time barred.  See footnote 3, *supra*.  These include Plaintiffs who entered into leases after March 16, 2020. Because they all fell within two years of the original filing of the complaint, their VCPA claims are unquestionably timely.  The following is just a sampling of the various Plaintiffs who have entered into leases in reliance on the false assurances and concealment of deceptive and fraudulent practices of the Defendant landlords since March 16, 2020:

- The Adams family lived at 9248 Miller Road at Fort Belvoir from August 2021 to September 12, 2022, and had numerous instances of maintenance requests at their home to address mold, water intrusion, and animals living in the ceiling. There were serious concerns over testing and quality of work that were not addressed. Mold in the Adams' home was clearly a reoccurring problem and the root cause was never explored or remediated by the Defendants. ECF 56, ¶340. On August 19, 2022, the Adams family tested bathrooms with a moisture meter and discovered high readings. ECF 56, ¶341.

- The Hernandez family lived at 5514 Grist Mill Court N at Ft. Belvoir from July 14, 2020, to September 12, 2022, and had numerous maintenance requests at their home to address mold, air quality issues, water leaking from the ceiling and leaking from A/C units, along with multiple requests to clean the A/C unit because of air quality issues. Serious concerns over testing and quality of work were not addressed. Mold in the home was clearly a reoccurring problem and the root cause was never explored or remediated by the Defendants. ECF 56, ¶368. Approximately two months after moving into the home, the Hernandez family had to request a work order on September 9, 2020, requesting maintenance to clean the AC system due to air quality and allergies like symptoms that were impacting the family. ECF 56, ¶369.

- Sergeant First Class Aguilar and his wife, Megan, and their minor daughter have resided in military housing at Fort Belvoir at 5957 Stevens Road since November 2020 through the present.  ECF 56, ¶387. The Aguilar family has had continuing and constant water intrusion problems since they moved in. There were and continue to be consistent and unresolved problems with water intrusion through the back door area since the family moved in November 2020. For example, whenever it rains water leaks through the area where the back door is located and permeates its way into the home. In May 2021, water intrusion continued into the home.  After multiple requests to repair the problem, TMO installed a new back door and replaced the carpet, but this did not address the source of the water intrusion and after every time it rained thereafter, water has continued to leak into the home. ECF 56, ¶389.

- The Camechis family occupied Fort Belvoir residential housing from March 2021 through the present. ECF 56, ¶414.  TMO found mold in the Camechis family home

in March 2021, but TMO (in violation of VRTLA) did not relocate or displace the family while the home was remediated.  The mold remediation was performed while the family was forced to remain in the home. (*Id.* ¶ 417)

Thus, there is no question that the VCPA claim as to several Plaintiffs, and those properly defined class members, is not time barred by the applicable statute of limitations.

> **2. The Fifteen other Class Representatives did not discover, nor by the exercise of due diligence reasonably should have discovered, the VCPA claims prior to March 16, 2020.**

While the fifteen Plaintiffs identified by the Defendants in the pending motion may have discovered the mold prior to March 16, 2020, none of them discovered the fraudulent scheme concocted by the Defendants to conceal the nature of their fraudulent enterprise at Ft. Belvoir prior to March 16, 2020.  None of the Plaintiffs discovered, or under the exercise of due diligence reasonably should have discovered, the Defendants' concealment, misrepresentations, and deceptions relating to the violations of the VCPA claims less than two years from the filing of this action.  Each would not have entered into the lease provided had they known about the Defendants' fraudulent practices.  ECF 56, ¶766.

### *Chief Petty Officer John Fischer (CPO, E-7) and his wife Ashley Fischer*

Chief Petty Officer John Fischer, who has served with the U.S. Navy for over 13 years, and his wife Ashley and three minor children resided in military housing at Fort Belvoir at at 9547 Kezia Trail from October 2017 through August 2019 and at 9225 Soldier Road from August 2019 to December 2020. ECF 56, ¶ 41.  On October 24, 2017, Chief Fischer executed a form lease with FBRC regarding the 9547 Kezia Trail property, which he would not have signed had he known about the Defendants' fraudulent practices. ECF 56, ¶42. "Had Plaintiffs and class members known in advance of the actual nature of the Defendants' leasing and property management practices and the actual condition of the units, they would not have entered into the leases on the terms proposed by Defendants." ECF 56, ¶766. Plaintiffs only recently discovered Defendants fraudulent practices, misrepresentation, and violations of the VCPA relating to the Defendants' management of the military housing at Fort Belvoir. ECF 56, ¶775.

### *Chief Warrant Officer 3 Jorge Roman (CW3) and his wife Raven Roman*

Chief Warrant Officer 3 Jorge Roman, who has served in the U.S. Army for over 18 years, and  his wife Raven and their three minor children resided in military housing at Fort Belvoir at

5200 Stable Court, known as the "Woodlawn Village," from May 2018 through September 2018 and at 5493 Jadwin Loop, known as the "Jadwin Loop Village," from September 2018 to September 2019. ECF 56, ¶ 44. On May 17, 2018, Chief Roman executed a form lease with FBRC regarding the 5200 Stable Court property, which he would not have signed had he known about the Defendants' fraudulent practices. ECF 56, ¶ 45 and ¶766. Plaintiffs only recently discovered Defendants fraudulent practices, misrepresentation, and violations of the VCPA relating to the Defendants' management of the military housing at Fort Belvoir. ECF 56, ¶775.

### Supervisory Special Agent John Lane and his wife Cassandra Lane

Supervisory Special Agent John J. Lane is with the Fort Richardson CID Office of the U.S. Army. Agent Lane and his wife, Cassandra Lane, and their four children currently reside in Eagle River, Alaska. ECF 56, ¶ 47. Agent Lane and his family previously resided in military housing at Fort Belvoir at 9739 Barlow Road in the "Dogue Creek" area. On April 21, 2015, Agent Lane executed a form lease with FBRC regarding the 9739 Barlow Road property which he would not have signed had he known about the Defendants' fraudulent practices. ECF 56, ¶ 47 and ¶766. Plaintiffs only recently discovered Defendants fraudulent practices, misrepresentation, and violations of the VCPA relating to the Defendants' management of the military housing at Fort Belvoir. ECF 56, ¶775.

### Jennifer Cocco (Retired)

Jennifer Cocco, retired, and her two minor children previously resided in military housing at Fort Belvoir at 9627 Barlow Road beginning in May 2017 and at a second home at 9687 Maloney Road beginning in July 2019. On May 10, 2017, Mrs. Cocco executed a form lease with FBRC regarding the 9627 Barlow Road property which she would not have signed had she known about the Defendants' fraudulent practices. ECF 56, ¶ 66 and ¶766. Plaintiffs only recently discovered Defendants fraudulent practices, misrepresentation, and violations of the VCPA relating to the Defendants' management of the military housing at Fort Belvoir. ECF 56, ¶775.

### Tech Sergeant Bryson Hunt and his wife Abnie Hunt

Tech Sergeant Bryson Hunt, a career member of the United States Air Force, and his wife Abnie and their two minor children resided in military housing at Fort Belvoir at three different locations from June 2014 through February 2021: 9516 Hannah Lane, 9637 Barlow Road and 8717 Albert Drive. ECF 56, ¶¶549-550.The Hunt family resided in the 9516 Hannah Lane property from June 23, 2014, through June 2019. ECF 56, ¶552. The Hunt family discovered mold when the AC unit stopped working, and TMO performed mold remediation. ECF 56, ¶¶555-557. The Hunt family requested post remediation sampling for the mold remediation, and on July 24, 2019, True North (Defendants' mold inspector) conducted a "white glove" visual inspection and tests that showed varying levels of mold grown. ECF 56, ¶¶559-560. On December 13, 2019, True North inspected the property again and claimed that the contaminated mold was now "cleaned and encapsulated." ECF 56, ¶561. This statement was false.

The Hunt family was then relocated to 9637 Barlow Road from July 2019 through October of 2019, where mold was again discovered in the shower, the HVAC, the stove hood vent, and in

the upstairs bathroom. ECF 56, ¶¶562-563. As a result, the Hunt family were displaced to a hotel from October 2019 through February 2020. ECF, ¶564. The Hunt family was then relocated to 8717 Albert Drive from February 2020 through 2021. ECF, ¶565. During the occupancy of this house, additional mold was found in bathrooms, which the Hunts requested be remediated prior to move in. ECF, ¶566. All throughout the process, TMO lied to the family and hid facts. TMO failed to set up proper containment and lied about the results of testing. ECF, ¶567. Plaintiffs only recently discovered Defendants fraudulent practices, misrepresentation, and violations of the VCPA relating to the Defendants' management of the military housing at Fort Belvoir. ECF 56, ¶775.

### Petty Officer Andrew Armstrong and his wife Leslie Gonzalez

Petty Officer Third Class Andrew Armstrong is a career member of the United States Coast Guard. ECF 56, ¶398. The Armstrong family has occupied Fort Belvoir residential housing since September 2019 in a four (4) bedroom Townhouse located at 8229 Herb Garden Road in Woodlawn Village. ECF 56, ¶399. The Armstrong family has had continuing and constant water intrusion problems water intrusion and HVAC issues since the summer of 2020, which the Defendants claimed was fixed and remediated the resulting mold in the summer of 2022. ECF 56, ¶¶400-409. It is hard pressed to understand how the Andrews' families VCPA claims are time barred – they were just discovered within the last six months. ECF 56, ¶¶410-411; see also ECF 56, ¶775.

### Staff Sergeant Raymond Warden and his wife Tabitha Warden

SSG Raymond Warden, a career member of the United States Army, and his wife Tabitha and their five minor children have resided in military housing at Fort Belvoir at 5362A Orchard Court since August 2018 through the present. ECF 56, ¶¶602-603. The Warden family were not provided a copy of their seven-year work history at the time of the signing of the lease. ECF 56, ¶604. The Warden family has submitted numerous work orders within the last two years to address water leaks, mold, and pest infestation. ECF 56, ¶¶605-606. Recently, the Warden family discovered mold inside the home and on October 14, 2022, TMO and its contractor and agent, True North, inspected the home for water intrusion and mold. The Scope of Work (SOW) report prepared by True North misrepresented that there was "suspect fungal growth" in the home, when in fact it was known that there was actual mold growth inside the home. ECF 56, ¶¶607-609.

There is no question that the Warden's VCPA claims are timely – discovered less than three months ago in October 2022. See also ECF 56, ¶775. Moreover, under Virginia law now that visible mold has been identified TMO is required to pay for all relocation costs and move the Wardens to temporary housing pending any remediation, which they have refused to do. The Home is not habitable and is not a safe and healthy environment for any military family. ECF 56, ¶613.

### Staff Sergeant James Wayenberg and his wife Christine Wayenberg

Staff Sergeant Wayenberg is a career member of the United States Army. Staff Sergeant Wayenberg and his wife and their three minor children have occupied Fort Belvoir residential

housing at 9536 Kezia Trail from October 2017 to August 12, 2022.  ECF 56, ¶¶615-616.The Wayenberg family has had continuing and constant water intrusion problems and poor air quality, which was known by the Defendants but concealed from the Wayenbergs.  ECF 56, ¶618. SSG Wayenberg' s sons, age 8 and 9, have experienced unexplained nose bleeds and rashes across their bodies since July 2019, prompting the Wayenbergs to contact TMO maintenance to inspect their HVAC system for mold. In response, TMO represented that there was nothing significant to act upon, which was false. ECF 56, ¶¶620-621. The misrepresentations continued into 2020, when TMO misrepresented that there was no mold in the home or nothing was wrong.  ECF 56, ¶¶622-624.

Finally on July 8, 2022, TMO conducted an inspection of the HVAC system and discovered mold – which confirmed that the family had unknowingly been breathing air contaminated with mold spores for years. ECF 56, ¶626. On July 26, 2022 and August 8, 2022, the Wayenberg family performed private testing and found that mold was in fact present in the home. ECF 56, ¶632. Discovery was less than six months ago – the Wayenberg's VCPA claims are clearly timely.

The VCPA claims are not time barred by the affirmative defense of statute of limitations, which will have to be proven by Defendants at trial in any event. While the VCPA does not generally apply to transactions subject to the VRLTA, when it does apply it is because the landlord's acts and practices constitutes "misrepresentation or fraudulent act or practice" – those claims are expressly subject to the discovery rule and are not time barred as alleged by the Defendants.

Whether a plaintiff discovered or should have discovered the fraud is generally a factual question that cannot be resolved at the motion to dismiss stage. *Jones v. Shooshan*, 855 F. Supp. 2d 594, 604 (E.D. Va. 2012).  Whether a plaintiff is put on notice of the fraud and required to act with due diligence within two years thereafter is for resolution by the trier of fact. *Hansen v. Stanley Martin Companies, Inc.*, 266 Va. 345, 357, 585 S.E.2d 567, 575 (2003) (reversing trial court's ruling granting summary judgment on the accrual of fraud).  Accordingly, Defendant's motion for partial dismissal of some of the VCPA claims must be denied at this stage.

**D.    There is No Justification to Strike One Paragraph from the Complaint.**

Finally, Defendants contend that paragraph 696 should be stricken because it involves a

"non-party" that Plaintiffs dropped from a prior version of the complaint. In particular, the paragraph refers to Clark Realty, who Defendants represented was not involved at Ft. Belvoir during the relevant time of the proposed class action.  While Clark Realty is no longer a named defendant in this case, it does not change the fact that Clark Realty acted as FBRC's property manager at Fort Belvoir or that its conduct is any different than the conduct of FBRC's current property managers, Defendant Michaels or Defendant MMS. First, Defendant FBRC is and has been the "landlord" at Fort Belvoir since 2003 under the 50-year ground lease.  ECF 56, ¶76 and ¶80.

As of August 2021, "[t]he Michaels Organization acquired the 2100 Fort Belvoir homes formerly owned by Clark Realty Capital."[5] ECF 56, ¶83. The landlord/owner was and remained FBRC.  Defendants Michaels and/or MMS have taken over for Clark Realty as FBRC's property manager.  Accordingly, Clark Realty is the predecessor to the Michaels Defendants and was at all times relevant hereto acting as the agent of FBRC.  The allegations regarding the manner in which Clark Realty acted at Ft. Belvoir, as an agent and property manager of FBRC, are relevant to FBRC's knowledge of the fraudulent practices being performed at Fort Belvoir by FBRC and its property managers.  There is no basis to strike paragraph 696 of third amended complaint, which states:

> "We have heard and seen firsthand horror stories in these houses, from mold, to water leaks to incorrect lead abatement that has directly affected the health and safety of these families."[6] At the hearing, [Committee Chairwoman] Speier and other lawmakers said that they were recently briefed by housing advocates from Fort Belvoir who described "disturbing conditions" at housing on the post.[7]  Representative Speier further stated: "I

---

[5] https://home.army.mil/belvoir/index.php/about/Garrison/public-affairs/digital-belvoir-eagle/fort-belvoir-housing-under-new-ownership.

[6] Dickstein, Corey (2021)", "Lawmakers Say They Still Hear Reports of 'Horror Stories' in On-Post Housing, Blast Company for Declining to Testify," Stars And Stripes (March 10, 2021), accessed at https://www.stripes.com/news/us/lawmakers-say-they-still-hear-reports-of-horror-stories-in-on-post-housing-blast-company-for-declining-to-testify-1.665315.

[7] *Id.*

want to call out the irresponsible conduct of Clark Realty. I want to convey to them that you can run, but you can't hide."[8]

The motion to strike this paragraph must be denied as it definitely has a relation and logical connection to the subject matter of the pending action.  Defendants cannot hide relevant facts.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' motion to dismiss Plaintiffs' VCPA claims in its entirety and further request that the Court deny the motion to strike paragraph 696 of the third amended complaint. Alternatively, Plaintiffs request leave to file an amended complaint to address any issue that the Court deems appropriate regarding the VCPA allegations.

Dated:  January 12, 2023                    Respectfully submitted,


                                                    /s/ David Hilton Wise_____
                                                    David Hilton Wise, VA Bar No. 30828
                                                    Joseph M. Langone, VA Bar No. 43543
                                                    WISE LAW FIRM PLC
                                                    10640 Page Avenue, Suite 320
                                                    Fairfax, Virginia 22030
                                                    Phone: 703-934-6377
                                                    dwise@wiselaw.pro
                                                    jlangone@wiselaw.pro

                                                    Joel R. Rhine, NC State Bar No. 16028
                                                    Ruth A. Sheehan, NC State Bar No. 48069
                                                    RHINE LAW FIRM, P.C.
                                                    1612 Military Cutoff Rd., Suite 300
                                                    Wilmington, NC 28403
                                                    Phone: 910-772-9960
                                                    jrr@rhinelawfirm.com
                                                    RAS@rhinelawfirm.com

---

[8] Jowers, Karen (2021), "Lawmaker: Base Commanders Should Be Held Responsible for Enforcing Tenants' Rights", Military Times (March 10, 2021), accessed at https://www.militarytimes.com/pay-benefits/2021/03/11/base-commanders-should-be-held-responsible-for-enforcing-tenants-rights-lawmaker-says/.

Mona Lisa Wallace, NC Bar No. 009201
John Hughes, NC State Bar No. 22126
WALLACE AND GRAHAM, PA.
525 N. Main Street
Salisbury, NC 28144
Phone: 704-633-5244
mwallace@wallacegraham.com
jhughes@wallacegraham.com

John A. Yanchunis, FL Bar No. 324681
Kenya Reddy, FL Bar No. 459933
MORGAN & MORGAN LAW FIRM
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Phone: 813-223-5505
JYanchunis@ForThePeople.com
KReddy@ForThePeople.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 12th day of January 2023, a copy of the foregoing was served via ECF on all counsel of record, including:

Kathryn E. Bonorchis #80007
Joseph Doukmetzian, 91685
Lewis, Brisbois, Bisgaard & Smith, LLP
100 Light Street, Suite 1300
Baltimore, Maryland, 21202
Kathryn.Bonorchis@lewisbrisbois.com
Joseph.Doukmetzian@lewisbrisbois.com

Richard G, Morgan, Admitted *Pro Hac Vice*
Tina Syring, Admitted *Pro Hac Vice*
Emily Suhr, Admitted *Pro Hac Vice*
Lewis, Brisbois, Bisgaard & Smith, LLP
Wells Fargo Center
90 South 7th Street, Suite 2800
Minneapolis, Minnesota 55402
Richard.Morgan@lewisbrisbois.com
Tina.Syring@lewisbrisbois.com
Emily.Suhr@lewisbrisbois.com

*Attorneys for Defendants*

/s/ David Hilton Wise